ACCEPTED
15-25-00016-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
2/11/2025 3:44 PM
CHRISTOPHER A. PRINE
CLERK

No. 15-25-00016-CV

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
2/11/2025 3:44:21 PM
CHRISTOPHER A. PRINE
Clerk

**IN THE**

**FIFTEENTH COURT OF APPEALS**

**AUSTIN, TEXAS**

In re,

MARTY BERRY AND AXIS MIDSTREAM HOLDINGS, LLC

*Relators*

**RELATORS' APPENDIX**
**VOLUME 3 OF 5**

Original proceeding brought from Business Court 11A,
Cause No. 24-BC11A-0025
The Honorable Sofia Adrogue, Presiding

Douglas A. Allison
State Bar No. 01083500
LAW OFFICES OF
DOUGLAS A. ALLISON
403 N. Tancahua Street
Corpus Christi, TX 78401
Telephone: (361) 888-6002
Facsimile: (361) 888-6651
Email: doug@dallisonlaw.com

COUNSEL FOR RELATORS

# VERIFICATION OF APPENDIX

STATE OF TEXAS            §

COUNTY OF NUECES      §

Before me, the undersigned notary, on this day personally appeared Douglas A. Allison, the affiant, a person whose identity is known to me. After I administered an oath to affiant, affiant testified:

"My name is Douglas A. Allison. I am of sound mind and capable of making this affidavit. The facts in this affidavit are within my personal knowledge and are true and correct.

"I am serving as counsel for the relater. All of the documents included in the appendix to this petition are true copies."

*/s/ Douglas A. Allison*

_Kim Brunkenhoefer_
NOTARY SIGNATURE

KIM BRUNKENHOEFER
Notary ID #5348297
My Commission Expires
August 4, 2025

8-4-25
COMMISSION EXPIRATION

60

# APPENDIX VOLUME 3 OF 5

# TABLE OF CONTENTS

APPENDIX 31………………………………………………..……..….Dec. 6, 2024
Partial Hearing Transcript
Cause No. 24-BC11A-0025
11th Business Court, Harris County, Texas

# EXHIBIT 32

February 7, 2019

**Berry Carlyle – Lone Star Ports**

**Term Sheet**

| | |
|---|---|
| Term Sheet: | This Term Sheet, as signed and entered into by and between Carlyle and Berry (as those terms are defined in this Term Sheet) |
| Carlyle: | Carlyle Investment Management L.L.C., in its capacity as manager and advisor to Carlyle Global Infrastructure Opportunity Fund L.P. or a designated affiliate ("Carlyle") |
| Berry: | Lawrence Berry, Marvin Berry, Dennis Berry, and/or their various designees ("Berry") |
| Parties: | Berry and Carlyle (collectively, the "Parties" and, individually, each a "Party") |
| Project Companies; Board: | The initial entity to be used by the Parties in connection with the Project (as that term is defined in this Term Sheet) is Lone Star Ports, LLC, a Delaware limited liability company that has been established by Carlyle for and on behalf of the Parties ("Delco"). |
| | Following the signing of this Term Sheet by Berry and Carlyle and until the earlier of (a) April 1, 2019 (as such date may be extended in accordance with this Term Sheet, the "FID Date"), and (b) the date on which (i) Carlyle's Investment Committee has reached a Final Investment Decision to invest in the Project, in its sole discretion ("FID"), (ii) Definitive Documents (as that term is defined in this Term Sheet) are signed by all applicable Parties, and (iii) Carlyle commits to contribute the Carlyle Equity Contribution (as that term is defined in this Term Sheet) to one or more Project Companies (as that term is defined in this Term Sheet) agreed between Carlyle and Berry, with such commitment to be guaranteed or otherwise secured by Carlyle in a manner acceptable to Berry (A) all membership interests, shares, or other equity interests in Delco and each other Project Company will be beneficially owned 50% by Carlyle and 50% by Berry, and (B) Carlyle and Berry will each nominate 50% of all managers or directors of Delco and each other Project Company. All of the contracts and obligations of Delco entered into prior to the signing of this Term Sheet by Carlyle and Berry have been or promptly after the signing of this Term Sheet by Carlyle and Berry will be disclosed to Berry. |
| | A Board of Managers (the "Board") for Delco has been formed and is initially comprised of Marvin Berry, Lawrence Berry, Andrew Marino, and Ferris Hussein. |
| | As promptly as practicable following the signing of this Term Sheet by Carlyle and Berry, the Parties will negotiate in good faith the following matters: (I) the execution of an operating agreement for Delco, (II) the formalization of Carlyle's transfer of 50% of all membership interests in Delco to Berry, and (III) the formalization of the Board for Delco, which will be comprised of two Managers nominated by Carlyle and two managers nominated by Berry. |
| | Additional entities may also be established for and on behalf of the Parties for use in connection with the Project (together with Delco, each, a "Project Company", and collectively, the "Project Companies"). The type of entity and business structure of each |

Project Company and each HoldCo (e.g., one or more limited liability companies, limited partnerships, and/or other tax-efficient entities and/or structures) and the jurisdictions of establishment of such entities will be agreed by Carlyle and Berry after consultation with their respective legal, accounting, tax, and other advisors.

In the event that a positive FID has been taken, a "Closing" will occur as promptly as practicable after FID at which (a) Definitive Documents will be signed by all Parties (including for the contribution of the Contributed Land in accordance with this Term Sheet), (b) Carlyle will commit to make the Carlyle Equity Contribution, with such commitment to be guaranteed or otherwise secured by Carlyle in a manner acceptable to Berry, (c) the membership interests, shares, or other equity interests in the Project, Delco, and each Project Company will be calculated and adjusted according to this Term Sheet and the Definitive Documents, and (d) the appropriate membership interests, shares, or other equity interests in Delco and each other Project Company will be issued to Carlyle and Berry in accordance with the terms and conditions of this Term Sheet and the Definitive Documents.

In the event that Closing has not occurred on or before the FID Date (i) Carlyle will transfer to Berry (and Berry shall be obligated to assume) Carlyle's entire holdings of membership interests or units, shares, or other equity interests in Delco and each Project Company (with the effect that Berry will own 100% of all membership interests or units, shares, or other equity interests in Delco and each Project Company and Carlyle will be relieved and released of any liability with respect to the Project or the Project Company), (ii) Berry will retain its existing ownership of the Project and its interests in the Project Companies, (iii) Andrew Marino, Ferris Hussein, and each other officer, director, or employee of any Project Company who is or has been nominated or appointed by Carlyle will resign as members of the Board and from all other offices or positions in each Project Company, and (iv) Carlyle will have no ownership interest in, contractual relationship with, or continuing involvement in the Project or any Project Company (except as otherwise permitted by the provisions of "Exclusivity", as that term is defined in this Term Sheet) or any Project Company; provided, however, that if, on the FID Date, Berry in its sole discretion (acting reasonably) is satisfied that Carlyle is continuing to work in good faith towards the achievement of FID, the execution of Definitive Documents, and the commitment to make the Carlyle Equity Contribution, with such commitment to be guaranteed or otherwise secured by Carlyle in a manner acceptable to Berry, the FID Date may be extended by mutual agreement of the Parties.

| | |
|---|---|
| Purpose; Project: | The purpose of this Term Sheet is to outline the major terms and conditions for a project to (a) develop, construct, own, and operate a hydrocarbon delivery system which will allow hydrocarbon shippers maximum optionality to (i) deliver hydrocarbons to local refinery markets in the vicinity of Corpus Christi, Texas through tankage, shipping, reception, collection, consolidation, storage, transfer, staging, pumping, delivery, and other facilities to be developed near Midway Junction, Texas (collectively, the "Midway Junction Facility"), and (ii) export hydrocarbons via the Midway Junction Facility through (A) related pipelines and other facilities to be developed starting around the Midway Junction Facility, (B) related tankage, pumping, transfer, storage, staging, delivery facilities, pipelines, and other facilities to be developed adjacent to and under Redfish Bay, Texas (collectively, the "Redfish Bay Facility"), and (C) a premier deep-water crude oil export terminal and related tankage, pipelines, shipping, pumping, transfer, exporting, and other facilities to be developed on Harbor Island, Texas (collectively, the "Harbor Island Terminal"), and |

(b) facilitate the dredging of the Corpus Christi ship channel to a depth of 75 feet from the Gulf of Mexico to the site of the Harbor Island Terminal to permit the loading and unloading of fully-laden Very Large Crude Carriers ("VLCCs") at the Harbor Island Terminal (together, the "Project"). The Project is intended to include pipeline, shipping, reception, collection, consolidation, storage, staging, transfer, delivery, exporting, and other facilities, including (I) the Midway Junction Facility, (II) the Redfish Bay Facility, (III) the Harbor Island Terminal, and (IV) other associated infrastructure, assets, facilities, and businesses, including without limitation, certain real property currently owned, leased, optioned, or otherwise controlled by Berry at Midway Junction, Redfish Bay, and Harbor Island, Texas (collectively, the "Contributed Land"), (V) to the extent applicable, additional properties and facilities to be acquired, leased, optioned, developed, or otherwise controlled by one or more Project Companies, one or more of the Parties, the Port of Corpus Christi Authority ("POCCA"), and/or third parties, and (VI) facilities for controlling and collecting tolling and/or other fees or charges from vessels that transit the portion of the Corpus Christi ship channel for which the Project, or one or more Project Companies facilitates dredging.

Additionally, the purpose of this Term Sheet is to outline certain major terms and conditions for (a) the issuance to Carlyle and Berry of applicable percentage equity interests in the Project and each Project Company, (b) the development, construction, operation, maintenance, and ownership of the Project, and (c) the establishment of an incentive compensation pool to compensate and incentivize Berry and potentially third parties, including management and the Operator (as that term is defined in this Term Sheet), if any, in connection with the development and operation of certain aspects of the Project. The purpose of this incentive compensation pool is to (i) further reward Berry for its past and continuing tangible and intangible contributions to the Project, including without limitation Berry's development risk capital deployed to date, as well as to (ii) align participants in the Project with the long-term equity value of the Project.

| | |
|---|---|
| Construction Contract: | The Parties contemplate that Bay Ltd and/or one or more other entities designated by Berry ("Bay") will be the primary contractor responsible for the management of engineering, procurement, and construction for the Project (other than dredging and certain other specialty work outside of Bay's published expertise and capabilities that will be performed by third-party contractors) pursuant to the terms and conditions of a bonded fixed price lump sum turnkey ("LSTK") Engineering, Procurement, and Construction Management Contract between Bay and a Project Company as mutually agreed by Carlyle and Berry (the "EPCM Contract").

The process of establishing the LSTK price for the Project will (a) follow industry norms, (b) be negotiated in good faith between the Project Company and Bay, and (c) include open book principles pursuant to which Bay will illustrate to the Board (i) the steps taken to establish competitive pricing for all subcontracted work, (ii) the cost for work to be self-performed by Bay, (iii) Bay's agreed margin on all such work, and (iv) reasonable allowances for market risk and escalation.

While the Parties' expectation is for Bay to serve as the primary contractor for the Project under the EPCM Contract, the Parties recognize that certain portions of the Project may be alternatively priced, constructed by, or acquired from third parties to the extent required by commercial and technical considerations. The Parties will work in good faith to establish a procedure for determining the engagement of any third-party contractors, and the extent, if any, to which Berry will be involved in the management and bonding of any such |

| | |
|---|---|
| | third-party contractors, which procedure shall, in certain mutually agreed circumstances (a) provide Carlyle the opportunity to require that the Project Company solicit alternative proposals from qualified bonded third-party contractors for certain engineering, procurement, and construction work or services for the Project and (b) Bay the opportunity to participate in any bidding for such work on terms to be agreed. |
| Equity Contributions and Interests: | Berry (a) conceived of and strategized the Project, (b) originated planning and action in a multitude of spheres and on various levels to plan, initiate, shape, develop, further, advance, and commence the Project, (c) mobilized efforts to plan, acquire, and deploy properties and facilities, ascertain Project feasibility, seek approvals of, participation by, and cooperation with, various commercial parties and governmental bodies, including without limitation shippers, pipelines, other potential customers, POCCA, and other governmental bodies, and seek approvals to facilitate dredging of the Corpus Christi ship channel to a depth of 75 feet from the Gulf of Mexico to the Harbor Island Terminal and impose tolling or other charges on vessels that transit the portion of the Corpus Christi ship channel for which the Project facilitates dredging, (d) assembled the Contributed Land, (e) positioned the Project for further funding, including debt financing (e.g., conventional debt, municipal bonds, project finance, and other possible forms of non-equity financing), government grants or subsidies, and equity investment, including without limitation by endeavoring to secure commitments from and other commercial arrangements with shippers, pipelines, other potential customers, POCCA and other governmental bodies, and other parties to limit the likelihood of competitive projects being undertaken and confirm Project economics to potential investors and other financing parties, and (f) introduced the Project to Carlyle for potential investment, on terms and conditions to be agreed between Carlyle and Berry.

Carlyle has been discussing the Project and potentially providing a substantial equity investment in the Project with Berry for several months, but before making an investment in the Project, Carlyle's Investment Committee must give final approval and reach FID to make such an investment.

During the period preceding Closing, Berry and Carlyle will continue to jointly endeavor to proceed with and advance the Project, including without limitation (i) continuing and expanding their efforts to increase the likelihood of success of the Project over other potentially competitive projects being considered or undertaken by finalizing commercial and other arrangements with crude oil producers, shippers, aggregators, pipelines, other potential customers, POCCA and other governmental bodies, and other parties (much of which has already commenced) to confirm Project economics to a level of certainty that would enable Carlyle's Investment Committee to evaluate and determine whether to provide approval for an investment in the Project by Carlyle, (ii) collaborating with each other on design of the Project, (iii) continuing their efforts to (A) facilitate the dredging of the Corpus Christi ship channel to a depth of 75 feet from the Gulf of Mexico to the Harbor Island Terminal, and (B) establish facilities and rights for controlling the passage and collecting tolling and/or other fees or charges from vessels that transit the portion of the Christi ship channel for which the Project facilitates dredging, (iv) jointly continuing their efforts to achieve control over all land on Harbor Island, including without limitation the property currently being leased by ERF Port Aransas, Inc. to Gulf Copper, Inc. and the property owned by Martin Midstream Partners, L.P., and (v) [funding Project development |

costs, including engineering, procurement, and construction costs, on terms and with such contributions by Berry and Carlyle as are approved by the Board][1].

At or in connection with the Closing (a) Berry will (i) contribute to the relevant Project Companies (as agreed by Carlyle and Berry) its various interests in the Project via the following documents (A) in the case of the Contributed Land (I) special warranty deeds for (a) the parcels of land located near Midway Junction, Texas which are described on Exhibit 1 attached hereto (the "Midway Junction Land"), and (b) the parcels of land located in Aransas Pass, Texas which are described on Exhibit 2 attached hereto (the "Redfish Bay Land"), and (II) an assignment and assumption of Berry's rights and obligations, as lessee, in the parcel that is located on Harbor Island, Texas and which is described on Exhibit 3 attached hereto (the "Harbor Island Land") and which is leased from ERF Port Aransas, Inc., as lessor, pursuant to a lease a copy of which is attached hereto as Exhibit 4 (the "Harbor Island Lease"), in each case free and clear of all mortgages, deeds of trust, liens, and loans and subject to such liens and encumbrances as shall be agreed by Carlyle and Berry, (ii) provide its undertaking to be responsible for all outstanding litigation relating to the Contributed Land that is pending of record at the Closing or that otherwise arises in connection with pre-Closing matters that are actually known to Berry relating to the Contributed Land, if any, (iii) in the case of all of Berry's other interests in the Project, contribute such interests pursuant to a bill of sale or other instrument of transfer, (b) Carlyle will commit to contribute the Carlyle Equity Contribution, with such commitment to be guaranteed or otherwise secured by Carlyle in a manner acceptable to Berry, (c) Berry will be issued the Berry Percentage Interest (as that term is defined in this Term Sheet) in Delco and each Project Company and (d) Carlyle will be issued the initial Carlyle Percentage Interest (as that term is defined in this Term Sheet) in Delco and each Project Company.

Following Closing (a) Berry will not be expected to contribute any further tangible equity toward the development, construction, operation, or maintenance of the Project or any Project Company, including without limitation any further or continuing rent, fees, or other amounts payable in respect of the Contributed Land, (b) Berry will retain the option to continue to fund a portion of the Project at an equity level to be agreed upon by the Board, and (c) the Project Companies will continue the development, construction, operation, and maintenance of the Project until it achieves commercial operations, and all of the funding required to do so will be provided by a combination of debt financing, government grants or subsidies, any Third-Party Equity Contributions, Industry Investor Equity Contributions, and/or Operator Equity Contribution (as those terms are defined in this Term Sheet), and the Carlyle Equity Contribution.

FID will be defined in the Definitive Documents in terms mutually agreeable to Carlyle and Berry and, in general, will involve (a) the execution of Definitive Documents between Berry and Carlyle regarding the financing, development, construction, operation, and ownership of the Project, (including without limitation (i) Project scope, cost, and scheduling, (ii) business structure of the Project and each Project Company (e.g., one or more limited liability companies, limited partnerships, and/or other tax-efficient entities and/or structures and the jurisdictions of establishment of such entities), (iii) constitution and governing documents of each Project Company, (iv) capital structure of the Project and each Project Company, including debt to equity ratios (it being understood that the Project will be financed, to the maximum extent achievable on commercial terms, by debt instead

---

[1] Note to Draft: Principals to discuss at business level.

5

of equity), classes and terms of debt, governmental grants and subsidies, and equity ownership interests, (v) governance of each Project Company, (vi) management of the Project and each Project Company, including decisions on important entity, development, operational, and business matters, (vii) amount and timing of distributions of cash flow, (viii) transfers or other dispositions of Project assets or interests, (ix) future liquidity events, and (x) minority owner protections), (b) execution of the EPCM Contract by Bay and a Project Company, (c) the satisfaction or waiver of customary conditions precedent by the Parties (including approval by Carlyle's Investment Committee and Berry), (d) the finalization of necessary commercial and governmental arrangements to underwrite Project economics to a level acceptable to both Carlyle and Berry, and (e) other conditions precedent that are agreed in writing by Carlyle and Berry.

Berry's total contributions to the Project will include, without limitation (a) Berry's interests in the Contributed Land (free and clear of all mortgages, deeds of trust, liens, and loans, and subject to such liens and encumbrances as shall be agreed by Carlyle and Berry), (b) all development risk capital contributed to the Project, including without limitation the amount of all cash spent and the value of all tangible assets contributed to the Project as of the date on which this Term Sheet is signed by both Parties, and (c) the value of all of Berry's past and future intangible contributions to the Project, including without limitation (i) Berry's conception and strategizing of the Project, (ii) Berry's past and continuing business and governmental expertise, experience, and contacts, (iii) Berry's past and continuing intangible contributions to the planning, furtherance, approval, development, execution, advancement, completion, operation, and success of the Project, (iv) Berry's positioning of the Project for further funding, and (v) Berry's introduction of the Project to Carlyle for a potential equity investment (collectively, the "Berry Pre-Money Equity Contribution").

The Parties have agreed that, for purposes of calculating the amount of the Berry Equity Contribution, the Berry Percentage Interest, Total Project Equity, and the Carlyle Percentage Interest (as those terms are defined in this Term Sheet), the amount of the Berry Equity Contribution will be the sum of (a) the amount of the Berry Pre-Money Equity Contribution (as that term is defined in this Term Sheet, including without limitation any increase in such amount pursuant to the formula set forth below), (b) the amount of all cash (other than in respect of the Contributed Land) that actually has been paid by Berry toward the advancement or development of the Project before the date on which this Term Sheet is signed by both Parties, and which is not directly or indirectly reimbursed or reimbursable to Berry (whether by the Project or any third party), which amount shall be agreed by the Board within seven days of the signing of this Term Sheet by Carlyle and Berry, (c) the amount of all cash contributions that are approved by the Board, actually paid by Berry toward the advancement or development of the Project after the date on which this Term Sheet is signed by both Parties, and which is not directly or indirectly reimbursed or reimbursable to Berry (whether by the Project or any third party), and (d) the fair market value of all tangible assets other than the Contributed Land that are approved by the Board, contributed by Berry to the Project after the date on which this Term Sheet is signed by both Parties, and not directly or indirectly reimbursed or reimbursable to Berry (whether by the Project or any third party)(collectively, the "Berry Equity Contribution").

The Parties have agreed that, for purposes of calculating the Berry Equity Contribution, the Berry Percentage Interest, Total Project Equity, and the Carlyle Percentage Interest (as those terms are defined in this Term Sheet), the amount of the Berry Pre-Money Equity

Contribution is the pre-money enterprise value of the Project as of the Closing, which the Parties hereby agree shall be calculated at least seven days prior to the Closing pursuant to an agreed model that will be attached to the Definitive Documents (the "Model") which will take into account various agreed factors as illustrated in the Model and which shall provide that the Berry Pre-Money Equity Contribution shall be no less than $400,000,000 (calculated on a base case of 1,000,000 likely contracted barrels per day and budgeted overall hard and soft construction costs of $1,300,000,000). A draft Model is attached to this Term Sheet as Exhibit 5 and a final Model will be agreed by Berry and Carlyle and attached to the Definitive Documents. Illustrative calculations based on the draft Model are attached to this Term Sheet as Exhibit 6.

Carlyle's total contributions to the Project will include, without limitation, the value of all of Carlyle's past and future intangible contributions to the Project, including without limitation (a) Carlyle's past and continuing business and governmental expertise, experience, and contacts, and (b) Carlyle's past and continuing intangible contributions to the planning, furtherance, approval, development, execution, advancement, completion, operation, and success of the Project (collectively, the "Carlyle Pre-Money Equity Contribution").

The Parties have agreed that, for purposes of calculating the Carlyle Equity Contribution, the Berry Percentage Interest, Total Project Equity, and the Carlyle Percentage Interest (as those terms are defined in this Term Sheet), the amount of the Carlyle Pre-Money Equity Contribution is a portion of the pre-money enterprise value of the Project as of the Closing, which the Parties hereby agree shall be calculated pursuant to the Model.

The Parties have agreed that, for purposes of calculating the Berry Percentage Interest, Total Project Equity, and the Carlyle Percentage Interest, Carlyle's contribution to the Project will be the sum of (a) the amount of the Carlyle Pre-Money Equity Contribution, (b) the amount of all cash that has actually been paid by Carlyle toward the advancement and development of the Project prior to the date on which this Term Sheet is signed by both Parties and which is not directly or indirectly reimbursed or reimbursable to Carlyle (whether by the Project or any third party), which amount shall be agreed by the Board within seven days of the signing of this Term Sheet by Carlyle and Berry, and (c) the amount of all cash contributions that are approved by the Board, actually paid by Carlyle to fund Project development, construction, financing, operations, or maintenance after the date on which this Term Sheet is signed by both Parties, and not directly or indirectly reimbursed or reimbursable to Carlyle (whether by the Project or any third party)(collectively, the "Carlyle Equity Contribution").

It is estimated that (a) after the Berry Pre-Money Equity Contribution and the Carlyle Pre-Money Equity Contribution are made, the total costs of designing, permitting, approving, developing, constructing, completing, financing, commissioning, operating, and maintaining the Project until positive cash flow is achieved will be approximately $1,300,000,000, which is comprised of (i) approximately $875,000,000 in additional total capital expenses, operating expenses, maintenance costs, and financing costs from the date on which this Term Sheet is signed by both Parties until the Project achieves positive cash flow, and (ii) approximately $425,000,000 in costs to the Project to dredge the Corpus Christi ship channel from the Gulf of Mexico to the site of the Harbor Island Terminal to a depth of 75 feet to permit fully laden VLCCs to be loaded and unloaded at the Harbor Island Terminal, (b) approximately $800,000,000 of such costs will be funded by a

7

combination of debt financing and governmental grants or subsidies, and (c) the remaining approximately $500,000,000 will be funded by the Carlyle Equity Contribution. It is acknowledged by the Parties that the amount of the Carlyle Equity Contribution may be higher or lower than $500,000,000.

Berry's common equity percentage ownership interest in the Project and each Project Company (the "Berry Percentage Interest") will be calculated as (a) the Berry Equity Contribution, as calculated pursuant to the Model and the foregoing formula as of Closing, divided by (b) the sum of (i) the Carlyle Equity Contribution, (ii) the Berry Equity Contribution, (iii) any Third-Party Equity Contribution, (iv) any Operator Equity Contribution, and (v) any Industry Investor Equity Contribution (as those terms are defined in this Term Sheet) (collectively, "Total Project Equity").

Carlyle's common equity percentage ownership interest in the Project and each Project Company (the "Carlyle Percentage Interest") will be calculated as the Carlyle Equity Contribution, as calculated pursuant to the Model and the foregoing formula as of Closing, divided by Total Project Equity.

The Carlyle Equity Contribution and each Third-Party Equity Contribution, Operator Equity Contribution, or Industry Investor Equity Contribution, if any, will increase the Carlyle Percentage Interest and/or the relevant common equity percentage ownership interest in the Project and each Project Company to be owned by any Third-Party Investor, Operator, or Industry Investor (each, a Third-Party Percentage Interest, Operator Percentage Interest, and/or Industry Investor Percentage Interest, as the case may be), and dilute all other equity interests in the relevant Project Companies held by all owners of equity interests in the Project or the relevant Project Company, including without limitation the Berry Percentage Interest and the Carlyle Percentage Interest (if and as applicable), on a dollar-for-dollar basis as the relevant Carlyle Equity Contribution, Third-Party Equity Contribution, Operator Equity Contribution, and/or Industry Investor Equity Contribution is funded to the relevant Project Companies.

Carlyle shall have the right to (a) introduce its limited partners and other affiliated third party investors (each, a "Third-Party Investor") to the Project to provide a portion of the Carlyle Equity Contribution, on terms to the Project no less favorable than the terms of the Carlyle Equity Contribution, provided that no such Third-Party Investor will be entitled to any representation on the Board or other governing body of the Project or any Project Company unless mutually agreed by Carlyle and Berry, and (b) to arrange debt for the Project on a non-recourse or limited recourse basis, in each case on terms and conditions customary for similar projects and, in the case of such debt, subject to unanimous approval by the Board. Except for the Carlyle Percentage Interest, the Berry Percentage Interest, any Third-Party Investor Percentage Interest, any Operator Percentage Interest, any Industry Investor Percentage Interest, and any other equity interest in any Project Company that is unanimously approved by the Board and issued to another investor or other party, and subject to the foregoing sentence, no equity interest in the Project, any Project Company, or any entity holding any direct or indirect interest in the Project or any Project Company will be issued, offered, transferred, or sold without the express written agreement of Carlyle and Berry.

8

| | |
|---|---|
| | The Parties will work together and with their respective legal, accounting, tax, and other advisors in order to determine the most efficient structure for, and their ownership of interests in, the Project and each Project Company. |
| Operator and Monetization Events: | Carlyle and Berry will cooperate in good faith to attempt to enter into a transaction with a highly regarded, experienced, and qualified crude oil marine port operator that has the ability to improve Project economics (the "Operator"), pursuant to which the Operator may (a) participate in the planning for and development of the Project, (b) enter into an operating agreement with a Project Company to operate one or more of the Project facilities after their completion, (c) make an equity investment in the Project or one or more Project Companies, and (d) provide for a monetization event pursuant to which Carlyle and Berry will receive cash payments from the Operator prior to, simultaneously with, or after Closing. Any such transaction and the terms of such transaction will require that (i) Carlyle and Berry agree on the identity of the Operator and the terms of any transactions or relationships with the Operator, (ii) Carlyle and Berry jointly negotiate in good faith the terms of the transactions or relationships with the Operator, (iii) any equity interest in the Project or any Project Company to be received by such Operator (the "Operator Equity Interest") be in exchange for a cash equity contribution by the Operator (the "Operator Equity Contribution") to the relevant Project Company at or before Closing on terms agreed by Carlyle and Berry, and (iv) any cash payment received from the Operator pursuant to such a monetization event be paid 50% to Berry and 50% to Carlyle[2]; provided that Carlyle will be entitled to no such payment, and Berry will be entitled to the entire payment, in the event that Closing has not occurred on or before the FID Date. In considering whether to appoint a particular company as Operator for one or more Project, Companies (A) special caution will be exercised to ensure that, if such company operates, has any equity interest in, or otherwise has any other potentially competitive relationship with a port or refining facility within a radius of 750 miles of Harbor Island, Texas (the "Non-Compete Zone"), then special contractual provisions are instituted as mutually agreed by Carlyle and Berry to ensure that such company will not divert business opportunities from the Project or otherwise favor its other equity investments or competitive relationships, and (B) Berry and Carlyle shall disclose any material direct or indirect equity relationships or contractual relationships that they may have with such potential Operator.

Carlyle and Berry also will cooperate in good faith to attempt to enter into one or more transactions with crude oil producers, pipeline operators, aggregators, shippers, and/or other parties that have the ability to assist the Project to improve Project economics (each, an "Industry Investor"). Any such transaction and the terms of such transaction will require that (a) Carlyle and Berry agree on the identity of each such Industry Investor and the terms of any transactions or relationships with such Industry Investor, and (b) Carlyle and Berry jointly negotiate the terms of the transactions or relationships with such Industry Investor. In considering whether to enter into a transaction with an Industry Investor (i) special consideration shall be given to Industry Investors that will (A) make an equity investment in the Project or one or more Project Companies, and/or (B) provide for a monetization event pursuant to which Carlyle and Berry will receive cash payments from such party prior to, or simultaneously with, Closing, and (ii) special caution will be exercised to ensure that, if such Industry Investor operates, has any equity interest in, or otherwise has any other potentially competitive relationship with a port or refining facility within the Non-Compete |

[2] Note to Draft: Parties to discuss post-FID treatment of monetization events.

| | |
|---|---|
| | Zone, special contractual provisions will be instituted as agreed by Berry and Carlyle to ensure that such Industry Investor will not divert business opportunities from the Project or otherwise favor its other equity investments or competitive relationships. If an Industry Investor makes an equity investment in the Project or one or more Project Company, any equity interest in the Project or any Project Company to be received by such Industry Investor (each, an "Industry Investor Equity Interest") must be in exchange for a cash equity contribution by the Industry Investor to the relevant Project Company (each an "Industry Investor Equity Contribution") at or before Closing on terms agreed by Carlyle and Berry. If an Industry Investor provides a monetization event, any cash payment received from the Industry Investor pursuant to such a monetization event will be paid 50% to Berry and 50% to Carlyle, provided that Carlyle will be entitled to no such payment, and Berry will be entitled to the entire payment, in the event that Closing has not occurred on or before the FID Date. |
| Equity Incentive Pool: | Carlyle and Berry will establish an equity incentive pool at one or more holding companies formed to hold all direct and indirect equity interests owned at any time in the Project and each Project Company (each, a "HoldCo"). All distributions or other amounts of any type received at any time by any Project Company or any holder of direct or indirect interests in any Project Company in respect of all direct and indirect equity interests in the Project and each Project Company, including each HoldCo, including without limitation cash and other distributions paid from time to time from business operations, Corpus Christi ship channel tolling or other fees or charges, disposition of assets, financing activities, liquidation events, monetization events, transfers of equity interests, or transfers of equity interests in the Project or in any Project Company, shall be payable in the following order of priority: 

*First*, until each holder of direct and indirect equity interests has received a 10% IRR on its equity investment in the Project or Project Company: 100% to each holder of direct and indirect equity interests,

*Second*, until each holder of direct and indirect equity interests has received a 15% IRR: 88% to each holder of direct and indirect equity interests and 12% to the Incentive Pool Units,

*Third*, until each holder of direct and indirect equity interests has received a 20% IRR: 83% to each holder of direct and indirect equity interests and 17% to the Incentive Pool Units, and

*Thereafter*, 77% to each holder of direct and indirect equity interests and 23% to the Incentive Pool Units.

In each case, IRR will be calculated (a) on the basis of the Berry Equity Contribution, the Carlyle Equity Contribution, the relevant Third-Party Equity Contribution, the Industry Investor Equity Contribution, or the Operator Equity Contribution, if any, as the case may be, and (b) net of any compensation paid to third parties, management fees payable to the Operator or other managers or operators, or other costs associated with the execution and operations of the Project.

At all times, Berry shall be entitled to at least 90% of all Incentive Pool Units. The remaining Incentive Pool Units, including to Berry and the Operator, if any, will be allocated by Berry |

| | |
|---|---|
| | and Carlyle's mutual agreement for the benefit of Project execution and success; provided that there will be no other incentive compensation of any type or nature paid by or from the Project or any Project Company to any individuals or entities (whether employees, agents, advisors, developers, consultants, the Operator, any other managers or operators, or other third parties) that is not granted from the Incentive Pool Units or otherwise specifically unanimously approved by the Board.<br><br>Except for Berry's Incentive Pool Units, which shall be vested immediately and be non-forfeitable, all Incentive Pool Units will be subject to customary vesting and termination provisions approved by the Board. |
| Definitive Documents: | The terms and conditions for the transactions contemplated by this Term Sheet will be memorialized in and governed by definitive written contracts between Berry and Carlyle, or between other relevant parties, which contracts shall address the financing, development, construction, operation, and ownership of the Project, including without limitation the following specific documents and other standard documentation initially drafted by counsel to Carlyle, but specifically approved by Berry in its sole discretion:<br><br>• The EPCM Contract between Bay and a Project Company<br>• One or more LLC Operating Agreements or similar constitutional documents for each Project Company and HoldCo<br>• One or more agreements establishing the Equity Incentive Pool (collectively, the "Definitive Documents").<br><br>All Definitive Documents will require the approval and authorization by the relevant governing bodies of each Party and will be fully executed by each Party. |
| Principles of Governance: | As noted above, a Board has been formed and is initially comprised of Marvin Berry, Lawrence Berry, Andrew Marino, and Ferris Hussein. Certain material decisions will be made by unanimous agreement of the Board and other material decisions will be made by at least a majority of the members of the Board.<br><br>The Parties will agree and specify procedures for regular Board meetings and the approval of each Project expenditure and commitment above $100,000. The Board shall hold weekly meetings at a mutually agreeable time and place (which meetings may be conducted wholly or partially by telephone or other electronic means in which all participants are able to communicate with one another simultaneously) and the quorum for such meetings shall be 3 of 4 Directors. Neither Berry nor Carlyle may enter into a contractual arrangement with the Project or a Project Company without first obtaining Board approval.<br><br>Minority owner protections for the Project and each Project Company will be customary and may include, subject to agreement of the Parties, without limitation (a) full information rights, (b) participation in all significant management, operational, and ownership entity matters, (c) participation on board(s) of directors and in other management bodies commensurate with the relevant equity interests of the owners of the Project or relevant Project Company, with unanimity required for substantial business plan, development, business, operational, transactional, financial, contractual, senior management, appointment and continuation of any Operator or other manager or operator of any Project facilities, debt incurrence, capital expense, operating expense, amounts and timing of distributions of cash flow, appointment and remuneration of senior management and |

| | |
|---|---|
| | consultants, establishment and changes in audit policy, appointment of and changes in auditors, appointment and continuation of legal counsel for ownership and operating entity(ies), related party and non-ordinary course transactions, institution or settlement of legal proceedings, issuing further ownership interests or debt securities, and other ownership and ownership entity matters, (d) anti-dilution and preemptive rights protections, (e) rights of first offer and first refusal, (f) piggyback, drag-along, and tag-along rights, (g) demand registration rights, (h) non-competition, and (i) exit strategy, if applicable. |
| Permits; Incentive Programs; and Project Contracts: | All permits, incentive programs (including tax credits, tax abatements, and other tax incentives), reports, and other deliverables, rights, and/or benefits that are necessary for, applicable to, or that confer any cost reduction or other savings with respect to the development, construction, ownership, operation, or maintenance of the Project or any Project facility (collectively "Permits, Deliverables, and/or Incentives") shall be applied for and held by the relevant Project Company. If any Permits, Deliverables, and/or Incentives are applied for or held by any Party or any affiliate of any Party, such Party or affiliate shall, as soon as is reasonable and practicable, transfer such Permits, Deliverables, and/or Incentives to the relevant Project Company or a designated affiliate or subsidiary of such Project Company or, if such transfer is not possible, such Permits, Deliverables, and/or Incentives shall be held by such Party or affiliate in trust for and on behalf of the relevant Project Company.<br><br>All contracts necessary for the construction and operation of the Project or any Project facility (including, but not limited to, the EPCM Contract, terminalling and offtake agreements, easements, leases, operating agreements, and maintenance agreements) shall be entered into by (or, as soon as is reasonable and practicable assigned to) the relevant Project Company or a designated affiliate or subsidiary of such Project Company or, if such assignment is not possible, such contract(s) shall be held in trust for and on behalf of Delco or the relevant Project Company. |
| Intellectual Property: | Each Party shall continue to own all of its pre-existing intellectual property and shall grant a license to Delco or the relevant Project Company for such intellectual property to the extent necessary for use in connection with the Project.<br><br>Any intellectual property developed by Delco or any other Project Company in connection with the Project (including any improvements to either Party's pre-existing intellectual property) shall be held by Delco or the relevant Project Company and Delco or the relevant Project Company, as applicable, shall grant licenses to the Parties for such intellectual property. |
| Confidentiality: | This Term Sheet is being executed by Carlyle and Berry with the understanding that neither it nor its substance shall be disclosed publicly or privately by either Carlyle or Berry to any third person except those who are in a confidential relationship to Carlyle or Berry and who need to know such information in connection with Project execution, or where the same is absolutely required by law and then only to the extent of such requirement and on a basis that it not be further disclosed. |
| Exclusivity: | Carlyle and Berry agree that, prior to the earlier of (a) the FID Date, as such date may be extended in writing by the Parties, and (b) Closing (i) Carlyle and Berry shall cooperate to advance the Project, including without limitation working together and with the Project |

| | |
|---|---|
| | CEO to finalize negotiations with POCCA, achieve maximum contracting of crude oil barrel volumes for the Project, and achieve reductions in the overall budgeted hard and soft construction costs for the Project, (ii) none of Carlyle, Berry, or any of their respective affiliates will, directly or indirectly (A) solicit, provide information to, or otherwise pursue a Directly Competing Project, or (B) make, accept, or negotiate any offer with any operational, development, investment, financing, or other party other than the other Party to this Term Sheet (or their related entities) in respect of any Directly Competing Project, in each case without the express written consent of the other Party.<br><br>In the event that Closing has not occurred on or prior to the FID Date and Berry and Carlyle have negotiated in good faith and otherwise complied with their obligations herein, then (a) Berry shall be free to pursue the Project or any similar or competing project with any other investor, developer, operator, financing, governmental, or other party or parties, (b) until the earlier of (i) the substantial completion of the Project, (ii) the abandonment or suspension of the Project by Berry, and (iii) the date that is two years after the FID Date (A) Carlyle Global Infrastructure Opportunity Fund L.P. ("CGI") shall not, and (B) neither CGI nor any then-current director, officer, or employee of CGI shall provide information to or assist any affiliate of CGI to, directly or indirectly finance or invest in a Directly Competing Project, and (c) neither Party nor any of their respective shareholders, officers, directors, employees, advisors, or agents shall have any cause of action or claim of any kind against the other, including without limitation with respect to costs or expenses, except in respect of any breach of any of the terms or conditions of this Term Sheet.<br><br>"Directly Competing Project" means any project whose principal purpose is (i) the development of a crude export terminal to directly compete with the Harbor Island Terminal and is within 75 miles of Harbor Island (including any offshore systems originating with such radius), or (ii) any project to facilitate the dredging of the Corpus Christi ship channel, unless Carlyle provides to Berry either a carried interest in that project or an origination fee, upon terms and conditions to be agreed between Carlyle and Berry. |
| Non-Binding Nature: | Except for the "Project Companies; Board", "Principles of Governance", "Permits; Incentive Programs; and Project Contracts", "Intellectual Property", "Confidentiality", "Exclusivity", "Non-Binding Nature", and "Governing Law, Jurisdiction, and Venue" provisions set forth in this Term Sheet (all of which specifically are and shall continue to be binding obligations of the Parties), this Term Sheet does not constitute a binding commitment on the part of either Party, shall not constitute an agreement or an agreement to agree, and neither Party shall contend to the contrary. This Term Sheet shall not be construed as an offer or obligation by either Carlyle or Berry to invest in the Project or any Project Company, subscribe for, purchase, issue, or sell any shares, partnership interests, membership interests or units, securities, or interest of any kind in the Project or any Project Company, based upon any of the terms or conditions described in this Term Sheet or as a binding commitment of either Berry or Carlyle, except to the extent specifically provided in this Term Sheet. Any investment in the Project is conditioned upon the execution and delivery of Definitive Documents in form satisfactory to the Parties and upon the completion by the Parties of due diligence investigations, the results of which are satisfactory to each of the Parties in its respective sole discretion, in each case on or before the FID Date. Carlyle and Berry intend to negotiate in good faith to enter into Definitive Documents, but until each Party has received all required internal approvals (which shall be provided solely in its respective discretion) and Definitive Documents are properly executed by both Parties, neither of the Parties shall have any obligation to complete any of the transactions outlined |

| | |
|---|---|
| | in this Term Sheet. Each Party may, at any time prior to the execution and delivery of Definitive Documents, and notwithstanding anything to the contrary set forth in this Term Sheet, propose different terms from those outlined herein or unilaterally terminate (for any reason or no reason at all) all negotiations without any duty to negotiate or liability whatsoever to any person or entity, except as specifically provided in this Term Sheet.<br><br>Each of Carlyle and Berry shall be responsible for its own expenses, including without limitation legal expenses, in connection with the negotiation and documentation of this Term Sheet and all Definitive Documents or otherwise related to the finalization, implementation, and enforcement of this Term Sheet and any Definitive Documents. |
| Governing Law, Jurisdiction, and Venue: | This Term Sheet and all issues and questions concerning its application, construction, validity, interpretation, and enforcement shall be governed by and construed in accordance with the laws of the State of Texas, without giving effect to any choice or conflict of laws provisions or rules (whether of the State of Texas or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Texas. The Parties hereby agree that any suit, action, or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Term Sheet or the transactions contemplated hereby, whether in contract, tort, or otherwise, shall be brought in the state courts in Harris County, Texas, so long as one of such courts shall have subject-matter jurisdiction over such suit, action, or proceeding, and that any cause of action arising out of this Term Sheet shall be deemed to have arisen from a transaction of business in the State of Texas. Each of Carlyle and Berry hereby irrevocably consents to the exclusive jurisdiction of such courts and of the appropriate appellate courts therefrom in any such suit, action, or proceeding and irrevocably waives, to the fullest extent permitted by relevant law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action, or proceeding in any such court or that any such suit, action, or proceeding which is brought in any such court has been brought in an inconvenient forum. |

*[Signature Page Follows]*

Lawrence Berry

Marvin Berry

Dennis Berry

Carlyle Investment Management L.L.C., as manager and advisor to Carlyle Global Infrastructure Opportunity Fund L.P.

By:
Name: Ferris Hussein
Title: Managing Director

**Exhibit 1**

**Midway Junction Land**

1/31/2019

**FILE NO** **509538**

## EXECUTOR'S DEED

THE STATE OF TEXAS §

                   §        KNOW ALL MEN BY THESE PRESENTS:

COUNTY OF EL PASO §

THAT The Estate of Madelyn Hooper Campbell, Deceased ("Grantor"), has GR/. . ED.

SOLD and CONVEYED and by these presents does hereby GRANT, SELL and CONVEY unto

Campbell Farms, a general partnership ("Grantee"), whose address is *719 Los Miradores, El Paso, Texas 79912*

all those certain parcels of land situated in San Patricio, Texas and more particularly described as

follows:

Parcel 1:

Field notes of a Tract of land out of the west half of Section 66 of George H. Paul Company's Subdivision of the Coleman Fulton Pasture Company's Land South of Taft in San Patricio County, Texas, said Tract being the north 52.0646 acres of the south half of the northwest quarter of said Section 66 is situated in the E.G. Head Survey Ab. 155 and is more particularly described metes and bounds as follows:

Beginning at a point of the west line of Section 66 being the center of F.M. Highway No. 893 and the northwest corner of the south half of the northwest quarter of said Section;

Thence, East, at 40.00 feet set an iron rod in the east line of said highway for a reference, in all, 2643.28 feet to a 1 ½" iron pipe in concrete beside an old cedar post found for the northeast corner of this Tract;

Thence, South, 858.00 feet to an iron rod set for the southeast corner of this tract;

Thence, West, at 2603.28 feet set an iron rod for a reference in the east line of said Highway 893, in all 2643.28 feet to a point in the corner of said Highway and the west line of Section 66 for the southwest corner of this Tract;

Thence, North, with the west line of Section 66 and center of said Highway, 858.00 feet to the Point of Beginning and containing 52.0646 acres of land.

Parcel 2:

Field Notes of a Tract of land being the East Half of the North Half of the Southeast Quarter of Section 65 of George H. Paul Company's Subdivision of the Coleman Fulton Pasture Company's Subdivision of the Coleman Fulton Pasture Company's Land South of Taft, said

766137

1/9

FILE NO

509538

Tract is situated in the Henry S. Day Survey Ab. 103 in San Patricio County, Texas, as shown by the Map of said Subdivision recorded in Volume 1 at Page 32 of the said County Map Records and is more particularly described by metes and bounds as follows:

Beginning at a point at the intersection of County Road No. 75 and F.M. Highway No. 893 being the northeast corner of the southeast quarter of Section 65 and the northeast corner of this Tract;

Thence, South, with the east line of Section 65 and the center of County Road No. 75, 1320.00 feet to a 1" iron pipe in concrete for the southeast corner of this Tract;

Thence, West, at 30.00 feet set an iron rod for a reference, in all 1321.64 feet to an iron rod set for the southwest corner of this Tract;

Thence, North, at 1280.88 feet set an iron rod for a reference point, in all, 1320.88 feet to the center of F.M. Highway No. 893 for the northwest corner of this Tract;

Thence, S89° 57" 48" E, with the center of F.M. Highway No. 893, 1321.64 feet to the Point of Beginning and containing 40.053 acres of land.

Parcel 3:

One-fifth interest in the oil, gas and other minerals in and under the following described land, together with the rights of ingress, egress and regress for the purposes of exploring for, mining, drilling, producing, operating, storing and transporting the same from October 1, 1973 until the expiration of any valid and existing oil, gas and mineral lease covering the same or at October 1, 1973 in the event there was no valid and existing oil, gas and mineral lease covering the same one-fifth of the royalty attributable to the present mineral interest in the oil, gas and other minerals in and under the following tracts of land:

See Exhibit A attached hereto

This conveyance is made subject to all easements, restrictions, rights-of-way and prescriptive rights, whether of record or not; all presently recorded instruments, other than liens and conveyances, that affect the above-described property; taxes for 2002, the payment of which Grantee assumes; and subsequent assessments for that and prior years due to change in land usage, ownership, or both, the payment of which Grantee assumes.

TO HAVE AND TO HOLD the above described premises, together with all and singular

the rights and appurtenances thereto in anywise belonging unto the said Grantee. its successor,

legal representatives and assigns forever, and said Grantor does hereby bind itself, its successors,

legal representatives and assigns to WARRANT AND FOREVER DEFEND all and singular the

said premises unto the said Grantee, its successors, legal representatives and assigns, against every

509538

766138

FILE NO. 509538

person whomsoever lawfully claiming or to claim the same or any part thereof, when the claim is by, through, or under Grantor, but not otherwise.

IN WITNESS WHEREOF, this Deed has been executed this **7** day of **August**, 2002.

THE ESTATE OF MADELYN HOOPER CAMPBELL, DECEASED

By: *Leila Campbell Cosby*
Leila Campbell Cosby, Independent Executrix

THE STATE TEXAS §
                                    §
COUNTY OF **Navarro** §

This instrument was acknowledged before me on the **7th** day of **August**, 2002, by Leila Campbell Cosby, Independent Executrix of the Estate of Madelyn Hooper Campbell, Deceased, on behalf of such estate.

*Jane Ross*
Notary Public in and for the State of Texas

**2-28-05**
My Commission Expires:

JANE ROSS
NOTARY PUBLIC
State of Texas
Comm. Exp. 02-28-2005

AFTER RECORDING RETURN TO:

Karin Armen Carson
100 N. Stanton, Suite 1700
El Paso, TX 79901

PREPARED IN THE LAW OFFICE OF:

Karin Armen Carson
Mounce, Green, Myers, Safi & Galatzan, P.C.
P.O. Box 1977
El Paso, Texas 79950-1977

509538

766139

Tract One. Field notes of a tract of land out of the west half of Section 46 of George H. Paul Company's Subdivision of the Coleman Fulton Pasture Company's Land South of Taft in San Patricio County, Texas, said Tract being the South ⸺ ⸺ ⸺ ⸺ of the south half of the northwest quarter of Section 46 is situated in the E. S. Head Survey Ab. 155 and is more particularly described by metes and bounds as follows;

Beginning at a point in the center of F. M. Highway No. 893 for the southwest corner of the northwest quarter of Section ⸺ ⸺ the northwest corner and Point of Beginning of this ⸺ ⸺ ⸺ ⸺

⸺ East, with the south line of the northwest quarter of ⸺ ⸺ ⸺ mark in top of headwall for line, at ⸺ ⸺ feet 2.0 feet east of a 6"X6" concrete ⸺ ⸺ corner of this Tract and the center

⸺ ⸺ iron rod set for the northeast ⸺ ⸺ ⸺ ⸺ ⸺ ⸺ ⸺ ⸺ ⸺ ⸺ ⸺ ⸺ ⸺ set in iron rod for a reference, ⸺ in the west line of Section 46 ⸺ for the northwest corner of this ⸺ ⸺ of F. M. Highway ⸺ ⸺ line of Section 46 and the center ⸺ the Point of Beginning and ⸺ ⸺ ⸺ ⸺

FILED
509538

COUNTY CLERK'S MEMO
Portions of document
illegible when received.

Tract Two. ⸺ ⸺ ⸺ Tract of land out of the ⸺ ⸺ ⸺ ⸺ of George H. Paul Company's ⸺ ⸺ ⸺ Fulton Pasture Company's Land South ⸺ ⸺ Patricio County, Texas, ⸺ by the map of ⸺ ⸺ ⸺ ⸺ ⸺ ⸺ ⸺ said Tract being the north 1/4 of the southwest quarter of Section 46 is more particularly described by metes and bounds as follows;

Beginning at a point in the west line of Section 56 being the center of F. M. Highway No. 893, for the northwest corner of the southwest quarter of Section 56 and the northwest corner and Point of Beginning of this Tract;

Thence, East, with the north line of the southwest quarter of Section 56 set a chisel mark 'n top of culvert head wall for line, at 2643.28 feet, set an iron rod 1.0' east of a 6"x6" concrete monument for the center of Section 46 and the northeast corner of this tract;

Thence, South, 660.00 feet to an iron rod set for the southeast corner of this Tract;

Thence, West, at 2603.28 feet set an iron rod in the east line of said Highway for a reference, in all, 2643.28 feet to a point in the west line of Section 46 and the center of said Highway 893 for the southwest corner of this Tract;

Thence, North, with the west line of Section 46 and the center of F. M. Highway 893, 660.00 feet to the Point of Beginning and containing 40.0 ⸺ acres of land.

Tract Three. Field notes of a Tract of land out of the northeast quarter of Section 46 of George H. Paul Company's Subdivision of the Coleman Fulton Pasture Company's Land South of Taft, said Tract is situated in the E. S. Head Survey Ab. 155 ⸺ ⸺ and the Henry B. Day Survey Ab. 103 (⸺ acres) in San Patricio County, Texas, as shown by the Map of said Subdivision, recorded in Volume 1 at Page 32 of said County Map Records, and is the west 39.093 acres of the east 120.284 acres of the northeast quarter of Section 46 and is more particularly described by metes and bounds as follows;

Beginning at a point on the north line of Section 46 and the ⸺ line of Section 46 for the northeast corner of this Tract, from which the northeast corner of Section 46 bears East, 1235.0 ⸺ ⸺ ⸺ ⸺ ⸺ ⸺

39.093

at... 1... feet and iron rod for a reference on the north
...... Post 883; in all, 2642.91 feet to a point
...... way for the southeast corner of this
...... of ...
...... with the center of F. M. Highway No.
......37 feet to a point for the southwest

...... 00 feet ... set an iron rod for a reference,
... the north line of said Highway, at 2618.50 feet set an
...... in all, 2642.80 feet to a point in
the north line of Section 66 for the northwest corner of this
......
...... with the north line of Section 66 and South line
...... 3,441.97 feet to the Point of Beginning and con-
...... area of land ...

**FILE NO**
**509538**

COUNTY CLERK'S MEMO
Portions of document
illegible when received.

Tract Four ... Field notes of a Tract of land out of the
southwest quarter of Section 66 of George M. Paul Company's
subdivision of the Coleman-Fulton Pasture Company's Land South
of Corpus Christi, San Patricio County, Texas, as shown by the map
of said subdivision recorded in Volume 1 at Page 27 of the San
Patricio County, ... Records, said Tract being the south half
of the north half of the southwest quarter of said Section 66
and more particularly described by metes and bounds as follows:

...... point in the west line of Section 66 in the
center of said Highway for the southwest corner and Point of
Beginning of this Tract, from which the southwest corner of said
Section bears, South, 1320.00 feet;

Thence, East, parallel to the south line of said Section, at
40.00 feet set an iron rod for a reference, in all, 2643.28
feet to an iron rod set for the southeast corner of this Tract;

Thence, North, 750.00 feet to an iron rod set for the north-
east corner of this Tract;

Thence, West, at 2603.28 feet set an iron rod in the east line
of said Highway, in all 2643.28 feet to a point in the west
line of Section 66 and the center of said Highway for the
northwest corner of this Tract;

Thence, South, with the center of said Highway and the west
line of Section 66, 660.00 feet to the Point of Beginning and
containing 40.0487 acres of land.

Tract Five ... Field notes of a Tract of land out of Lot 2
Block 12 of Taft Farm Lands, San Patricio County, Texas, said
Tract is situated in the William Kaizor Survey Ab. 178
(22.000 acres) and the John Gibbs Sur. Ab. 196 (9.190 acres)
and is more particularly described by metes and bounds as
follows:

...... in the center of said
Beginning at a 1" iron pipe set beside an old cedar post for
the northeast corner of said Lot 2 and the northwest corner of
Lot 1 for the northeast corner and Point of Beginning of this
Tract; ... 02.00 feet ...

Thence, S 21° 07' 00 W, with the east line of Lot 2 and the
west line of Lots 10 and 3, at 685.00 feet pass the northwest
corner of Lot 3 and the southwest corner of Lot 1, in all,
1380.02 feet to an iron rod set for the southeast corner of
this Tract; ... line of ...

Thence, N 88° 27' 00" W, parallel to the south line of Lot 2,
2646.02 feet to an iron rod set for an angle point in the south
line of this Tract, from which the north line of Lot 2 bears
North, 20.00';

Thence, N 88° 27' 00" W, parallel to and 20.00 feet from the
north line of Lot 2, at 112.78 feet set an iron rod for a
reference in the east line of Terra-Bonnie Road, in all, 151.65
feet to a point in the center of said Road for the southwest
corner of this Tract; ...

... ... Road, 23.52 feet to a point for the ...

... with the north line of Lot 2, at ...
... rod for a reference, in all, ...

FILE NO 509538
31.65
COUNTY CLERK'S MEMO
Portions of document
illegible when received.

**Tract Six** ... field notes of a Tract of land out of the northeast quarter of Section 85 of George H. Paul Company's Subdivision of the Coleman-Fulton Pasture Company's Land ... Tract is situated in the E. R. Head Survey Ab 155 (53.790 acres) and the Henry S. Day Survey Ab 103 (16.303 acres) in San Patricio County, Texas, as shown by the Map of said Subdivision recorded in Volume 1 at Page 32 of said County Map Records and is the Middle 30.093 acres of the east 120.285 acres of the northeast quarter of Section 85 and is more particularly described by metes and bounds as follows:

Beginning at a point on the north line of Section 85 and the south line of Section 86 for the northeast corner of this Tract, from which point the northeast corner of Section 85 bears East, 827.99 feet;

Thence, South, at 23.00 feet set an iron rod for a reference, at 2315.85 feet set an iron rod in the north line of a 3.007 acre tract for a bend in the east line of this tract;

Thence, West, with the north line of said 3.007 acre tract, 47.21 feet to an iron rod set for an interior corner of this Tract and the northwest corner of said 3.007 acre tract;

Thence, South, with the west line of said 3.007 acre tract, ... feet set an iron rod in the north line of F. M. Highway No. 893 for a reference, in all, 827.45 feet to a point in the center of said Highway for the southeast corner of this Tract; ...

Thence, ... W. with the center of said Highway and ... 803.00 feet to a point for the southwest corner ...

Thence, North, at 30.00 feet set an iron rod in the north line of Highway No. 893 for a reference, at 2515.91 feet set ... for a reference, in all, 2532.91 feet to a point ... line of Section 85 for the northeast corner of ...

... the north line of Section 85, 830.11 feet ... point of beginning and containing 30.093 acres of ...

**Tract Seven** Field notes of a Tract of land out of the southeast quarter of Section 38 of George H. Paul Company's Subdivision of the Coleman-Fulton Pasture Company's Land South of ... Patricio County, Texas, as shown by the map of said ... in Volume 1 at Page 32 of the San Patricio ... said Tract being the south half of the south ... southeast quarter of Section 38 and is more ... by metes and bounds as follows:

... the southeast corner of Section 38 being a point ... Highway 893 for the southwest corner ... of this Tract; ...

... the south line of Section 38, set a chisel ... headwall for a reference, in all, ... a point for the southeast corner of this Tract;

Thence, North, at 30.00 feet set an iron rod for a reference ... to an iron rod set for the northeast corner of this Tract ... in all, ...

thence ,West, at 2893.25 feet set an iron rod in the east line
of F.M. Highway 893 for a reference, in all, 2893.25 feet to
a point in the west line of Section 65 and the center of said
Highway for the northwest corner of this Tract;

Thence, South, with the east line of Section 65 and center
of said Highway 50.00 feet to the Point of Beginning and
containing ____ acres of land;

Tract Eight Field notes of a tract of land being the
West Half of the North Half of the Southeast Quarter of
Section 65 of George H. Paul Company's Subdivision of the
Coleman, Fulton Pasture Company's Land South of Taft said
tract is situated in the Henry S. Day Survey Ab. 103 in San
Patricio County, Texas, as shown by the Map of said Sub-
division recorded in Volume 1 at Page 22 of the Map Records
of said County and is more particularly described by metes
and bounds as follows:

Beginning at a point in the center of F. M. Highway No. 893
being the north line of the southeast quarter of Section 65
for the northeast corner of this Tract from which the east
line of Section bears S 89° 57' 41" E, 1321.84 feet;

Thence, South, at 50.00 feet set an iron rod in the south
line of F. M. Highway 893 for a reference, in all, 1320.00
feet to an iron rod set for the southeast corner of this
Tract;

Thence, West, 1321.84 feet to an iron rod set for the south-
west corner of this Tract;

Thence, North, at 1291.89 feet set an iron rod in the south
line of said Highway for a reference, in all, 1321.89 feet
to a point in the center of said Highway for the northwest
corner of this Tract;

Thence, S 89° 57' 41" E, with the center of F. M. Highway
No. 893, 1321.84 feet to the Point of Beginning and containing
40.00 acres of land;

Tract Nine Field notes of a tract of land out of Lot 2
............... San Patricio County, Texas,
............... William Keiser Survey Ab. 178
............... Gibbs Sur. Ab. 131 (18.954 acres)
............... 7.000 acres of the south 54.000 acres of
............... particularly described by metes and
...............

............... in the east line of Lot 2 for the
............... Tract from which the northeast corner
............... 00° E, 1280.41 feet;

............... with the east line of Lot 2, 524.80.
............... for the southeast corner of this Tract;

............... parallel to the south line of Lot 2, at
............... in the east line of Terre-Bonnie
............... all, 2089.18 feet, to a point in the
............... southwest corner of this Tract;

............... with the center of Terre-Bonnie Road
............... 180.09 feet to a point for the
............... from which the northwest corner
............... E, 23.81 feet ...............
...............
............... parallel to and 1.00 feet from the
............... feet set an iron rod for a
............... in all, feet to an iron rod set for an angle
............... in the north line of this Tract;

Thence, S 89° 57' 00" E, parallel to the south line of Lot
2, 2084.18 feet to the Point of Beginning and containing
27.000 acres of land.

FILE NO
509538

COUNTY CLERK'S MEMO
Portions of document
illegible when received.

509538

766143

1/31/2019

Tract Ten — Field notes of a tract of land ... out of ... Quarter of Section 86 of George N. Paul Company's ... division of the Coleman-Fulton Pasture Company's Land ... of ... in San Patricio County, Texas, as shown by the **FILE NO** ... said Subdivision recorded in Volume 1 at Page 32 of the **509538**

San Patricio County Map Record., said Tract being the North half of the South half of the Southwest 1/4 of Section 86 is more particularly described by metes and bounds as follows;

COUNTY CLERK'S MEMO
Portions of document
illegible when received

Beginning at a Point in the west line of Section 86 in the center of F. M. Highway 893 for the southwest corner and Point of Beginning of this Tract from which point the southwest corner of Section 86 bears, 660.00 feet;

Thence, East, at 40.00 feet set an iron rod in the east line of said Highway for a reference, in all, 2643.28 feet to an iron rod set for the southeast corner of this Tract;

Thence, North, 660.00 feet to an iron rod set for the northeast corner of this Tract;

Thence, West, at 2603.28 ...set an iron rod in the east line of said Highway for a reference, in all, 2643.28 feet to a point in the west line of said Section and the center of said Highway for the northwest corner of this Tract;

Thence, South, with the west line of Section 86 and the center of F. M. Highway 893, 660.00 feet to the Point of Beginning and containing 40.00 acres of land.

Tract Eleven — Field notes of a Tract of land out of Lot 2 Block 12 of Taft Farm Lands, San Patricio County, Texas, said Tract ... situated in the William Kaiser Survey Ab. 178 (3,953 acres) and ... John Gibbs Survey Ab. 115 (23.037 acres) and is more particularly described by metes and bounds as follows;

Beginning at ... in the center of Terre-Bonnie Road for the northeast corner of Lot 2 Block 12 and the southwest corner ...

Thence ... with the south line of Lot 2 and block ... a 2" iron pipe set for a reference, in ... feet to an iron rod set for the southeast corner of this Tract;

Thence ... with the east line of Lot 2 and the ... feet to an iron rod set for the ... corner of this Tract;

Thence ... parallel to the south line of Lot 2, ... Block 12 ... feet set an iron rod for a reference, ... feet to a point in the center of Terre-Bonnie ... line of Lot 2 and Block 12 for the northwest corner ... Road;

Thence ... with the center of Terre-Bonnie Road ... line of Lot 2 and Block 12, 639.19 feet to the ... Beginning and containing 27.000 acres of land.

... together with the ...

Tract Twelve — Field notes of a tract of land out of the ... northeast quarter of Section 85 of George N. Paul Company's Subdivision of the Coleman-Fulton Pasture Company's Land South of Taft, said Tract is situated in the E. S. Head Survey, Ab. ... 195 (35.037 acres) and the Henry S. Day Survey Ab. 103 (14.056 acres) in San Patricio County, Texas, as shown by the Map of said Subdivision recorded in Volume 1 at Page 32 of said County Map Records and is the east 23.093 acres of the east 120.286 acres of the northeast quarter of Section 85 and is more particularly described by metes and bounds as follows:

Beginning at a point in the center of County Road No. 75 for the northeast corner of Section 85 and the northeast corner of this Tract from which an iron rod set for a reference bears South 23.00 feet and west 30.00 feet;

Thence, South, with the center of said County Road and the east line of Section 65, 2849.77 feet to a point in the center of F.M. Highway No. 893 for the southeast corner of this Tract; from which an iron rod bears north, 40.00 feet and east, 30.00 feet;

Thence, N 89° 57' 48" W, with the center of F. M. Highway No. 893, 937.07 feet to a point for the southeast corner of a 3.007 acre tract and a corner of this Tract;

Thence, Northerly with the west line of said 3.007 acre tract at 30.00 feet an iron rod for a reference, in all, 327.09 feet an iron rod for the northeast corner of said 3.007 acre tract and an interior corner of this Tract;

Thence, West with the north line of said 3.007 acre tract ... an iron rod set for the southwest corner of ...

... 1782.91 feet to an iron rod set for a reference, ... feet to a point in the north line of Section ... northwest corner of this Tract;

... said north line of Section 65, 937.99 feet ... containing 30.093 acres of ...

COUNTY CLERK'S MEMO
Portions of document
illegible when received.

FILE NO
509538

FILE NO 509538 COMPARED

FILED FOR RECORD
at 8 o'clock A M.
AUG 26 2002
DOTTIE MALEY
CLERK-COUNTY COURT SAN PATRICIO CO. TX
By _____ Deputy
Janie Franco

THE STATE OF TEXAS
COUNTY OF SAN PATRICIO
I HEREBY CERTIFY THAT THIS INSTRUMENT WAS FILED ON THE DATE AND AT THE TIME STAMPED HEREON BY ME AND WAS DULY RECORDED ... OF THE REAL PROPERTY RECORDS OF SAN PATRICIO COUNTY, TEXAS
DOTTIE MALEY
COUNTY CLERK
SAN PATRICIO
COUNTY, TEXAS
By _____ Janie Franco

Filed for Record 26th Day of ....August....... 2002 at 8:00 A M.
Compared ....4th...... Day of ....September... 2002 at 8:00 A M.
Real Property File Number ....509538....

DOTTIE MALEY, County Clerk
San Patricio County, Texas

By _____ Deputy

509538

766145

## Exhibit 2

## Redfish Bay Land

Field notes of a 52.0352 acre tract of land, being the same tract of land, called 52.0646 acres, conveyed from the Estate of Madelyn Hooper Campbell to Campbell Farms by Executor's Deed recorded in Clerk's File No. 509558 of the Real Property Records of San Patricio County, Texas;

Said 52.0352 acre tract of land being the north portion of the south half of the northwest quarter of Section 66 of the George H. Paul Company's Subdivision of the Coleman Fulton Company's Land as recorded in Volume 1, Page 32 of the Map Records of San Patricio County, Texas;

Said 52.0352 acre is comprised of a portion of the E. G. Head Survey, Abstract 155, is situated in San Patricio County, Texas; approximately 5.0 miles south of the town of Taft, and is described by metes and bounds as follows:

Beginning at a point in the centerline of F. M. Highway 893, the east line of Section 61 of said George H. Paul Company's Subdivision, and the west line of said Section 66, for the northwest corner of the south half of the northwest quarter of said Section 66 and the northwest corner of this tract;

Thence S 89° 18' 19" E along the north line of this tract, at 37.92 feet passing a cable in concrete found for a line marker, in all a distance of 2643.28 feet to a 5/8" iron rod with surveyor's cap stamped "RPLS 6493" set for the northeast corner of this tract;

Thence S 00° 45' 49" W along east line of this tract, a distance of 857.37 feet to a cable in concrete found for the southeast corner of this tract;

Thence N 89° 19' 09" W along the south line of this tract, at 2602.25 feet passing a 5/8" iron rod with surveyor's cap stamped "RPLS 6493" set for a line marker, in all a distance of 2642.25 feet to a point in the east line of said Section 61 and the west line of said Section 66, for the southwest corner of this tract;

Thence N 00° 41' 41" E along the centerline of said F. M. Highway 893, the east line of said Section 61, the west line of said Section 66, and the west line of this tract, a distance of 858.00 feet to the point of beginning, containing 52.0352 acres of land, more or less, subject to all easements of record.

Bearings are GRID, Texas Coordinate System of 1927, South Zone.

I, Major R. Joseph, Registered Professional Land Surveyor of Texas, do hereby state that this description represents an actual survey made on the ground this the 27th day of October, 2016.

Registered Professional Land Surveyor
Texas Registration No. 6493

ZKP: 24326 Tract One Legal
*A Plat was prepared in conjunction with this description.*



PLAT SHOWING SURVEY OF
52.0352 ACRES BEING THE NORTH PORTION
OF THE SOUTH HALF OF THE NORTHWEST QUARTER OF SECTION 66
OF THE GEORGE H. PAUL COMPANY'S SUBDIVISION
OF THE COLEMAN FULTON COMPANY'S LAND
VOLUME 1, PAGE 32, MAP RECORDS
SAN PATRICIO COUNTY, TEXAS
G. F. No. 16-1003P
SCALE 1" = 300 FEET

I, Major R. Joseph, Registered Professional Land Surveyor of Texas, do hereby state that the above plat represents an actual survey made on the ground, under my direction, and to the best of my knowledge and ability, this the 27th day of October, 2016.

Registered Prof. Land Surveyor
Texas Registration No. 6493

King & Petrus, Inc.
Firm No. 10127800
P. O. Box 606
Sinton, Texas 78387
Phone 361-364-2622
Fax 351-364-2841
C:\ZKP\24300\24326 Easterwood

Bearings are GRID, Texas Coordinate System of 1927, South Zone.

⊕ – Denotes a 5/8" iron rod found, unless otherwise denoted.
○ – Denotes a 5/8" iron rod with surveyor's cap stamped "RPLS 6493" set.

There may be existing pipelines not shown on map. Use the Texas One Call System to locate pipelines before performing any excavations.

The FEMA Flood Maps show that the property described here is located in Flood Zone X, an area of minimal flooding. Community Panel No. 48409 C 0425 E. Revised date: August 29, 2014.

80.15 Acres
Koch Pipeline Company
Clerk's File No. 640230
O.P.R, S.P.C., Tx.

39.4 Acres
Marilyn Flinn Freund

Section 61
George H. Paul Company's Subdivision
Coleman Fulton Company's Land

119.98 Acres
Luther Charles Flinn, Jr.

F.M. Highway 893 (80' ROW)
N00°41'41"E    858.00'

Additional 20' Easement (10.b)

50.00 Acres
Martha Jean Hilliard
Clerk's File No. 635512
O.P.R. S.P.C., Tx.
S89°18'19"E    2043.28'

Tract 1
52.0846 Acres
Campbell Farms
Cert's File No. 508538
R.P.R. S.P.C., Tx.

Tract One
52.0352 Acres
(Called 52.0846 Acres)

Section 66
George H. Paul Company's Subdivision
Coleman Fulton Company's Land
Vol. 1, Pg. 32
M.R. S.P.C., Tx.

N88°19'09"W    2042.26'

68.00 Acres
Joyce M. Tuthill

158.00 Acres
Martha Jean Hilliard
Clerk's File No. 635512
O.P.R. S.P.C., Tx.

S00°45'49"W    857.37'

E. G. Head Survey
Abstract – 155

## OWNER'S POLICY OF TITLE INSURANCE (Form T-1)

### Issued by

### ALLIANT NATIONAL TITLE INSURANCE COMPANY

### SCHEDULE B

File No.: 16-1003P                                                                 Policy No.: 1231768

### EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) that arise by reason of the terms and conditions of the leases and easements, if any, shown in Schedule A, and the following matters:

1.      ~~The following restrictive covenants of record itemized below (the Company must either insert specific recording data or delete this exception):~~

2.      Any discrepancies, conflicts, or shortages in area or boundary lines, or any encroachments or protrusions, or any overlapping of improvements.

3.      Homestead or community property or survivorship rights, if any, of any spouse of any Insured.

4.      Any titles or rights asserted by anyone, including but not limited to, persons, the public, corporations, governments or other entities,

     (a)     to tidelands, or lands comprising the shores or beds of navigable or perennial rivers and streams, lakes, bays, gulfs or oceans, or

     (b)     to lands beyond the line of the harbor or bulkhead lines as established or changed by any government, or

     (c)     to filled-in lands, or artificial islands, or

     (d)     to statutory water rights, including riparian rights, or

     (e)     to the area extending from the line of mean low tide to the line of vegetation, or the right of access to that area or easement along and across that area.

5.      Standby fees, taxes and assessments by any taxing authority for the year 2017, and subsequent years; and subsequent taxes and assessments by any taxing authority for prior years due to change in land usage or ownership, but not those taxes or assessments for prior years because of an exemption granted to a previous owner of the property under Section 11.13, Texas Tax Code, or because of improvements not assessed for a previous tax year.

6.      The following matters and all terms of the documents creating or offering evidence of the matters (The Company must insert matters or delete this exception).:

     (a)     Vendor's Lien retained in Deed dated NOVEMBER 10, 2016, executed by CAMPBELL FARMS, a Texas General Partnership, to JOE VINCENT EASTERWOOD and SHARON FLOERKE EASTERWOOD, Husband and Wife, filed for record on NOVEMBER 15, 2016 under County Clerk's File No. 661624, Official Public Records of San Patricio County, Texas, securing TEXAS FARM CREDIT SERVICES, FLCA, in the payment of one note of even date therewith in the principal sum of $217,400.00; said note being additionally secured by a Real Estate Deed of Trust (With Future Advance Clause) of even date therewith executed by JOE VINCENT EASTERWOOD a/k/a JOE EASTERWOOD and spouse, SHARON FLOERKE

EASTERWOOD, a/k/a SHARON EASTERWOOD, to MARK A. MILLER, Trustee, filed for record on NOVEMBER 15, 2016 under County Clerk's File No. 661625 of the Official Public Records of San Patricio County, Texas.

(b) Reservation of minerals described in Partition Deed dated October 1, 1973, executed by IRMA NEELY, ET AL to EACH OTHER, recorded in Volume 475, Page 312 of the Deed Records of San Patricio County, Texas, reference to which instrument is here made for all purposes. Title to said interest not checked subsequent to date of aforesaid instrument.

(c) Right-of-Way easement dated March 5, 1937, executed by Z.D. CAMPBELL, ET UX to SAN PATRICIO COUNTY, by instrument recorded in Volume 113, Page 362 of the Deed Records of San Patricio County, Texas.

(d) All leases, grants, exceptions or reservations of coal, lignite, oil, gas and other minerals, together with all rights, privileges, and immunities relating thereto, appearing in the Public Records whether listed in Schedule B or not. There may be leases, grants, exceptions or reservations of mineral interest that are not listed.

(e) Rights of parties in possession.

(f) Reservation of mineral and/or royalty interests described in Deed dated NOVEMBER 10, 2016 executed by CAMPBELL FARMS, a Texas General Partnership, to JOE VINCENT EASTERWOOD and SHARON FLOERKE EASTERWOOD, Husband and Wife, filed NOVEMBER 115, 2016 under County Clerk's File No. 661624 of the Official Public Records of San Patricio County, Texas.

(g) Waiver of ingress and egress to and from the surface of the property described in Deed dated NOVEMBER 10, 2016 executed by CAMPBELL FARMS, a Texas General Partnership, to JOE VINCENT EASTERWOOD and SHARON FLOERKE EASTERWOOD, Husband and Wife, filed NOVEMBER 115, 2016 under County Clerk's File No. 661624 of the Official Public Records of San Patricio County, Texas.

## TRACT 1 - 52.0646 ACRES SEC 66

(h) Right-of-Way easement dated February 26, 1977, executed by LUTHER L. CAMPBELL to RINCON WATER SUPPLY CORP., filed January 25, 1978 under County Clerk's File No. 266310, recorded in Volume 573, Page 499 of the Deed Records of San Patricio County, Texas.

(i) Pipeline Easement executed by JOSIE CAMPBELL, ET AL to SINCLAIR OIL & GAS CO., by instrument recorded March 4, 1964 in Volume 300, Page 398 of the Deed Records of San Patricio County, Texas.

(j) Right-of-Way easement dated March 26, 1958, executed by JOSIE CAMPBELL to GENERAL TELEPHONE COMPANY OF THE SOUTHWEST, filed April 28, 1958 under County Clerk's File No. 122685, recorded in Volume 233, Page 113 of the Deed Records of San Patricio County, Texas.

(k) Pipeline Easement dated February 27, 1950, executed by Z.D. CAMPBELL, ET UX to SINCLAIR OIL & GAS CO., by instrument recorded in Volume 163, Page 568 of the Deed Records of San Patricio County, Texas.

(l) Oil, gas and mineral lease dated March 26, 1980, executed by THELMA CAMPBELL, ET AL to DALPORT OIL CORPORATION, filed under County Clerk's File No. 288952 of the Oil & Gas Lease Records of San Patricio County, Texas, together with all subsequent instruments thereunder. Title to this lease has not been investigated subsequent to date thereof.

## TRACT 2 - 40.053 ACRES SEC 65

(m) Pipeline Easement dated July 14, 1926, executed by W.H. NELSON to HUMBLE PIPE LINE COMPANY, by instrument recorded in Volume 84, Page 372 of the Deed Records of San Patricio County, Texas.

Amended and ratified by instrument filed September 19, 1996 under County Clerk's File No. 445250, Real Property Records of San Patricio County, Texas.

(n)  Pipeline Easement dated December 15, 1928, executed by Z.D. CAMPBELL to MORAN CORPORATION OF THE SOUTH, by instrument recorded in Volume 91, Page 153 of the Deed Records of San Patricio County, Texas.

(o)  Pipeline Easement dated February 16, 1938, executed by Z.D. CAMPBELL, ET UX to REPUBLIC PIPELINE CO., by instrument recorded in Volume 115, Page 172 of the Deed Records of San Patricio County, Texas.

(p)  Pipeline Easement dated June 20, 1951, executed by Z.D. CAMPBELL, ET UX to HOUSTON NATURAL GAS CORP., by instrument recorded in Volume 171, Page 475 of the Deed Records of San Patricio County, Texas.

(q)  Pipeline Easements executed by LUTHER CAMPBELL, ET AL to CROSSTEX CCNG GATHERING, LTD., by instruments filed October 12, 2007 under County Clerk's File Nos. 573978-80, Official Public Records of San Patricio County, Texas.

(r)  Oil, gas and mineral lease dated March 14, 1973, executed by LUTHER LEE CAMPBELL, ET AL to A.L. HOTING, recorded in Volume 241, Page 318 of the Oil & Gas Lease Records of San Patricio County, Texas, together with all subsequent instruments thereunder. Title to this lease has not been investigated subsequent to date thereof

Countersigned
Northshore Title, Inc.

3) _____

**Exhibit 3**

**Harbor Island Land**

# EXHIBIT A

Field Notes of a 64.468 acre tract out of the F.C. Robertson, Survey No. 785, Abstract 2675 and Coy Burnett Survey No. 841, Abstract 2676, Nueces County, Texas. Said 64.468 acre tract being the same 64.46 acre tract described in a deed recorded in a deed recorded in Document No. 2006028103, Deed Records Nueces County, Texas. Said 64.468 acres being more particularly described as follows:

BEGINNING at a found 5/8" iron rod in the southwest right of way of Texas State Highway 361, for the north corner of said Survey No. 841, and for the north corner of this survey.

THENCE with the southwest right of way of Texas State Highway 361, South 45°50'03" East, a distance of 84.42 feet to a set 5/8" iron rod for an outside corner of this survey.

THENCE South 35°50'03" East, a distance of 6.37 feet to a found 5/8" iron rod for the north corner of the 136.77 acre J. Ray McDermott tract as described in a deed recorded I Document No. 2014012158, Deed Records Nueces County, Texas and for the upper east corner of this survey.

THENCE South 51°29'30" West, a distance of 12.88 feet to a found 5/8" iron rod for an outside corner of this survey.

THENCE South 79°51'14" West, a distance of 262.04 feet to a fence post for an outside corner of this survey.

THENCE South 83°55'55" West, a distance of 64.65 feet to a point for an outside corner of this survey.

THENCE South 86°42'28" West, a distance of 150.73 feet to a fence post for an inside corner of this survey.

THENCE South 62°36'21" West, a distance of 51.55 feet to a fence post for an outside corner of this survey.

THENCE South 70°14'03" West, a distance of 110.81 feet to a fence post for an outside corner of this survey.

THENCE South 75°54'34" West, a distance of 210.46 feet to a fence post for an outside corner of this survey.

THENCE South 77°47'46" West, a distance of 787.18 feet to a found 5/8" iron rod for an inside corner of this survey.

THENCE South 63°06'46" West, a distance of 134.44 feet to a found 5/8" iron rod for an inside corner of this survey.

THENCE South 47°43'31" West, a distance of 140.07 feet to a found 5/8" iron rod for an outside corner of this survey.

THENCE South 67°24'37" West, a distance of 947.18 feet to a set 5/8" iron rod for an inside corner of this survey.



THENCE South 35°30'54" West, a distance of 49.29 feet to a found 5/8" iron rod for an inside corner of this survey.

THENCE South 11°52'59" West, a distance of 67.45 feet to a found 5/8" iron rod for an inside corner of this survey.

THENCE South 18°02'14" East, a distance of 49.01 feet to a point for an inside corner of this survey.

THENCE South 45°34'57" East, at a distance of 1695.19 feet pass a drill hole set on a concrete bulkhead as an offset, and in all a total distance of 3578.24 feet to a point for the lower east corner of this survey.

THENCE South 77°47'23" West, a distance of 838.21 feet to a point for the south corner of this survey.

THENCE South 45°34'57" West, at a distance of 1262.05 feet pass a found 5/8" iron rod as an offset and in all a total distance of 3611.44 feet to a set 5/8" iron rod for the west corner of this survey.

THENCE North 67°26'49" East, a distance of 1815.47 feet to a fence post for an inside corner of this survey.

THENCE North 45°43'11" West, a distance of 168.61 feet to a point for an outside corner of this survey.

THENCE North 77°45'29" East, a distance of 2000.00 feet to the **POINT OF BEGINNING** of this survey, and containing 64.468 acres of land, more or less.

Notes:
1.) Bearings are based on Global Positioning System NAD 83 (93) 4205 Datum.
2.) A Map of equal date accompanies this Metes and Bounds description.
3.) Set 5/8" iron rod = iron rod set with yellow plastic cap labeled Brister Surveying.

I, Ronald E. Brister do hereby certify that this survey of the property legally described herein was made on the ground this day December 17, 2015 and is correct to the best of my knowledge and belief.

Ronald E. Brister

Ronald E. Brister, RPLS No. 5407
Date: December 18, 2015.



Job No. 151730





EXHIBIT "A"
Page 4 of 4



EXHIBIT "B"

# EXHIBIT "C"

## GROUND LEASE AGREEMENT

### BASIC LEASE TERMS AND DEFINITIONS

Date:  September 1, 2017                         *Seven Seas Lease*

Landlord:  ERF PORT ARANSAS, INC.
A Texas nonprofit corporation

Landlord's Address:

555 N. Carancahua, Suite 700
Corpus Christi, Texas 78401

Tenant:  SEVEN SEAS WATER CORPORATION

Tenant's Address:

14400 Carlson Circle
Tampa, Florida 33626

Premises:  The Premises include the following:

Land.
That 10 acre tract, more or less, described on EXHIBIT "A" hereto attached, being a portion of that 64.468 acre tract conveyed by Wood Group PSN, Inc., as Grantor, to ERF Port Aransas, Inc. in that Special Warranty Deed dated January 22, 2016, recorded at Document No. 2016002915 of the Official Public Records of Nueces County, Texas (the "Land").

Roadway Easement.
A non-exclusive easement for vehicular and pedestrian ingress and egress between State Highway 361 and the Premises, and for underground utilities, described on EXHIBIT "A" hereto attached (the "Roadway Easement").

Intake Easement.
A non-exclusive easement for one pipeline and conduits for power and control wiring and lift station for withdrawing water from Corpus Christi Ship Channel and transporting the water to the Land portion of the Premises, including a 50' X 75' lift station site adjacent the bulkhead as shown, such being described and shown on EXHIBIT "B" hereto attached (the "Intake Easement"). A portion of the Intake Easement is submerged and any pipeline extending into the water from the bulkhead must follow the bulkhead downward (in close proximity thereto) until it reaches the upper surface of the submerged land, and shall then extend from the bulkhead and substantially perpendicular thereto along the surface of the submerged land within Intake Easement boundaries. The lower side of the pipeline shall not be above the surface of the submerged land as it extends from the bulkhead. Poles, buoys or other devices readily visible from the surface must mark the

# EXHIBIT "C"

path of the submerged pipeline. The Intake Basement may also be used as a roadway for vehicles, vessels equipment and pedestrian traffic between the Premises and the lift station site, and to install, maintain, repair and replace the pipeline in the Intake Basement.

Discharge Basement.

A non-exclusive easement for one pipeline and conduits for power and control wiring for discharge of waste water from the Premises into the Corpus Christi Ship Channel, such being shown and described on EXHIBIT "B" hereto attached (the "Discharge Basement"). A portion of the Discharge Basement is submerged. The portion of the pipeline for the Discharge Basement which extends into the water from the bulkhead shall follow the bulkhead and upper surface of the submerged land just as the pipeline for the Intake Basement. Poles, buoys or other devises readily visible from the surface must mark the path of the submerged pipeline. The Discharge Basement may also be used for vehicles, vessels, equipment and pedestrian traffic to install, maintain, repair and replace the pipeline in the Discharge Basement.

IF, during the permitting period, the relevant State and/or local authorities determine that a pilot plant is necessary, the Tenant shall have access to the 50' x 50' area in the south-west corner of the tract on the waterfront and the discharge easement for the period of time necessary to install and operate the pilot for the purposes of obtaining the necessary permit(s).

Seven Seas Lease



# EXHIBIT "C"

Seven Seas
Lease
Ex. A

EXHIBIT "C"

Seven Seas
Lease
Ex A

EXHIBIT "A"
Page 2 of 2



EXHIBIT "C"

Seven Seas
Lease
Ex B

EXHIBIT "D"

SPOIL DISPOSAL AREA ON McDERMOTT TRACT

ROBERTSON, F.C.
SURVEY # 715

HARBOR ISLAND
A-3575
SURVEY # 541

HUMBLE OIL & REF. CO.
A-2074
SURVEY # 606

PRELIMINARY

CANYON OFFSHORE

FRONTIER

**Exhibit 4**

**Harbor Island Lease**

# COMMERCIAL GROUND LEASE AGREEMENT

## BASIC LEASE TERMS AND DEFINITIONS

Date: **August 7**, 2018

Landlord: ERF PORT ARANSAS, INC.
A Texas nonprofit corporation

Landlord's Address:

> 555 N. Carancahua, Suite 700
> Corpus Christi, Texas 78401

Tenant: CANADA PROJECTS HOLDING, INC.

Tenant's Address:

> 5005 Riverway Drive, Ste. 400
> Houston, Texas 77056

Premises: That 64.468 acre tract (sometimes called the "Wood Group Tract") on Harbor Island, Nueces County, Texas described on EXHIBIT "A" hereto attached;

SAVE AND EXCEPT THEREFROM a 10-acre tract leased to Seven Seas Water Corporation ("Seven Seas") as shown on EXHIBIT "B" hereto attached. Portions of the Lease to Seven Seas are attached hereto as EXHIBIT "C".

Rent: The sum of the following

    (a)   Base Rent. For the first five (5) years of this Lease, the Base Rent shall be $70,000.00 per month. For the second five years of this Lease, the monthly Base Rent shall be the greater of (i) $78,000.00, or (ii) $70,000.00 multiplied by a fraction, the numerator of which is the Producer Price Index for "Ship Building and Repair" issued by the Bureau of Labor Statistics of the Unites States Department of Labor (the "PPI") for December 2022, and the denominator is the PPI for December 2018. The Base Rent shall be payable in advance on the first day of each month commencing on the Commencement Date.

    (b)   Taxes. As additional rent, Tenant will reimburse Landlord for Taxes on the Premises during the term of this Lease as set forth below.

    (c)   Wharfage & Dockage Rent. As additional Wharfage & Dockage Rent the Tenant shall pay to Landlord the amount by which one-half (1/2) of the standard wharfage and dockage fees for each month would have exceeded the then applicable Base Rent. By the term "standard wharfage and dockage fees" is meant those wharfage fees and dockage fees that would have been paid to the Port of Corpus Christi during such particular month if the Port of Corpus Christi had jurisdiction over the Premises and were able to charge wharfage and/or dockage fees. The wharfage and dockage fees utilized to calculate the additional rent

hereunder shall be those standard wharfage and dockage fees (and not any "special" wharfage and dockage fees) promulgated from time to time by the Port of Corpus Christi for properties subject to its jurisdiction. Within 20 days after the end of each month, the Tenant shall furnish Landlord with the volumes and tonnages for the Premises during the previous month on which such standard wharfage and dockage fees would be based, accompanied by a payment of the additional rent with respect thereto.

Term: Commencing on the date hereof, 2018 (the "Commencement Date") and terminating on July 31, 2028 (the "Termination Date").

Buildout: Landlord and Tenant agree that all buildout is to be the obligation of Tenant, and Landlord shall not be required to do any buildout. Tenant accepts the Premises in AS IS condition.

Guarantors: None.

Security Deposit: None

Use: The Premises may be used ONLY for transloading of bulk products. No other uses or services shall be allowed on the Premises.

Amount of Liability Insurance

Death/Bodily Injury: $10,000,000.00

Property: $1,000,000.00

"Rent" means Base Rent plus any other sums of money due Landlord by Tenant.

"Taxes" means all ad valorem taxes and assessments on the Premises.

"Landlord" means Landlord and its agents, employees, invitees, licensees, or visitors.

"Tenant" means Tenant and its agents, employees, invitees, licensees.

"Lease Year" means the one year period commencing on August 1st of each calendar year and terminating on July 31st of the following calendar year.

## LEASE CLAUSES AND COVENANTS

A. Tenant agrees to—

1. Lease the Premises for the entire term beginning on the Commencement Date and ending on the Termination Date.

2. Obey all laws, ordinances, orders, and rules and regulations applicable to the use, condition and occupancy of the Premises.

3. Pay monthly, in advance, on the first day of each calendar month, the Base Rent to Landlord at Landlord's address.

-2-

4. Reimburse Landlord for all Taxes due on the Premises accruing during the term of this Lease. All Taxes due for the calendar year in which this Lease commences or terminates shall be prorated. Either party hereto shall have the right at its sole expense to dispute and contest any Taxes. The Landlord shall furnish to Tenant a copy of all Notices of Appraised Value from the Nueces County Appraisal District and such other correspondence regarding and valorem taxes immediately upon receipt.

Prior to the end of each calendar year the Landlord shall furnish to Tenant a copy of the Taxes assessed and due for such calendar year, and Tenant shall pay such amount (or prorated portion for the first and final years) by the January 15th following such calendar year.

5. Pay, as additional rent, all other sums due under this Lease.

6. Pay a late charge of five (5) percent of any Rent not received by Landlord by the tenth day after it is due.

7. Obtain and pay for all utility connections and utility services to the Premises desired by Tenant.

8. Allow Landlord to enter the Premises to perform Landlord's obligations, inspect the Premises, and show the Premises to prospective purchasers or tenants during regular business hours and upon at least 36 hours prior notice to Tenant.

9. Make and accomplish such repairs, replacements and maintenance of the Premises and improvements thereon as desired by Tenant; however Tenant is in any event required to maintain wharves, bulkheads and piers as set forth below. Landlord is not responsible for repair or replacement of any part of the Premises, or improvements thereon, whatsoever and regardless of the cause of damage or disrepair.

10. Tenant will provide all janitorial service and garbage disposal.

11. Maintain public liability insurance for the Premises and the conduct of Tenant's business, naming Landlord as an additional insured, in the amounts stated in the Basic Lease Terms And Definitions.

12. Maintain such insurance as desired and selected by Tenant for damage by fire, windstorm and other casualty to improvements now or hereafter constructed on the Premises and/or Tenant's property on the Premises. All proceeds of such insurance shall be the property of Tenant. Tenant shall not be required to carry any fire, windstorm and casualty insurance if it so desires.

13. Deliver certificates of insurance for liability insurance to Landlord before the commencement date and thereafter when insurance is renewed.

14. INDEMNIFY, DEFEND, AND HOLD LANDLORD HARMLESS FROM ANY LOSS, ATTORNEY'S FEES, EXPENSES, OR CLAIMS ARISING OUT OF USE OF THE PREMISES CAUSED BY ANY ACT OR OMISSION OF TENANT OR TENANT'S EMPLOYEES, AGENTS, INVITEES OR VISITORS OR ANY PARTY CONTRACTING WITH TENANT WITH RELATION TO THE PREMISES.

15. At termination of this Lease, as it may be extended, the Premises shall be left in a clean condition, and Tenant shall remove from the Premises all loose metal, junk, refuse, waste, containers, dilapidated structures and piles of soil, gravel, minerals and the like. This includes the submerged portion of the Premises.

16. Without limiting any other provisions herein and in addition to any other provisions herein, Tenant shall maintain the wharves, bulkheads and piers on and serving the Premises, and the roadway from State

- 3 -

Highway 361, and shall return the Premises in all respects suitable for its intended use as existed at the commencement of the Lease including any replacements that may be needed from time to time.

17. Vacate the Premises on termination of this lease.

**B.** Tenant agrees not to—

1. Use the Premises for any purpose other than that stated in the Basic Lease Terms And Definitions.

2. Allow a lien to be placed on the Premises unless such lien is approved in writing by Landlord.

3. Assign this lease or sublease any portion of the Premises without Landlord's written consent, which consent shall not be unreasonably withheld. No assignment or sublease will release or relieve Tenant from its liability and obligations hereunder unless specifically agreed to in writing by Landlord.

**C.** Landlord agrees to—

1. Lease to Tenant the Premises for the entire term beginning on the Commencement Date and ending on the Termination Date.

2. Warrant Tenant's right of occupancy and quiet enjoyment of the premises as of the effective date of this Lease.

**D.** Landlord agrees not to—

Interfere with Tenant's possession of the Premises as long as Tenant is not in default.

**E.** Landlord and Tenant agree to the following:

1. **Improvements.** At the sole expense of Tenant, Tenants shall have the right during the term of this Lease (and any extensions hereof) to construct any lawful improvements to the Premises that Tenant may desire, and to make such alterations, deletions, removals, additions and changes to the Premises and improvements thereon as Tenant desires. Provided no bulkheads, wharves or piers shall be removed unless replaced with like or better replacements. Further provided, that within the three years prior to the termination of the Lease (as it may be extended), the Tenant shall not intentionally destroy or remove any building, street or parking area improvements without Landlord's permission, such permission will not be unreasonably withheld. Upon termination of this Lease the Tenant may remove its equipment and trade fixtures from the Premises, including any equipment and trade fixtures which may be attached to but are not a part of the HVAC, plumbing and electrical systems on the Premises. Tenant shall not remove equipment serving or a part of the HVAC, plumbing and electrical systems on the Premises. Tenant shall in any event remove any underground storage tanks placed on the Premises during the term of this Lease and any extension thereof, and obtain certificates from applicable and governing governmental agencies that the underground tank site is free of contamination.

2. **Use of Spoil Disposal Area.** The Landlord owns a Spoil Disposal Area on the westerly portion of Landlord's adjacent 219.00 acre tract (known as the McDermott Tract) shown on EXHIBIT "D" hereto attached. Landlord has reserved the Spoil Disposal Area for disposal of spoil from dredging operations on properties owned by Landlord, and for disposal from other sites and for other uses as may be desired by Landlord. In the event the Tenant conducts dredging operations on the submerged portion of the Premises, then Tenant shall be allowed to dispose of and place the spoil from such dredging on the Spoil Disposal, to

-4-



be placed at such locations directed by Landlord. Tenant shall have access to and easement over and across the Spoil Disposal Area for pipes, machinery and vehicles necessary for the spoil disposal operations.

3. **Abatement.** Tenant's covenant to pay Rent and Landlord's covenants are independent of each other. Except as otherwise provided, Tenant shall not be entitled to abate Rent for any reason.

4. **Release of Claims/Subrogation.** Landlord and Tenant release each other from any claim, by subrogation or otherwise, for any damage to the Premises, by reason of fire, windstorm, flooding or the elements, regardless of cause, including negligence of Landlord or Tenant. This release applies only to the extent that it is permitted by law, the damage is covered by insurance proceeds, and the release does not adversely affect any insurance coverage.

5. **Notice to Insurance Companies.** Landlord and Tenant will notify the issuing insurance companies of the release set forth in the preceding paragraph and will have the insurance policies endorsed, if necessary, to prevent invalidation of the insurance coverage.

6. **Condemnation/Substantial or Partial Taking.** (a) If the Premises cannot be used for the purposes contemplated by this lease because of condemnation or purchase in lieu of condemnation, this lease will terminate. (b) Whether or not any portion of the Premises is taken by condemnation or purchase in lieu of condemnation, Landlord or Tenant may elect to terminate this lease if 75 percent or more of the common area is taken. (c) If there is a condemnation or purchase in lieu of condemnation and this Lease is not terminated, the rent payable during the unexpired portion of the term will be adjusted as may be fair and reasonable. (d) Tenant will have no claim to the condemnation award or proceeds associated with the underlying raw land including improvements existing on the property upon the commencement of this lease in lieu of condemnation. Claims for business loss damages and improvements installed by Tenant shall remain the property of the Tenant. Each of Landlord and Tenant, at its own expense, must prosecute any claim against the condemning authority for damages it may suffer. Neither Landlord nor Tenant shall have any rights in any award made to the other by any condemning authority.

7. **Default by Landlord/Events.** Defaults by Landlord is failing to comply with any provision of this Lease within thirty days after written notice.

8. **Default by Landlord/Tenant's Remedies.** Tenant's remedies for Landlord's default are to (a) sue for damages and (b) if Landlord does not comply with any provision of this lease for thirty days after default, terminate this Lease.

9. **Default by Tenant/Events.** Defaults by Tenant are (a) failing to pay timely rent within five days after it is due, or (b) failing to comply within thirty days after written notice with any provision of this Lease other than the default set forth in (a) above.

10. **Default by Tenant/Landlord's Remedies.** Landlord's remedies for Tenant's default are to (a) enter and take possession of the Premises, after which Landlord may relet the Premises on behalf of Tenant and receive the rent directly by reason of the reletting, and Tenant agrees to reimburse Landlord for any reasonable and necessary expenditures made in order to relet; (b) enter the Premises and perform Tenant's obligations; or (c) terminate this lease by written notice and sue for damages. Landlord may enter and take possession of the Premises by self-help, by or changing locks if necessary, and may lock out Tenant or any other person who may be occupying the Premises, until the default is cured, without being liable for damages.

11. **Default/Waiver/Mitigation.** It is not a waiver of default if the nondefaulting party fails to declare immediately a default or delays in taking any action. Pursuit of any remedies set forth in this lease does not preclude pursuit of other remedies in this lease or provided by law. Landlord and Tenant have a duty to mitigate damages.

- 5 -



12. **Holdover.** If Tenant does not vacate the Premises following termination of this lease, Tenant shall be a tenant at will and sufferance of the Landlord, and shall vacate the Premises on receipt of notice from Landlord. No holding over by Tenant, whether with or without the consent of Landlord, will extend the term.

13. **Alternative Dispute Resolution.** Landlord and Tenant shall submit in good faith to mediation before filing a suit for damages.

14. **Attorney's Fees.** If either party retains an attorney to enforce this lease, the prevailing party is entitled to recover reasonable attorney's fees.

15. **Venue.** Venue is in the county in which the Premises are located.

16. **Entire Agreement.** *This Lease, together with the attached exhibits and riders, is the entire agreement of the parties, and there are no oral representations, warranties, agreements, or promises pertaining to this lease or to the expressly mentioned exhibits and riders not incorporated in writing in this lease.*

17. **Amendment of Lease.** *This lease may be amended only by an instrument in writing signed by Landlord and Tenant.*

18. **Limitation of Warranties.** *There are no implied warranties of merchantability, of fitness for a particular purpose, or of any other kind arising out of this lease, and there are no warranties that extend beyond those expressly stated in this lease.*

19. **Notices.** Any notice required by this lease shall be deemed to be delivered (whether or not actually received) when deposited with the United States Postal Service, postage prepaid, certified mail, return receipt requested, and addressed to Landlord or Tenant at their addresses.

20. **Abandoned Property.** Landlord may retain, destroy, or dispose of any property left on the Premises at the end of the term upon thirty (30) days' written notice to Tenant, unless otherwise agreed between Landlord and Tenant in writing.

21. **Attornment.** In the event Landlord encumbers its interest in the Premises as security for any bona fide debt, or in the event any proceedings are brought for the foreclosure of any such mortgage, deed of trust or other lien, or in the event Landlord conveys the Premises, the rights of Tenant, its successors and assigns, shall expressly survive. This Lease shall in all respects continue in full force and effect, and Tenant shall attorn to the purchaser upon foreclosure sale or sale under power of sale, and shall recognize such purchaser as Landlord under this Lease and, so long as Tenant, its successors and assigns, are not in default hereunder, any such event shall not terminate this Lease or otherwise affect Tenant's rights hereunder. Landlord agrees to cause the holder of any existing recorded mortgage or deed of trust lien to execute a non-disturbance and attornment agreement with Tenant to the effect that this Lease shall survive any foreclosure. The form and content of such non-disturbance and attornment agreement must be approved by and be acceptable to Tenant.

22. **Condition of Premises.** (a). Notwithstanding anything in this Lease to the contrary, Landlord makes no representation as to the physical condition of the Premises or its suitability for any particular purpose, and the Premises are leased AS IS, WHERE IS, IN ITS PRESENT CONDITIONS WITHOUT ANY WARRANTY OF THE SURFACE OR SUB-SURFACE CONDITIONS EXISTING ON THE PREMISES FOR ANY PARTICULAR PURPOSE. Landlord makes no representations or warranties, expressed or implied, with respect to the environmental conditions of the Premises and the surrounding property.



(b). Tenant acknowledges and agrees that Landlord has not made, and Landlord specifically disclaims any representations, warranties, promises, covenants, agreements or guarantees of any kind or character whatsoever, whether express or implied, oral or written, past, present or future, of, as to, concerning or with respect to: (1) the nature, quality or condition of the Premises, including without limitation, the water, soil and geology; (ii) the income to be derived from the Premises; (iii) the suitability of the Premises for any and all activities and uses which Tenant may conduct thereon; (iv) the compliance of or by the Premises or its operation with any laws, rules, ordinances or regulations, of any applicable governmental authority or body; (v) the habitability, merchantability or fitness for a particular purpose of the Premises. Tenant acknowledges and agrees that Landlord has not made nor given any representations regarding: (i) solid waste, as defined by the Texas Solid Waste Disposal Act and the regulations adopted thereunder; (ii) the disposal of or existence of in or on the Premises, of any Hazardous Substance. Hazardous Substance shall mean any substance which (at any time) shall be listed as "hazardous" or "toxic" in the regulations implementing the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C. §§9601 et seq., the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§6901 et seq., or which has been or shall be determined at any time by any agency or court to be a hazardous or toxic substance regulated under Applicable Law. The term "Hazardous Substance" shall also include, without limitation, raw materials, building components, the products of any manufacturing or other activities on the subject Premises, wastes, petroleum, and source, special nuclear or by-product material as defined by the Atomic Energy Act of 1954, as amended (42 U.S.C. §§3011, et seq., as amended).

(c). Tenant further acknowledges and agrees that Tenant or Tenant's agents have inspected the Premises and are relying on investigation of the Premises by Tenant or Tenant's agents and not on any reports or information provided or to be provided by Landlord. Tenant acknowledges and agrees that any reports or information provided or to be provided with respect to the Premises was obtained from a variety of sources and that Landlord has not made any independent investigation or verification of such information and makes no representations as to the accuracy or completeness of such information.

(d). TENANT RELEASES THE LANDLORD AND ITS SUCCESSORS, FROM ANY CLAIMS TENANT MAY HAVE AGAINST THE LANDLORD NOW OR IN THE FUTURE UNDER THE COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION, AND LIABILITY ACT, 42 U.S.C.§§ 9601 ET SEQ. AS AMENDED; THE RESOURCE CONSERVATION AND RECOVERY ACT, 42 U.S.C. §§ 6901 ET SEQ. AS AMENDED; THE TEXAS SOLID WASTE DISPOSAL ACT, TEX. HEALTH & SAFETY CODE CHAPTER 361 AS AMENDED; AND OTHER ANALOGOUS STATE OR FEDERAL STATUTE; AND COMMON LAW ARISING FROM THE ENVIRONMENTAL CONDITIONS OF THE PREMISES OR THE PRESENCE OF HAZARDOUS SUBSTANCES, SOLID WASTES, OR ANY OTHER POLLUTANTS OR CONTAMINANTS ON THE PREMISES.

(e). TENANT SHALL INDEMNIFY AND HOLD THE LANDLORD AND ITS SUCCESSORS, HARMLESS FROM ANY CLAIMS ARISING FROM THE PRESENCE OF HAZARDOUS SUBSTANCES, SOLID WASTES OR ANY OTHER POLLUTANTS OR CONTAMINANTS INTRODUCED ONTO THE PREMISES BY TENANT DURING THE TERM OF THIS LEASE, INCLUDING ANY EXTENSIONS THEREOF. TENANT SHALL BE RESPONSIBLE FOR REMOVAL FROM THE PREMISES OF ANY HAZARDOUS SUBSTANCES SOLID WASTES OR ANY OTHER POLLUTANTS OR CONTAINMENTS INTRODUCED BY TENANT ONTO THE PREMISES DURING THE TERM HEREOF, INCLUDING ANY EXTENSIONS HEREOF.

23. **Option to Renew.** Provided Tenant is not then in default hereunder, Tenant shall have the option to extend this Lease for three (3) renewal terms of ten (10) years each. All terms and conditions for a renewal term shall be the same as during the initial term except as follows:

(a) The monthly Base Rent for each five years of a particular renewal term shall be the greater of: (i) $78,000.00; or (ii) $70,000.00 multiplied by a fraction, the numerator of which is the Producer Price Index for "Ship Building and Repair" issued by the Bureau of Labor Statistics of the United States Department of Labor (the "PPI") for the December prior to commencement of that particular five-year term, and the denominator of which is the PPI for December 2018.

(b) During each renewal term the Tenant shall also continue to pay Taxes as additional rent as during the initial term.

(c) During each renewal term the Tenant shall also pay monthly Wharfage & Dockage Rent as additional rent as during the initial term.

(d) At the beginning of each renewal term the Amount of Liability Insurance shall be increased over and above the amounts set forth in the basic lease terms and definition for any percentage increases in the PPI since December 2018 as compared to the PPI for the second month prior to the commencement of the renewal term. The Amount of Liability Insurance shall however never be less than the amounts set forth in the basic lease terms and definitions.

To exercise its option to renew, Tenant must deliver written notice to Landlord at least twelve (12) months prior to the end of the term then in effect.

24. Right of Refusal on McDermott Tract Lease.

a. The Landlord is presently leasing Landlord's adjacent 219.00 acre McDermott Tract (save and except the Spoil Disposal Area) to Gulf Copper & Manufacturing Corp. pursuant to a Commercial Ground Lease Agreement dated June 27, 2016 (the "Gulf Copper Lease"). Tenant acknowledges that it has received a copy of the signed Gulf Copper Lease. If the Gulf Copper Lease terminates during the Refusal Period commencing on the date hereof and ending on December 31, 2021, then the Tenant hereunder shall be entitled to lease the McDermott Tract (save and except the Spoil Disposal Area) on the same terms and conditions and rents then existing and in effect under the Gulf Copper Lease (if it were then still in force and effect). Thus, in effect, Tenant would be assuming the position of Gulf Copper under its Lease as if it were then in force and effect, and be liable for all obligations thereafter arising under the Gulf Copper Lease and entitled to all of the rights and privileges of a lessee under the Gulf Copper Lease. Thus, for example, if Tenant leased the McDermott Tract (save and except the Spoil Disposal Area) at a time which would be the beginning of the third lease year of the Gulf Copper Lease, then Tenant would have seven years remaining on the initial term and the rights of renewal provided in the Gulf Copper Lease, at the rental in effect at the beginning of the third lease year.

b. Upon any termination of the Gulf Copper Lease during the Refusal Period, Landlord shall deliver to Tenant a notice of the termination and inform Tenant of its right herein granted to lease the McDermott Property (save and except the Soil Disposal Area). Within the thirty (30) days following actual delivery of the notice to Tenant (even if such 30 days ends after the termination of the Refusal Period), the Tenant shall have the right to exercise its option to lease by actual delivery to Landlord within the 30 days of a written notice that Tenant elects to exercise its option. If so, the lease to Tenant of the McDermott Tract (save and except the Soil Disposal Area), shall commence on the date the notice is delivered to the Landlord. The Landlord and Tenant will then execute formal documents as to the leasing to Tenant.

c. This agreement and the option to lease herein granted is personal to Tenant and cannot be assigned. This agreement and the option to lease will also terminate if this Lease terminates. Further provided, the Tenant shall not have the option to lease at any time the Tenant is in default under this Lease.

25. Right of First Refusal to Purchase McDermott Tract.

    a. In the event Landlord proposes or agrees to sell or convey the McDermott Tract or any part thereof or interest therein to a third party, then the contract (herein called the "third party contract") pertaining thereto shall be expressly subject to Tenant's prior right to purchase the McDermott Tract or the portion thereof or interest therein proposed to be sold.

    b. Landlord shall give prompt written notice to Tenant of a proposed sale or conveyance which is subject to the terms of this agreement, and shall furnish Tenant a complete copy and/or disclosure of the proposed third party contract of sale. The notice by Landlord to Tenant shall also specify the street address of a title company in Corpus Christi, Texas, wherein Tenant's written response and election to purchase may be delivered. Tenant shall have the option and privilege to purchase the McDermott Tract or the portion thereof or interest therein proposed to be sold to a third party at the price, consideration and terms specified in the third party contract, and Tenant must within fifteen (15) days of the giving of written notice by Landlord deliver to said title company Tenant's exercise of the option to purchase. If Tenant elects to purchase the McDermott Tract or the portion thereof or interest therein upon the terms set forth in the third party contract, then Landlord and Tenant shall execute a sales contract upon the same terms provided in the third party contract and providing a closing on the same date as specified in the third party contract. If within the fifteen (15) days Tenant fails to actually deliver to the title company Tenant's election to purchase, or if Tenant elects in writing not to exercise the option to purchase, then Landlord may convey the McDermott Tract or the portion thereof or interest therein proposed to be sold under the terms of the third party contract (including any assignee thereof); and at closing of the third party contract Tenant shall execute and deliver to Landlord a release of such option as to the McDermott Tract being sold in recordable form. Provided, if Tenant fails or refuses to provide a release then the affidavit of Landlord as to Tenant's failure to exercise their option after the giving of notice as required herein shall be sufficient.

    c. If for any reason Landlord does not sell or convey the McDermott Tract or a portion thereof or interest therein to the third party under the terms of the third party contract, then the purchase option shall remain in force and effect as to the McDermott Tract or the portion thereof or interest therein covered by the third party contract, and notice of any subsequent third party contract by Landlord to sell the McDermott Tract or any portion thereof or interest therein shall again be given to Tenant in the manner herein provided. However once the McDermott Tract or the portion thereof or interest therein is sold to a third party purchaser under a third party contract of which Tenant was given notice and did not elect to exercise its option pursuant hereto, then this right of first refusal shall forever terminate as to the McDermott Tract or the portion thereof or interest therein so sold to the third party.

    d. The term of this right of first refusal to purchase shall be for a Refusal Period beginning on the date hereof and ending on December 31, 2021. The right of first refusal herein contained shall not apply to contracts for sale of the McDermott Tract entered into after December 31, 2021.

    e. This agreement and the option herein granted is personal to Tenant and cannot be assigned. This agreement will also terminate if this Lease terminates. Further provided, the Tenant shall not have a right of first refusal to purchase at any time the Tenant is in default under this Lease.

26. Subject To Easements. The Premises, and Tenant's rights under this Lease, are subject to the rights of Seven Seas under its lease of the 10 acres, and subject to an access easement for the Port of Corpus Christi. As depicted on EXHIBIT "B", Seven Seas has the following rights and easements appurtenant to its lease of the 10 acres (to which this lease of the Premises is subject):

    a. Non-exclusive Roadway Easement for vehicular and pedestrian ingress and egress between State Highway 361 and the 10 acres and underground utilities for the 10 acres and along the north boundary of the Wood Group Tract;



b. Non-exclusive Intake Easement for a pipeline and wiring along the north boundary of the Wood Group Tract and extending into the submerged areas of the Wood Group Tract as shown on EXHIBIT "B";

c. Non-exclusive Discharge Easement for a pipeline and wiring along the south boundary of the Wood Group Tract and extending into the submerged areas of the Wood Group Tract as shown on EXHIBIT "B";

d. Exclusive easement for a Lift Station Site on a 50'x75' area adjacent to the north end of the bulkhead on the Wood Group Tract as shown on EXHIBIT "B".

Attached hereto as EXHIBIT "C" are portions of the Lease to Seven Seas of the 10 acres, and which portions of the Lease more specifically define the rights and easements of Seven Seas. The rights of Seven Seas to the Intake Easement, the Discharge Easement and the Lift Station Site shall be superior to Tenant's rights, and Tenant shall not interfere with the rights of Seven Seas under its Lease. Tenant shall not construct any buildings on, nor park or store any vehicles, boats or other vessels, or any materials, on the above four areas.

The Port of Corpus Christi has a non-exclusive roadway access easement recorded at Document No. 2001047627 of the Official Records of Nueces County to provide access to lands south of and adjacent to the Wood Group Tract. This access easement is for the roadway from State Highway 361 and on the 100 feet wide strip along the westerly boundary of the Wood Group Tract (between the west boundary of the 10 acres leased to Seven Seas and the west boundary of the Wood Group Tract). Tenant shall not construct any buildings on, nor park or store any vehicles, boats or other vessels, or any materials, on the Port's access easement or in the 100 feet wide strip between the 10 acres and the west boundary of the Wood Group Tract.

LANDLORD:                                      TENANT:

ERF PORT ARANSAS, INC.                         CANADA PROJECTS HOLDING, INC.

By: _Paul D Altheide_                          By: _A. Lawrence Berry   Dennis B. Berry_
Paul Altheide                                  A. Lawrence Berry
Chief Executive Officer                        Vice President

# EXHIBIT A

Field Notes of a 64.468 acre tract out of the F.C. Robertson, Survey No. 785, Abstract 2675 and Coy Burnett Survey No. 841, Abstract 2676, Nueces County, Texas. Said 64.468 acre tract being the same 64.46 acre tract described in a deed recorded in a deed recorded in Document No. 2006028103, Deed Records Nueces County, Texas. Said 64.468 acres being more particularly described as follows:

BEGINNING at a found 5/8" iron rod in the southwest right of way of Texas State Highway 361, for the north corner of said Survey No. 841, and for the north corner of this survey.

THENCE, with the southwest right of way of Texas State Highway 361, South 45°50'03" East, a distance of 84.42 feet to a set 5/8" iron rod for an outside corner of this survey.

THENCE South 35°50'03" East, a distance of 6.37 feet to a found 5/8" iron rod for the north corner of the 136.77 acre J. Ray McDermott tract as described in a deed recorded I Document No. 2014012158, Deed Records Nueces County, Texas and for the upper east corner of this survey.

THENCE South 51°29'30" West, a distance of 12.88 feet to a found 5/8" iron rod for an outside corner of this survey.

THENCE South 79°51'14" West, a distance of 262.04 feet to a fence post for an outside corner of this survey.

THENCE South 83°55'55" West, a distance of 64.65 feet to a point for an outside corner of this survey.

THENCE South 86°42'28" West, a distance of 150.73 feet to a fence post for an inside corner of this survey.

THENCE South 62°36'21" West, a distance of 51.55 feet to a fence post for an outside corner of this survey.

THENCE South 70°14'03" West, a distance of 110.81 feet to a fence post for an outside corner of this survey.

THENCE South 75°54'34" West, a distance of 210.46 feet to a fence post for an outside corner of this survey.

THENCE South 77°47'46" West, a distance of 787.18 feet to a found 5/8" iron rod for an inside corner of this survey.

THENCE South 63°06'46" West, a distance of 134.44 feet to a found 5/8" iron rod for an inside corner of this survey.

THENCE South 47°43'31" West, a distance of 140.07 feet to a found 5/8" iron rod for an outside corner of this survey.

THENCE South 67°24'37" West, a distance of 947.18 feet to a set 5/8" iron rod for an inside corner of this survey.



THENCE South 35°30'54" West, a distance of 49.29 feet to a found 5/8" iron rod for an inside corner of this survey.

THENCE South 11°52'59" West, a distance of 67.45 feet to a found 5/8" iron rod for an inside corner of this survey.

THENCE South 18°02'14" East, a distance of 49.01 feet to a point for an inside corner of this survey.

THENCE South 45°34'57" East, at a distance of 1695.19 feet pass a drill hole set on a concrete bulkhead as an offset, and in all a total distance of 3578.24 feet to a point for the lower east corner of this survey.

THENCE South 77°47'23" West, a distance of 838.21 feet to a point for the south corner of this survey.

THENCE South 45°34'57" West, at a distance of 1262.05 feet pass a found 5/8" iron rod as an offset and in all a total distance of 3611.44 feet to a set 5/8" iron rod for the west corner of this survey.

THENCE North 67°26'49" East, a distance of 1815.47 feet to a fence post for an inside corner of this survey.

THENCE North 45°43'11" West, a distance of 168.61 feet to a point for an outside corner of this survey.

THENCE North 77°45'29" East, a distance of 2000.00 feet to the **POINT OF BEGINNING** of this survey, and containing 64.468 acres of land, more or less.

Notes:
1.) Bearings are based on Global Positioning System NAD 83 (93) 4205 Datum.
2.) A Map of equal date accompanies this Metes and Bounds description.
3.) Set 5/8" iron rod = iron rod set with yellow plastic cap labeled Brister Surveying.

I, Ronald E. Brister do hereby certify that this survey of the property legally described herein was made on the ground this day December 17, 2015 and is correct to the best of my knowledge and belief.

*Ronald E. Brister*

Ronald E. Brister, RPLS No. 5407
Date: December 18, 2015.



Job No. 151730





EXHIBIT "A"
Page 4 of 4



EXHIBIT "B"

# EXHIBIT "C"

## GROUND LEASE AGREEMENT

### BASIC LEASE TERMS AND DEFINITIONS

*Seven Seas Lease*

Date:   September 1, 2017

Landlord:   ERF PORT ARANSAS, INC.
A Texas nonprofit corporation

Landlord's Address:

555 N. Carancahua, Suite 700
Corpus Christi, Texas 78401

Tenant:   SEVEN SEAS WATER CORPORATION

Tenant's Address:

14400 Carlson Circle
Tampa, Florida 33626

Premises:   The Premises include the following:

Land.
That 10 acre tract, more or less, described on EXHIBIT "A" hereto attached, being a portion of that 64.468 acre tract conveyed by Wood Group PSN, Inc., as Grantor, to ERF Port Aransas, Inc. in that Special Warranty Deed dated January 22, 2016, recorded at Document No. 2016002915 of the Official Public Records of Nueces County, Texas (the "Land").

Roadway Easement.
A non-exclusive easement for vehicular and pedestrian ingress and egress between State Highway 361 and the Premises, and for underground utilities, described on EXHIBIT "A" hereto attached (the "Roadway Easement").

Intake Easement.
A non-exclusive easement for one pipeline and conduits for power and control wiring and lift station for withdrawing water from Corpus Christi Ship Channel and transporting the water to the Land portion of the Premises, including a 50' X 75' lift station site adjacent the bulkhead as shown, such being described and shown on EXHIBIT "B" hereto attached (the "Intake Easement"). A portion of the Intake Easement is submerged and any pipeline extending into the water from the bulkhead must follow the bulkhead downward (in close proximity thereto) until it reaches the upper surface of the submerged land, and shall then extend from the bulkhead and substantially perpendicular thereto along the surface of the submerged land within Intake Easement boundaries. The lower side of the pipeline shall not be above the surface of the submerged land as it extends from the bulkhead. Poles, buoys or other devices readily visible from the surface must mark the

# EXHIBIT "C"

path of the submerged pipeline. The Intake Easement may also be used as a roadway for vehicles, vessels equipment and pedestrian traffic between the Premises and the lift station site, and to install, maintain, repair and replace the pipeline in the Intake Easement.

Discharge Easement.
A non-exclusive easement for one pipeline and conduits for power and control wiring for discharge of waste water from the Premises into the Corpus Christi Ship Channel, such being shown and described on EXHIBIT "B" hereto attached (the "Discharge Easement"). A portion of the Discharge Easement is submerged. The portion of the pipeline for the Discharge Easement which extends into the water from the bulkhead shall follow the bulkhead and upper surface of the submerged land just as the pipeline for the Intake Easement. Poles, buoys or other devices readily visible from the surface must mark the path of the submerged pipeline. The Discharge Easement may also be used for vehicles, vessels, equipment and pedestrian traffic to install, maintain, repair and replace the pipeline in the Discharge Easement.

IF, during the permitting period, the relevant State and/or local authorities determine that a pilot plant is necessary, the Tenant shall have access to the '50' x 50' area in the south-west corner of the tract on the waterfront and the discharge easement for the period of time necessary to install and operate the pilot for the purposes of obtaining the necessary permit(s).

Seven Seas Lease

-2-

EXHIBIT "C"

Seven Seas
Lease
Ex. A

EXHIBIT "A"



Page 1 of 2

EXHIBIT "C"

Seven Seas
Lease
Ex A



EXHIBIT "C"

Seven Seas
Lease
Ex B

EXHIBIT "D"

SPOIL DISPOSAL AREA ON McDERMOTT TRACT

**Exhibit 5**

**Draft Model**

20

## Model Inputs to Be Adjusted at FID

### Construction Assumptions

| | Unit | |
|---|---|---|
| Construction Start Date | m/dd/yyyy | 1/31/2019 |
| FID | m/dd/yyyy | 2/28/2019 |
| Construction Completion / Commercial Operations Date (COD) | m/dd/yyyy | 10/31/2019 |
| 75' Dredging Start Date | m/dd/yyyy | 1/31/2019 |
| Planned 75' Dredging Completion Date | m/dd/yyyy | 9/30/2020 |
| Harbor Island Crude Terminal Construction Costs | ($000s) | 854,034 |
| 75' Channel Dredging Project Construction Costs | ($000s) | 424,966 |
| Total Construction Costs* | ($000s) | 1,279,000 |

### Contracted Customer Summary

| | Contracted Throughput* (Kbd) | 54' Commercial Tariff* ($ / bbl) | 75' Commercial Tariff* ($ / bbl) |
|---|---|---|---|
| Customer 1 | 500 | $0.70 | $0.85 |
| Customer 2 | 500 | $0.70 | $0.85 |
| Customer 3 | 0 | $0.70 | $0.85 |
| Customer 4 | 0 | $0.70 | $0.85 |
| Customer 5 | 0 | $0.70 | $0.85 |
| **Total Contracted Throughput** | **1,000** | | |

### Other Operating Assumptions

| | Unit | |
|---|---|---|
| Fixed Operating Expenses* | ($000s / month) | 4,000 |
| Variable Operating Expenses* | ($ / bbl) | $0.034 |
| Assumed Opex Inflation* | (%) | 2.0% |
| Maximum Contract Escalator* | (%) | 2.0% |

### Maintenance Capex Assumptions

| | Unit | $000s / month |
|---|---|---|
| Terminal Maintenance Capital Expenditures* | (% of capex) | 2.5% | $1,779 |
| 75' Dredging Maintenance Capital Expenditures* | (% of capex) | 5.0% | $1,771 |

## Model Outputs

### Key Outputs for Ownership Sizing

| | |
|---|---|
| Berry Pre-Money Equity Value | ($000s) | 401,035 |
| Carlyle Pre-Money Equity Value | ($000s) | 259 |

*Reference: Implied Returns*

**Berry Returns**

| | | |
|---|---|---|
| Implied Berry Unlevered IRR (incl. Equity Incentive Pool) | (%) | 38.3% |
| Implied Berry Levered IRR (incl. Equity Incentive Pool) | (%) | 37.6% |
| Implied Berry Levered MOIC (incl. Equity Incentive Pool) | (x) | 11.0x |
| Implied Total Levered Cash to Berry (inc. Equity Incentive Pool) | ($000s) | 1,380,606 |
| Implied Berry Cash from Equity Incentive Pool | ($000s) | 177,842 |

**Carlyle Returns**

| | | |
|---|---|---|
| Implied Carlyle Unlevered IRR (incl. Equity Incentive Pool) | (%) | 15.9% |
| Implied Carlyle Levered IRR (incl. Equity Incentive Pool) | (%) | 18.1% |
| Implied Carlyle Levered MOIC (incl. Equity Incentive Pool) | (x) | 3.0x |
| Check: Carlyle Unlevered IRR (excl. Equity Incentive Pool and Promote Sharing) | (%) | 16.5% |

## Fixed Transaction Assumptions

| | | |
|---|---|---|
| Exit Date | m/dd/yyyy | 9/30/2027 |
| Exit Multiple | x EBITDA | 10.0x |
| Carlyle Target IRR (Before Incentive Share Drag) | (%) | 16.5% |
| Fair Value of Berry Land | ($000s) | 124,600 |
| Minimum Berry Upfront Equity Value | ($000s) | 400,000 |
| Carlyle Share of Upfront Equity Above $400MM | (%) | 20.0% |

## Illustrative Leverage Assumptions

| | | |
|---|---|---|
| Debt-Funded Construction Costs | (%) | 50.0% |
| Interest Rate | (%) | 7.0% |
| Post-Operation Cash Sweep | (%) | 50.0% |
| Financing Fees | (%) | 1.5% |

## Exhibit 6

## Illustrative Model Calculations

| Amount of Berry Pre-Money Equity Contribution | | | | | | |
|---|---|---|---|---|---|---|
| Total Hard and Soft Constructed Costs Budgeted as of FID | Crude Oil Volumes Contracted as of FID (Barrels per Day) | | | | | |
| | 1,000,000 | 1,100,000 | 1,200,000 | 1,300,000 | 1,400,000 | 1,500,000 |
| $1,000,000 | $652,000,000 | $837,000,000 | $1,023,000,000 | $1,204,000,000 | $1,386,000,000 | $1,570,000,000 |
| $1,100,000 | $567,000,000 | $749,000,000 | $932,000,000 | $1,113,000,000 | $1,297,000,000 | $1,478,000,000 |
| $1,200,000 | $475,000,000 | $658,000,000 | $841,000,000 | $1,022,000,000 | $1,206,000,000 | $1,387,000,000 |
| $1,300,000 | $400,000,000 | $564,000,000 | $750,000,000 | $934,000,000 | $1,115,000,000 | $1,297,000,000 |

| Amount of Carlyle Pre-Money Equity Contribution | | | | | | |
|---|---|---|---|---|---|---|
| Total Hard and Soft Constructed Costs Budgeted as of FID | Crude Oil Volumes Contracted as of FID (Barrels per Day) | | | | | |
| | 1,000,000 | 1,100,000 | 1,200,000 | 1,300,000 | 1,400,000 | 1,500,000 |
| $1,000,000 | $63,000,000 | $110,000,000 | $156,000,000 | $201,000,000 | $247,000,000 | $292,000,000 |
| $1,100,000 | $42,000,000 | $87,000,000 | $133,000,000 | $178,000,000 | $224,000,000 | $270,000,000 |
| $1,200,000 | $19,000,000 | $64,000,000 | $110,000,000 | $155,000,000 | $201,000,000 | $247,000,000 |
| $1,300,000 | $0 | $41,000,000 | $87,000,000 | $133,000,000 | $179,000,000 | $224,000,000 |

# EXHIBIT 33

**Attachments:** Terms for Carlyle and Magellan Agreements (ATP) (Both Fund) 052719.docx, Terms for Carlyle and

From: **Albert Theodore Powers** <atpowers@allied-pacific-group.com>
Date: Mon, May 27, 2019 at 9:05 AM
Subject: Compensation and Investment Agreements
To: Berry Marvin (Marty) <captberry@aol.com>, Dennis Berry <berryd@bayltd.com>,
Lawrence Berry <alb@riverway.us>
Cc: Boyd Butch <butchboyd@butchboydlawfirm.com>, Tonja Fulghum
<tfulghum@riverway.us>

Good Morning All,

I hope you are all having a good Memorial Day with your families.

In anticipation of our meetings tomorrow with Carlyle and Magellan, If you have a chance
please take a look at the attached proposals for deals that I think could be made with
Carlyle and Magellan. One alternative would be for both Carlyle and Magellan to
contribute funding before the current FID Date, but require performance for them to
continue to be involved in the Project. The other alternative is for Carlyle to provide all
such funding and Magellan to merely become construction adviser and operator of the
facility.

I would also greatly appreciate it if tomorrow morning Marty and Dennis would sign the
attached Compensation Agreement and Investment Agreement, which Lawrence has
already signed.

See you all tomorrow.

Best regards,

Ted

--
Albert Theodore Powers
Allied Pacific Group
Email: atpowers@allied-pacific-group.com

New York
Telephone: +(1) (212) 899-9889
Mobile: +(1) (212) 899-9888
Hong Kong
Telephone: +(852) 8108-8380
Mobile: +(852) 9099-3909

--
*Tonja Fulghum*
5005 Riverway, Ste. 440
Houston, Texas  77056
Office:  713/963-9112
Cell:  713/560-9250

# Proposed Terms for Agreements with Magellan and Carlyle
## (Both Carlyle and Magellan Contribute Funding)

1. Berry/Carlyle ownership interests in LSP to be held by a Delaware holding company, Lone Star Ports Enterprises LLC ("Holdco").

2. For existing FID Date of 6/13/19 ("Existing FID Date") to be extended (a) Carlyle must contribute $25 Million to Holdco by Existing FID Date, (b) Carlyle must contribute all interests in LSP to Holdco by Existing FID Date, (c) Carlyle and Berry must sign Holdco Operating Agreement by Existing FID Date, (d) Carlyle FID must be achieved and confirmed to Berrys by 7/31/19 ("New FID Date"), (e) Carlyle must agree to contribute and/or commit with security acceptable to Berrys another $250 Million to Holdco by New FID Date, provided Carlyle FID is achieved by New FID Date, (f) $300 Million of debt financing must be arranged for LSP by 9/10/19 ("Closing Date")(LSP CAPEX and OPEX budgets to be minimized and LSP debt to be maximized), (g) Magellan must be appointed as construction adviser and operator for Project and the terms of the construction advisory and operating agreement must be agreed by Carlyle and the Berrys, and by LSP and Magellan by Existing FID Date, and (h) closing of Carlyle's total investment in Holdco must be completed by Closing Date.

3. Ownership interests in Holdco in accordance with 2/7/19 Term Sheet.

4. If Carlyle FID is not achieved by New FID Date and closing does not occur by Closing Date, Carlyle's continuing involvement in, and ownership interest in, Project/LSP/Holdco forfeited to Berrys for $1 on New FID Date or Closing Date, as the case may be.

5. Magellan must contribute $25 Million to LSP by Existing FID Date in exchange for 10% operating interest in LSP, subject to 6-13 below.

6. LSP and Magellan must sign construction advisor and operating agreement by Existing FID Date. Agreement between LSP and Magellan must be negotiated and on reasonable commercial terms, not unbridled sole Magellan control. Berrys must be fully and directly involved in negotiation and drafting of agreement.

7. Magellan, LSP, and Bay will jointly develop Project scope and CAPEX and OPEX budgets. Berrys to be fully involved in this process on behalf of both LSP and Bay.

8. Magellan's continued participation and percentage ownership interest in LSP depend on milestones being achieved. Construction advisory and operating agreement and Magellan's ownership interests in LSP terminable by LSP if milestones are not achieved or on monetization event if Magellan is not the acquiring party.

9. Milestones:

A. 600,000 barrels per day must be committed at agreed price and term by New FID Date.

B. 1,200,000 barrels per day must be committed at agreed price and term by 10/15/19 (the "True-Up Date").

10. If Milestone A. is not achieved, Operating Agreement would be terminable by LSP and Magellan's interests in LSP forfeited to Holdco for $1 on New FID Date.

11. If Milestone A. is achieved, Magellan would have option to contribute an additional $75 Million to LSP by New FID Date in exchange for an additional 10% operating interest in LSP, subject to 12-13 below. If that option is exercised, Magellan would also have the obligation to (a) reimburse Holdco, Berrys and Carlyle for 20% of all costs incurred by them before the New FID Date, and (b) contribute 20% of all equity required for LSP after the New FID Date.

12. If (a) Magellan has closed the transactions described in 5. and 6. above, (b) Milestone 1. has been achieved by New FID Date, (c) Magellan has exercised the option described in 11. above and provided all required funding, and (d) either FID is not achieved by New FID Date or Carlyle does not close by Closing Date, then Magellan would have the option to step into shoes of Carlyle in Holdco, if (i) Magellan commits to do so and provide any necessary guaranty or surety to POCCA by 8/15/19, and (ii) closes by 8/31/19.

13. If (a) Magellan has closed the transactions described in 5. and 6. above, (b) Milestone 1. has been achieved by New FID Date, and (c) Magellan has not exercised the option described in 11. above and provided all required funding, but Milestone B. is not achieved, Magellan's operating interest in LSP reduced to 5% on the True-Up Date.

14. If (a) Magellan has closed the transactions described in 5. and 6. above, (b) Milestone 1. has been achieved by New FID Date, and (c) Magellan has exercised the option described in 11. above and provided all required funding, but Milestone B. is not achieved, Magellan's operating interest in LSP reduced to 10% on the True-Up Date.

# Proposed Terms for Agreements with Magellan and Carlyle
## (Operating Agreement With, But No Investment By, Magellan)

1. Berry/Carlyle ownership interests in LSP to be held by a Delaware holding company, Lone Star Ports Enterprises LLC ("Holdco").

2. For existing FID Date of 6/13/19 ("Existing FID Date") to be extended to July 31, 2019 ("New FID Date")(a) Carlyle must contribute $50 Million to Holdco by Existing FID Date, (b) Carlyle and Berrys must contribute all interests in LSP to Holdco by Existing FID Date, (c) Carlyle and Berry must sign Holdco Operating Agreement by Existing FID Date, (d) Carlyle must agree to contribute and/or commit with security acceptable to Berrys another $250 Million to Holdco by August 9, 2019 ("Closing Date"), (e) $300 Million of debt financing must be arranged for LSP by New FID Date (LSP CAPEX and OPEX budgets to be minimized and LSP debt to be maximized), with debt financing to be funded by Closing Date, (f) Magellan must be appointed as construction advisor and operator for Project and the terms of the construction advisory and operating agreement must be agreed by Carlyle and the Berrys, and by LSP and Magellan by Existing FID Date, and (g) closing of Carlyle's total investment in Holdco must be completed by Closing Date.

3. Ownership interests in Holdco in accordance with 2/7/19 Term Sheet.

4. If Carlyle FID is not achieved by New FID Date and closing does not occur by Closing Date, Carlyle's continuing involvement in, and ownership interest in, Project/LSP/Holdco forfeited to Berrys for $1 on New FID Date or Closing Date, as the case may be.

5. LSP and Magellan must sign construction advisory and operating agreement by Existing FID Date. Agreement between LSP and Magellan must be negotiated on reasonable commercial terms, not unbridled sole Magellan control. Agreement must be terminable by LSP if 600,000 barrels per day are not committed at agreed price and term by September 1, 2019 or on monetization event if Magellan is not the acquiring party. Berrys must be fully and directly involved in negotiation and drafting of agreement.

6. Magellan, LSP, and Bay will jointly develop Project scope and CAPEX and OPEX budgets. Berrys to be fully involved in this process on behalf of both LSP and Bay.

# AGREEMENT

THIS AGREEMENT is made and entered into as of the 1st day of November, 2018 by and among Allen Lawrence Berry, Marvin Glen Berry, and Dennis Wayne Berry (collectively, the "**Berrys**"), and Albert Theodore Powers ("**Powers**") (each of the Berrys and Powers being referred to herein individually as a "**Party**" and collectively as the "**Parties**").

## RECITALS:

WHEREAS, the Berrys intend to develop, construct, own, and operate a system to allow hydrocarbon shippers maximum optionality to deliver hydrocarbons to local refinery markets in the vicinity of Corpus Christi, Texas and to export hydrocarbons via a premier United States Gulf Coast deep-water exporting facility, including without limitation shipping, reception, collection, consolidation, storage, staging, delivery, and exporting facilities, including a deep-water export terminal on Harbor Island, Texas, related tankage and pipelines, and other associated infrastructure, assets, facilities, and businesses, including without limitation certain real property and improvements currently owned, leased, optioned, or otherwise controlled by the Berrys at Redfish Bay, Midway Junction, and Harbor Island, Texas and additional properties and facilities to be acquired, leased, optioned, developed, or otherwise controlled by the Berrys (collectively, the "**Project**"); and

WHEREAS, the Berrys intend to finance the Project through a combination of contributions of cash and tangible and intangible property from their own resources, third party debt financing, government grants and/or subsidies, and equity contributions from outside investors; and

WHEREAS, the Berrys have been engaged for several months in discussions with The Carlyle Group regarding the Project and The Carlyle Group potentially providing a substantial equity investment in the Project; and

WHEREAS, the Berrys wish to appoint Powers to represent them and to act as their chief negotiator and adviser for the financing of the Project, including without limitation negotiations with The Carlyle Group, and to perform due diligence, advice, and assistance regarding the sourcing of capital, develop strategy, and provide financial management and structuring advice and services, upon and subject to the terms and conditions of this Agreement; and

WHEREAS, Powers is willing to represent the Berrys and to act as their chief negotiator and adviser for the financing of the Project, including without limitation negotiations with The Carlyle Group, and to perform due diligence, advice, and assistance regarding the sourcing of capital, develop strategy, and provide financial management and structuring advice and services upon and subject to the terms and conditions of this Agreement;

NOW, THEREFORE, in consideration of the foregoing recitals and other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the Berrys and Powers hereby agree as follows:

1.    **Appointment**.  The Berrys hereby appoint Powers as their representative and chief negotiator and adviser for the financing of the Project including without limitation negotiations with The Carlyle Group, and to perform due diligence, advice, and assistance regarding the sourcing of capital, develop strategy, and provide financial management and structuring advice and services.  It is understood that Powers shall investigate various alternatives for financing all or portions of the Project, discuss with the Berrys various financing alternatives, assist the Berrys in formulating and interpreting financial projections for the Project and various potential transactions relating to the Project, assist the Berrys in formulating strategies to arrange the most favorable forms of financing for the Project, make financing recommendations to the Berrys, assist the Berrys in formulating strategies for achieving the most favorable terms for financing the Project, assist the Berrys in formulating business and holding structures for the Project, and negotiate terms and conditions of financing for the Project on behalf of the Berrys with various potential finance providers, including without limitation The Carlyle Group.  In performing his duties under this Agreement, Powers shall at all times act as agent for the Berrys and shall have no power to conclude any financing arrangement for all or any portion of the Project without the express consent of the Berrys, in their sole discretion.

2.    **Term of Appointment**.  The term of Powers's appointment under this Agreement shall commence on the date first set forth above and shall continue until the Project is fully financed or until either the Berrys or Powers terminates this Agreement by providing at least three (3) month's written notice to the other Parties.

3.    **Compensation**.  As compensation for his services as representative and chief negotiator for the financing of the Project, the Berrys hereby agree to pay Powers compensation and to reimburse his expenses, as follows:

    **(a)    Compensation**.  The Berrys shall pay to Powers, Allied Pacific Group Limited, or such other individual or entity designated by Powers from time to time fixed ordinary compensation in the amount of One Hundred Thousand Dollars ($100,000) per month during the term of his appointment under this Agreement ("**Compensation**").  Powers shall provide to the Berrys monthly invoices during the term which shall designate the account or accounts to which payments of Ordinary Compensation shall be made.

    **(b)    Expenses**.  In addition to Compensation, the Berrys shall promptly reimburse Powers for his actual out-of-pocket expenses incurred in performing his services pursuant to this Agreement, including without limitation travel and transportation expenses.  Powers shall provide to the Berrys invoices which shall indicate the expense amounts to be reimbursed and the account or accounts to which reimbursement payments shall be made.

2

**(c)** **Interest on Late Payments.** All amounts payable under this agreement shall be paid promptly and in cash or by wire transfer to such accounts as shall be designated from time to time by Powers. In the event that any amounts are not paid promptly when due, the Party liable for making such payment shall pay such amounts, plus interest thereon, at the rate of ten percent (10%) per annum on the overdue amount, without prior demand or notice.

**(d)** **No Offset.** All payments of Compensation, reimbursements, and interest made pursuant to this Agreement shall be made in cash or by wire transfer to such accounts as shall be designated from time to time by Powers, without withholding or offsets of any kind, shall be non-refundable, and shall be free and clear of any and all encumbrances of any type or nature.

**4.** **Investment Agreement.** In addition to the Compensation and other matters described in this Agreement, the Berrys and Powers are simultaneously with this Agreement entering into another agreement (the "**Investment Agreement**") relating to the investment by Powers or an entity designated by him in one or more limited liability companies or other entities that will hold all of the Berrys' interests in the Project and its major components in exchange for a twenty percent (20%) overall carried interest and profits interest in such limited liability companies or entities after priority distributions to the Berrys of Two Hundred Fifty Million Dollars ($250,000,000) plus a ten percent (10%) cumulative preferred return on the outstanding balance of such amount. The ownership of such limited liability companies or other entities and the entitlement to distributions from such limited liability companies or other entities shall be governed by the Investment Agreement and the governing documents of such limited liability companies or other entities.

**5.** **Miscellaneous Provisions.**

**(a)** **Governing Law, Jurisdiction, and Venue.** This Agreement and all issues and questions concerning its application, construction, validity, interpretation, and enforcement shall be governed by and construed in accordance with the laws of the State of Texas, without giving effect to any choice or conflict of laws provisions or rules (whether of the State of Texas or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Texas. Powers and each of the Berrys hereby agrees that any suit, action, or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby, whether in contract, tort, or otherwise, shall be brought in the state or federal courts in Harris County, Texas, so long as one of such courts shall have subject-matter jurisdiction over such suit, action, or proceeding, and that any cause of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of Texas. Powers and each of the Berrys hereby irrevocably consents to the exclusive jurisdiction of such courts and of the appropriate appellate courts therefrom in any

3

such suit, action, or proceeding and irrevocably waives, to the fullest extent permitted by relevant law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action, or proceeding in any such court or that any such suit, action, or proceeding which is brought in any such court has been brought in an inconvenient forum.

        **(b)**    <u>Notices</u>. All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of (i) actual receipt, (ii) the time of personal delivery to the party to be notified, (iii) when sent, if sent by electronic mail during normal business hours of the recipient, and if not sent during normal business hours, then on the recipient's next business day, (iv) five (5) days after having been sent by registered or certified United States Post Office air mail, return receipt requested, postage prepaid, or (v) one (1) business day after deposit with a nationally recognized overnight air courier, freight prepaid, specifying next business day delivery, with written verification of receipt. All communications shall be sent to the respective Parties at their addresses as set forth in this section or to such addresses as subsequently modified by written notice given in accordance with this section. Each Party to this Agreement agrees to promptly notify the other Parties of any change in its address or electronic mail address, and any failure to do so shall not affect the foregoing.

        Mailing and delivery address for Allen Lawrence Berry, Marvin Glen Berry, Dennis Wayne Berry, Bay Ltd, and all Berry entities:

> Berry Group
> 5005 Riverway
> Suite 440
> Houston, Texas 77056
>
> Email address for Lawrence Allen Berry:
> alb@riverway.us
>
> Email address for Marvin Glen Berry:
> captberry@aol.com
>
> Email address for Dennis Wayne Berry:
> berryd@bayltd.com

        Mailing and delivery address for Albert Theodore Powers, Allied Pacific Group Limited, and all Powers entities:

4

Albert Theodore Powers
205 West 57th Street
Apartment 4C
New York, New York 10019

Email address for Albert Theodore Powers
atpowers@allied-pacific-group.com

(c)     **Delays or Omission**s.  No delay or omission to exercise any right, power, or remedy accruing to any Party under this Agreement, upon any breach or default of any other Party under this Agreement, shall impair any such right, power, or remedy of such non-breaching or non-defaulting Party nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring.  Any waiver, permit, consent, or approval of any kind or character on the part of any Party of any breach or default under this Agreement, or any waiver on the part of any Party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing.  All remedies, either under this Agreement or by law or otherwise afforded to any Party, shall be cumulative and not alternative.

(d)     **Amendment, Waiver, and Termination**.  This Agreement may be amended, modified, or terminated and the observance of any term hereof may be waived (either generally or in a particular instance and either retroactively or prospectively) only by a written instrument executed by all Parties.  Any amendment, modification, termination, or waiver so effected shall be binding upon the Parties and all of their respective successors and permitted assigns whether or not such Party, successor, assignee, or other individual or entity entered into or approved such amendment, modification, termination, or waiver.  No waivers of or exceptions to any term, condition, or provision of this Agreement, in any one or more instances, shall be deemed to be, or construed as, a further or continuing waiver of any such term, condition, or provision or any other term, condition, or provision.

(e)     **Assignment of Rights**.  The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns.  Nothing in this Agreement, express or implied, is intended to confer upon any individual or entity other than the Parties hereto or their respective successors and permitted assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.  Any successor or permitted assignee of any of the Berrys' interests in the Project, including any prospective transferee who purchases any direct or indirect interest in the Project and/or any inter vivos

5

or testamentary donee or transferee of any such interest, shall deliver to Powers, as a condition to any transfer or assignment, a counterpart signature page hereto pursuant to which such successor or permitted assignee shall confirm his or its agreement to be subject to and bound by all of the provisions set forth in this Agreement that were applicable to the predecessor or assignor of such successor or permitted assignee.

        **(f)**     <u>**Severability**</u>.  The invalidity or unenforceability of any provision of this Agreement shall in no way affect the validity or enforceability of any other provision.

        **(g)**     <u>**Titles and Subtitles**</u>.  The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

        **(h)**     <u>**Counterparts**</u>.  This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Counterparts may be delivered via electronic mail (including pdf or any electronic signature complying with the United States Federal ESIGN Act of 2000, i.e., www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

        **(i)**     <u>**Specific Performance**</u>.  In addition to any and all other remedies that may be available at law in the event of any breach of this Agreement, each Party shall be entitled to specific performance of the agreements and obligations of the other Parties hereunder and to such other injunctive or other equitable relief as may be granted by a court of competent jurisdiction.

        **(j)**     <u>**No Partnership**</u>.  This Agreement does not create or constitute any partnership, joint venture, or other similar relationship among the Parties, no such relationship shall be implied, and no Party shall make any representation to the contrary.

        **(k)**     <u>**Advice of Counsel**</u>.  Each Party hereby acknowledges that he has sought and obtained the advice of legal counsel before entering into this Agreement and has fully read and understands the meaning and import of all terms in this Agreement.

**(l)** <u>**Entire Agreement**</u>.  This Agreement constitutes and expresses the entire agreement and understanding among the Parties in reference to all matters referred to; all previous discussions, promises, representations, and understandings relative thereto, if any, among the Parties, being herein merged. No modification of this Agreement shall be binding unless in writing and signed by authorized representatives of all Parties.

**IN WITNESS WHEREOF**, the Parties, intending to be bound, have executed this Agreement as of the date first written above.

_____
ALLEN LAWRENCE BERRY

_____
MARVIN GLEN BERRY

_____
DENNIS WAYNE BERRY

_____
ALBERT THEODORE POWERS

7

# INVESTMENT AGREEMENT

**THIS INVESTMENT AGREEMENT** (the "**Agreement**") is made and entered into as of the 1st day of November, 2018 by and among Marvin Glen Berry, Dennis Wayne Berry, and Allen Lawrence Berry (collectively, the "**Berrys**"), and Albert Theodore Powers ("**Powers**") (each of the Berrys and Powers being referred to herein individually as a "**Party**" and collectively as the "**Parties**").

## RECITALS:

**WHEREAS**, the Berrys have devised a plan to develop, construct, own, and operate a system to allow hydrocarbon shippers maximum optionality to deliver hydrocarbons to local refinery markets in the vicinity of Corpus Christi, Texas and to export hydrocarbons via a premier United States Gulf Coast deep-water exporting facility, including without limitation shipping, reception, collection, consolidation, storage, staging, delivery, and exporting facilities, including a deep-water export terminal on Harbor Island, Texas, related tankage and pipelines, and other associated infrastructure, assets, facilities, and businesses, including without limitation certain real property and improvements currently owned, leased, optioned, or otherwise controlled by the Berrys and others at Redfish Bay, Midway Junction, and Harbor Island, Texas and additional properties and facilities to be acquired, leased, optioned, developed, or otherwise controlled by the Berrys and others (collectively, the "**Project**"); and

**WHEREAS**, simultaneously with this Agreement, the Parties are entering into another Agreement, pursuant to which the Berrys are appointing Powers as their representative and chief negotiator and adviser for the financing of the Project including without limitation negotiations with The Carlyle Group, and to perform due diligence, advice, and assistance regarding the sourcing of capital, develop strategy, and provide financial management and structuring advice and services. It is understood that Powers shall investigate various alternatives for financing all or portions of the Project, discuss with the Berrys various financing alternatives, assist the Berrys in formulating and interpreting financial projections for the Project and various potential transactions relating to the Project, assist the Berrys in formulating strategies to arrange the most favorable forms of financing for the Project, make financing recommendations to the Berrys, assist the Berrys in formulating strategies for achieving the most favorable terms for financing the Project, assist the Berrys in formulating business and holding structures for the Project, and negotiate terms and conditions of financing for the Project on behalf of the Berrys with various potential finance providers, including without limitation The Carlyle Group; and

**WHEREAS**, the Berrys and Powers wish to cooperate to (a) devise an ownership structure for directly and indirectly holding the Project and each of its major components, (b) secure third party financing for the Project, and (c) own and hold a portion of all interests in the Project, upon and subject to the terms and conditions of this Agreement;

**NOW, THEREFORE**, in consideration of the foregoing recitals and other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the Berrys and Powers hereby agree as follows:

1. **Creation of Holding Structure and Contribution of Project and Project Interests**.  On or before May 31, 2019 (a) the Berrys and all other owners of interests in the Project and its major components or their respective designees will form one or more corporations, limited liability companies, or other tax efficient limited liability entities (each a "**Project Company**" and, collectively, the "**Project Companies**) to collectively own and hold one hundred percent (100%) of all equity interests in the Project and its major components, (b) the Berrys will transfer to the Project Companies one hundred percent (100%) of their interests in the Project and each of its major components in exchange for one hundred percent (100%) of the equity interests in the Project Companies, (c) the Berrys will form a limited liability company or other tax efficient limited liability entity ("**Holding Company**") to hold all equity interests in the Project Companies, (d) the Berrys will contribute to Holding Company all equity interests in the Project Companies in exchange for one hundred percent (100%) of the equity interests in Holding Company, (e) the Berrys will form a limited liability company or other tax efficient limited liability entity ("**Investment Company**") to hold all equity interests in Holding Company, and (f) the Berrys will contribute to Investment Company all equity interests in Holding Company in exchange for one hundred percent (100%) of the equity interests in Investment Company.

2. **Investment By Manager in Investment Company.**  Within fifteen (15) days after (a) the Berrys and all other owners of interests in the Project and its major components or their respective designees have formed the Project Companies and transferred one hundred percent (100%) of their interests in the Project and each of its major components to the Project Companies, (b) all equity interests in the Project Companies have been contributed to Holding Company, (c) all equity interests in Holding Company have been contributed to Investment Company, and (d) the Berrys or their designees have received all equity interests in Investment Company (i) Powers will form a  limited liability company or other tax efficient limited liability entity that is wholly owned by, or for the benefit of, Powers or his designees ("**Manager**"), (ii) Powers will contribute Five Thousand United States Dollars (US$5,000.00) to Manager in exchange for one hundred percent (100%) of Manager's operating interests and other ownership rights and interests, and (iii) Manager will contribute Five Thousand United States Dollars ($5,000) to Investment Company in exchange for a twenty percent (20%) overall carried interest and future profits interest in Investment Company after priority distributions to the Berrys or their designees of Two Hundred Fifty Million United States Dollars ($250,000,000) plus a ten percent (10%) cumulative preferred return on the outstanding balance of such amount. Except for the Five Thousand United States Dollar ($5,000) contribution to Manager and Investment Company described above, none of Manager, Powers, or any of their respective designees shall have any other obligation to contribute any other amounts to Investment Company, Holding Company, or any Project Company.  The governing documents of Investment Company will reflect the respective interests of the Berrys, including their entitlement to priority distributions and preferred returns, and Investment Manager's twenty percent (20%) overall carried interest and future profits interest in Investment Company. Until the Berrys receive a priority return from Investment Company, Holding Company, and/or the Project Companies of Two

2

Hundred Fifty Million United States Dollars ($250,000,000) plus a ten percent (10%) cumulative preferred return on the outstanding balance of such amount, all gross amounts received by, or distributions made to, or on behalf of, Investment Company, Holding Company, and the Project Companies, including without limitation all earnings, proceeds, dividends, refinancing proceeds, disposition proceeds, incentive units or payments, or other receipts of any type or nature, shall be distributed to and paid to or on behalf of the Berrys or their designees and none of such amounts shall be paid or payable to or for the benefit of Manager or its designees. After the Berrys or their designees have received their priority distributions of Two Hundred Fifty Million United States Dollars plus a ten percent (10%) cumulative preferred return on the outstanding balance of such amount and Manager has received catch-up distributions from the Investment Company, eighty percent (80%) of all gross amounts received by, or distributions made to, or on behalf of Investment Company, Holding Company, and the Project Companies, including without limitation all earnings, proceeds, dividends, refinancing proceeds, disposition proceeds, incentive units or payments, or other receipts of any type or nature, shall be distributed to and paid to or on behalf of the Berrys or their designees and twenty percent (20%) of such amounts shall be paid or payable to or for the benefit of Manager or its designees. It is intended that the interests of Manager in Investment Company will qualify (i) as a carried interest within the meaning of Section 1061 of the United States Internal Revenue Code, and (ii) as a future profits interest within the meaning of Revenue Procedure 93-27, and that the governing documents of Investment Company will be drafted to reflect this intent. It is also intended that the capital accounts to be established and maintained by Investment Company will comply with the requirements of Treasury Regulations §1.704-1(b)(2)(iv) or any successor provision, and that such provisions will be interpreted and applied in a manner consistent with such Treasury Regulations or successor provisions and that the targeted allocations to be made to such capital accounts will reflect the Members' interests in the Company and have substantial economic effect. On or before the fifth (5th) day of each month, the Berrys shall provide to Manager a statement setting forth the total amounts of preferred return and priority distributions, if any, that have been received by them from Investment Company, Holding Company, and the Project Companies. Manager shall review each such statement and either confirm its agreement with the amounts shown on such statement or provide an alternative calculation of such amounts. If the Berrys and Manager do not agree on such calculation, they shall meet and attempt to reconcile their differences in the calculation of such amounts before resorting to any other remedy.

3.    **Financing of Project**. To finance the development of the Project, it is anticipated that Investment Company will transfer its equity interests in Holding Company and/or one or more Project Companies to one or more other corporations, limited liability companies, or other tax efficient limited liability entities (each, a "**Project Entity**" and. collectively, the "**Project Entities**") that will be jointly owned by Investment Company and other investors that will contribute equity capital for the development of the Project. In exchange for contributing its interests in Holding Company and/or one or more of the Project Companies to such Project Entities, it is anticipated that Investment Company will receive (a) shares, operating interests, or other equity interests in the Project Entities, (b) other rights and interests, including incentive

interests, incentive units, or other benefits in or from the Project Entities, and (c) other amounts directly or indirectly received, or distributions made, in respect of the Project Entities, including without limitation earnings, proceeds, dividends, refinancing proceeds, disposition proceeds, incentive units or payments, and other receipts of any type or nature in respect of or relating to the Project or any Project Company (collectively, "**Project Interests**").

4. **Distributions From Project Entities**. All (a) shares, operating interests, or other equity interests in the Project Entities, (b) other rights and interests, including incentive interests, incentive units, or other benefits in or from the Project Entities, and (c) Project Interests shall be distributed to and held by Investment Company. Distributions shall be made from Investment Company in accordance with the governing documents of Investment Company, which shall reflect the interests of the Berrys, including their entitlement to priority distributions and preferred returns, and the twenty percent (20%) carried interest and future profits interest of Manager.

5. **Miscellaneous Provisions**.

(a) **Governing Law, Jurisdiction, and Venue**. This Agreement and all issues and questions concerning its application, construction, validity, interpretation, and enforcement shall be governed by and construed in accordance with the laws of the State of Texas, without giving effect to any choice or conflict of laws provisions or rules (whether of the State of Texas or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Texas. Powers and each of the Berrys hereby agrees that any suit, action, or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby, whether in contract, tort, or otherwise, shall be brought in the state or federal courts in Harris County, Texas, so long as one of such courts shall have subject-matter jurisdiction over such suit, action, or proceeding, and that any cause of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of Texas. Powers and each of the Berrys hereby irrevocably consents to the exclusive jurisdiction of such courts and of the appropriate appellate courts therefrom in any such suit, action, or proceeding and irrevocably waives, to the fullest extent permitted by relevant law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action, or proceeding in any such court or that any such suit, action, or proceeding which is brought in any such court has been brought in an inconvenient forum.

(b) **Notices**. All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of (i) actual receipt, (ii) the time of personal delivery to the party to be notified, (iii) when sent, if sent by electronic mail during normal business hours of the recipient, and if not sent during normal business hours, then on the recipient's next business day, (iv) five (5) days after

4

having been sent by registered or certified United States Post Office air mail, return receipt requested, postage prepaid, or (v) one (1) business day after deposit with a nationally recognized overnight air courier, freight prepaid, specifying next business day delivery, with written verification of receipt.  All communications shall be sent to the respective Parties at their addresses as set forth in this section or to such addresses as subsequently modified by written notice given in accordance with this section.  Each Party to this Agreement agrees to promptly notify the other Parties of any change in its address or electronic mail address, and any failure to do so shall not affect the foregoing.

Mailing and delivery address for Marvin Glen Berry, Dennis Wayne Berry, Allen Lawrence Berry, Bay Ltd, and all Berry entities:

Berry Group
5005 Riverway
Suite 440
Houston, Texas 77056

Email address for Allen Lawrence Berry:
alb@riverway.us

Email address for Marvin Glen Berry:
captberry@aol.com

Email address for Dennis Wayne Berry:
berryd@bayltd.com

Mailing and delivery address for Albert Theodore Powers and Manager:

Albert Theodore Powers
205 West 57th Street
Apartment 4C
New York, New York 10019

Email address for Albert Theodore Powers
atpowers@allied-pacific-group.com

**(c)** **Delays or Omission**s.  No delay or omission to exercise any right, power, or remedy accruing to any Party under this Agreement, upon any breach or default of any other Party under this Agreement, shall impair any such right, power, or remedy of such non-breaching or non-defaulting Party nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring.  Any

waiver, permit, consent, or approval of any kind or character on the part of any Party of any breach or default under this Agreement, or any waiver on the part of any Party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement or by law or otherwise afforded to any Party, shall be cumulative and not alternative.

**(d)** **Amendment, Waiver, and Termination**. This Agreement may be amended, modified, or terminated and the observance of any term hereof may be waived (either generally or in a particular instance and either retroactively or prospectively) only by a written instrument executed by all Parties. Any amendment, modification, termination, or waiver so effected shall be binding upon the Parties and all of their respective successors and permitted assigns whether or not such Party, successor, assignee, or other individual or entity entered into or approved such amendment, modification, termination, or waiver. No waivers of or exceptions to any term, condition, or provision of this Agreement, in any one or more instances, shall be deemed to be, or construed as, a further or continuing waiver of any such term, condition, or provision or any other term, condition, or provision.

**(e)** **Assignment of Rights**. The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns. Nothing in this Agreement, express or implied, is intended to confer upon any individual or entity other than the Parties hereto or their respective successors and permitted assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement. Any successor or permitted assignee of any of the Berry Interests, including without limitation any prospective transferee who purchases any direct or indirect interest in the Project and/or any inter vivos or testamentary donee or transferee of any such interest, shall deliver to Powers, as a condition to any transfer or assignment, a counterpart signature page hereto pursuant to which such successor or permitted assignee shall confirm his or its agreement to be subject to and bound by all of the provisions set forth in this Agreement that were applicable to the predecessor or assignor of such successor or permitted assignee.

**(f)** **Severability**. The invalidity or unenforceability of any provision of this Agreement shall in no way affect the validity or enforceability of any other provision.

**(g)** **Titles and Subtitles**. The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

**(h)** **Counterparts**. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which

together shall constitute one and the same instrument. Counterparts may be delivered via electronic mail (including pdf or any electronic signature complying with the United States Federal ESIGN Act of 2000, i.e., www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

**(i)** **Specific Performance**. In addition to any and all other remedies that may be available at law in the event of any breach of this Agreement, each Party shall be entitled to specific performance of the agreements and obligations of the other Parties hereunder and to such other injunctive or other equitable relief as may be granted by a court of competent jurisdiction.

**(j)** **No Partnership**. This Agreement does not create or constitute any partnership, joint venture, or other similar relationship among the Parties, no such relationship shall be implied, and no Party shall make any representation to the contrary.

**(k)** **Advice of Counsel**. Each Party hereby acknowledges that he has sought and obtained the advice of legal counsel before entering into this Agreement and has fully read and understands the meaning and import of all terms in this Agreement.

**(l)** **Entire Agreement**. This Agreement constitutes and expresses the entire agreement and understanding among the Parties in reference to all matters referred to; all previous discussions, promises, representations, and understandings relative thereto, if any, among the Parties, being herein merged. No modification of this Agreement shall be binding unless in writing and signed by authorized representatives of all Parties.

**IN WITNESS WHEREOF**, the Parties, intending to be bound, have executed this Agreement as of the date first written above.

_____
ALLEN LAWRENCE BERRY

_____
MARVIN GLEN BERRY

_____
DENNIS WAYNE BERRY

_____
ALBERT THEODORE POWERS

# EXHIBIT 34



September 25, 2019

The Carlyle Group
Carlyle Investment Management LLC
Carlyle Global Infrastructure Opportunity Fund
1001 Pennsylvania Avenue, NW
Washington, D.C. 20004-2505

Attention:     Mr. Andrew Marino,
               Managing Director and Co-Head of Global Infrastructure Investing

Dear Andrew,

We have previously believed that we could amicably come to terms with Carlyle and that Carlyle would perform its contractual and statutory obligations without our being compelled to resort to litigation. Regrettably, we are now forced to conclude that Carlyle has no intention to act reasonably or morally and is continuing to unlawfully attempt to steal our Project from us. These conclusions have been reinforced by Carlyle's continuing failure to adhere to its contractual obligations under the Term Sheet, Carlyle's repeated tortious interference with our business interests, your failure to respond to Lawrence's email to you dated September 20, 2019, and Anna-Louise Oliver's email of yesterday.

Accordingly, yesterday the undersigned, Lawrence Berry, Marvin Berry, and Dennis Berry, individually and on behalf of Lone Star Ports, LLC, a Delaware limited liability company, commenced a legal proceeding in Texas State District Court in Harris County against The Carlyle Group, Carlyle Investment Management LLC, and Carlyle Global Infrastructure Opportunity Fund, L.P., asserting our claims for declaratory judgment, specific performance, and both actual and punitive damages based on Carlyle's breach of contract and tortious interference with our business interests.

We are in the process of preparing amendments to our pleadings in that proceeding to include (a) additional defendants, (b) more serious claims including fraud, extortion, conspiracy, and racketeering, and (c) requests for damages in amounts involving billions of dollars, which amendments we intend to file today.

/S/  Lawrence Berry

/S/  Marvin Berry

/S/  Dennis Berry

| | | |
|---|---|---|
| ALBERT THEODORE POWERS; | § | IN THE BUSINESS COURT |
| ALLIED PORTS LLC, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | 11A – STATE OF TEXAS |
| | § | |
| AXIS MIDSTREAM HOLDINGS LLC; | § | |
| ALLEN LAWRENCE BERRY; | § | |
| MARVIN GLENN BERRY; and | § | |
| BONNIE BERRY, as successor in | § | |
| interest to DENNIS WAYNE BERRY | § | |
| | § | |
| *Defendants*. | § | HONORABLE SOFIA ADROGUE |

# DEFENDANTS' EXHIBIT 35

# AVAILABLE IN CAMERA

**From:** "Tonja Fulghum" <tfulghum@riverway.us>

**To:** "Berry, Marty" <captberry@aol.com>, "Dennis Berry" <berryd@bayltd.com>, "Lawrence Berry" <sanpatranch@gmail.com>, "Albert Theodore Powers" <atpowers@allied-pacific-group.com>

**Subject:** Amended and Restated Operating Agreement for LSPE

**Date:** Thu, 15 Sep 2022 19:48:34 +0000

**Importance:** Normal

**Attachments:** TRANSFER_OF_LSPE_INTERESTS_FROM_LSPV_TO_FIVE_MEMBERS_(082622-CLEAN).docx; AMENDED_AND_RESTATED_LONE_STAR_PORTS_ENTERPRISES_OPERATING_AGREEMENT_(082622-CLEAN).docx; LSP_-_INVESTOR_ORG_CHART_08.26.22.pptx

---

I am going to circulate a docusign for an Amended and Restated Operating Agreement for Lone Star Ports Enterprises and an Assignment that transfers management from LSPV to LSPE. This is an exercise to clean up corporate documentation as part of our due diligence with UpCountry.

I am attaching a corporate organization chart just to refresh memories on how the structure was originally envisioned by legal. Each shareholder's interest would sit in the appropriate Trust or ownership structure depending on preference. For the top tier of companies on the organization chart there are no Operating Agreements in place so each individual would need to do their own to fit their requirements.

I am attaching the documents for your review but will send a docusign for ease of execution. Please call Ted if you have questions on the structure.

--

*Tonja Fulghum*
5005 Riverway, Ste. 440
Houston, Texas 77056
Office: 713/963-9112
Cell: 713/560-9250

Confidential

ALB_000905

**EXHIBIT 36**

 **PORT CORPUS CHRISTI**®

**Sean C. Strawbridge**
*CHIEF EXECUTIVE OFFICER*

March 16, 2021

***VIA EMAIL & CERTIFIED MAIL***

Mr. A. Lawrence Berry
Chief Executive officer
Lone Star Ports, LLC
1414 Valero Way
Corpus Christi, Texas 78409

RE:  Official Notice of Termination of Amended and Restated Lease Agreement between the Port of Corpus Christi Authority of Nueces County, Texas ("***Authority***") and Lone Star Ports, LLC ("***Lone Star Ports***") dated December 10, 2019 (the "***Lease Agreement***" or "***Lease***")

Dear Mr. Berry:

Today, the Authority's Port Commission voted to terminate the Lease pursuant to, and in accordance with, Section 2.3(e) of the Lease Agreement, and directed me to deliver this Notice of Termination to you.

Should you wish to discuss this matter further, I and Port Counsel can avail ourselves to you.

Sincerely,
PORT OF CORPUS CHRISTI AUTHORITY

Sean C. Strawbridge
Chief Executive Officer

cc:    Mr. Butch Boyd, Counsel for Lone Star Ports, LLC
       Port of Corpus Christi Commission
       Jimmy Welder, General Counsel, Port of Corpus Christi Authority
       Dane Bruun, Counsel, Port of Corpus Christi Authority
       Kent Britton, Chief Financial Officer, Port of Corpus Christi Authority
       Clark Robertson, Chief Operating Officer, Port of Corpus Christi Authority
       Jeff Pollack, Chief Strategy Officer, Port of Corpus Christi Authority
       Samuel Esquivel, Director, *Real* Estate Services, Port of Corpus Christi Authority

**EXHIBIT 37**

**Gohlke, Shanna**

| | |
|---|---|
| **From:** | Powers, Robert |
| **Sent:** | Monday, January 8, 2024 4:53 PM |
| **To:** | Gohlke, Shanna; Hummell, Mike |
| **Subject:** | Fwd: Related Party Reconciliation |
| **Attachments:** | image002.png; image003.png; image004.jpg; ALB Add Info Request List for Bay 12.21.23.pdf; Due from Bay - Summary thru 12.20.23.xlsx; ALB-Berry GP - Related Party Bal Rec for J Klein - 12.21.23.xlsx |

Robert Powers
+1 281 245 8161

Begin forwarded message:

> **From:** "Powers, Robert" <PowersR@bayltd.com>
> **Date:** January 8, 2024 at 4:10:00 PM CST
> **To:** Marty Berry <captberry@aol.com>
> **Subject: FW: Related Party Reconciliation**

> **From:** Klein, James <KleinJ@bayltd.com>
> **Sent:** Monday, January 8, 2024 2:29 PM
> **To:** Powers, Robert <PowersR@bayltd.com>
> **Subject:** FW: Related Party Reconciliation
> **Importance:** High

> Rob,

> I received this from Lawrence's team at Riverway.

> We have not reviewed this.

> Regards,
> JIM

> **James A Klein**
> *Vice President and CFO, Bay Ltd.*
> O: 361.693.2413 |
> 1414 Valero Way Corpus Christi, TX 78409
> KleinJ@Bayltd.com | www.bayltd.com

> **From:** Gretchen Reed <gretchen@riverway.biz>
> **Sent:** Monday, January 8, 2024 11:55 AM
> **To:** Klein, James <KleinJ@bayltd.com>
> **Cc:** Tonja Fulghum Riverway <TFulghum@riverway.us>

1

**Subject:** Related Party Reconciliation
**Importance:** High

This sender is trusted.

Good morning Jim

After an initial review of the Berry Family Related Expense Excel analysis, we are sending the attached request list. Once we receive the requested reconciliations and additional support, we will likely have additional questions as we continue our review process.

We are also sending you a reconciliation of amounts that Bay owes to Lawrence and his Trust entities as outlined below, much of which relates to Riverway Group labor provided to Bay and the LSP project as well as some other expenses that Lawrence has covered. The $1,709,766.64 should be netted against Bay's Due from ALB balance.

We look forward to receiving the historical credits from 2021/2022 for disputes totaling ($190,233.73) and previously netted costs for historical unpaid check requests totaling ($88,298.64) and the offset for Riverway Group and ALB costs of $1,709,766.64 (outlined above). If you could please send us an updated reconciliation of the revised balance once these adjustments have been reflected, we would appreciate it. The estimated adjusted balance is approximately $1,444,514.35 before we receive additional information allowing us to follow along with the 2023 and historical charges to Lawrence's account. We reserve the right to question and adjust this balance based on the review of the detailed timesheets and equipment tickets, etc.

As soon as the additional support is received, we will review and continue this reconciliation process.

Thank you for your help with this.

Gretchen Reed
Direct: 281.833.2182 | Mobile: 713.373.2165
5005 Riverway Drive | Suite 440 | Houston, TX 77056

| | A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|---|
| 1 | Due from Bay to ALB and Related Parties | | | | | | | |
| 2 | As of 12.20.23 | | | | | | | |
| 3 | | | | | | | | |
| 4 | | | Riverway Group | | | | | |
| 5 | | | Bay G&A | | | 27,472.23 | | |
| 6 | | | Axis Midstream G&A | | | 302,074.16 | | |
| 7 | | | Wind Farm G&A | | | 68,653.52 | | |
| 8 | | | Green Hydrogen G&A | | | 12,248.13 | | |
| 9 | | | Bay Deposition | | | 822.50 | | |
| 10 | | | | | | 411,270.54 | | |
| 11 | | | | | | | | |
| 12 | | | Lone Star Ports G&A | | | 745,735.45 | labor for midstream project | |
| 13 | | | Total Due to Riverway Group | | | 1,157,005.99 | | |
| 14 | | | | | | | | |
| 15 | | | | | | | | |
| 16 | | | Allen Lawrence Berry | | | | | |
| 17 | | | Reimbursable Credit Card Expenses | | | 214,842.29 | | |
| 18 | | | Equipment Expense | | | 113,924.63 | | |
| 19 | | | Flying Bull Ranch Expense | | | 80,465.41 | | |
| 20 | | | Holding - Flying Bull Ranch Expense | | | 45,517.50 | | |
| 21 | | | Company Event | | | 1,260.00 | | |
| 22 | | | Charitable Contributions | | | 17,500.00 | | |
| 23 | | | Lone Star Ports Expense | | | 6,138.47 | | |
| 24 | | | San Patricio Sand & Gravel | | | 45,187.49 | | |
| 25 | | | Total Due to Allen Lawrence Berry | | | 524,835.79 | | |
| 26 | | | | | | | | |
| 27 | | | | | | | | |
| 28 | | | West 17th Resources | | | | | |
| 29 | | | Reimbursable Expenses | | | 8,036.56 | | |
| 30 | | | Total Due to West 17th Resources | | | 8,036.56 | | |
| 31 | | | | | | | | |
| 32 | | | | | | | | |
| 33 | | | Orca Properties | | | | | |
| 34 | | | Reimbursable Expenses | | | 19,888.30 | | |
| 35 | | | Total Due to Orca Properties | | | 19,888.30 | | |
| 36 | | | | | | | | |
| 37 | | | | | | | | |
| 38 | | | Total Due from Bay to ALB & Related Parties | | | 1,709,766.64 | | |
| 39 | | | | | | | | |
| 40 | | | | | | | | |

# EXHIBIT 38

-----Original Message-----
From: Gary Ramirez <gramirez@ramirezlawoffices.com>
Sent: Friday, November 1, 2024 10:01 AM
To: Berry, Bonnie <bkbathome@aol.com>; 'Sandra Martin' <smartin@ramirezlawoffices.com>; Marty Berry AOL <captberry@aol.com>; Hummell, Mike <HummellM@bayltd.com>
Subject: FW: Investment Agreement

Never received response when this was sent back in august

Gary E. Ramirez

RAMIREZ LAW OFFICES, PC
555 N. Carancahua, Suite 880
Corpus Christi, Texas 78401
C- Phone: 361/885-8100
/- Direct: 361/885-8105
/ - Fax: 361/885-8101
/ - E-mail: gramirez@ramirezlawoffices.com

This email and any files transmitted with it are confidential and may be subject to the attorney-client and/or attorney work product privilege, and are intended solely for the individu
al or entity to whom they are addressed. If you have received this em
ail in error, please notify the sender at gramirez@ramirezlawoffices.com and destroy the email immediately.

-----Original Message-----
From: Gary Ramirez <gramirezlawoffices@icloud.com>
Sent: Friday, August 2, 2024 1:36 PM
To: atpowers@allied-pacific-group.com; bkbathome <bkbathome@aol.com>; Sandra Martin <smartin@ramirezlawoffices.com>; gramirez@ramirezlawoffices.com
Subject: Investment Agreement

Hello Ted, this is Gary Ramirez

On behalf of Bonnie Berry, can you please forward the Nov 1, 2018 executed Investment Agreement?

Thank you,


Sent from my iPhone
Gary Ramirez=

# EXHIBIT 39

**From:** Doug Allison
**Sent:** Friday, July 26, 2024 5:00 PM
**To:** Hummell, Mike
**Subject:** Fw: Berry/Berry/Berry

**From:** Doug Allison
**Sent:** Friday, July 26, 2024 4:29 PM
**To:** Butch Boyd; 'Barrett H. Reasoner'
**Subject:** Re: Berry/Berry/Berry

Butch/Barrett-

We scratched the surface with some discussion (limited) about Axis/LSP.  Butch, thanks for 'step 1' (which is talking about it).  As discussed, let's not go further until we have Barrett on the conference call (good luck to Barrett with his upcoming trial).

I think you guys know that Berry GP (and likely some of its subsidiaries) has invested millions (literally) in Axis/LSP.  Butch, I think you said that Lawrence has invested, also ($4,000,000).  I suggest we all get our accounting of these investments organized, and shared.  Please let me know your thoughts on this.

All of the Axis/LSP assets/project are Berry GP (owned by LDMA -- Marty, Lawrence, Bonnie).  My thought is that we need to work on this structure knowing permits are in name of Axis, and lease is in the name of Berry GP, and let's discuss any continuing role that LSP may have.  Please visit with your client, and confirm:

1.legal/equitable ownership of Axis;
2.legal/equitable ownership of LSP; and
3.control of both (now, and path-forward).

As noted above, let's get all accountings prepared so that everyone knows and can discuss who has what money in the project.  I think it behooves that process for the lawyers to have these discussions in advance of August 6 (the date of the scheduled

meetings).

Thanks
Doug

---

Gentlemen;

I hope this email finds you guys in good spirits.
There is a 'Berry' business/company (companies) set up for development of a Harbor Island project. I think the relevant companies may be 'Lone Star' and 'Axis' (and there may be others). I know that Lawrence and Marty have had some discussions about a possible path-forward for this Harbor Island project. I've been asked to inquire. What do you guys see as the existing and/or preferred structure for Harbor Island development to move forward? There is reasonable hope (and I wish I could say a real expectation) that USACE permits may be forthcoming. Can we talk about this now? (hope springs eternal).

thanks

Doug

**From:** Butch Boyd <butchboyd@butchboydlawfirm.com>
**Sent:** Monday, July 29, 2024 8:38 AM
**To:** Doug Allison
**Subject:** LSP

Doug,

hope you are enjoying your time in the Alps with your mother.

did you have any luck getting the meetings next week pushed out to give us time for calm discussion?  please let me know

best

Butch Boydl Attorney



**Butch Boyd Law Firm, P.C.**
2905 Sackett Street
Houston, Texas  77098

T)    713-589-8477
F)    713-589-8563
T/F 800-980-BOYD (2693)

CONFIDENTIALITY STATEMENT:
This email is covered by the Electronic Communications Privacy Act, 18 U.S.C. Sections
2510-2521, and is legally privileged. This e-mail and any documents attached may contain
confidential information belonging to the sender that is protected by the attorney-client, work

product and/or other privileges. The information is intended only for the use of the individuals
or entities named above. If you have received this e-mail in error, we would appreciate your
immediate notification to us by collect telephone call to arrange for the return of all copies of
the e-mail. You should also delete this transmission from any computer or system.

Barrett/Butch:

I don't see the meetings getting pushed.  From our point of view, we need to be talking about things, not avoiding things.  In my view, the more we (the attorneys) can address in advance of the called meetings --- the better.  There is a real desire to 'make ready' Axis and LSP in anticipation of USACE action (granting of the permit).  This is business -- that's all; and good business means that we should have a plan.

The easy 'first step' is to organize and support whatever expenses/costs any of the Berry companies have in the Harbor Island terminal.  Berry GP is taking this first step; and please confirm Lawrence (or one of the companies Lawrence may have chosen as a vehicle) will take this first step.  You guys tell me what is a reasonable time frame for exchanging this information.

The easy 'second step' is to share company documents regarding corporate status.  Butch, I think you were Berry GP's attorney (all 3 brothers' attorney) on the Axis/LSP deal, yes?  Please provide all documents that show how Carlyle participated, and then how Carlyle exited LSP (such that LSP returned to Berrys).  I do not know details, but I am a fast study if you'll provide information.  Same with Axis, please provide all company formation documents, and other company documents, so that we can see how things have been held for us during this pre-permitting window of time.

Simply put:  1) who has what money in it?  2) let's get the company documents up on the table for all to see so that we can make a plan about what needs to happen.

thanks
Doug


**From:** Butch Boyd <butchboyd@butchboydlawfirm.com>
**Sent:** Monday, July 29, 2024 8:38 AM

**To:** Doug Allison
**Subject:** LSP

Doug,

hope you are enjoying your time in the Alps with your mother.

did you have any luck getting the meetings next week pushed out to give us time for calm discussion?  please let me know

best

Butch Boydl Attorney



**Butch Boyd Law Firm, P.C.**
2905 Sackett Street
Houston, Texas  77098

T)    713-589-8477
F)    713-589-8563
T/F 800-980-BOYD (2693)

CONFIDENTIALITY STATEMENT:
This email is covered by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510-2521, and is legally privileged. This e-mail and any documents attached may contain confidential information belonging to the sender that is protected by the attorney-client, work product and/or other privileges. The information is intended only for the use of the individuals or entities named above. If you have received this e-mail in error, we would appreciate your immediate notification to us by collect telephone call to arrange for the return of all copies of the e-mail. You should also delete this transmission from any computer or system.

**EXHIBIT 40** 1

AUGUST 6, 2024

BEACON, INC.,

M. BERRY: Let's start. August 6 at 10:06. We are going to start with the Beacon, Inc., shareholder meeting and I will read the minutes to you all from the last meeting.

Bylaws: Discuss concerning the sell of (inaudible) real property. Resolution was presented to require a minimum of 48-hours notice to the Board on a proposed sale of any real property owned by the company as ordered by the court as a result of the TRO. Motion was made by Bonnie. Seconded by Marty, passed two to one. We had a discussion concerning establishment of protocol for directors making prompt temporary loans to the company. Resolution was proposed on motion by Bonnie. Seconded by Marty. It passed two to one.

A request was made by Bonnie Berry that Lawrence Berry resign from the Board until he paid all his company debts. As a discussion was held, Bonnie moved for removal of Lawrence Berry as the director of Berry GP, seconded by Marty. Motion pass two to one. Bonnie moved for the removal of Lawrence as director of Beacon, Inc., seconded by Marty Berry. Motion passed two to one. Meeting was adjourned. Any others on that one?

L. BERRY: I have a general objection. I want to note that I was never properly removed from the Board of Directors of Beacon. I exercise my rights under Article 6, the Beacon Articles of Incorporation and *cumulatively vote my shares of Beacon against my removal to protect per Texas Business Organization Code 21.409 (c) the 1000 votes cast against my removal would have been sufficient to elect one director on a plurality basis if cumulatively voted at an election of three directors. So the votes removed me fail. Any action supposedly taken by the Beacon Board after my improper purported removal as a director are all unauthorized and invalid.

Additionally, I have not been provided with the minutes of the prior meeting despite requesting them in advance. I cannot vote to approve these minutes because I have not had time to review them and determine whether they are accurate nor do I believe that those minutes are accurate. The meeting minutes are inaccurate because I was not properly removed from the Board. I voted my shares *against my removal so I am still the director so I cannot vote to approve these minutes because they are inaccurate.

M. BERRY: I guess that will be a matter decided on a different day. Do you have any changes,

Bonnie?

MS. BONNIE:  No.  That sounds like what I remember.  I would like a copy of those minutes.  But that is what happened in the meeting.

MR. HUMMELL:  They are in there.

MS. BONNIE:  They are?

MR. HUMMELL:  They should be.

MS. BONNIE:  Okay.  Here they are.

M. BERRY:  I guess we will have a motion.  All in favor to accept the minutes as written.

MS. BONNIE:  I so move.

L. BERRY:  No.

M. BERRY:  I say yes.

L. BERRY:  Subject to my earlier objections.

UNIDENTIFIED:  I say yes.

M. BERRY:  All right.  We are short one director of -- director of Beacon, Inc.  I would suggest that we put Dr. Hinojosa in that spot.

MS. BONNIE:  Since she is on Berry GP already.

M. BERRY:  She is on Berry GP already.

MS. BONNIE:  That's a natural procession, I suppose.  So moved.

M. BERRY:  Do you have anybody you want

to put on there, Lawrence?

L. BERRY:  No.

(Pause.)

M. BERRY:  I will second the nomination of Dr. Hinojosa.  Did you make that?  Ted came in right --

MS. BONNIE:  Yes, I did.  But I would like a copy of your objection, Lawrence.  That's a lot for me to understand.

L. BERRY:  I will get it to you in just a second.

MS. BONNIE:  Not at this moment.  I am just saying before we are done.

L. BERRY:  All right.

M. BERRY:  All in favor say I.

MS. BONNIE:  I.

M. BERRY:  I.  Opposed.  All right.  So we will put Dr. Hinojosa in as the director of Beacon, Inc.

Being no further business, I will entertain a motion for adjournment of Beacon, Inc.

MS. BONNIE:  Do you have anything else?

L. BERRY:  I don't.

MS. BONNIE:  So moved.

M. BERRY:  I second.

MR. HUMMELL:  What time is it?

M. BERRY:  10:09.  All in favor of adjournment.

M. BERRY:  I.

MS. BONNIE:  I.

M. BERRY:  Beacon, Inc., is adjourned.

*******

ACCESS MIDSTREAM HOLDINGS, LLC

M. BERRY:  Next is Access Midstream Holdings.  Access Midstream Holdings, LLC is -- what we want to do is I just want it clarified.  I want it fixed.  Papers show different things.  Butch says that Lawrence owns this solely.

L. BERRY:  That is not true.

M. BERRY:  That's what he told the attorney.  I know it's not true.

MS. BONNIE:  I think I remember him saying that all the brothers own it.  Is that right, Lawrence?

L. BERRY:  I am going to have to look at the paperwork but -- I did found it.  I did start it.

MS. BONNIE:  Who funded it?

L. BERRY:  Me.

MS. BONNIE:  You funded it personally

with your own money?

L. BERRY: Yes, ma'am.

MS. BONNIE: Can you produce -- I am going to have to do it any way for the 706 and IRS. Can you produce Articles of Incorporation, directors, shareholders, bylaws.

L. BERRY: Absolutely. It's all here somewhere already.

M. BERRY: On our behalf and your husband's behalf -- I guess your behalf too, there is a Lone Star Ports, LLC; Alan Lawrence Berry, Marvin Glen Berry and Dennis Berry, Plaintiffs. We sued the Carlyle Group, LP, Carlyle Investments Management, LLC and Carlyle Global Infrastructure Opportunity. In that it says that the plaintiffs request a declaratory judgment. Plaintiffs own 100 percent of the membership and all equity interest in the project Lone Star Ports and each project company and until the day of -- you can read it yourself but it says we all own parts of it.

L. BERRY: Never been a doubt about that.

M. BERRY: I am just trying --

MS. BONNIE: But you are saying you own it.

L. BERRY: I didn't say I owned it. I said I funded it. You have to have Ted unwind this

shit.  I am not the author of this model --

MS. BONNIE:  It's a lot for me to unwind.

L. BERRY:  Don't worry.  I don't understand it either.

M. BERRY:  So what I am saying is I want the paperwork to reflect the fact that we have three owners of this company.  That's what I want, nothing much.

L. BERRY:  I believe it does.

M. BERRY:  Do what?

ATTORNEY 2:  I believe it does.

M. BERRY:  It doesn't.  We pulled it up and it doesn't.  I don't know if it does or not.  I don't have nothing here to tell me one way or the other to be honest -- the documents.

MS. BONNIE:  Where is it going to be, Lawrence, if you think it's here?

L. BERRY:  No, I know it's here.  I just don't know where.  I could not say.  I'm happy to discuss the ownership structure of Access Midstream with no formal actions to be taken this meeting with respect to Access Midstream because it was not validly noticed and because Marty had no authority to act as non-members and non-managers.

MS. BONNIE:  Well, who is the manager?

L. BERRY:  It's Lone Star Ports Enterprises, LLC.

MS. BONNIE:  Of Access Midstream?

L. BERRY:  Access Midstream Holdings, yes.  That's what my chart says.

M. BERRY:  Lone Star Ports, LLC owns it?

L. BERRY:  Yes.

MR. HUMMELL:  Lone Star Ports Enterprises, LLC is what he just said.

MS. BONNIE:  So are they different?  Because that's really confusing.

L. BERRY:  This was all structured with Carlyle.  That's why I said you are going have to Ted to unwind this.  It's -- there is a bunch.  It's like mess of spaghetti.  All I know is that we own it together at the end of the day.

M. BERRY:  I just want to see the documents that show that I own it on my part.  That's it.

MS. BONNIE:  Well, me too.

M. BERRY:  I want to have those documents by the end of the week to show that I own my part of this.  I don't have them.  You are shown as manager with the Secretary of State, Lawrence.  You can fill that out in two minutes and change it and we can all have it.  I

just put this as something to talk about this meeting and that's really.

MR. HUMMELL: I think considering the Carlyle Group is out and that the Carlyle deal died by virtue of y'all's lawsuit back in 2019 that it makes sense to kill the Carlyle model.

MS. BONNIE: And clean it up.

MR. HUMMELL: And get this organized.

MS. BONNIE: So that all normal people can understand it.

MR. HUMMELL: Well, so you can do something if you get the permit. If you are able to move something along.

MS. BONNIE: When we get the permit. So Lawrence, the court requires in an estate upon the death to have what is created called a 706. So the IRS requires a snapshot in time of everything and anything that Dennis had of value except for possibly T-shirts and socks. But really it's that and we have to do that to establish a basis for his estate going forward. So by law, I have to have this information. The court will make it be produced.

L. BERRY: I understand. This is a liability not an obligation -- I mean, not an asset. This whole thing.

MS. BONNIE:  Why would that be?

L. BERRY:  Because we owe a fortune to the Rachal Foundation that we contracted and we currently don't have anything to sell.

M. BERRY:  We don't owe them.  We've paid them all along.

L. BERRY:  I know but you have a going forward contractual obligation to fund.  So this constitutes a liability until the day you sell it pursuant to gap.

M. BERRY:  It's a limited liability corporation.  It does not make a difference if we owe or not.

L. BERRY:  Bonnie, from an asset standpoint, it has negative value.  Do you follow me?

MS. BONNIE:  I do.  I understand that.  But I still think that it has potential asset.

L. BERRY:  It does for sure.  But for your purposes, this has no value.  That's the most important thing.

MS. BONNIE:  Well, it's really not because what we are trying to do is establish a basis as much as we can get it at right now, Lawrence, so that when I die -- the point from the basis forward is what my kids are going to be taxed on.  Does that make sense

to you?

L. BERRY:  Yes, it does.

MS. BONNIE:  So if it's low and there is this much more assets, this much more appreciation --

L. BERRY:  Oh, that's right.  You're his wife.  I forgot about that.

M. BERRY:  Access Midstream does not have any obligation, whatsoever, to the Foundation.

MR. HUMMELL:  That lease is with a completely different entity.

M. BERRY:  We will talk about that in a minute.  This has nothing to do with it whatsoever.  This is what the permit is going to come in and it will have value.  It will have a lot of value provided everything else.

L. BERRY:  More than it's ever had before now with the 75-foot dredge.

MR. HUMMELL:  I heard that happened last week.

M. BERRY:  Last time they had a permit like that, it only took 25-years to get funding.

MR. HUMMELL:  Well, funding is another step but the permit is helpful.  The bottom line though is Access Midstream does not have the obligation on the lease.  The lease is owned by Canada Project Holdings, I

think.

L. BERRY: The way I see it, if you look at the deal in totality, I agree each of these entities -- it's all -- it's like a big 'ol transmission, gears interconnected. So like I said, we are down to the sweet spot now and blessed by God, like I am so shocked that that permit was awarded, I just can't believe it. But it's a function of how effective Mr. Teague's people have been because this has all been Enterprise that screwed us.

MS. BONNIE: Who is Mr. Teague?

L. BERRY: The guy that runs Enterprise. He told me when I met with him down at the Coronado Club when Bobby and I had that meeting, we stayed there for four hours, and at the end of the day when he shock my hand, looked real nice, Mr. Berry, I want you to come back see me when you have something to sell. He looked me right in the eyes and shook my hand and squeezed real hard and said, good luck getting that permit and started laughing. I should have known I'd have a lot more respect for Mr. Teague now than I might have then. He scared the heck out of me.

MS. BONNIE: He's not the only game in town either.

L. BERRY: No. We have not responded to

Exxon Mobile yet. This is right in their wheel house.

MR. HUMMELL: Did you say the permit has already been issued?

L. BERRY: No. It's approved for the Port, not issued.

MR. HUMMELL: Okay.

L. BERRY: Okay. Ours is -- we are right there not anything else that can happen to us that I am aware of. We have checked everything. It's just eminent from everything I can hear and every meeting I've sat in. Eminent being cool and then the joker in all of this is that there has been a recommendation made Gibson bought Buckeye's terminal in Ingleside point, about the size of Naval Air Station. Their docks are inadequate. They are just a huge fiasco. They are -- Gibson needs another dock and the nearest term and most cost effective way for one to get one is our project. You have to remember that decreases our cap X by like $300 million because they have all that tankage already. It's a line from Ingleside Point to Red Fish Bay. All of a sudden your cap X, there is no cross, there is no coming from Midway Junction, no pumps and tankage at Midway, everything is already there. So now this is just the last link in the chain, if you follow that. So Gibson owns Buckeyes.

MR. HUMMELL: So they have a tank farm there already?

L. BERRY: Yeah, big giant --

MR. HUMMELL: So all they got to do is connect their tank farm to Red Fish Bay.

L. BERRY: To the lines going across. They've already had board meeting --

MR. HUMMELL: Can I stop you there?

L. BERRY: Sure.

MR. HUMMELL: I am afraid I might be missing something.

Is the permit still good if you abandon parts of the project?

L. BERRY: Of course.

MR. HUMMELL: Okay.

L. BERRY: They have to know the whole title going backwards what you are doing. If you have less impact, you are decreasing a whole bunch of scope because it's already been done. Then the plan is for Gibson to convert their docks into LPG which -- because LPG vessels are smaller, physically not as imposing as something a quarter mile long.

MR. HUMMELL: But you have to have, for instance, a pipe connect from Gibson to Red Fish Bay that you don't have.

L. BERRY:  Straight down that *right a way.

MR. HUMMELL:  But you don't have that now.  So if that's going to be added to what y'all have in place, won't that change your permit.

L. BERRY:  Not at all.

MR. HUMMELL:  Okay.

MS. BONNIE:  So back to --

MR. HUMMELL:  Who owns Lone Star Ports Enterprises, LLC?

L. BERRY:  Us.

MS. BONNIE:  Who is us?

MR. HUMMELL:  The three brothers?

L. BERRY:  The three trusts.

MR. HUMMELL:  The three trusts?

L. BERRY:  As I recall.

MS. BONNIE:  And where are those Articles of Incorporation.

M. BERRY:  Hey, I think we ought to stick to one thing at a time.  All of these things are going to come up.

MS. BONNIE:  What were we on?  Lone Star Ports?

M. BERRY:  We are on Access Midstream. Access Midstream Holdings.

MS. BONNIE:  You say this is under the umbrella of Lone Star Port--

M. BERRY:  I did not say that.  That's what Lawrence is saying.  It's a separate entity.

L. BERRY:  Manager of Access Midstream Holdings is Lone Star Ports Enterprises, LLC.

MS. BONNIE:  Then we follow the flow chart.  Is Lone Star Ports, LLC -- okay.  Sole manager of Access Midstream Holdings, LLC is Loan Star Ports.

L. BERRY:  Enterprises, LLC.

MS. BONNIE:  Lone Star Port Enterprises. Do you have anything that you want to action or are we just trying to figure this out?

M. BERRY:  I can't do the action.  Only Lawrence can do the action.  I want to be put down as my ownership.  It will also exhibit your ownership of Access Midstream.  It's nothing more than one piece of paper and that can be done by the end of the week.

MR. HUMMELL:  Well, if the three of y'all all are members of Lone Star Ports Enterprises, LLC, then you all own Access Midstream Holdings, LLC.

M. BERRY:  Then let's see that paperwork.

MR. HUMMELL:  Yes, I got it.

MS. BONNIE:  How do we get that?

M. BERRY:  Lawrence has got it.  It has

to come from him.

MS. BONNIE: Well, this isn't pre-digital era. This is not the 1950s.

L. BERRY: All of this was executed. Should be copies here. I don't know where but it is here.

MR. HUMMELL: Here in Corpus?

L. BERRY: Corpus, yes. All of this was -- like the originals are going to end up being here.

M. BERRY: So you would have no problem if we went and filled out a Secretary of State deal right now showing all three of us as owners as signing it. If you are listed as the manager with the Secretary of State, the only way it can happen is you sign it.

L. BERRY: Marty, I don't have a problem clarifying all this. I've never had a problem with all of that. I don't know why you think that would be an issue. I never been an impediment to getting a God thing done around here.

M. BERRY: Good. Let's get that done today then. It's simple.

MS. BONNIE: You'll deal with this. I have to understand it to feel competent that I know what is going on in front of a judge, Lawrence.

L. BERRY:  Understood.

MS. BONNIE:  So you will get -- you will get the form corrected with the Secretary of State that indicates that three -- the brothers own this.

M. BERRY:  Whatever it takes for clarity, I don't have a problem with.

MS. BONNIE:  Let's make sure that we understand this, Marty --

L. BERRY:  All that being said -- we are like tippy toeing -- to understand all this shit, we need Ted.

MS. BONNIE:  Well, let's finish with the guts of it and then maybe Ted can come and draw some pictures.

L. BERRY:  I am more than willing to clarify whatever we have to do, Marty.

MS. BONNIE:  Thank you, Lawrence, for that.  So because manager, a sole manager of Access Midstream is Lone Star Port Enterprises, LLC --

M. BERRY:  Sole owner or sole manager?

L. BERRY:  Member and manager.

MS. BONNIE:  Member and manager?

MR. HUMMELL:  Owner and controller.

MS. BONNIE:  Is that extrapolated from --

MR. HUMMELL:  Members are owners.

Managers are -- they manage the entity.

MS. BONNIE: Managers are owners.

MR. HUMMELL: When you are talking about an LLC, the members actually own and the managers run or operate.

MS. BONNIE: Okay. All right. So put that on your list, Lawrence, please, to file with Secretary of State that clears that up.

M. BERRY: The sole member and manager of Access Midstream Holdings is?

MS. BONNIE: Lone Star Ports Enterprises, LLC, right? Is that right, Lawrence?

L. BERRY: Yes, that's what it says here.

MS. BONNIE: Okay. Where are you reading from, is that from --

L. BERRY: All my notes from my counsel.

MS. BONNIE: Okay. But we still don't have anything official saying that except for what your counsel says. Maybe Ted has it.

M. BERRY: It will be easily changed, nothing to it.

MS. BONNIE: Are we through with Access Midstream Holdings meeting?

M. BERRY: This is not a -- more of a clarification. I might have called it a meeting. I

want to get it clarified.  That's all a number of these really are.

MS. BONNIE:  So anything -- who are the officers and directors right now, Lawrence, of Access? Do you know?

L. BERRY:  No.  It's Lone Star Ports.

MS. BONNIE:  Okay.  So whoever's managers, officers or directors of Lone Star Ports is the same by default -- by association, I should say.

M. BERRY:  Let's just move on from Access Midstream.  The only request is it says it's owned or whatever, it's to reflect our third, third, and third ownership.

We will go ahead and move to Lone Star Ports, LLC.  Lone Star Ports, LLC that one is still owned by the Carlyle group.  Period.  No question about that.  So there is a bunch of Lone Star Ports --

L. BERRY:  I don't think so, Marty.  They tendered all the stocks.

MR. HUMMELL:  Secretary of State is what he is talking about.  If you look on the website.

L. BERRY:  We settled with them they tendered their stocks so I don't think they own anything anymore.

MR. HUMMELL:  But it never got changed

| | | |
|---|---|---|
| ALBERT THEODORE POWERS; | § | IN THE BUSINESS COURT |
| ALLIED PORTS LLC, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | 11A – STATE OF TEXAS |
| | § | |
| AXIS MIDSTREAM HOLDINGS LLC; | § | |
| ALLEN LAWRENCE BERRY; | § | |
| MARVIN GLENN BERRY; and | § | |
| BONNIE BERRY, as successor in | § | |
| interest to DENNIS WAYNE BERRY | § | |
| | § | |
| *Defendants.* | § | HONORABLE SOFIA ADROGUE |

# DEFENDANTS' EXHIBIT 41

# AVAILABLE IN CAMERA



**RRY CONTRACTING LP**
**Cost Ledger v4**

*A BERRY Company*

| 817380 | BAY LTD | Start Date | ####### | BAY, LTD. |
|---|---|---|---|---|
| Show all PO | Gulf Coast Gatewa | Completion Date | | |
| 817380 AR Aging | | Revision Date | | |

**200. G GENERAL**

| Job # | Journal Date | GL Account | Account Description | JR Ctl | JR Seq | Transaction Source | Transaction Description | Reference/ Invoice Number | GL Amount |
|---|---|---|---|---|---|---|---|---|---|
| 817380 | 02/28/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ38461 | 0004 | BERRY Y&V FABRICATORS LLC | Personnel-Gulf Coast | 4021 | 21,032.00 |
| 817380 | 03/22/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ38674 | 0022 | BERRY Y&V FABRICATORS LLC | Bay Exp-Gulf Coast | 4046 | 2,159.81 |
| 817380 | 03/22/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ38674 | 0024 | BERRY Y&V FABRICATORS LLC | Bay Exp-Gulf Coast | 4047 | 47.73 |
| 817380 | 03/22/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ38674 | 0026 | BERRY Y&V FABRICATORS LLC | Bay Exp-Gulf Coast | 4048 | 4,285.12 |
| 817380 | 03/22/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ38674 | 0028 | BERRY Y&V FABRICATORS LLC | Bay Exp-Gulf Coast | 4049 | 44.52 |
| 817380 | 03/22/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ38674 | 0078 | BERRY Y&V FABRICATORS LLC | Personnel-Gulf Coast | 4088 | 29,636.00 |
| 817380 | 03/31/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ38854 | 0058 | GULLET & ASSOCIATES INC | Consulting | 126925 | 779.40 |
| 817380 | 03/31/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ38854 | 0060 | GULLET & ASSOCIATES INC | Consulting | 126920 | 27,718.53 |
| 817380 | 03/31/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ38854 | 0062 | GULLET & ASSOCIATES INC | Consulting | 126923 | 1,299.54 |
| 817380 | 04/30/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ39325 | 0026 | BERRY Y&V FABRICATORS LLC | Bay Exp-Gulf Coast | 4112 | 606.89 |
| 817380 | 04/30/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ39325 | 0076 | BERRY Y&V FABRICATORS LLC | Personnel-Gulf Coast | 4148 | 39,196.00 |
| 817380 | 05/31/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ39789 | 0046 | BERRY Y&V FABRICATORS LLC | Bay Exp-Gulf Coast | 4196 | 175.52 |
| 817380 | 05/31/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ39789 | 0060 | BERRY Y&V FABRICATORS LLC | Bay Exp-Gulf Coast | 4205 | 193.23 |
| 817380 | 05/31/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ39789 | 0064 | BERRY Y&V FABRICATORS LLC | Bay Exp- Axis | 4207 | 2,370.33 |
| 817380 | 05/31/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ39789 | 0092 | BERRY Y&V FABRICATORS LLC | Personnel-Gulf Coast | 4225 | 28,680.00 |
| 817380 | 05/31/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ39824 | 0023 | GULLET & ASSOCIATES INC | Gulf Coast Gateway | 127170 | 597.54 |
| 817380 | 05/31/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ39824 | 0025 | GULLET & ASSOCIATES INC | Gulf Coast Gateway | 127077 | 389.70 |
| 817380 | 06/30/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ40280 | 0020 | BERRY Y&V FABRICATORS LLC | Bay Exp-Gulf Coast | 4249 | 56.84 |
| 817380 | 06/30/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ40280 | 0024 | BERRY Y&V FABRICATORS LLC | Bay Exp-Gulf Coast | 4251 | 535.06 |
| 817380 | 06/30/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ40280 | 0070 | BERRY Y&V FABRICATORS LLC | Personnel-Gulf Coast | 4286 | 63,575.25 |
| 817380 | 07/31/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ41162 | 0006 | BERRY Y&V FABRICATORS LLC | Bay Exp-Gulf Coast | 4312 | 271.43 |
| 817380 | 07/31/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ41162 | 0050 | BERRY Y&V FABRICATORS LLC | Personnel-Gulf Coast | 4341 | 75,326.00 |
| 817380 | 08/07/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ41153 | 0014 | BERRY Y&V FABRICATORS LLC | Bay Exp-Gulf Coast | 4307 | 400.84 |
| 817380 | 08/27/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ41548 | 0022 | BERRY Y&V FABRICATORS LLC | Bay Exp-Gulf Coast | 4369 | 199.52 |
| 817380 | 08/27/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ41548 | 0034 | BERRY Y&V FABRICATORS LLC | Bay Exp - Gulf Coast | 4381 | 116.47 |
| 817380 | 08/27/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ41548 | 0044 | BERRY Y&V FABRICATORS LLC | Bay Exp-Gulf Coa | 4388 | 164.19 |
| 817380 | 08/27/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ41548 | 0100 | BERRY Y&V FABRICATORS LLC | Personnel-Gulf Coast | 4425 | 82,209.50 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 817380 | 08/28/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ41568 | 0038 | LAWRENCE BERRY | Legal Fees | 5212018 | 1,200.00 |
| 817380 | 08/31/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ41648 | 0004 | TUBOS REUNIDOS AMERICA | Gulf Coast Gateway | 1002 | 40,402.00 |
| 817380 | 09/18/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ42265 | 0002 | LAWRENCE BERRY | Gateway legal Fee | 42018 | (1,200.00) |
| 817380 | 09/18/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ41908 | 0012 | LAWRENCE BERRY | Gateway legal Fee | 42018 | 1,200.00 |
| 817380 | 09/27/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ42127 | 0046 | ARGUS MEDIA INC | Crude License | AMI1019022 | 6,396.00 |
| 817380 | 09/27/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ42127 | 0048 | ENVIRONMENTAL SYSTEMS | ARCGIS Desktop | 93472737 | 2,056.75 |
| 817380 | 09/27/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ42127 | 0050 | ENVIRONMENTAL SYSTEMS | ARCGIS online servic | 93472581 | 106.60 |
| 817380 | 09/30/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | GJ46653 | 0003 | CE750444BC | MONTYHLY ENTRIES | | 34,170.00 |
| 817380 | 10/08/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ42302 | 0002 | ICON BANK | Appraisal Fee | 10052018 | 13,000.00 |
| 817380 | 10/11/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ42405 | 0042 | ICON BANK | Gulf Marine Property | 10112018 | 3,200.00 |
| 817380 | 10/23/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ42639 | 0023 | BERRY Y&V FABRICATORS LLC | Personnel - Veri | 4469 | 57.78 |
| 817380 | 10/23/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ42639 | 0034 | BERRY Y&V FABRICATORS LLC | D. Duke - Bay Ex | 4440 | 639.38 |
| 817380 | 10/23/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ42639 | 0042 | BERRY Y&V FABRICATORS LLC | P. Hicks-Bay Ex | 4448 | 1,471.91 |
| 817380 | 10/23/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ42639 | 0048 | BERRY Y&V FABRICATORS LLC | Bay Exp-Gulf Coa | 4451 | 857.78 |
| 817380 | 10/23/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ42639 | 0062 | BERRY Y&V FABRICATORS LLC | Bay Exp-Gulf Coa | 4477 | 2,124.68 |
| 817380 | 10/23/2018 | 4012-10100-000-000 | DIRECT SUBCONTRACT | PJ42639 | 0019 | BERRY Y&V FABRICATORS LLC | Personnel - T-Mo | 4468 | 44.91 |
| 817380 | 10/23/2018 | 4012-10100-000-000 | DIRECT SUBCONTRACT | PJ42639 | 0070 | BERRY Y&V FABRICATORS LLC | Personnel-Gulf C | 4485 | 134,513.25 |
| 817380 | 10/23/2018 | 4012-10100-000-000 | DIRECT SUBCONTRACT | PJ42639 | 0072 | BERRY Y&V FABRICATORS LLC | Personnel - Hous | 4482 | 8,681.40 |
| 817380 | 10/23/2018 | 4012-10100-000-000 | DIRECT SUBCONTRACT | PJ42639 | 0078 | BERRY Y&V FABRICATORS LLC | Personnel - Hous | 4487 | 4,780.00 |
| 817380 | 10/23/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ42653 | 0086 | JEB BROWN, ATTY AT LAW | Legal Fees | 9142018 | 75.00 |
| 817380 | 10/23/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ42653 | 0110 | THE BUSINESS LAB | Gulf Coast Logo | 1227 | 1,136.63 |
| 797380 | 10/31/2018 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ53480 | 0010 | ALLIED PACIFIC GROUP LTD | CONSULTING | 11041922BERRY | 100,000.00 |
| 817380 | 10/31/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ43003 | 0002 | BERRY Y&V FABRICATORS LLC | Bay Exp-Gulf Coa | 4521 | 32.55 |
| 817380 | 10/31/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ42932 | 0003 | BERRY Y&V FABRICATORS LLC | Personnel - Veri | 4493 | 57.78 |
| 817380 | 10/31/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ43000 | 0008 | BERRY Y&V FABRICATORS LLC | Bay Exp-Gulf Coa | 4515 | 130.69 |
| 817380 | 10/31/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ43003 | 0008 | BERRY Y&V FABRICATORS LLC | T. Fulghum - Bay | 4527 | 129.34 |
| 817380 | 10/31/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ43000 | 0014 | BERRY Y&V FABRICATORS LLC | Personnel - T-Mo | 4495 | 47.08 |
| 817380 | 10/31/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ43003 | 0016 | BERRY Y&V FABRICATORS LLC | Bay Exp- P. Hicks | 4534 | 131.25 |
| 817380 | 10/31/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ43003 | 0018 | BERRY Y&V FABRICATORS LLC | Bay Exp-Gulf Coa | 4535 | 735.74 |
| 817380 | 10/31/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ43003 | 0026 | BERRY Y&V FABRICATORS LLC | Bay Exp-Gulf Coa | 4542 | 334.08 |
| 817380 | 10/31/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ43003 | 0030 | BERRY Y&V FABRICATORS LLC | Bay Exp-Gulf Coa | 4544 | 320.78 |
| 817380 | 10/31/2018 | 4012-10100-000-000 | DIRECT SUBCONTRACT | PJ43003 | 0042 | BERRY Y&V FABRICATORS LLC | Personnel - Harbor | 4564 | 4,136.00 |
| 817380 | 10/31/2018 | 4012-10100-000-000 | DIRECT SUBCONTRACT | PJ43003 | 0050 | BERRY Y&V FABRICATORS LLC | Personnel - Midway | 4562 | 796.00 |
| 817380 | 10/31/2018 | 4012-10100-000-000 | DIRECT SUBCONTRACT | PJ43003 | 0052 | BERRY Y&V FABRICATORS LLC | Personnel - Harbor | 4563 | 6,088.00 |
| 817380 | 10/31/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ42909 | 0006 | BUTCH BOYD LAW FIRM, P.C. | Duplicate Billing | CM20135 | (1,700.00) |
| 817380 | 10/31/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ42909 | 0008 | BUTCH BOYD LAW FIRM, P.C. | Legal Services | 20144A | 12,750.00 |
| 817380 | 10/31/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ42909 | 0004 | JEB BROWN, ATTY AT LAW | Legal Services | 10082018 | 8,730.00 |
| 817380 | 10/31/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ42943 | 0007 | KNUDSON LP | Retainer | 1821060 | 10,000.00 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 817380 | 10/31/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | GJ47028 | 0002 | N&A PROJECT MANAGEMENT | | | (93,488.50) |
| | | | | | | | | 686,211.82 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 797380 | 11/13/2018 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | GJ55932 | 0011 | ACH TRANS | USACE FINANCE CENTER | | 168,519.00 |
| 797380 | 11/13/2018 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ46346 | 0013 | ALBERT THEODORE POWERS | CONSULTANT | 228192 | 107,499.19 |
| 797380 | 11/13/2018 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ54691 | 0002 | ALLIED PACIFIC GROUP LTD | CONSULTING | 1022023BERRY | 100,000.00 |
| 817380 | 11/13/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ43082 | 0022 | BAKER & MCKENZIE LLP | STX Eagleford | 9655445870 | 5,071.05 |
| 797380 | 11/13/2018 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ46433 | 0006 | GULLET & ASSOCIATES INC | 9/30-10/13/2018 | 128140A | 2,603.41 |
| 817380 | 11/13/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ43082 | 0020 | ORCA ASSETS GP, LLC | PDI-Accounting Class | 258 | 1,580.00 |
| 817380 | 11/13/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ43082 | 0010 | PROJECT CONSULTING SRVCS | Services 6/1-6/30 | 40305 | 1,197.10 |
| 817380 | 11/13/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ43082 | 0012 | PROJECT CONSULTING SRVCS | Services 7/1-7/31 | 40439 | 3,589.80 |
| 817380 | 11/13/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ43082 | 0014 | PROJECT CONSULTING SRVCS | Services 6/1-8/31 | 40638 | 8,802.75 |
| 797380 | 11/16/2018 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ47852 | 0010 | ALBERT THEODORE POWERS | CONSULTANT | 501193 | 107,219.11 |
| 797380 | 11/16/2018 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ49181 | 0006 | ALBERT THEODORE POWERS | CONSULTANT | 702194 | 110,572.35 |
| 797380 | 11/16/2018 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ51105 | 0051 | ALBERT THEODORE POWERS | CONSULTANT | 902195 | 107,449.62 |
| 797380 | 11/16/2018 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ53480 | 0008 | ALBERT THEODORE POWERS | CONSULTING | 1104196 | 116,106.01 |
| 797380 | 11/20/2018 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ46812 | 0012 | GULLET & ASSOCIATES INC | 7/22/18-8/4/18 | 127697A | 2,998.09 |
| 797380 | 11/20/2018 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ46816 | 0012 | GULLET & ASSOCIATES INC | 9/16/18-9/29/18 | 128058A | 4,277.50 |
| 797380 | 11/29/2018 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ54690 | 0002 | ALBERT THEODORE POWERS | CONSULTING | 102207 | 103,976.91 |
| 817380 | 11/29/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ43384 | 0026 | N&A PROJECT MANAGEMENT | Integration Project | 263 | 93,488.50 |
| 797380 | 12/06/2018 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ46433 | 0008 | GULLET & ASSOCIATES INC | 9/30-10/13/2018 | 128140B | 7,020.00 |
| 817380 | 12/11/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ43641 | 0027 | BUTCH BOYD LAW FIRM, P.C. | Legal Services | 20154 | 11,615.00 |
| 817380 | 12/11/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ43641 | 0029 | JEB BROWN, ATTY AT LAW | Legal Services | 111918 | 11,963.53 |
| 817380 | 12/13/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ43699 | 0088 | BAKER & MCKENZIE LLP | Professional Service | 9655466433 | 12,179.25 |
| 817380 | 12/13/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ43699 | 0090 | BAKER & MCKENZIE LLP | Professional Service | 9655455443 | 50,018.00 |
| 817380 | 12/13/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ43699 | 0094 | CARR, RIGGS & INGRAM LLC | Legal Services | 16563669 | 1,000.00 |
| 797380 | 12/13/2018 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ46816 | 0014 | GULLET & ASSOCIATES INC | 9/16/18-9/29/18 | 128058B | 4,680.00 |
| 797380 | 12/13/2018 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ46812 | 0044 | GULLET & ASSOCIATES INC | 7/22/18-8/4/18 | 127766A | 2,383.50 |
| 817380 | 12/14/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ43728 | 0002 | BERRY Y&V FABRICATORS LLC | Personnel - Burleson | 4558 | 796.00 |
| 817380 | 12/14/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ43728 | 0004 | BERRY Y&V FABRICATORS LLC | Personnel - Central | 4559 | 796.00 |
| 817380 | 12/14/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ43728 | 0006 | BERRY Y&V FABRICATORS LLC | Personnel - Central | 4560 | 796.00 |
| 817380 | 12/14/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ43728 | 0008 | BERRY Y&V FABRICATORS LLC | Personnel - Midw | 4561 | 8,226.00 |
| 817380 | 12/14/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ43728 | 0010 | BERRY Y&V FABRICATORS LLC | Personnel - RBT | 4565 | 10,712.00 |
| 817380 | 12/14/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ43728 | 0012 | BERRY Y&V FABRICATORS LLC | Personnel - Midw | 4566 | 4,614.00 |
| 817380 | 12/14/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ43728 | 0014 | BERRY Y&V FABRICATORS LLC | Personnel - Midstrea | 4567 | 73,180.00 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 797380 | 12/18/2018 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ56133 | 0009 | ALLIED PACIFIC GROUP LTD | ALLIED PACIFIC GRO | 3012024BERRY | 100,000.00 |
| 817380 | 12/18/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ43764 | 0032 | BAKER & MCKENZIE LLP | Professional Service | 9655475595 | 30,022.65 |
| 817380 | 12/18/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ43764 | 0056 | BUTCH BOYD LAW FIRM, P.C. | Legal Services | 20164 | 33,275.00 |
| 817380 | 12/18/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ43764 | 0052 | GULLET & ASSOCIATES INC | Professional Service | 128114 | 17,592.05 |
| 817380 | 12/18/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ43764 | 0054 | GULLET & ASSOCIATES INC | Professional Service | 127965 | 2,587.18 |
| 797380 | 12/18/2018 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ46812 | 0054 | GULLET & ASSOCIATES INC | 9/16/18-9/29/18 | 128135X | (1,012.88) |
| 817380 | 12/18/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ43764 | 0060 | KNUDSON LP | Consulting Services | 5802IN | 3,321.00 |
| 817380 | 12/19/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ43799 | 0092 | ANDREASON LAW FIRM | Legal Services | 7168 | 1,175.00 |
| 817380 | 12/31/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ44260 | 0004 | ALBERT THEODORE POWERS | Professional Service | 1215181 | 102,904.79 |
| 817380 | 12/31/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ44260 | 0006 | ALLIED PACIFIC GROUP LTD | Professional Service | 121818_16_BERF | 100,000.00 |
| 817380 | 12/31/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ44103 | 0009 | BERRY Y&V FABRICATORS LLC | Personnel - Veri | 4580 | 57.78 |
| 817380 | 12/31/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ44111 | 0015 | BERRY Y&V FABRICATORS LLC | Personnel - Veri | 4660 | 57.78 |
| 817380 | 12/31/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ44111 | 0020 | BERRY Y&V FABRICATORS LLC | Personnel - T-Mo | 4662 | 53.92 |
| 817380 | 12/31/2018 | 4012-10100-000-000 | DIRECT SUBCONTRACT | PJ44103 | 0004 | BERRY Y&V FABRICATORS LLC | Personnel - T-Mo | 4579 | 53.00 |
| 817380 | 12/31/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ44048 | 0084 | GULLET & ASSOCIATES INC | Professional Service | 128138 | 23,892.54 |
| 817380 | 12/31/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ44048 | 0086 | GULLET & ASSOCIATES INC | Professional Service | 128138Z | (23,892.54) |
| 797380 | 12/31/2018 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ46812 | 0056 | GULLET & ASSOCIATES INC | 9/16/18-9/29/18 | 128135A | 213,387.55 |
| 817380 | 12/31/2018 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ44005 | 0025 | THE BUSINESS LAB | Deposit on Logo | 1269 | 1,136.63 |
| 817380 | 01/08/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ44191 | 0002 | GULLET & ASSOCIATES INC | Professional Service | 128138Z | 23,892.54 |
| 817380 | 01/08/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ44191 | 0004 | GULLET & ASSOCIATES INC | Professional Service | 128138Z | (23,892.54) |
| 797380 | 01/08/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ46433 | 0010 | GULLET & ASSOCIATES INC | 10/14-10/27/2018 | 128225A | 119.08 |
| 797380 | 01/08/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ46433 | 0012 | GULLET & ASSOCIATES INC | 10/14-10/27/2018 | 128225B | 588.00 |
| 797380 | 01/08/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ46433 | 0014 | GULLET & ASSOCIATES INC | 10/28-11/10/2018 | 128314B | 405.94 |
| 817380 | 01/10/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ44276 | 0002 | GULLET & ASSOCIATES INC | Professional Service | 128138 | (23,892.54) |
| 817380 | 01/10/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ44276 | 0004 | GULLET & ASSOCIATES INC | Professional Service | 128138 | 23,892.54 |
| 797380 | 01/15/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ56575 | 0002 | ALLIED PACIFIC GROUP LTD | 797380 | 5012025BERRY | 100,000.00 |
| 817380 | 01/15/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ44400 | 0023 | BAKER & MCKENZIE LLP | Professional Service | 9655485767 | 13,166.55 |
| 797380 | 01/15/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ45656 | 0082 | BUTCH BOYD LAW FIRM, P.C. | Service 11/13-10/31 | 20176 | 56,083.60 |
| 817380 | 01/15/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ44400 | 0013 | KNUDSON LP | Consulting Services | 5819IN | 1,766.75 |
| 797380 | 01/16/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ46802 | 0057 | GULLET & ASSOCIATES INC | CORRECTION | 128314A | (81.19) |
| 797380 | 01/16/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ47632 | 0002 | GULLET & ASSOCIATES INC | 9/2-9/15/18 | 127966B | 1,980.00 |
| 817380 | 01/16/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ44453 | 0014 | OSO DEVELOPMENT PARTNERS | Professional Service | 1063 | 7,253.00 |
| 817380 | 01/21/2019 | 4012-10100-000-000 | DIRECT SUBCONTRACT | PJ44562 | 0002 | BERRY Y&V FABRICATORS LLC | CORRECTION | 4419A | 36.58 |
| 797380 | 01/24/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ46382 | 0032 | BUTCH BOYD LAW FIRM, P.C. | LEGAL SERVICES | 20183 | 41,690.50 |
| 817380 | 01/24/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ44649 | 0122 | GULLET & ASSOCIATES INC | Professional Service | 127937D | 172.10 |
| 817380 | 01/31/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ44855 | 0002 | DISORBO CONSULTING, LLC | Consulting Services | 181552 | 2,465.00 |
| 817380 | 01/31/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ44855 | 0006 | DISORBO CONSULTING, LLC | Consulting Services | 181551 | 4,152.50 |
| 797380 | 01/31/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ47641 | 0002 | GULLET & ASSOCIATES INC | 9/30-10/13/18 | 128140XX | (2,145.00) |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 817380 | 01/31/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ44855 | 0008 | JEB BROWN, ATTY AT LAW | Legal Sevices | 1292019 | 637.50 |
| 817380 | 02/13/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ45052 | 0011 | DISORBO CONSULTING, LLC | Consulting Services | 181410 | 13,650.70 |
| 797380 | 02/13/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ47632 | 0004 | GULLET & ASSOCIATES INC | 9/2-9/15/18 | 127966A | 70,430.31 |
| 797380 | 02/19/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ48342 | 0035 | BUTCH BOYD LAW FIRM, P.C. | Legal Services | 20203 | 52,207.64 |
| 797380 | 02/19/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ47641 | 0004 | GULLET & ASSOCIATES INC | 9/30-10/13/18 | 128140XXX | 2,145.00 |
| 817380 | 02/28/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ45578 | 0014 | DISORBO CONSULTING, LLC | Service 1/1-1/31/19 | 190004 | 8,553.05 |
| 817380 | 02/28/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ45578 | 0016 | DISORBO CONSULTING, LLC | Service 1/1-1/31/19 | 190006 | 1,198.75 |
| 817380 | 02/28/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ45578 | 0018 | DISORBO CONSULTING, LLC | Service 1/1-1/31/19 | 190005 | 355.00 |
| 817380 | 02/28/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ45475 | 0004 | GULLET & ASSOCIATES INC | Professional Service | 127794A | 604.68 |
| 817380 | 02/28/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ45475 | 0006 | GULLET & ASSOCIATES INC | Professional Service | 127794B | 2,880.00 |
| 817380 | 02/28/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ45475 | 0008 | GULLET & ASSOCIATES INC | Professional Service | 127877A | 1,618.34 |
| 817380 | 02/28/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ45475 | 0010 | GULLET & ASSOCIATES INC | Professional Service | 127877B | 2,880.00 |
| 817380 | 02/28/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ45475 | 0014 | GULLET & ASSOCIATES INC | Professional Service | 128057A | 108,239.72 |
| 797380 | 02/28/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ46433 | 0016 | GULLET & ASSOCIATES INC | 10/28-11/10/2018 | 128314C | 588.00 |
| 797380 | 02/28/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ47632 | 0010 | GULLET & ASSOCIATES INC | 8/19-9/1/18 | 127936D | 92.71 |
| 797380 | 02/28/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ47632 | 0012 | GULLET & ASSOCIATES INC | 8/19-9/1/18 | 127938W | (264.80) |
| 817380 | 02/28/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ45593 | 0002 | Y&V ENGINEERING & CONSTRU | Service 1/1-1/31/19 | 1210 | 45,820.00 |
| 817380 | 02/28/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ45598 | 0002 | Y&V ENGINEERING & CONSTRU | 11/26-12/31/2018 | 1208 | 27,840.00 |
| 797380 | 03/12/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ43082 | 0053 | TCEQ | Air Permit | 11132018 | 85,000.00 |
| 797380 | 03/12/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ47632 | 0014 | GULLET & ASSOCIATES INC | 8/19-9/1/18 | 127398B | 4,766.44 |
| 817380 | 03/12/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ45656 | 0084 | JEB BROWN, ATTY AT LAW | Service 1/1-1/31/19 | 2252019 | 2,287.50 |
| 817380 | 03/12/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ45656 | 0042 | LLOYD ENGINEERING, INC. | Nov/Dec Services | 5814R | 365,000.00 |
| 817380 | 03/12/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ45656 | 0036 | TOUR & TRAVEL | Car Service | 4101 | 456.00 |
| 817380 | 03/13/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ45692 | 0006 | COASTAL BEND COMMUNITY | CONTRIBUTION | 2142019 | 1,000.00 |
| 817380 | 03/13/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ45692 | 0002 | NUECES COUNTY JUNIOR | CONTRIBUTION | 2012019 | 50,092.50 |
| 817380 | 03/13/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ45692 | 0004 | SAN PATRICIO COUNTY | CHARITABLE CONTRB | 220 | 15,750.00 |
| 817380 | 03/21/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ45862 | 0027 | DISORBO CONSULTING, LLC | CONS SVC 2/1-2/28/19 | 190158 | 6,365.00 |
| 817380 | 03/21/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ45862 | 0029 | DISORBO CONSULTING, LLC | CONS SVC 2/1-2/28/19 | 190157 | 2,350.00 |
| 797380 | 03/21/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ47632 | 0016 | GULLET & ASSOCIATES INC | 9/16-9/29/18 | 128137A | 2,648.25 |
| 817380 | 03/21/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ45862 | 0031 | KNUDSON LP | CONSULTING SVC | 5898IN | 2,145.48 |
| 817380 | 03/21/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ45862 | 0033 | UNDERWATER SERVICES, INC. | SURVEY CREW | 190213 | 1,063.00 |
| 817380 | 03/25/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ45921 | 0002 | Y&V ENGINEERING & CONSTRU | PROF SERVICES | 1222 | 44,370.00 |
| 817380 | 03/26/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ45974 | 0010 | ARGUS MEDIA INC | CRUDE DSKTP 4/1-9/30 | AMI1021548 | 6,396.00 |
| 797380 | 03/26/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ47632 | 0026 | GULLET & ASSOCIATES INC | 9/16-9/29/18 | 128136A | 1,644.48 |
| 797380 | 03/26/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ47632 | 0028 | GULLET & ASSOCIATES INC | 8/19-9/1/18 | 127937C | 5,036.42 |
| 817380 | 03/31/2019 | 4032-10100-000-000 | COC - THIRD PARTY RENTA | PJ46360 | 0016 | AHERN RENTALS | (2)DUEL SET 5-PASSEN | 20141479001 | 389.70 |
| 817380 | 03/31/2019 | 4032-10100-000-000 | COC - THIRD PARTY RENTA | PJ46360 | 0020 | AHERN RENTALS | TX DEALERS EQUIP TAX | 20141479001 | 0.84 |
| 817380 | 03/31/2019 | 4032-10100-000-000 | COC - THIRD PARTY RENTA | PJ46360 | 0022 | AHERN RENTALS | (2)DUEL SET 5-PASSEN | 20141458001 | 660.33 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 817380 | 03/31/2019 | 4032-10100-000-000 | COC - THIRD PARTY RENTA | PJ46360 | 0026 | AHERN RENTALS | TX DEALERS EQUIP TAX | 20141458001 | 0.84 |
| 797380 | 03/31/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ47632 | 0032 | GULLET & ASSOCIATES INC | 9/16-9/29/18 | 128056A1 | 27,178.97 |
| 797380 | 03/31/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ47764 | 0020 | GULLET & ASSOCIATES INC | Prof SVCS 2/17-3/02 | 128950A | 5,900.00 |
| 797380 | 04/10/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ43170 | 0002 | TCEQ | Air Permit | 11132018 | (85,000.00) |
| 797380 | 04/10/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ47764 | 0022 | GULLET & ASSOCIATES INC | PROF SVCS 3/3-3/30 | 129102 | 7,755.00 |
| 797380 | 04/10/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ47764 | 0024 | GULLET & ASSOCIATES INC | PROF SVCS 3/3-3/16 | 129026 | 23,600.00 |
| 797380 | 04/10/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ47764 | 0026 | GULLET & ASSOCIATES INC | PROF SVCS | 128868A | 29,500.00 |
| 797380 | 04/11/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ43082 | 0055 | GULLET & ASSOCIATES INC | Consulting Services | 11132018 | 200,000.00 |
| 797380 | 04/11/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ43525 | 0002 | GULLET & ASSOCIATES INC | Retainer | 12092018 | 100,000.00 |
| 797380 | 04/11/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ44191 | 0006 | GULLET & ASSOCIATES INC | Retainer | 1032019 | (200,000.00) |
| 797380 | 04/11/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ44191 | 0008 | GULLET & ASSOCIATES INC | Retainer | 1032019 | 200,000.00 |
| 797380 | 04/12/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ49917 | 0046 | BUTCH BOYD LAW FIRM, P.C. | LEGAL SERV GCG | 20215 | 66,801.56 |
| 797380 | 04/12/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ50913 | 0024 | BUTCH BOYD LAW FIRM, P.C. | Services 8/1-8/31/19 | 20225 | 34,750.00 |
| 797380 | 04/12/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ53027 | 0013 | BUTCH BOYD LAW FIRM, P.C. | 09/24-12/02/19 SERV | 20261 | 32,852.83 |
| 797380 | 04/12/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ58597 | 0004 | BUTCH BOYD LAW FIRM, P.C. | 7/1-8/5/20 | 20342 | 22,453.08 |
| 797380 | 04/12/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ74139 | 0025 | BUTCH BOYD LAW FIRM, P.C. | CONFERENCE W/PERMIT | 20602 | 2,210.00 |
| 797380 | 04/12/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ74139 | 0027 | BUTCH BOYD LAW FIRM, P.C. | CONFERENCE LSP AXIS | 20596 | 1,550.00 |
| 797380 | 04/12/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ46507 | 0037 | CONTRACT LAND STAFF LLC | Professional Service | 530018110108990 | 310.83 |
| 817380 | 04/12/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ46433 | 0004 | GULLET & ASSOCIATES INC | 9/30-10/13/2018 | 128139B | 1,440.00 |
| 797380 | 04/12/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ50343 | 0012 | LAWRENCE BERRY | 3D Engineering | 256 | 106,844.00 |
| 797380 | 04/12/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ57442 | 0022 | LAWRENCE BERRY | 3D Engineering | 256 | (106,844.00) |
| 797380 | 04/12/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ57442 | 0024 | LAWRENCE BERRY | 3D Engineering | 256 | 106,844.00 |
| 797380 | 04/16/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ56133 | 0007 | ALBERT THEODORE POWERS | ALBERT POWERS | 301208 | 113,464.17 |
| 817380 | 04/19/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ46607 | 0002 | Y&V ENGINEERING & CONSTRU | PROFESSIONAL SERV | 1226 | 56,129.68 |
| 797380 | 04/22/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ56575 | 0006 | ALBERT THEODORE POWERS | 797380 | 501209 | 111,857.98 |
| 797380 | 04/22/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ58306 | 0002 | ALBERT THEODORE POWERS | 797380 | 7012010 | 9,124.26 |
| 797380 | 04/22/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ59208 | 0002 | ALBERT THEODORE POWERS | CONSULTING | 9012011 | 8,341.31 |
| 797380 | 04/22/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ61467 | 0002 | ALBERT THEODORE POWERS | 9/1-10/31/2020 | 11012020 | 8,072.80 |
| 817380 | 04/22/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ46661 | 0014 | BUTCH BOYD LAW FIRM, P.C. | Legal Services | 20186 | 30,640.00 |
| 797380 | 04/22/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ44181 | 0016 | GULLET & ASSOCIATES INC | Retainer | 1032019 | 200,000.00 |
| 797380 | 04/26/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ46662 | 0008 | CONTRACT LAND STAFF LLC | PROFESSIONAL SERVICE | 530018110109484 | 321.93 |
| 797380 | 04/26/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ47985 | 0026 | CONTRACT LAND STAFF LLC | PROFESSIONAL SERVICE | 530018110109779 | 610.00 |
| 797380 | 04/26/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ54309 | 0004 | CONTRACT LAND STAFF LLC | 11/24-12/07/19 SERV | 663419100120206 | 123.50 |
| 797380 | 04/26/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ45656 | 0044 | CONTRACT LAND STAFF LLC | Service 1/20-2/2/19 | 530018110107885 | 919.50 |
| 797380 | 04/26/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ45974 | 0006 | CONTRACT LAND STAFF LLC | PROF SVCS 2/17-3/2 | 530018110108534 | 207.00 |
| 797380 | 04/26/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ46382 | 0036 | CONTRACT LAND STAFF LLC | PROFESSIONAL SERVICE | 530018110107377 | 33,420.98 |
| 797380 | 04/26/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ46382 | 0038 | CONTRACT LAND STAFF LLC | PROFESSIONAL SERVICE | 530018110106199 | 46,347.65 |
| 797380 | 04/26/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ46428 | 0002 | CONTRACT LAND STAFF LLC | PROFESSIONAL SERVICE | 530018110107377 | (33,420.98) |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 797380 | 04/26/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ46428 | 0004 | CONTRACT LAND STAFF LLC | PROFESSIONAL SERVICE | 530018110107377 | 33,420.98 |
| 797380 | 04/26/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ46428 | 0006 | CONTRACT LAND STAFF LLC | PROFESSIONAL SERVICE | 530018110106199 | (46,347.65) |
| 797380 | 04/26/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ46428 | 0008 | CONTRACT LAND STAFF LLC | PROFESSIONAL SERVICE | 530018110106199 | 46,347.65 |
| 797380 | 04/26/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ55108 | 0030 | CONTRACT LAND STAFF LLC | 12/8/-12/31/19 | 663419100120536 | 123.50 |
| 797380 | 04/26/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ55108 | 0032 | CONTRACT LAND STAFF LLC | 10/27-11/9/19 | 663419100118603 | 123.50 |
| 797380 | 04/26/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ55108 | 0036 | CONTRACT LAND STAFF LLC | 11/10-11/23/19 | 663419100119295 | 237.50 |
| 817380 | 04/26/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ46816 | 0002 | GULLET & ASSOCIATES INC | 9/2/18-9/15/18 | 127967A | 43,059.49 |
| 817380 | 04/26/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ46816 | 0004 | GULLET & ASSOCIATES INC | 9/2/18-9/15/18 | 127967B | 1,800.00 |
| 817380 | 04/26/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ46816 | 0010 | GULLET & ASSOCIATES INC | 9/16/18-9/29/18 | 128057B | 2,700.00 |
| 817380 | 04/26/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ46812 | 0014 | GULLET & ASSOCIATES INC | 8/19/18-9/1/18 | 127935A | 26,790.78 |
| 817380 | 04/26/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ46812 | 0016 | GULLET & ASSOCIATES INC | 8/19/18-9/1/18 | 127934A | 727.70 |
| 817380 | 04/26/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ46812 | 0018 | GULLET & ASSOCIATES INC | 8/5/18-8/18/18 | 127845A | 30,408.53 |
| 817380 | 04/26/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ46812 | 0020 | GULLET & ASSOCIATES INC | 8/5/18-8/18/18 | 127844A | 1,607.75 |
| 817380 | 04/26/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ46812 | 0022 | GULLET & ASSOCIATES INC | 4/15/18-4/28/18 | 127170ST | (44.55) |
| 817380 | 04/26/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ46812 | 0024 | GULLET & ASSOCIATES INC | 4/1/18-4/14/18 | 127077ST | (29.70) |
| 817380 | 04/26/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ46812 | 0026 | GULLET & ASSOCIATES INC | 3/4/18-3/17/18 | 126925ST | (59.40) |
| 817380 | 04/26/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ46812 | 0028 | GULLET & ASSOCIATES INC | 12/1/17-3/3/18 | 126923ST | (99.04) |
| 817380 | 04/26/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ46812 | 0030 | GULLET & ASSOCIATES INC | 12/1/17-3/3/18 | 126920ST | (623.70) |
| 817380 | 04/26/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ46812 | 0032 | GULLET & ASSOCIATES INC | 8/19/18-9/1/18 | 127875B | 2,160.00 |
| 817380 | 04/26/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ46812 | 0034 | GULLET & ASSOCIATES INC | 8/19/18-9/1/18 | 127875A | 2,083.81 |
| 817380 | 04/26/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ46812 | 0036 | GULLET & ASSOCIATES INC | 8/5/18-8/18/18 | 127792B | 3,600.00 |
| 817380 | 04/26/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ46812 | 0038 | GULLET & ASSOCIATES INC | 8/5/18-8/18/18 | 127792A | 952.60 |
| 817380 | 04/26/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ46812 | 0040 | GULLET & ASSOCIATES INC | 7/22/18-8/4/18 | 127696B | 3,240.00 |
| 817380 | 04/26/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ46812 | 0042 | GULLET & ASSOCIATES INC | 7/22/18-8/4/18 | 127696A | 357.23 |
| 817380 | 04/26/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ46812 | 0046 | GULLET & ASSOCIATES INC | 7/22/18-8/4/18 | 127765A | 372.28 |
| 817380 | 04/26/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ46812 | 0048 | GULLET & ASSOCIATES INC | 7/8/18-7/21/18 | 127611B | 1,440.00 |
| 817380 | 04/26/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ46812 | 0050 | GULLET & ASSOCIATES INC | 7/8/18-7/21/18 | 127611A | 162.38 |
| 817380 | 04/26/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ46812 | 0052 | GULLET & ASSOCIATES INC | 7/8/18-7/21/18 | 127673A | 735.00 |
| 797380 | 04/26/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ45475 | 0012 | GULLET & ASSOCIATES INC | Professional Service | 127936C | 92,192.36 |
| 797380 | 05/15/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ47638 | 0002 | GULLET & ASSOCIATES INC | Retainer Application | 1032019A | (200,000.00) |
| 817380 | 05/15/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ47318 | 0030 | LAWRENCE BERRY | Ted Powers Travel | 4181 | 216.00 |
| 817380 | 05/15/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ47318 | 0028 | TOUR & TRAVEL | Ted Powers Travel | 4247A | 462.00 |
| 797380 | 05/29/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ47638 | 0004 | GULLET & ASSOCIATES INC | Retainer Application | 12092018A | (100,000.00) |
| 797380 | 05/30/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ61783 | 0002 | ALBERT THEODORE POWERS | 11/1/20-12/31/20 | 1022113 | 9,141.52 |
| 797380 | 05/30/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ64353 | 0002 | ALBERT THEODORE POWERS | 1/1/2021-2/28/2021 | 03012114 | 7,933.20 |
| 797380 | 05/30/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ55108 | 0038 | CONTRACT LAND STAFF LLC | 10/20-10/26/2019 | 663419100117787 | 242.25 |
| 797380 | 05/30/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ43082 | 0024 | DISORBO CONSULTING, LLC | Services 9/1-9/30 | 18117 | 14,710.00 |
| 797380 | 05/30/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ46662 | 0002 | DISORBO CONSULTING, LLC | Consulting Services | 190287 | 2,370.00 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 797380 | 05/30/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ46662 | 0004 | DISORBO CONSULTING, LLC | Consulting Services | 190286 | 7,457.50 |
| 797380 | 05/30/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ46662 | 0006 | DISORBO CONSULTING, LLC | Consulting Services | 190285 | 2,015.00 |
| 797380 | 05/30/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ60170 | 0027 | DISORBO CONSULTING, LLC | 9/1-9/30/20 SVCS | 201481 | 20,133.75 |
| 797380 | 05/30/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ60170 | 0031 | DISORBO CONSULTING, LLC | 9/1-9/30 SVCS | 201482 | 12,831.25 |
| 797380 | 05/30/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ60392 | 0010 | DISORBO CONSULTING, LLC | 10/20 CONSULTING | 201650 | 1,180.00 |
| 797380 | 05/30/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ44400 | 0015 | DISORBO CONSULTING, LLC | Consulting Services | 181411 | 6,086.25 |
| 797380 | 05/30/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ43699 | 0002 | DISORBO CONSULTING, LLC | Consulting Services | 181259 | 12,796.25 |
| 797380 | 05/30/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ43699 | 0096 | DISORBO CONSULTING, LLC | Consulting Services | 181260 | 1,105.00 |
| 817380 | 05/30/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ47632 | 0024 | GULLET & ASSOCIATES INC | 9/30-10/13/18 | 128141A | 481.94 |
| 797380 | 05/30/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ46433 | 0018 | GULLET & ASSOCIATES INC | 12/9/12/22/2018 | 128568 | 23,993.61 |
| 797380 | 05/30/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ46433 | 0020 | GULLET & ASSOCIATES INC | 9/30-10/13/2018 | 128139W | (2,145.00) |
| 797380 | 05/30/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ46433 | 0022 | GULLET & ASSOCIATES INC | 9/30-10/13/2018 | 128139X | (3,050.52) |
| 797380 | 05/30/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ46802 | 0002 | GULLET & ASSOCIATES INC | CREDIT 5211 | 128140X | (2,145.00) |
| 797380 | 05/30/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ46812 | 0002 | GULLET & ASSOCIATES INC | REVISED FROM 127876 | 127876B | 1,980.00 |
| 797380 | 05/30/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ46812 | 0004 | GULLET & ASSOCIATES INC | 8/19/18-9/1/18 | 127876A | 64,249.22 |
| 797380 | 05/30/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ47632 | 0006 | GULLET & ASSOCIATES INC | 9/16-9/29/18 | 128055B | 540.00 |
| 797380 | 05/31/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ44855 | 0004 | DISORBO CONSULTING, LLC | Consulting Services | 181670 | 10,769.10 |
| 797380 | 05/31/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ48060 | 0021 | DISORBO CONSULTING, LLC | Consulting Service | 190417 | 19,902.50 |
| 797380 | 05/31/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ48060 | 0023 | DISORBO CONSULTING, LLC | Consulting Service | 190416 | 10,705.00 |
| 797380 | 05/31/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ48352 | 0005 | DISORBO CONSULTING, LLC | Consulting Service | 190415 | 10,684.00 |
| 797380 | 05/31/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ47638 | 0006 | GULLET & ASSOCIATES INC | Retainer Application | 11132018A | (200,000.00) |
| 797380 | 05/31/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ47632 | 0008 | GULLET & ASSOCIATES INC | 9/16-9/29/18 | 128055A | 357.23 |
| 817380 | 05/31/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | GJ47911 | 0002 | RECLASS | GMF RECLASS | | (16,200.00) |
| 817380 | 05/31/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | GJ47911 | 0003 | RECLASS | GMF RECLASS | | (2,287.50) |
| 797380 | 06/12/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ64503 | 0002 | ALBERT THEODORE POWERS | 3/1/21-4/30/21 | 5012115 | 7,933.43 |
| 817380 | 06/12/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ47985 | 0024 | LAWRENCE BERRY | Annual Subscription | 4162019 | 4,264.00 |
| 797380 | 06/14/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ43171 | 0002 | TCEQ | Expedite Fee | 11152018 | 10,000.00 |
| 797380 | 06/14/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ47632 | 0022 | GULLET & ASSOCIATES INC | 9/16-9/29/18 | 128055X | (2,376.00) |
| 797380 | 06/14/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ45183 | 0112 | GULLET & ASSOCIATES INC | 11/1-11/24/2018 | 128477A | 14,346.25 |
| 817380 | 06/14/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ48053 | 0002 | Y&V ENGINEERING & CONSTRU | 817380 | 1227 | 50,460.00 |
| 817380 | 06/19/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ48195 | 0044 | ENVIRONMENTAL SYSTEMS | ARCGIS DESKTOP | 93647877 | 2,056.75 |
| 797380 | 06/24/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ43170 | 0004 | TCEQ | Air Permit | 11132018 | 85,000.00 |
| 817380 | 06/24/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ48331 | 0002 | BERRY Y&V FABRICATORS LLC | 817380 | 4643 | 7,718.00 |
| 817380 | 06/24/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ48331 | 0004 | BERRY Y&V FABRICATORS LLC | Midstream Proj Mgmt | 4644 | 114,292.00 |
| 817380 | 06/24/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ48331 | 0006 | BERRY Y&V FABRICATORS LLC | Midstream Personnel | 4646 | 7,474.00 |
| 817380 | 06/24/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ48331 | 0008 | BERRY Y&V FABRICATORS LLC | Personnel Harbor Isl | 4641 | 7,636.00 |
| 817380 | 06/24/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ48331 | 0010 | BERRY Y&V FABRICATORS LLC | Personnel Harbor Isl | 4640 | 8,944.00 |
| 817380 | 06/24/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ48331 | 0012 | BERRY Y&V FABRICATORS LLC | Personnel Midway Jun | 4636 | 8,924.00 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 817380 | 06/24/2019 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ48331 | 0016 | BERRY Y&V FABRICATORS LLC | Personnel Axis | 4633 | 36,517.40 |
| 817380 | 06/24/2019 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ48331 | 0020 | BERRY Y&V FABRICATORS LLC | Bay Exp Midstream | 4601 | 1,323.08 |
| 817380 | 06/24/2019 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ48331 | 0024 | BERRY Y&V FABRICATORS LLC | Bay Exp Tonja Flughu | 4593 | 1,583.06 |
| 817380 | 06/24/2019 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ48331 | 0028 | BERRY Y&V FABRICATORS LLC | Bay Exp Darral Duke | 4589 | 281.93 |
| 817380 | 06/24/2019 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ48331 | 0042 | BERRY Y&V FABRICATORS LLC | Bay Exp Midstream | 4611 | 541.01 |
| 817380 | 06/24/2019 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ48331 | 0046 | BERRY Y&V FABRICATORS LLC | Bay Exp Harbor Islan | 4610 | 73.30 |
| 817380 | 06/24/2019 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ48331 | 0048 | BERRY Y&V FABRICATORS LLC | Bax Exp Midway | 4608 | 243.32 |
| 817380 | 06/24/2019 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ48331 | 0050 | BERRY Y&V FABRICATORS LLC | Bay Exp Midstream | 4605 | 349.35 |
| 817380 | 06/24/2019 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ48331 | 0052 | BERRY Y&V FABRICATORS LLC | Bay Exp Gen Gatheri | 4604 | 3,188.25 |
| 817380 | 06/24/2019 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ48331 | 0054 | BERRY Y&V FABRICATORS LLC | Bay Exp Midway Redfi | 4603 | 183.12 |
| 817380 | 06/24/2019 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ48342 | 0020 | TOUR & TRAVEL | Ted Powers Travel | 4321 | 744.00 |
| 797380 | 06/25/2019 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ45578 | 0020 | GULLET & ASSOCIATES INC | Service 1/6-1/19/19 | 128700 | 751.26 |
| 797380 | 06/26/2019 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ45862 | 0035 | GULLET & ASSOCIATES INC | PROF SVC 1/20-2/2-19 | 128778 | 10,557.89 |
| 817380 | 06/30/2019 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ48494 | 0002 | BERRY Y&V FABRICATORS LLC | Personnel Gen Gather | 4702 | 21,388.38 |
| 817380 | 06/30/2019 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ48493 | 0014 | BERRY Y&V FABRICATORS LLC | Personnel Midway/Red | 4700 | 6,124.00 |
| 817380 | 06/30/2019 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ48493 | 0016 | BERRY Y&V FABRICATORS LLC | Personnel Harbor Isl | 4698 | 6,760.00 |
| 817380 | 06/30/2019 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ48493 | 0018 | BERRY Y&V FABRICATORS LLC | Personnel Harbor Isl | 4697 | 6,804.00 |
| 817380 | 06/30/2019 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ48493 | 0020 | BERRY Y&V FABRICATORS LLC | Personnel Burleson | 4696 | 1,352.00 |
| 817380 | 06/30/2019 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ48493 | 0022 | BERRY Y&V FABRICATORS LLC | Personel Midway Junc | 4695 | 676.00 |
| 817380 | 06/30/2019 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ48493 | 0044 | BERRY Y&V FABRICATORS LLC | Bay Exp TH Midstream | 4679 | 220.14 |
| 817380 | 06/30/2019 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ48517 | 0048 | BERRY Y&V FABRICATORS LLC | Verizon Midstream | 4749 | 57.78 |
| 817380 | 06/30/2019 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ48517 | 0052 | BERRY Y&V FABRICATORS LLC | T-Mobile Midstream | 4752 | 53.92 |
| 817380 | 06/30/2019 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ48517 | 0080 | BERRY Y&V FABRICATORS LLC | Personnel Pipline De | 4779 | 21,428.83 |
| 817380 | 06/30/2019 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ48517 | 0082 | BERRY Y&V FABRICATORS LLC | Personnel Midway Jun | 4780 | 1,820.00 |
| 817380 | 06/30/2019 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ48517 | 0084 | BERRY Y&V FABRICATORS LLC | Personnel Burl Midwa | 4781 | 2,704.00 |
| 817380 | 06/30/2019 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ48517 | 0086 | BERRY Y&V FABRICATORS LLC | Personnel Harbor Isl | 4782 | 10,852.00 |
| 817380 | 06/30/2019 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ48517 | 0088 | BERRY Y&V FABRICATORS LLC | Personnel Harbor Isl | 4783 | 8,164.00 |
| 817380 | 06/30/2019 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ48517 | 0090 | BERRY Y&V FABRICATORS LLC | Personnel RBT | 4785 | 5,160.00 |
| 817380 | 06/30/2019 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ48493 | 0046 | BERRY Y&V FABRICATORS LLC | Bay Exp MH Midstream | 4677 | 496.16 |
| 817380 | 06/30/2019 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ48517 | 0006 | BERRY Y&V FABRICATORS LLC | Bay Exp K Cedeno | 4714 | 9.71 |
| 817380 | 06/30/2019 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ48517 | 0008 | BERRY Y&V FABRICATORS LLC | Bay Exp Joyce Cotrin | 4715 | 37.01 |
| 817380 | 06/30/2019 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ48517 | 0010 | BERRY Y&V FABRICATORS LLC | Bay Exp Darral Duke | 4718 | 545.88 |
| 817380 | 06/30/2019 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ48517 | 0016 | BERRY Y&V FABRICATORS LLC | Bay Exp J Hamilton | 4725 | 259.32 |
| 817380 | 06/30/2019 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ48517 | 0022 | BERRY Y&V FABRICATORS LLC | Bay Exp Tonja Fulghu | 4728 | 677.31 |
| 817380 | 06/30/2019 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ48517 | 0024 | BERRY Y&V FABRICATORS LLC | Bay Exp M Harper | 4729 | 330.77 |
| 817380 | 06/30/2019 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ48517 | 0026 | BERRY Y&V FABRICATORS LLC | Bay Exp M Harper | 4730 | 416.60 |
| 817380 | 06/30/2019 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ48517 | 0028 | BERRY Y&V FABRICATORS LLC | Bay Exp M Harper | 4731 | 790.28 |
| 817380 | 06/30/2019 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ48517 | 0030 | BERRY Y&V FABRICATORS LLC | Bay Exp M Harper | 4732 | 1,249.79 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 817380 | 06/30/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ48517 | 0032 | BERRY Y&V FABRICATORS LLC | Bay Exp T Henderson | 4735 | 44.16 |
| 817380 | 06/30/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ48517 | 0034 | BERRY Y&V FABRICATORS LLC | Bay Exp Matt Hicks | 4736 | 12.60 |
| 817380 | 06/30/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ48517 | 0036 | BERRY Y&V FABRICATORS LLC | Bay Exp Pat Hicks | 4737 | 1,460.47 |
| 817380 | 06/30/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ48493 | 0040 | BERRY Y&V FABRICATORS LLC | Bay Exp PH Midstream | 4681 | 3,446.96 |
| 817380 | 06/30/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ48517 | 0040 | BERRY Y&V FABRICATORS LLC | Bay Exp David Odell | 4740 | 112.16 |
| 817380 | 06/30/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ48493 | 0042 | BERRY Y&V FABRICATORS LLC | Bay Exp MH Gen Gathe | 4680 | 2,539.78 |
| 817380 | 06/30/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ48493 | 0058 | BERRY Y&V FABRICATORS LLC | Bay Exp B Midstream | 4686 | 422.12 |
| 817380 | 06/30/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ48493 | 0060 | BERRY Y&V FABRICATORS LLC | Bay Exp TM Midstream | 4684 | 27.53 |
| 817380 | 06/30/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ48517 | 0092 | BERRY Y&V FABRICATORS LLC | Bay Exp Babak Salehi | 4742 | 65.17 |
| 817380 | 07/12/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ48806 | 0002 | BERRY Y&V FABRICATORS LLC | 817380 | 4670 | 504.75 |
| 817380 | 07/12/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ48806 | 0014 | BERRY Y&V FABRICATORS LLC | T-MOBILE MIDSTREAM | 4830 | 53.95 |
| 817380 | 07/12/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ48806 | 0022 | BERRY Y&V FABRICATORS LLC | Exp General Gatherin | 4811 | 4,675.25 |
| 817380 | 07/12/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ48806 | 0036 | BERRY Y&V FABRICATORS LLC | Midstream D Duke | 4797 | 217.34 |
| 817380 | 07/12/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ48806 | 0038 | BERRY Y&V FABRICATORS LLC | Midstream K Cedeno | 4789 | 9.71 |
| 817380 | 07/15/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ48851 | 0017 | Y&V ENGINEERING & CONSTRU | 817380 | 1233 | 52,780.00 |
| 797380 | 07/17/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ45974 | 0012 | GULLET & ASSOCIATES INC | PROF SVCS 2/3-2/16 | 128867 | 5,727.35 |
| 817380 | 07/17/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ48939 | 0046 | TOUR & TRAVEL | 817380 | 4378 | 954.00 |
| 797380 | 07/23/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ46816 | 0008 | GULLET & ASSOCIATES INC | 9/16/18-9/29/18 | 128056B | 2,520.00 |
| 817380 | 07/23/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ49085 | 0017 | JEB BROWN, ATTY AT LAW | Legal Serv 5/1-5/31 | 62020191 | 632.00 |
| 797380 | 07/26/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ47632 | 0030 | GULLET & ASSOCIATES INC | 9/2-9/15/18 | 127968 | 876.83 |
| 797380 | 07/26/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ49837 | 0002 | GULLET & ASSOCIATES INC | Refund Over Pymt | 128477ACM | (145.53) |
| 817380 | 07/29/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ49233 | 0002 | Y&V ENGINEERING & CONSTRU | 817380 | 1227 | (50,460.00) |
| 817380 | 07/29/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ49233 | 0004 | Y&V ENGINEERING & CONSTRU | 817380 | 1227 | 50,460.00 |
| 817380 | 07/31/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | GJ48226 | 0002 | 62020191 | RECLASS JB AXIS | | (632.00) |
| 817380 | 07/31/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ49445 | 0056 | BERRY Y&V FABRICATORS LLC | Personnel Midway Jun | 4865 | 4,824.00 |
| 817380 | 07/31/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ49445 | 0058 | BERRY Y&V FABRICATORS LLC | Personnel Gen Gather | 4864 | 36,858.05 |
| 817380 | 07/31/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ49445 | 0060 | BERRY Y&V FABRICATORS LLC | Personnel Burleson | 4866 | 4,056.00 |
| 817380 | 07/31/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ49445 | 0062 | BERRY Y&V FABRICATORS LLC | Personnel Harbor Isl | 4867 | 11,448.00 |
| 817380 | 07/31/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ49445 | 0064 | BERRY Y&V FABRICATORS LLC | Personnel Redfish | 4869 | 23,164.00 |
| 817380 | 07/31/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ49445 | 0066 | BERRY Y&V FABRICATORS LLC | Personnel Midway Red | 4870 | 6,512.00 |
| 817380 | 07/31/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ49445 | 0002 | BERRY Y&V FABRICATORS LLC | Midstream Proj Mgmt | 4812 | 2,125.79 |
| 817380 | 07/31/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ49445 | 0006 | BERRY Y&V FABRICATORS LLC | Exp Pipeline Gen Gat | 4814 | 171.70 |
| 817380 | 07/31/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ49445 | 0014 | BERRY Y&V FABRICATORS LLC | Exp Pipeline Gen Gat | 4819 | 108.15 |
| 817380 | 07/31/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ49445 | 0016 | BERRY Y&V FABRICATORS LLC | Midstream Proj Mgmt | 4823 | 1,104.60 |
| 817380 | 07/31/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ49445 | 0018 | BERRY Y&V FABRICATORS LLC | Bay Exp Tonja Fulghu | 4821 | 87.39 |
| 817380 | 07/31/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ49445 | 0020 | BERRY Y&V FABRICATORS LLC | Bay Exp Tonja Fulghu | 4820 | 122.16 |
| 817380 | 07/31/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ49445 | 0040 | BERRY Y&V FABRICATORS LLC | Midstream Proj Mgmt | 4852 | 1,017.68 |
| 817380 | 07/31/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ49445 | 0042 | BERRY Y&V FABRICATORS LLC | Midstream Proj Mgmt | 4853 | 60.62 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 797380 | 07/31/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ48060 | 0025 | JEB BROWN, ATTY AT LAW | Legal Service Apr | 5052019A | 434.50 |
| 817380 | 08/14/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ49705 | 0004 | BERRY Y&V FABRICATORS LLC | BYV Fab Personnel Ha | 4868 | 6,520.00 |
| 817380 | 08/14/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ49705 | 0006 | BERRY Y&V FABRICATORS LLC | Fab Person Midstream | 4871 | 114,364.00 |
| 797380 | 08/16/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ52471 | 0003 | JEB BROWN, ATTY AT LAW | SERVICES 8/1-8/31/1 | 9232019 | 1,106.25 |
| 817380 | 08/19/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ49878 | 0044 | BERRY Y&V FABRICATORS LLC | BYV fab Personnel | 4902 | 34,560.13 |
| 817380 | 08/19/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ49878 | 0046 | BERRY Y&V FABRICATORS LLC | BYV Fab Personnel | 4903 | 7,828.00 |
| 817380 | 08/19/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ49878 | 0048 | BERRY Y&V FABRICATORS LLC | Exp S Riggins | 4904 | 3,380.00 |
| 817380 | 08/19/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ49878 | 0050 | BERRY Y&V FABRICATORS LLC | BYV Fab Personnel | 4905 | 10,015.00 |
| 817380 | 08/19/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ49878 | 0052 | BERRY Y&V FABRICATORS LLC | BYV Fab Personnel | 4906 | 10,182.00 |
| 817380 | 08/19/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ49878 | 0054 | BERRY Y&V FABRICATORS LLC | BYV Fab Personnel | 4907 | 18,807.00 |
| 817380 | 08/19/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ49878 | 0056 | BERRY Y&V FABRICATORS LLC | BYV Fab Personnel | 4908 | 5,320.00 |
| 817380 | 08/19/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ49878 | 0058 | BERRY Y&V FABRICATORS LLC | BYV Fab Personnel | 4909 | 93,902.00 |
| 817380 | 08/19/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ49878 | 0100 | BERRY Y&V FABRICATORS LLC | Exp Gen Gathering | 4956 | 391.59 |
| 817380 | 08/19/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ49878 | 0020 | BERRY Y&V FABRICATORS LLC | Exp M Harper | 4887 | 518.05 |
| 817380 | 08/19/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ49878 | 0002 | BERRY Y&V FABRICATORS LLC | Bay Exp Redfish Fac | 4602 | 183.12 |
| 817380 | 08/19/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ49878 | 0014 | BERRY Y&V FABRICATORS LLC | Exp T Fulghum | 4881 | 454.93 |
| 817380 | 08/19/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ49878 | 0022 | BERRY Y&V FABRICATORS LLC | Exp M. Harper | 4888 | 221.68 |
| 817380 | 08/19/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ49878 | 0024 | BERRY Y&V FABRICATORS LLC | Exp Matthew Hicks | 4889 | 4,429.33 |
| 817380 | 08/19/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ49878 | 0026 | BERRY Y&V FABRICATORS LLC | Exp P Hicks | 4890 | 611.59 |
| 817380 | 08/19/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ49878 | 0032 | BERRY Y&V FABRICATORS LLC | Exp D O'Dell | 4894 | 418.13 |
| 817380 | 08/19/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ49878 | 0036 | BERRY Y&V FABRICATORS LLC | Exp B Salehi | 4896 | 454.14 |
| 817380 | 08/19/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ49878 | 0102 | BERRY Y&V FABRICATORS LLC | Exp T. Fulghum | 4957 | 155.83 |
| 817380 | 08/19/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ49878 | 0106 | BERRY Y&V FABRICATORS LLC | Exp M Hicks | 4964 | 54.47 |
| 817380 | 08/19/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ49878 | 0108 | BERRY Y&V FABRICATORS LLC | Exp P Hicks | 4965 | 461.09 |
| 817380 | 08/19/2019 | 4013-10100-000-000 | DIRECT FUEL | PJ49878 | 0008 | BERRY Y&V FABRICATORS LLC | Exp D Duke | 4876 | 996.89 |
| 797380 | 08/20/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ43171 | 0004 | TCEQ | Air Permit | 11152018A | 75,000.00 |
| 817380 | 08/30/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ50205 | 0013 | BERRY Y&V FABRICATORS LLC | BYV Fab Personnel | 4642 | 18,768.00 |
| 817380 | 08/30/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ50205 | 0002 | BERRY Y&V FABRICATORS LLC | Exp David ODell | 4609 | 151.92 |
| 817380 | 08/30/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ50252 | 0071 | CONTRACT LAND STAFF LLC | Service 4/28-5/25 | 530018110111059 | 13.00 |
| 797380 | 08/30/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ49346 | 0004 | DISORBO CONSULTING, LLC | 797380 | 190692 | 2,167.50 |
| 817380 | 08/30/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ50343 | 0002 | LAWRENCE BERRY | CRI-Tax Planning | 16523747 | 4,100.00 |
| 817380 | 08/30/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ50343 | 0004 | LAWRENCE BERRY | JSK Holdings Service | AM91018 | 1,100.00 |
| 817380 | 08/30/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ50343 | 0006 | LAWRENCE BERRY | Professional Service | AM818 | 2,400.00 |
| 817380 | 08/30/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ50343 | 0008 | LAWRENCE BERRY | Travel Expenses | AM818A | 23.98 |
| 817380 | 08/30/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ50252 | 0014 | LAWRENCE BERRY | Reimburse Expens | 5202019 | 4,264.00 |
| 817380 | 08/30/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ50252 | 0060 | LAWRENCE BERRY | Car Service Midstrea | 3888 | 552.00 |
| 817380 | 08/30/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ50252 | 0045 | LAWRENCE BERRY | MIlard Aviation | 1018 | 1,350.00 |
| 797380 | 08/30/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ58903 | 0018 | LLOYD ENGINEERING, INC. | JULY/AUG 2020 | 6418 | 21,358.00 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 797380 | 08/30/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ60606 | 0002 | LLOYD ENGINEERING, INC. | SEP 2020 | 6451 | 44,940.00 |
| 817380 | 08/30/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ50286 | 0005 | WINSTEAD PC ATTORNEYS | Service July 2019 | 2787796 | 12,464.00 |
| 817380 | 09/01/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | GJ48326 | 0002 | BERRY Y&V FABRICATORS LLC | BYV RECLASS | | (87.39) |
| 817380 | 09/01/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | GJ48326 | 0004 | BERRY Y&V FABRICATORS LLC | BYV RECLASS | | (155.83) |
| 817380 | 09/17/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | GJ48419 | 0001 | RECLASS | GOLD SPONSORSHIP | | 6,000.00 |
| 817380 | 09/18/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ50746 | 0051 | MATTHEW E MARRA | Services 8/12-8/23 | MARRA09 | 7,826.90 |
| 817380 | 09/18/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ50746 | 0053 | MATTHEW E MARRA | Services 8/26-9/6 | MARRA10 | 7,307.70 |
| 817380 | 09/19/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ50789 | 0097 | DHYEAGER CONSULTING LLC | Service 8/12-8/25 | DHY019 | 10,621.75 |
| 817380 | 09/19/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ50789 | 0099 | DHYEAGER CONSULTING LLC | Services 8/26-9/7 | DHY020 | 7,975.81 |
| 797380 | 09/19/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ65396 | 0014 | LLOYD ENGINEERING, INC. | CONSULTING SERVICE | 6636JUNE21 | 53,335.00 |
| 797380 | 09/24/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ43373 | 0002 | TCEQ | CORRECTION | 11132018B | (85,000.00) |
| 797380 | 09/24/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ66700 | 0032 | LLOYD ENGINEERING, INC. | JULY 2021 | 6889 | 8,640.00 |
| 817380 | 09/24/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ50913 | 0040 | MEREDITH SADLOWSKI | Services 8/9-8/23/19 | 8262019 | 9,615.00 |
| 817380 | 09/24/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ50913 | 0042 | MEREDITH SADLOWSKI | Services 8/23-9/13 | 9092019 | 14,423.00 |
| 817380 | 09/24/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ50913 | 0032 | TOUR & TRAVEL | Ted Powers Travel | 4524 | 600.00 |
| 817380 | 09/30/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ51331 | 0010 | BERRY Y&V FABRICATORS LLC | BYV PERSON MIDSTREAM | 4701 | 110,510.00 |
| 817380 | 09/30/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ51331 | 0012 | BERRY Y&V FABRICATORS LLC | BYV PERSON REDFISH | 4699 | 25,792.00 |
| 817380 | 09/30/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ51331 | 0016 | BERRY Y&V FABRICATORS LLC | BYV PERSON REDFISH | 4784 | 4,892.00 |
| 817380 | 09/30/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ51331 | 0018 | BERRY Y&V FABRICATORS LLC | BYV PERSON MIDSTREAM | 4786 | 161,202.00 |
| 817380 | 09/30/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ51371 | 0038 | BERRY Y&V FABRICATORS LLC | Verizon Midstream | 5053 | 57.78 |
| 817380 | 09/30/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ51371 | 0042 | BERRY Y&V FABRICATORS LLC | T-Mobile Midstream | 5055 | 130.04 |
| 817380 | 09/30/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ51331 | 0046 | BERRY Y&V FABRICATORS LLC | BAY EXP P HICKS | 5230 | 979.45 |
| 817380 | 09/30/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ51331 | 0071 | BERRY Y&V FABRICATORS LLC | T-MOBILE MIDSTREAM | 5251 | 71.03 |
| 817380 | 09/30/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ51331 | 0095 | BERRY Y&V FABRICATORS LLC | BYV FAB PERS HARBOR | 5267 | 15,936.00 |
| 817380 | 09/30/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ51331 | 0097 | BERRY Y&V FABRICATORS LLC | BYV FAB PERS HARBOR | 5268 | 4,840.00 |
| 817380 | 09/30/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ51331 | 0099 | BERRY Y&V FABRICATORS LLC | BYV FAB PERS REDFISH | 5269 | 10,356.00 |
| 817380 | 09/30/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ51331 | 0101 | BERRY Y&V FABRICATORS LLC | BYV FAB PERS MIDWAY | 5270 | 6,940.00 |
| 817380 | 09/30/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ51331 | 0103 | BERRY Y&V FABRICATORS LLC | BYV FAB PERS MIDSTRE | 5271 | 71,217.30 |
| 817380 | 09/30/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ51331 | 0004 | BERRY Y&V FABRICATORS LLC | BAY EXP DAVID ODELL | 4685 | 36.99 |
| 817380 | 09/30/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ51371 | 0008 | BERRY Y&V FABRICATORS LLC | Bay Exp T Fulghum GG | 5027 | 666.37 |
| 817380 | 09/30/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ51371 | 0014 | BERRY Y&V FABRICATORS LLC | Bay Exp M Hicks | 5033 | 5,202.11 |
| 817380 | 09/30/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ51371 | 0016 | BERRY Y&V FABRICATORS LLC | Bay Exp Patrick Hick | 5034 | 1,470.35 |
| 817380 | 09/30/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ51371 | 0018 | BERRY Y&V FABRICATORS LLC | Bay Exp D ODell GG | 5038 | 846.92 |
| 817380 | 09/30/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ51331 | 0020 | BERRY Y&V FABRICATORS LLC | VERIZON MIDSTREAM | 4832 | 57.78 |
| 817380 | 09/30/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ51371 | 0022 | BERRY Y&V FABRICATORS LLC | Bay Exp B Salehi | 5040 | 254.05 |
| 817380 | 09/30/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ51331 | 0026 | BERRY Y&V FABRICATORS LLC | BAY EXP D DUKE | 5216 | 423.45 |
| 817380 | 09/30/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ51331 | 0034 | BERRY Y&V FABRICATORS LLC | BAY EXP T FULGHUM | 5223 | 215.00 |
| 817380 | 09/30/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ51331 | 0038 | BERRY Y&V FABRICATORS LLC | BAY EXP M HARPER | 5226 | 408.03 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 817380 | 09/30/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ51331 | 0042 | BERRY Y&V FABRICATORS LLC | BAY EXP M HICKS | 5228 | 3,274.88 |
| 817380 | 09/30/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ51331 | 0044 | BERRY Y&V FABRICATORS LLC | BAY EXP P HICKS | 5229 | 2,644.57 |
| 817380 | 09/30/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ51331 | 0050 | BERRY Y&V FABRICATORS LLC | BAY EXP D ODELL | 5233 | 14.01 |
| 817380 | 09/30/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ51331 | 0052 | BERRY Y&V FABRICATORS LLC | BAY EXP B SHALEHI | 5234 | 815.17 |
| 797380 | 09/30/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ58419 | 0025 | DISORBO CONSULTING, LLC | 7/1-7/31/20 | 201211 | 6,026.25 |
| 797380 | 09/30/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ44453 | 0016 | LLOYD ENGINEERING, INC. | Consulting Services | 5746 | 19,100.00 |
| 797380 | 09/30/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ66148 | 0012 | LLOYD ENGINEERING, INC. | CONSULTING SERVICES | 6660 | 4,620.00 |
| 817380 | 09/30/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ51332 | 0049 | MATTHEW E MARRA | Services 9/20 | MARRA11 | 7,307.70 |
| 817380 | 09/30/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ51332 | 0047 | WINSTEAD PC ATTORNEYS | Legal Services 8/19 | 2798037 | 6,548.00 |
| 817380 | 10/11/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ51461 | 0012 | BERRY Y&V FABRICATORS LLC | Fab Pers Gen Gatheri | 5075 | 10,256.00 |
| 817380 | 10/11/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ51461 | 0014 | BERRY Y&V FABRICATORS LLC | Fab Pers Midway Junc | 5076 | 6,804.00 |
| 817380 | 10/11/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ51461 | 0016 | BERRY Y&V FABRICATORS LLC | Fab Pers Burleson | 5077 | 4,564.00 |
| 817380 | 10/11/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ51461 | 0018 | BERRY Y&V FABRICATORS LLC | Fab Pers Harbor Isla | 5078 | 12,600.00 |
| 817380 | 10/11/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ51461 | 0020 | BERRY Y&V FABRICATORS LLC | Fab Pers Harbor Isla | 5079 | 6,432.00 |
| 817380 | 10/11/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ51461 | 0022 | BERRY Y&V FABRICATORS LLC | Fab Pers Redfish | 5080 | 14,032.00 |
| 817380 | 10/11/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ51461 | 0024 | BERRY Y&V FABRICATORS LLC | Fab Pers Midway | 5081 | 11,208.00 |
| 817380 | 10/11/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ51461 | 0026 | BERRY Y&V FABRICATORS LLC | Fab Pers Midstream | 5082 | 59,264.00 |
| 817380 | 10/11/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ51464 | 0002 | BERRY Y&V FABRICATORS LLC | Bay Exp D Duke Midst | 5023 | 1,190.88 |
| 817380 | 10/15/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ51533 | 0008 | DHYEAGER CONSULTING LLC | Services 9/22-10/5 | DHY022 | 8,325.56 |
| 817380 | 10/15/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ51533 | 0012 | MATTHEW E MARRA | Services 9/23-10/4 | MARRA12 | 7,501.30 |
| 817380 | 10/15/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ51533 | 0002 | RAILROAD COMMISSION OF TX | P5 for 2019-2020 | 2806001 | 562.50 |
| 817380 | 10/15/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ51533 | 0006 | TOUR & TRAVEL | Ted Powers Travel | 4599 | 960.00 |
| 817380 | 10/15/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ51533 | 0010 | WINSTEAD PC ATTORNEYS | Legal Services 9/19 | 2806001 | 13,011.50 |
| 797380 | 10/18/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ68427 | 0002 | LLOYD ENGINEERING, INC. | SEP 21 CONSULTING | 6944 | 60,462.88 |
| 797380 | 10/18/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ69244 | 0012 | LLOYD ENGINEERING, INC. | OCT/NOV 2021 | 7003 | 5,020.00 |
| 817380 | 10/24/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ51804 | 0013 | DHYEAGER CONSULTING LLC | 10/6-10/19/19 | DHY023 | 8,347.74 |
| 817380 | 10/24/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ51804 | 0015 | DHYEAGER CONSULTING LLC | 9/8-9/21/19 | DHY021 | 8,325.51 |
| 817380 | 10/24/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ51804 | 0019 | MATTHEW E MARRA | 10/7-10/18/19 | MARRA13 | 7,566.20 |
| 817380 | 10/24/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ51804 | 0017 | WINSTEAD PC ATTORNEYS | Legal Services 8/19 | 2798038 | 20,406.50 |
| 817380 | 10/31/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ51970 | 0067 | BERRY Y&V FABRICATORS LLC | Fab Person Midway | 5402 | 5,516.00 |
| 817380 | 10/31/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ51970 | 0069 | BERRY Y&V FABRICATORS LLC | Fab Pers Harbor Isl | 5403 | 9,024.00 |
| 817380 | 10/31/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ51970 | 0071 | BERRY Y&V FABRICATORS LLC | Fab Pers Harbor Isl | 5404 | 6,976.00 |
| 817380 | 10/31/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ51970 | 0073 | BERRY Y&V FABRICATORS LLC | Fab Pers Redfish | 5405 | 8,568.00 |
| 817380 | 10/31/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ51970 | 0075 | BERRY Y&V FABRICATORS LLC | Fab Per MidayRedfish | 5406 | 6,432.00 |
| 817380 | 10/31/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ51970 | 0077 | BERRY Y&V FABRICATORS LLC | Fab Pers Midstream | 5407 | 50,472.00 |
| 817380 | 10/31/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ51970 | 0006 | BERRY Y&V FABRICATORS LLC | Bay Exp K Cedeno Mid | 5346 | 52.33 |
| 817380 | 10/31/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ51970 | 0008 | BERRY Y&V FABRICATORS LLC | Bay Exp D Duke Midst | 5348 | 807.27 |
| 817380 | 10/31/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ51970 | 0020 | BERRY Y&V FABRICATORS LLC | Bay Exp MHarper Harb | 5359 | 1,500.67 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 817380 | 10/31/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ51970 | 0022 | BERRY Y&V FABRICATORS LLC | Bay Exp M Hicks | 5360 | 86.37 |
| 817380 | 10/31/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ51970 | 0026 | BERRY Y&V FABRICATORS LLC | Bay Exp JMcCord RBT | 5364 | 363.79 |
| 817380 | 10/31/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ52600 | 0005 | JEB BROWN, ATTY AT LAW | CORRECTION | 10142019A | 869.00 |
| 797380 | 10/31/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ53617 | 0030 | Y&V ENGINEERING & CONSTRU | MAR,APR,MAY SERIVCE | 1232 | 135,712.00 |
| | | | | | | | | 6,303,304.82 |
| | | | | | | | | |
| 797380 | 11/01/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ66385 | 0002 | ALBERT THEODORE POWERS | 070120116 | 37255242 | 10,233.64 |
| 797380 | 11/12/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ67420 | 0002 | ALBERT THEODORE POWERS | 7/1-8/31/2021 | 9012117 | 8,936.43 |
| 817380 | 11/13/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ52323 | 0004 | FTI CONSULTING SC INC | SERVICES 10/19 | 7526775 | 20,250.00 |
| 817380 | 11/13/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ52323 | 0006 | FTI CONSULTING SC INC | SERVICES 09/19 | 7524726 | 20,250.00 |
| 817380 | 11/13/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ52323 | 0008 | FTI CONSULTING SC INC | SERVICES 08/19 | 7522338 | 20,440.06 |
| 817380 | 11/13/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ52323 | 0014 | JSK HOLDINGS INC | PROFESSIONAL SERVIC | 1019 | 815.66 |
| 817380 | 11/13/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ52323 | 0010 | STALWART STRATEGIES INC | SERVICES 10/19 | 1559 | 10,500.00 |
| 817380 | 11/13/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ52323 | 0012 | STALWART STRATEGIES INC | SERVICES 09/19 | 1542 | 10,802.24 |
| 797380 | 11/14/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ68617 | 0002 | ALBERT THEODORE POWERS | SEP/OCT 2021 | 11012118 | 10,544.11 |
| 817380 | 11/15/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ52397 | 0052 | BERRY Y&V FABRICATORS LLC | Verizon - Midstream | 4988 | 57.78 |
| 817380 | 11/15/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ52397 | 0054 | BERRY Y&V FABRICATORS LLC | T-Mobile - Midstream | 4989 | 53.84 |
| 817380 | 11/15/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ52397 | 0006 | BERRY Y&V FABRICATORS LLC | Bay Exp DDuke Midstr | 4951 | 1,735.91 |
| 817380 | 11/15/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ52397 | 0016 | BERRY Y&V FABRICATORS LLC | Bay Exp JMcCord RBT | 4967 | 254.23 |
| 817380 | 11/15/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ52397 | 0026 | BERRY Y&V FABRICATORS LLC | Bay Exp BSalehi Mids | 4970 | 296.44 |
| 817380 | 11/15/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ52397 | 0028 | BERRY Y&V FABRICATORS LLC | Bay Exp PWisniewski | 4971 | 84.21 |
| 817380 | 11/15/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ52397 | 0030 | BERRY Y&V FABRICATORS LLC | Bay Exp PW HarborIsl | 4972 | 657.15 |
| 817380 | 11/15/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ52386 | 0006 | BUTCH BOYD LAW FIRM, P.C. | SERVICES 10/1-10/31 | 20248 | 45,518.13 |
| 817380 | 11/15/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ52386 | 0008 | BUTCH BOYD LAW FIRM, P.C. | SERVICES 10/1-10/31 | 20249 | 17,350.00 |
| 817380 | 11/15/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ52386 | 0010 | BUTCH BOYD LAW FIRM, P.C. | SERVICES 9/1-9/30/1 | 20233 | 30,836.14 |
| 817380 | 11/15/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ52386 | 0012 | BUTCH BOYD LAW FIRM, P.C. | SERVICES 9/1-9/30/1 | 202034 | 20,703.64 |
| 817380 | 11/15/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ52386 | 0058 | DHYEAGER CONSULTING LLC | SERVICES 10/20-11/2 | DHY024 | 8,324.22 |
| 817380 | 11/15/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ52386 | 0016 | FTI CONSULTING SC INC | APRIL-JULY 19 | 7519519 | 40,542.91 |
| 817380 | 11/15/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ52386 | 0004 | MATTHEW E MARRA | SERVICES 10/21-11/2 | MARRA14 | 7,566.20 |
| 817380 | 11/15/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ52386 | 0060 | MDR ADVERT | 10/19 RETAINER | 1931800 | 6,500.00 |
| 817380 | 11/15/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ52386 | 0014 | TOUR & TRAVEL | TED POWERS TRAVEL | 4678 | 648.00 |
| 817380 | 11/18/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ52429 | 0012 | BERRY Y&V FABRICATORS LLC | Fab Per Harbor Islan | 5010 | 8,164.00 |
| 817380 | 11/18/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ52448 | 0012 | BERRY Y&V FABRICATORS LLC | Fab Per Harbor Islan | 5152 | 7,228.00 |
| 817380 | 11/18/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ52429 | 0014 | BERRY Y&V FABRICATORS LLC | Fab Per Harbor Islan | 5011 | 11,804.00 |
| 817380 | 11/18/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ52448 | 0014 | BERRY Y&V FABRICATORS LLC | Fab Per Harbor Islan | 5153 | 5,552.00 |
| 817380 | 11/18/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ52429 | 0016 | BERRY Y&V FABRICATORS LLC | Fab Per Redfish | 5012 | 12,796.00 |
| 817380 | 11/18/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ52448 | 0016 | BERRY Y&V FABRICATORS LLC | Fab Per Redfish | 5154 | 9,280.00 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 817380 | 11/18/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ52429 | 0018 | BERRY Y&V FABRICATORS LLC | Fab Per Midway | 5013 | 15,080.00 |
| 817380 | 11/18/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ52448 | 0018 | BERRY Y&V FABRICATORS LLC | Fab Per Midway-Redfi | 5155 | 4,840.00 |
| 817380 | 11/18/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ52429 | 0020 | BERRY Y&V FABRICATORS LLC | Fab Per Midstream | 5014 | 54,480.00 |
| 817380 | 11/18/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ52448 | 0020 | BERRY Y&V FABRICATORS LLC | Fab Per Midstream | 5156 | 74,735.86 |
| 817380 | 11/18/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ52436 | 0028 | BERRY Y&V FABRICATORS LLC | T-Mobile - Midstream | 5118 | 125.87 |
| 817380 | 11/18/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ52436 | 0056 | BERRY Y&V FABRICATORS LLC | Fab Per Habor Island | 5138 | 6,264.00 |
| 817380 | 11/18/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ52436 | 0058 | BERRY Y&V FABRICATORS LLC | Fab Per Midway/Redfi | 5140 | 7,144.00 |
| 817380 | 11/18/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ52436 | 0060 | BERRY Y&V FABRICATORS LLC | Fab Per Midstream | 5141 | 67,293.50 |
| 817380 | 11/18/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ52450 | 0064 | BERRY Y&V FABRICATORS LLC | Fab Per Midway | 5334 | 4,128.00 |
| 817380 | 11/18/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ52450 | 0066 | BERRY Y&V FABRICATORS LLC | Fab Per Harbor Islan | 5335 | 14,864.00 |
| 817380 | 11/18/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ52450 | 0068 | BERRY Y&V FABRICATORS LLC | Fab Per Harbor Islan | 5336 | 6,976.00 |
| 817380 | 11/18/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ52450 | 0070 | BERRY Y&V FABRICATORS LLC | Fab Per Redfish | 5337 | 7,180.00 |
| 817380 | 11/18/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ52450 | 0072 | BERRY Y&V FABRICATORS LLC | Fab Per Midway Redfi | 5338 | 7,736.00 |
| 817380 | 11/18/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ52450 | 0074 | BERRY Y&V FABRICATORS LLC | Fab Per Midstream | 5339 | 62,757.50 |
| 817380 | 11/18/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ52436 | 0004 | BERRY Y&V FABRICATORS LLC | Bay Exp KCedeno Mids | 5085 | 1,109.50 |
| 817380 | 11/18/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ52450 | 0004 | BERRY Y&V FABRICATORS LLC | Bay Exp DDuke Midstr | 5280 | 571.60 |
| 817380 | 11/18/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ52436 | 0006 | BERRY Y&V FABRICATORS LLC | Bay Exp DDuke Midstr | 5087 | 1,257.39 |
| 817380 | 11/18/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ52448 | 0010 | BERRY Y&V FABRICATORS LLC | Fab Per Midway | 5150 | 2,136.00 |
| 817380 | 11/18/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ52450 | 0012 | BERRY Y&V FABRICATORS LLC | Bay Exp MartinHarper | 5290 | 1,773.41 |
| 817380 | 11/18/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ52450 | 0014 | BERRY Y&V FABRICATORS LLC | Axis Matt Hicks GG | 5291 | 189.53 |
| 817380 | 11/18/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ52450 | 0018 | BERRY Y&V FABRICATORS LLC | Bay Exp PatrickHicks | 5293 | 278.70 |
| 817380 | 11/18/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ52450 | 0024 | BERRY Y&V FABRICATORS LLC | Bay Exp BSalehi | 5299 | 539.04 |
| 817380 | 11/18/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ52448 | 0026 | BERRY Y&V FABRICATORS LLC | Bay Exp DDuke Midstr | 5166 | 1,892.39 |
| 817380 | 11/18/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ52448 | 0028 | BERRY Y&V FABRICATORS LLC | Bay Exp V Figueroa | 5169 | 194.10 |
| 817380 | 11/18/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ52436 | 0038 | BERRY Y&V FABRICATORS LLC | Bay Exp - CPI | 5126 | 319.29 |
| 817380 | 11/18/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ52448 | 0053 | BERRY Y&V FABRICATORS LLC | Bay Exp MHarper | 5183 | 534.52 |
| 817380 | 11/18/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ52448 | 0069 | BERRY Y&V FABRICATORS LLC | Bay Exp CPI | 5199 | 46.10 |
| 817380 | 11/18/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ52448 | 0077 | BERRY Y&V FABRICATORS LLC | T-Mobile Midstream | 5205 | 70.99 |
| 817380 | 11/19/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ52461 | 0051 | ORCA ASSETS GP, LLC | PDI CLASSES | 310 | 1,323.33 |
| 797380 | 11/19/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ55108 | 0002 | TREAS NYC/ | 797380 | 1282020 | 32,300.00 |
| 817380 | 11/25/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ52642 | 0051 | CLIPPERDATA LLC | ANNUAL SUBSCRIPTION | 10042019 | 18,122.00 |
| 817380 | 11/25/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ52642 | 0039 | MATTHEW E MARRA | SERVICES 11/4-11/15 | MARR15 | 7,307.70 |
| 817380 | 11/25/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ52632 | 0010 | MEREDITH SADLOWSKI | OCT 19 SERVICES | 29966 | 1,045.00 |
| 817380 | 11/29/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ52900 | 0008 | MDR ADVERT | NOV 19 RETAINER | 1931855 | 6,500.00 |
| 817380 | 11/29/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ52900 | 0010 | WINSTEAD PC ATTORNEYS | OCT 19 LEGAL SERVIC | 2819880 | 2,113.00 |
| 817380 | 12/11/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ52942 | 0030 | TOUR & TRAVEL | TED POWERS-TRAVEL | 4732 | 972.00 |
| 817380 | 12/16/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ53027 | 0011 | MATTHEW E MARRA | 11/18-11/29/19 | MARRA16 | 7,307.70 |
| 817380 | 12/16/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ53027 | 0009 | STALWART STRATEGIES INC | 11/19 SERVICES | 1606 | 10,900.00 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 797380 | 12/16/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ70665 | 0008 | TRINITY CONSULTANTS, INC. | PROFESSIONAL SVCS - | 220084 | 536.25 |
| 817380 | 12/23/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ53203 | 0004 | SMYSER KAPLAN & VESELKA | LEGAL SERVICES 10/1 | 32332 | 1,105.00 |
| 817380 | 12/24/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ53220 | 0010 | DHYEAGER CONSULTING LLC | 4/14-4/27/19 SERVIC | DHY011 | 9,110.15 |
| 817380 | 12/31/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ53439 | 0016 | DHYEAGER CONSULTING LLC | 11/17-12/1/19 | DHY026 | 9,053.45 |
| 817380 | 12/31/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ53439 | 0018 | DHYEAGER CONSULTING LLC | 11/3-11/16/19 | DHY025 | 10,558.40 |
| 797380 | 12/31/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ70795 | 0008 | LLOYD ENGINEERING, INC. | CONSULTING SVCS 09/ | 7015 | 4,440.00 |
| 797380 | 12/31/2019 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ70665 | 0006 | LLOYD ENGINEERING, INC. | DEC 2021 | 7058 | 17,372.50 |
| 817380 | 12/31/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ53407 | 0036 | MATTHEW E MARRA | 12/2-12/13/19 | MARRA17 | 7,708.81 |
| 817380 | 12/31/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ53407 | 0038 | MDR ADVERT | DEC 19 RETAINER | 1931917 | 6,500.00 |
| 817380 | 12/31/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ53480 | 0026 | PERRYMAN CONSULTANTS INC | PROJECT NO. 2928 | SEP20192928 | 80,516.75 |
| 817380 | 12/31/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ53407 | 0040 | STALWART STRATEGIES INC | NOV19 SERVICES OCT | 1586 | 10,500.00 |
| 817380 | 12/31/2019 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | GJ48941 | 0005 | | AVIATION DEC | | 7,250.00 |
| 817380 | 01/15/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ53556 | 0012 | BUTCH BOYD LAW FIRM, P.C. | 12/3-12/31/19 | 20265 | 23,894.50 |
| 817380 | 01/15/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ53556 | 0008 | DHYEAGER CONSULTING LLC | 12/02-12/15/19 | DHY027 | 9,574.87 |
| 817380 | 01/15/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ53556 | 0010 | DHYEAGER CONSULTING LLC | 12/16-12/29/19 | DHY028 | 8,506.84 |
| 817380 | 01/15/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ53556 | 0006 | ESCOPETA OIL | 1/2020 RENT | 12020 | 967.92 |
| 817380 | 01/15/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ53556 | 0016 | MATTHEW E MARRA | 12/16-12/27/19 | MARRA18 | 7,307.70 |
| 817380 | 01/15/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ53556 | 0018 | MDR ADVERT | LONE STAR PORTS WEB | 1931926 | 6,765.63 |
| 817380 | 01/15/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ53556 | 0020 | TOUR & TRAVEL | TED POWERS-TRAVEL | 47804 | 672.00 |
| 817380 | 01/15/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ53556 | 0014 | WINSTEAD PC ATTORNEYS | 11/19 LEGAL SERVICE | 2825712 | 11,323.00 |
| 797380 | 01/16/2020 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ47632 | 0018 | GULLET & ASSOCIATES INC | 9/2-9/15/18 | 128028A | 345.25 |
| 797380 | 01/16/2020 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ72899 | 0018 | LLOYD ENGINEERING, INC. | DEC21 HARBOR ISLAND | 7088 | 9,300.00 |
| 797380 | 01/16/2020 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ73045 | 0008 | LLOYD ENGINEERING, INC. | HARBOR ISLAND SHIP | 7172 | 27,947.50 |
| 817380 | 01/21/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ53674 | 0029 | MATTHEW E MARRA | 12/30-1/10/2020 SER | MARRA19 | 7,566.20 |
| 817380 | 01/21/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ53682 | 0004 | NICOLAS S COCAVESSIS dba | 12/19 SERVICES | ENALPS012019 | 11,350.00 |
| 817380 | 01/21/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ53672 | 0092 | STALWART STRATEGIES INC | 1/20 SERVICES | 1647 | 10,600.00 |
| 817380 | 01/22/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ53709 | 0080 | BERRY Y&V FABRICATORS LLC | FAB PER LSP MIDWAYJU | 5526 | 4,840.00 |
| 817380 | 01/22/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ53709 | 0082 | BERRY Y&V FABRICATORS LLC | FAB PER LSP HARBORIS | 5527 | 12,280.00 |
| 817380 | 01/22/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ53709 | 0084 | BERRY Y&V FABRICATORS LLC | FAB PER LSP HAR ISL | 5528 | 5,552.00 |
| 817380 | 01/22/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ53709 | 0086 | BERRY Y&V FABRICATORS LLC | FAB PER LSP REDFISH | 5529 | 4,200.00 |
| 817380 | 01/22/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ53709 | 0088 | BERRY Y&V FABRICATORS LLC | FAB PER LSP MID REDF | 5530 | 5,552.00 |
| 817380 | 01/22/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ53709 | 0090 | BERRY Y&V FABRICATORS LLC | FAB PER LSP MIDSTREA | 5531 | 42,800.00 |
| 817380 | 01/22/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ53709 | 0092 | BERRY Y&V FABRICATORS LLC | FAB PER LSP | 5532 | 60,224.00 |
| 817380 | 01/22/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ53709 | 0002 | BERRY Y&V FABRICATORS LLC | Bay Exp EliCantu LSP | 5470 | 134.81 |
| 817380 | 01/22/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ53709 | 0006 | BERRY Y&V FABRICATORS LLC | Bay Exp JContino LSP | 5472 | 98.31 |
| 817380 | 01/22/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ53709 | 0010 | BERRY Y&V FABRICATORS LLC | Bay Exp DDuke LSP | 5474 | 389.42 |
| 817380 | 01/22/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ53709 | 0014 | BERRY Y&V FABRICATORS LLC | Bay Exp VFigueroaLS | 5477 | 52.99 |
| 817380 | 01/22/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ53709 | 0018 | BERRY Y&V FABRICATORS LLC | Bay Exp TFulghum LSP | 5480 | 598.19 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 817380 | 01/22/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ53709 | 0048 | BERRY Y&V FABRICATORS LLC | Staples Bus LSP | 5500 | 62.65 |
| 817380 | 01/22/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ53709 | 0052 | BERRY Y&V FABRICATORS LLC | Bay Exp Babak Salehi | 5503 | 2,003.27 |
| 817380 | 01/22/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ53709 | 0062 | BERRY Y&V FABRICATORS LLC | T-MOBILE MIDSTREAM | 5510 | 61.82 |
| 817380 | 01/22/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ53709 | 0094 | BERRY Y&V FABRICATORS LLC | Houston Off Rent 110 | 5533 | 8,196.16 |
| 817380 | 01/22/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ53709 | 0096 | BERRY Y&V FABRICATORS LLC | Bay Exp Parks Coffee | 5534 | 21.50 |
| 817380 | 01/22/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ53709 | 0098 | BERRY Y&V FABRICATORS LLC | Houston Off Utilitie | 5535 | 856.46 |
| 817380 | 01/29/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ53840 | 0024 | DHYEAGER CONSULTING LLC | 12/29-1/12/2020 | DHY029 | 7,901.23 |
| 817380 | 01/29/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ53840 | 0022 | MDR ADVERT | 1/2020 RETAINER | 2031981 | 6,500.00 |
| 817380 | 01/29/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ53840 | 0026 | WINSTEAD PC ATTORNEYS | 12/19 SERVICES | 2835734 | 21,347.00 |
| 817380 | 01/31/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ54104 | 0049 | BERRY Y&V FABRICATORS LLC | T-Mobile Midstream | 5448 | 62.54 |
| 817380 | 01/31/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ54104 | 0057 | BERRY Y&V FABRICATORS LLC | Fab Per Midway Junct | 5456 | 6,264.00 |
| 817380 | 01/31/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ54104 | 0059 | BERRY Y&V FABRICATORS LLC | Fab Per HarborIsland | 5457 | 14,272.00 |
| 817380 | 01/31/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ54104 | 0061 | BERRY Y&V FABRICATORS LLC | Fab Per Habor IsLine | 5458 | 9,280.00 |
| 817380 | 01/31/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ54104 | 0063 | BERRY Y&V FABRICATORS LLC | Fab Per Redfish | 5459 | 7,856.00 |
| 817380 | 01/31/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ54104 | 0065 | BERRY Y&V FABRICATORS LLC | Fab Per Midway-Redfi | 5460 | 5,636.00 |
| 817380 | 01/31/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ54104 | 0067 | BERRY Y&V FABRICATORS LLC | Fab Per Midstream | 5461 | 51,528.00 |
| 817380 | 01/31/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ54104 | 0016 | BERRY Y&V FABRICATORS LLC | Bay Exp DDukeMidstre | 5415 | 396.47 |
| 817380 | 01/31/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ54104 | 0020 | BERRY Y&V FABRICATORS LLC | Bay Exp TFulghumMids | 5417 | 785.90 |
| 817380 | 01/31/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ54104 | 0029 | BERRY Y&V FABRICATORS LLC | Bay Exp PHicks LSP | 5426 | 296.54 |
| 817380 | 01/31/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ54104 | 0031 | BERRY Y&V FABRICATORS LLC | Bay Exp MHicks LSP | 5425 | 76.65 |
| 817380 | 01/31/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ54104 | 0037 | BERRY Y&V FABRICATORS LLC | Bay Exp Babak Salehi | 5430 | 715.42 |
| 817380 | 01/31/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ54051 | 0020 | ESCOPETA OIL | 2/2020 RENT | 22020 | 967.92 |
| 817380 | 01/31/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ54051 | 0014 | MATTHEW E MARRA | 1/13-1/24/2020 | MARRA20 | 7,307.70 |
| 817380 | 01/31/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ54051 | 0012 | NICOLAS S COCAVESSIS dba | 1/1-1/26/2020 | ENALPS012020 | 14,875.00 |
| 817380 | 01/31/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ54051 | 0022 | TOUR & TRAVEL | TED POWERS-TRAVEL | 4914 | 864.00 |
| 817380 | 02/05/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ54018 | 0002 | MEREDITH SADLOWSKI | Services 8/9-8/23/19 | 8262019 | (9,615.00) |
| 817380 | 02/05/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ54018 | 0004 | MEREDITH SADLOWSKI | Services 8/23-9/13 | 9092019 | (14,423.00) |
| 817380 | 02/13/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ54252 | 0002 | BERRY Y&V FABRICATORS LLC | MRE CONSULTING LSP | 5442 | 813.75 |
| 817380 | 02/13/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ54260 | 0010 | BERRY Y&V FABRICATORS LLC | T-Mobile Midstream | 5543 | 61.82 |
| 817380 | 02/13/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ54260 | 0018 | BERRY Y&V FABRICATORS LLC | HoustonOffUtilSte110 | 5551 | 852.32 |
| 817380 | 02/13/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ54260 | 0034 | BERRY Y&V FABRICATORS LLC | Bay Exp DDuke Midstr | 5560 | 301.11 |
| 817380 | 02/13/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ54260 | 0040 | BERRY Y&V FABRICATORS LLC | Bay Exp TFulghum LSP | 5564 | 969.27 |
| 817380 | 02/13/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ54260 | 0042 | BERRY Y&V FABRICATORS LLC | Bay Exp JHamiltonLSP | 5567 | 55.19 |
| 817380 | 02/13/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ54260 | 0050 | BERRY Y&V FABRICATORS LLC | Bay Exp MHicks LSP | 5571 | 517.08 |
| 817380 | 02/13/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ54260 | 0054 | BERRY Y&V FABRICATORS LLC | Bay Exp PHicks LSP | 5573 | 1,706.95 |
| 817380 | 02/13/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ54260 | 0058 | BERRY Y&V FABRICATORS LLC | Bay Exp BSalehi LSP | 5576 | 512.74 |
| 817380 | 02/13/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ54260 | 0066 | BERRY Y&V FABRICATORS LLC | Parks Coffee LSP | 5580 | 28.37 |
| 817380 | 02/13/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ54260 | 0072 | BERRY Y&V FABRICATORS LLC | HouOffRentste110LSP | 5586 | 8,196.16 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 797380 | 02/17/2020 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ71623 | 0002 | ALBERT THEODORE POWERS | JAN-FEB28 EXPENSES | 3012022 | 10,231.55 |
| 817380 | 02/17/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ54307 | 0026 | DHYEAGER CONSULTING LLC | 1/13-1/26/20 SERVIC | DHY030 | 9,091.67 |
| 817380 | 02/17/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ54307 | 0028 | DISORBO CONSULTING, LLC | 1/1-1/31/20 SERVICE | 200085 | 5,877.09 |
| 817380 | 02/17/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ54307 | 0024 | PROJECT CONSULTING SRVCS | 12/1-12/31/19 SERVI | 43063 | 32,345.56 |
| 817380 | 02/17/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ54307 | 0030 | PROJECT CONSULTING SRVCS | 9/1-9/30/19 SERVICE | 42657 | 89,393.31 |
| 817380 | 02/17/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ54307 | 0022 | STALWART STRATEGIES INC | 2/2020 SERVICES | 1665 | 10,500.00 |
| 817380 | 02/17/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ54307 | 0018 | WINSTEAD PC ATTORNEYS | 12/19 SERVICES | 2825713 | 10,546.50 |
| 817380 | 02/17/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ54307 | 0020 | WINSTEAD PC ATTORNEYS | 12/19 SERVICES | 2835735 | 5,800.00 |
| 817380 | 02/24/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ54469 | 0032 | BUTCH BOYD LAW FIRM, P.C. | 1/1-1/31/2020 SERVI | 20281 | 11,450.00 |
| 817380 | 02/24/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ54469 | 0030 | DHYEAGER CONSULTING LLC | 1/27-2/09 SERVICES | DHY031 | 7,807.72 |
| 817380 | 02/24/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ54469 | 0060 | MATTHEW E MARRA | 1/27-2/7/2020 | MARRA21 | 7,307.70 |
| 817380 | 02/24/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ54469 | 0028 | WINSTEAD PC ATTORNEYS | 1/2020 SERVICES | 2843831 | 178.50 |
| 817380 | 02/29/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ54698 | 0014 | DISORBO CONSULTING, LLC | 12/1-12/31/2019 | 191723 | 2,235.00 |
| 817380 | 02/29/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ54698 | 0024 | DISORBO CONSULTING, LLC | 12/1-12/31/2019 | 191760 | 13,938.45 |
| 817380 | 02/29/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ54698 | 0008 | ESCOPETA OIL | 3/2020 RENT | 32020 | 973.33 |
| 797380 | 02/29/2020 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ73045 | 0038 | LLOYD ENGINEERING, INC. | HARBOR ISLAND SHIP | 7124 | 27,245.00 |
| 797380 | 02/29/2020 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ74142 | 0008 | LLOYD ENGINEERING, INC. | HARBOR ISLAND SHIP | 7210 | 44,666.86 |
| 797380 | 02/29/2020 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ74801 | 0004 | LLOYD ENGINEERING, INC. | HARBOR ISLAND SHIP | 7269 | 15,210.00 |
| 797380 | 02/29/2020 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ75657 | 0013 | LLOYD ENGINEERING, INC. | SEPT 2022-LSP PERMI | 7314 | 19,537.97 |
| 797380 | 02/29/2020 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ78876 | 0010 | LLOYD ENGINEERING, INC. | CONSULTING SVCS BER | 7535 | 34,414.50 |
| 817380 | 02/29/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ54698 | 0020 | MATTHEW E MARRA | 2/10-2/21/2020 | MARRA22 | 7,307.70 |
| 817380 | 02/29/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ54698 | 0030 | MCGINNIS LOCHRIDGE LLP | 1/1-1/31/2020 | 235636 | 7,380.50 |
| 797380 | 02/29/2020 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ59955 | 0017 | MCGINNIS LOCHRIDGE LLP | HARBOR ISLAND | 240673 | 66,480.75 |
| 817380 | 02/29/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ54698 | 0016 | MDR ADVERT | FEB 20 RETAINER | 2032034 | 6,500.00 |
| 817380 | 02/29/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ54698 | 0022 | NICOLAS S COCAVESSIS dba | 1/28-2/18/2020 | ENALPS022020 | 12,075.00 |
| 817380 | 02/29/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ54698 | 0032 | ORCA ASSETS GP, LLC | LONE STAR PORTS | 328 | 20.00 |
| 817380 | 03/09/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ54702 | 0011 | TOUR & TRAVEL | TED POWERS | 4981 | 864.00 |
| 817380 | 03/10/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ54744 | 0006 | BERRY Y&V FABRICATORS LLC | Houston Rent 110 LSP | 5658 | 8,196.16 |
| 817380 | 03/10/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ54744 | 0016 | BERRY Y&V FABRICATORS LLC | Logix HoustonOff Uti | 5638 | 852.30 |
| 817380 | 03/10/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ54744 | 0024 | BERRY Y&V FABRICATORS LLC | Bay Exp Babak Salehi | 5633 | 1,633.99 |
| 817380 | 03/10/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ54744 | 0028 | BERRY Y&V FABRICATORS LLC | BayExp PHicks LSP | 5626 | 6,288.95 |
| 817380 | 03/10/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ54744 | 0030 | BERRY Y&V FABRICATORS LLC | BayExp MHicks LSP | 5625 | 1,060.07 |
| 817380 | 03/10/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ54744 | 0034 | BERRY Y&V FABRICATORS LLC | BayExp THendersonLSP | 5623 | 180.50 |
| 817380 | 03/10/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ54744 | 0038 | BERRY Y&V FABRICATORS LLC | BayExp TFulghum LSP | 5619 | 1,193.51 |
| 817380 | 03/10/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ54744 | 0040 | BERRY Y&V FABRICATORS LLC | BayExp VFigueroa LSP | 5616 | 79.32 |
| 817380 | 03/10/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ54744 | 0044 | BERRY Y&V FABRICATORS LLC | BayExp JCotrino LSP | 5611 | 86.15 |
| 817380 | 03/10/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ54760 | 0004 | BUTCH BOYD LAW FIRM, P.C. | 2/1-3/1/2020 | 20291 | 8,350.00 |
| 817380 | 03/10/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ54760 | 0008 | DHYEAGER CONSULTING LLC | 2/10-2/23/2020 | DHY032 | 9,899.26 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 817380 | 03/17/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ54966 | 0006 | DISORBO CONSULTING, LLC | AIR PERMIT ASSISTAN | 200346 | 6,763.40 |
| 817380 | 03/17/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ54966 | 0004 | MATTHEW E MARRA | 02/24-03/06/2020 | MARRA23 | 7,307.70 |
| 817380 | 03/17/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ54966 | 0008 | STALWART STRATEGIES INC | 3/20 SERVICES | 1681 | 10,580.00 |
| 817380 | 03/17/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ54966 | 0010 | WINSTEAD PC ATTORNEYS | 1/20 LEGAL SERVICES | 2843830 | 615.00 |
| 817380 | 03/24/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ55061 | 0024 | DHYEAGER CONSULTING LLC | 2/24-3/8/2020 | DHY033 | 8,803.29 |
| 817380 | 03/24/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ55061 | 0026 | WINSTEAD PC ATTORNEYS | OCT19 LEGAL SERVICE | 2819880A | 23,314.50 |
| 797380 | 03/25/2020 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ46346 | 0015 | ALLIED PACIFIC GROUP LTD | CONSULTING | 2281917BERRY | 100,000.00 |
| 817380 | 03/25/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ55108 | 0034 | LLOYD ENGINEERING, INC. | 2/20 CONSULTING SER | 6211 | 28,365.00 |
| 797380 | 03/25/2020 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ59955 | 0022 | MCGINNIS LOCHRIDGE LLP | HARBOR ISLAND | 240209 | 75,586.50 |
| 797380 | 03/25/2020 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ69538 | 0087 | MCGINNIS LOCHRIDGE LLP | LEGAL SVCS | 250988 | 4,520.70 |
| 797380 | 03/25/2020 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | GJ47028 | 0001 | N&A PROJECT MANAGEMENT | | | 93,488.50 |
| 797380 | 03/25/2020 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ43764 | 0030 | N&A PROJECT MANAGEMENT | Weelhead Project | 266 | 66,777.50 |
| 817380 | 03/31/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ55431 | 0004 | DHYEAGER CONSULTING LLC | 3/9-3/22/20 | DHY034 | 7,693.24 |
| 817380 | 03/31/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ55226 | 0002 | MATTHEW E MARRA | 3/9-3/20/20 | MARRA24 | 7,307.70 |
| 817380 | 03/31/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ55226 | 0006 | MDR ADVERT | MAR 20 RETAINER | 2032092 | 6,500.00 |
| 797380 | 03/31/2020 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ43236 | 0008 | OSO DEVELOPMENT PARTNERS | Laura 8/26-9/30 | 1049 | 18,635.00 |
| 797380 | 03/31/2020 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ43236 | 0010 | OSO DEVELOPMENT PARTNERS | Duplicate Billing | CM1049 | (2,010.00) |
| 797380 | 03/31/2020 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ43082 | 0018 | PERRYMAN CONSULTANTS INC | Services 9/1-9/30 | SEP20182889 | 82,510.75 |
| 817380 | 03/31/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ55226 | 0004 | PROJECT CONSULTING SRVCS | 8/1-8/13/19 REMAINI | 42479A | 68,401.46 |
| 817380 | 04/14/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ55584 | 0008 | BUTCH BOYD LAW FIRM, P.C. | 3/2-4/6/2020 | 20298 | 16,896.03 |
| 817380 | 04/14/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ55584 | 0002 | DISORBO CONSULTING, LLC | AIR PERMITTING ASSI | 200443 | 412.50 |
| 817380 | 04/16/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ55648 | 0002 | MATTHEW E MARRA | 817380 | MARRA25 | 7,307.70 |
| 817380 | 04/21/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ55744 | 0008 | CARR, RIGGS & INGRAM LLC | TAX PLANNING | 16866819 | 500.00 |
| 817380 | 04/21/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ55742 | 0002 | CT CORPORATION SYSTEM | DOMESTIC REPRESENTA | 500551876600 | 417.00 |
| 817380 | 04/21/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ55742 | 0020 | MDR ADVERT | 4/20 RETAINER | 2032148 | 6,500.00 |
| 817380 | 04/21/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ55742 | 0016 | STALWART STRATEGIES INC | 4/20 SERVICES | 1713 | 10,250.00 |
| 817380 | 04/22/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ55795 | 0003 | ESCOPETA OIL | 4/2020 RENT | 42020 | 967.92 |
| 817380 | 04/27/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ55864 | 0018 | DHYEAGER CONSULTING LLC | 3/23-4/5/2020 | DHY035 | 7,693.24 |
| 817380 | 04/27/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ55864 | 0016 | MCGINNIS LOCHRIDGE LLP | 3/31/2020 LEGAL SER | 236709 | 13,079.50 |
| 817380 | 04/29/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ55911 | 0017 | DHYEAGER CONSULTING LLC | 4/6-4/19/2020 | DHY036 | 7,693.24 |
| 817380 | 04/29/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ55911 | 0029 | MATTHEW E MARRA | 4/6-4/17/2020 | MARRA26 | 7,307.70 |
| 817380 | 04/29/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ55911 | 0040 | ORCA ASSETS GP, LLC | IDRIVE.COM | 338 | 114.14 |
| 817380 | 04/30/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | GJ49462 | 0002 | KNUDSON LP | REFUND | | (10,000.00) |
| 797380 | 04/30/2020 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ44400 | 0011 | PERRYMAN CONSULTANTS INC | Professional Service | OCT20182889 | 63,856.75 |
| 797380 | 04/30/2020 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ45183 | 0110 | PERRYMAN CONSULTANTS INC | 11/1-11/30/2018 | NOV20182889 | 82,207.25 |
| 817380 | 05/11/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ56160 | 0006 | MATTHEW E MARRA | 4/20/20-5/1/202 | MARRA27 | 7,307.70 |
| 817380 | 05/13/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ56215 | 0009 | ESCOPETA OIL | MAY 2020 RENT | 52020 | 967.92 |
| 817380 | 05/19/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ56324 | 0008 | BERRY Y&V FABRICATORS LLC | FAB PERSONNEL MIDSTR | 5595 | 45,108.00 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 817380 | 05/19/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ56324 | 0010 | BERRY Y&V FABRICATORS LLC | FAB PER MIDWAY REDFI | 5594 | 4,924.00 |
| 817380 | 05/19/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ56324 | 0014 | BERRY Y&V FABRICATORS LLC | FAB PER HARBOR ISLAN | 5592 | 4,840.00 |
| 817380 | 05/19/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ56324 | 0016 | BERRY Y&V FABRICATORS LLC | FAB PER HARBOR ISLAN | 5591 | 4,924.00 |
| 817380 | 05/19/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ56324 | 0029 | BERRY Y&V FABRICATORS LLC | FAB PERSONNEL LSP | 5671 | 72,312.00 |
| 817380 | 05/19/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ56324 | 0031 | BERRY Y&V FABRICATORS LLC | FAB PER MIDWAY REDFI | 5669 | 4,840.00 |
| 817380 | 05/19/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ56324 | 0035 | BERRY Y&V FABRICATORS LLC | FABPER HAR ISLAND LI | 5667 | 6,976.00 |
| 817380 | 05/19/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ56324 | 0037 | BERRY Y&V FABRICATORS LLC | FAB PER HARBOR ISLAN | 5666 | 7,276.00 |
| 817380 | 05/19/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ56324 | 0039 | BERRY Y&V FABRICATORS LLC | FABPER MIDWAY JUNCTI | 5665 | 6,264.00 |
| 817380 | 05/19/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ56324 | 0006 | BERRY Y&V FABRICATORS LLC | FAB PERSONNEL LSP | 5596 | 55,552.00 |
| 817380 | 05/19/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ56324 | 0058 | BERRY Y&V FABRICATORS LLC | T-MOBILE MIDSTREAM | 5651 | 61.81 |
| 817380 | 05/19/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ56324 | 0062 | BERRY Y&V FABRICATORS LLC | BAY EXP PARKS COFFEE | 5645 | 36.88 |
| 817380 | 05/19/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ56324 | 0083 | BERRY Y&V FABRICATORS LLC | BAY EXP DDUKE | 5609 | 287.70 |
| 817380 | 05/21/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ56409 | 0018 | DHYEAGER CONSULTING LLC | 5/4/20-5/17/20 | DHY038 | 7,693.24 |
| 817380 | 05/21/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ56409 | 0026 | DISORBO CONSULTING, LLC | 4/1-4/30/20 | 200619 | 6,981.70 |
| 817380 | 05/21/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ56409 | 0028 | DISORBO CONSULTING, LLC | 4/1-4/30/20 | 200620 | 8,112.50 |
| 817380 | 05/21/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ56409 | 0020 | MATTHEW E MARRA | 5/4/20-5/15/20 | MARRA28 | 7,307.70 |
| 817380 | 05/21/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ56409 | 0030 | MCGINNIS LOCHRIDGE LLP | 4/30/2020 LEGAL | 237416 | 1,207.80 |
| 817380 | 05/21/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ56409 | 0022 | ORCA ASSETS GP, LLC | QUICKBOOKS ENTERPR | 346 | 581.45 |
| 817380 | 05/21/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ56409 | 0024 | STALWART STRATEGIES INC | SERVICES MAY 20 | 1732 | 10,275.86 |
| 797380 | 05/29/2020 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ47632 | 0020 | GULLET & ASSOCIATES INC | 9/2-9/15/18 | 128029A | 23,136.74 |
| 817380 | 05/31/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ56623 | 0002 | BUTCH BOYD LAW FIRM, P.C. | APR LEGAL SERVICES | 20308 | 30,642.42 |
| 817380 | 05/31/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ56637 | 0036 | BUTCH BOYD LAW FIRM, P.C. | 5/1-31 LEGAL SERVI | 20316 | 7,592.56 |
| 817380 | 05/31/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ56623 | 0004 | DHYEAGER CONSULTING LLC | 4/20-5/3/20 | DHY037 | 7,693.24 |
| 817380 | 05/31/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ56637 | 0029 | ESCOPETA OIL | JUNE 2020 RENT | 62020 | 967.92 |
| 817380 | 05/31/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ56623 | 0012 | MCGINNIS LOCHRIDGE LLP | LEGAL 4/30/20 | 237415 | 27,246.60 |
| 817380 | 05/31/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ56637 | 0018 | ORCA ASSETS GP, LLC | USPS CERTIFIED MAIL | 349 | 127.10 |
| 817380 | 05/31/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ56637 | 0032 | TOUR & TRAVEL | TED POWERS TRAVEL | 5027 | 432.00 |
| 817380 | 06/04/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ56638 | 0010 | MATTHEW E MARRA | 5/18-5/29 | MARRA-29 | 7,307.70 |
| 817380 | 06/04/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ56638 | 0006 | NICOLAS S COCAVESSIS dba | 5/15-5/31/20 | ENALPS032020 | 5,600.00 |
| 817380 | 06/04/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ56638 | 0008 | TOUR & TRAVEL | TED POWERS TRAVEL | 5038 | 564.00 |
| 817380 | 06/09/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ56746 | 0002 | MCGINNIS LOCHRIDGE LLP | FEB LEGAL | 236234 | 14,868.00 |
| 817380 | 06/10/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ56793 | 0002 | DHYEAGER CONSULTING LLC | 5/18-5/31/20 | DHY039 | 7,693.24 |
| 817380 | 06/11/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ56822 | 0006 | DISORBO CONSULTING, LLC | MAY CONSULTING | 200793 | 7,029.55 |
| 817380 | 06/11/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ56822 | 0012 | JEB BROWN, ATTY AT LAW | APRIL LEGAL SRVC | 6012020 | 118.50 |
| 817380 | 06/19/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ57005 | 0002 | BERRY Y&V FABRICATORS LLC | BAY EXP - LSP | 5876 | 105.18 |
| 817380 | 06/23/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ57044 | 0023 | DHYEAGER CONSULTING LLC | 6/1-6/14/20 | DHY040 | 7,693.24 |
| 817380 | 06/23/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ57044 | 0013 | ENVIRONMENTAL SYSTEMS | ARCGIS DESKTOP | 93838523 | 2,056.75 |
| 817380 | 06/23/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ57044 | 0021 | STALWART STRATEGIES INC | JUNE 20 SERVICES | 1753 | 10,380.00 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 817380 | 06/30/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ57182 | 0008 | AMERICAN EXPRESS | AL BERRY 19009 | AMX 06.2020 | 2,771.20 |
| 817380 | 06/30/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ57378 | 0002 | BERRY Y&V FABRICATORS LLC | MIDWAY | 5803 | 4,804.00 |
| 817380 | 06/30/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ57508 | 0002 | BERRY Y&V FABRICATORS LLC | HARBOR ISLAND | 5804 | 5,516.00 |
| 817380 | 06/30/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ57510 | 0004 | BERRY Y&V FABRICATORS LLC | BYV LSP EXP | 5768 | 100.41 |
| 817380 | 06/30/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ57508 | 0006 | BERRY Y&V FABRICATORS LLC | FAB PERSONNEL - MI | 5807 | 4,840.00 |
| 817380 | 06/30/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ57508 | 0008 | BERRY Y&V FABRICATORS LLC | FAB PERSONNEL - MI | 5808 | 26,072.00 |
| 817380 | 06/30/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ57508 | 0010 | BERRY Y&V FABRICATORS LLC | FAB PERSONNEL - LSP | 5809 | 74,224.00 |
| 817380 | 06/30/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ57508 | 0021 | BERRY Y&V FABRICATORS LLC | HARBOR ISLAND | 5805 | 5,552.00 |
| 817380 | 06/30/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ57510 | 0002 | BERRY Y&V FABRICATORS LLC | T FULGHUM LSP EXP | 5773 | 2,753.77 |
| 817380 | 06/30/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ57378 | 0004 | BERRY Y&V FABRICATORS LLC | D DUKE MIDSTREAM E | 5765 | 277.73 |
| 817380 | 06/30/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ57378 | 0006 | BERRY Y&V FABRICATORS LLC | D DUKE LSP EXP | 5766 | 134.01 |
| 817380 | 06/30/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ57510 | 0010 | BERRY Y&V FABRICATORS LLC | LSP LOGIX | 5750 | 709.53 |
| 817380 | 06/30/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ57508 | 0012 | BERRY Y&V FABRICATORS LLC | LSP RENT | 5798 | 6,584.48 |
| 817380 | 06/30/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ57509 | 0013 | BERRY Y&V FABRICATORS LLC | COFFEE | 5790 | 10.75 |
| 817380 | 06/30/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ57509 | 0022 | BERRY Y&V FABRICATORS LLC | P HICKS LSP EXP | 5782 | 635.42 |
| 817380 | 06/30/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ57373 | 0004 | LAWRENCE BERRY | FUEL AUSTIN | 3122020 | 780.13 |
| 817380 | 06/30/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ57471 | 0016 | LAWRENCE BERRY | AMEX 95003 | 51920 | 1,737.60 |
| 817380 | 06/30/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ57424 | 0008 | LLOYD ENGINEERING, INC. | CONSULTING SVCS | 6291 | 207,590.69 |
| 817380 | 06/30/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ57424 | 0012 | MATTHEW E MARRA | 6/15-6/26/2020 | MARRA31 | 7,307.70 |
| 817380 | 06/30/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ57176 | 0020 | MATTHEW E MARRA | 6/1-6/12 PROFESSIO | MARRA30 | 7,307.70 |
| 817380 | 06/30/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ57373 | 0002 | MCGINNIS LOCHRIDGE LLP | LEGAL FEB 2020 | 236428 | 3,181.50 |
| 817380 | 06/30/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ57424 | 0010 | MCGINNIS LOCHRIDGE LLP | LEGAL SERVICES TO | 238363 | 42,868.35 |
| 797380 | 07/08/2020 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ44649 | 0124 | GULLET & ASSOCIATES INC | Professional Service | 128483A | 588.00 |
| 797380 | 07/08/2020 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ46433 | 0002 | GULLET & ASSOCIATES INC | 9/30-10/13/2018 | 128139A | 68,427.88 |
| 817380 | 07/08/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ57442 | 0002 | LAWRENCE BERRY | CRI-Tax Planning | 16523747 | (4,100.00) |
| 817380 | 07/08/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ57442 | 0004 | LAWRENCE BERRY | CRI-Tax Planning | 16523747 | 4,100.00 |
| 817380 | 07/08/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ57442 | 0006 | LAWRENCE BERRY | JSK Holdings Service | AM91018 | (1,100.00) |
| 817380 | 07/08/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ57442 | 0008 | LAWRENCE BERRY | JSK Holdings Service | AM91018 | 1,100.00 |
| 817380 | 07/08/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ57442 | 0010 | LAWRENCE BERRY | Professional Service | AM818 | (2,400.00) |
| 817380 | 07/08/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ57442 | 0012 | LAWRENCE BERRY | Professional Service | AM818 | 2,400.00 |
| 817380 | 07/08/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ57442 | 0014 | LAWRENCE BERRY | Travel Expenses | AM818A | (23.98) |
| 817380 | 07/08/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ57442 | 0016 | LAWRENCE BERRY | Travel Expenses | AM818A | 23.98 |
| 817380 | 07/14/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ57556 | 0049 | BUTCH BOYD LAW FIRM, P.C. | 6/1-7/6/2020 | 20330 | 18,041.53 |
| 817380 | 07/14/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ57556 | 0055 | DHYEAGER CONSULTING LLC | 6/15-6/28/20 SVCS | DHY041 | 7,693.24 |
| 817380 | 07/14/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ57556 | 0046 | ESCOPETA OIL | JULY 20 RENT | 72020 | 967.92 |
| 817380 | 07/14/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ57556 | 0057 | TOUR & TRAVEL | TED POWERS TRAVEL | 5052 | 216.00 |
| 817380 | 07/16/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ57626 | 0006 | THE ROY JAMES FLOERKE AND | 817380 | 7012020 | 800.00 |
| 817380 | 07/21/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ57716 | 0016 | CARR, RIGGS & INGRAM LLC | YE12.31.19 FRANCHI | 16937572 | 500.00 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 817380 | 07/21/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ57716 | 0018 | CARR, RIGGS & INGRAM LLC | YE12.31.19 FRANCHI | 16937567 | 500.00 |
| 817380 | 07/21/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ57716 | 0024 | DISORBO CONSULTING, LLC | 6/1-6/30/20 CONSUL | 200961 | 367.50 |
| 817380 | 07/21/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ57716 | 0026 | DISORBO CONSULTING, LLC | 6/1-6/30/20 HARBOR | 200962 | 3,827.61 |
| 817380 | 07/21/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ57716 | 0028 | DISORBO CONSULTING, LLC | 6/1-6/30/20 LITIGA | 200960 | 21,370.74 |
| 817380 | 07/21/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ57716 | 0050 | HIGHWAY 181, LLC | 817380 | 7082020 | 800.00 |
| 817380 | 07/21/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ57716 | 0022 | LLOYD ENGINEERING, INC. | MAY/JUNE 2020 | 6345 | 127,058.00 |
| 817380 | 07/21/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ57716 | 0004 | LOCKTON COMPANIES | GENERAL LIABILITY | 17174638 | 2,444.40 |
| 817380 | 07/21/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ57716 | 0020 | MATTHEW E MARRA | 6/29-7/10/2020 | MARRA32 | 7,307.70 |
| 817380 | 07/21/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ57716 | 0030 | STALWART STRATEGIES INC | JULY 2020 SVCS | 1791 | 10,400.00 |
| 817380 | 07/28/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ57867 | 0046 | DHYEAGER CONSULTING LLC | 6/29-7/12/20 | DHY042 | 7,693.24 |
| 817380 | 07/29/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ57924 | 0002 | BERRY Y&V FABRICATORS LLC | Fab Per Midway Junc | 5008 | 6,008.00 |
| 817380 | 07/29/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ57924 | 0004 | BERRY Y&V FABRICATORS LLC | Fab Per Burleson Mid | 5009 | 6,932.00 |
| 817380 | 07/29/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ57924 | 0010 | BERRY Y&V FABRICATORS LLC | Fab Per Burleson Mid | 5136 | 4,056.00 |
| 817380 | 07/29/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ57924 | 0012 | BERRY Y&V FABRICATORS LLC | Fab Per Harbor Islan | 5137 | 13,084.00 |
| 817380 | 07/29/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ57924 | 0014 | BERRY Y&V FABRICATORS LLC | Fab Per Redfish | 5139 | 9,344.00 |
| 817380 | 07/29/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ57924 | 0016 | BERRY Y&V FABRICATORS LLC | Fab Per Burleson Mid | 5151 | 2,704.00 |
| 817380 | 07/29/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ57924 | 0006 | BERRY Y&V FABRICATORS LLC | Bay Exp Matthew Hick | 5096 | 110.57 |
| 817380 | 07/29/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ57916 | 0004 | MATTHEW E MARRA | 7/13-7/24/2020 | MARRA33 | 7,307.70 |
| 817380 | 07/30/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ57927 | 0016 | CT CORPORATION SYSTEM | DOMESTIC REPRESENT | 500551876600CM | (417.00) |
| 817380 | 07/31/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ58060 | 0002 | DHYEAGER CONSULTING LLC | 7/13-7/26 SVCS | DHY043 | 7,750.83 |
| 817380 | 07/31/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ58060 | 0007 | LAWRENCE BERRY | FUEL CC | 205798 | 793.95 |
| 797380 | 08/06/2020 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ43764 | 0036 | PROJECT CONSULTING SRVCS | Professional Service | 40606 | 51,668.63 |
| 817380 | 08/19/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ58345 | 0004 | STALWART STRATEGIES INC | AUG 2020 SVCS | 1802 | 10,426.79 |
| 817380 | 08/20/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ58366 | 0038 | MATTHEW E MARRA | 7/27-8/7/20 | MARRA34 | 7,307.70 |
| 817380 | 08/24/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ58419 | 0007 | AMERICAN EXPRESS | AL BERRY 19009 | AMX 072020 | 93.98 |
| 817380 | 08/24/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ58419 | 0019 | ORCA ASSETS GP, LLC | MRE CONSULTING | 359 | 214.83 |
| 817380 | 08/24/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ58419 | 0023 | ORCA ASSETS GP, LLC | TX SECRETARY OF ST | 364 | 15.41 |
| 797380 | 08/24/2020 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ44005 | 0023 | PROJECT CONSULTING SRVCS | Professional Service | 40727 | 6,304.25 |
| 817380 | 08/31/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ58728 | 0017 | DHYEAGER CONSULTING LLC | 8/10-8/23/2020 | DHY045 | 7,693.24 |
| 817380 | 08/31/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ58597 | 0006 | DISORBO CONSULTING, LLC | 7/1-7/31/20 | 201135 | 3,613.75 |
| 817380 | 08/31/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ58781 | 0003 | ESCOPETA OIL | SEP 2020 RENT | 92020 | 967.92 |
| 817380 | 08/31/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ58634 | 0023 | ESCOPETA OIL | AUG 2020 RENT | 82020 | 967.92 |
| 817380 | 08/31/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ58728 | 0042 | LAWRENCE BERRY | MALLARD AIRCRAFT | 7282020 | 785.00 |
| 797380 | 08/31/2020 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ71271 | 0002 | TRINITY CONSULTANTS, INC. | PROFESSIONAL SVC | 220266 | 48.75 |
| 817380 | 09/10/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ58817 | 0006 | MATTHEW E MARRA | 8/10-8/21/2020 | MARRA35 | 7,307.70 |
| 817380 | 09/15/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ58903 | 0012 | DISORBO CONSULTING, LLC | 8/1-8/31/20 | 201306 | 10,693.75 |
| 817380 | 09/15/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ58903 | 0014 | DISORBO CONSULTING, LLC | 8/1-8/30 HARBOR IS | 201307 | 21,770.00 |
| 797380 | 09/15/2020 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ46812 | 0006 | GULLET & ASSOCIATES INC | 8/5/18-8/18/18 | 127793B | 2,160.00 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 817380 | 09/15/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ58903 | 0016 | MATTHEW E MARRA | 8/24-9/4/20 | MARRA36 | 7,307.70 |
| 817380 | 09/16/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ58975 | 0002 | ENVIRONMENTAL SYSTEMS | ARCGIS ONLINE | 93888291 | 106.60 |
| 817380 | 09/17/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ59013 | 0029 | AMERICAN EXPRESS | AL BERRY 19009 | AMX082020 | 5,710.91 |
| 817380 | 09/17/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ59013 | 0002 | WEST 17TH RESOURCES, LLC | TX SECRETARY OF ST | 20 | 30.82 |
| 817380 | 09/22/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ59084 | 0004 | BUTCH BOYD LAW FIRM, P.C. | LEGAL 8/5-9/1/20 | 20351 | 22,155.00 |
| 817380 | 09/22/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ59084 | 0002 | DHYEAGER CONSULTING LLC | 8/24-9/6/20 SERVIC | DHY046 | 7,693.24 |
| 817380 | 09/24/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ59170 | 0002 | DHYEAGER CONSULTING LLC | 7/27-8/9/20 | DHY044 | 7,693.24 |
| 797380 | 09/25/2020 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ44453 | 0008 | PROJECT CONSULTING SRVCS | Professional Service | 40726 | 91,432.94 |
| 817380 | 09/28/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ59239 | 0013 | DHYEAGER CONSULTING LLC | 9/7-9/20/20 SVCS | DHY047 | 8,697.12 |
| 817380 | 09/28/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ59239 | 0009 | DISORBO CONSULTING, LLC | MAY CONSULTING | 200791 | 8,702.50 |
| 817380 | 09/28/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ59239 | 0011 | MATTHEW E MARRA | 9/7-9/18/20 | MARRA37 | 7,307.70 |
| 817380 | 09/28/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ59239 | 0015 | TOUR & TRAVEL | TED POWERS TRAVEL | 5150 | 108.00 |
| 817380 | 09/28/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ59239 | 0007 | WEST 17TH RESOURCES, LLC | IDRIVE.COM | 29 | 121.15 |
| 817380 | 09/30/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ59484 | 0007 | AMERICAN EXPRESS | AL BERRY 19009 | AMX092020 | 12.79 |
| 817380 | 10/13/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ59618 | 0149 | DHYEAGER CONSULTING LLC | 9/21-10/4/20 | DHY048 | 8,528.95 |
| 817380 | 10/13/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ59618 | 0138 | ESCOPETA OIL | RENT STE 440 | 102020 | 967.92 |
| 817380 | 10/13/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ59618 | 0151 | MATTHEW E MARRA | 9/21-10/2/20 | MARRA38 | 7,307.70 |
| 817380 | 10/13/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ59618 | 0135 | STALWART STRATEGIES INC | OCT2020 | 1869 | 10,452.21 |
| 817380 | 10/14/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ59665 | 0009 | STALWART STRATEGIES INC | SEP 20 SERVICES | 1844 | 10,220.98 |
| 817380 | 10/22/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ59883 | 0016 | MATTHEW E MARRA | 10/5-10/16/20 | MARRA39 | 7,307.70 |
| 817380 | 10/26/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ59955 | 0026 | BUTCH BOYD LAW FIRM, P.C. | SEPT LEGAL | 20360 | 15,100.00 |
| 797380 | 10/26/2020 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | GJ52000 | 0002 | LLOYD ENGINEERING, INC. | LLOYD ENF FRM 817380 | | 960,172.89 |
| 817380 | 10/26/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ59955 | 0016 | MCGINNIS LOCHRIDGE LLP | HARBOR ISLAND | 240673 | 30,204.44 |
| 817380 | 10/26/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ59955 | 0019 | MCGINNIS LOCHRIDGE LLP | HARBOR ISLAND | 239237 | 50,938.11 |
| 817380 | 10/26/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ59955 | 0021 | MCGINNIS LOCHRIDGE LLP | HARBOR ISLAND | 240209 | 15,261.97 |
| 817380 | 10/26/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ59955 | 0028 | RAILROAD COMMISSION OF TX | HARBOR ISLAND | 2 | 963.50 |
| 817380 | 10/26/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ59955 | 0035 | WEST 17TH RESOURCES, LLC | CARD EXPENSES | 38 | 7.60 |
| 817380 | 10/26/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ59955 | 0038 | WEST 17TH RESOURCES, LLC | CARD EXPENSES | 39 | 487.81 |
| 797380 | 10/26/2020 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ52186 | 0033 | WINSTEAD PC ATTORNEYS | LEGAL SERVICES 09/ | 2806002 | 11,020.50 |
| 817380 | 10/27/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ59986 | 0012 | AMERICAN EXPRESS | AL BERRY 19009 | AMX102020 | 1,623.20 |
| 797380 | 10/31/2020 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ47859 | 0004 | ALLIED PACIFIC GROUP LTD | CONSULTING | 5011918BERRY | 100,000.00 |
| 797380 | 10/31/2020 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ49181 | 0008 | ALLIED PACIFIC GROUP LTD | CONSULTING | 7021919BERRY | 100,000.00 |
| 817380 | 10/31/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60170 | 0029 | DHYEAGER CONSULTING LLC | 10/5-10/18/20 SVCS | DHY049 | 7,693.24 |
| 817380 | 10/31/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60170 | 0032 | DISORBO CONSULTING, LLC | 9/1-9/30 SVCS | 201482 | 398.25 |

5,509,606.55

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 797380 | 11/12/2020 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ51105 | 0049 | ALLIED PACIFIC GROUP LTD | 808100358838 | 9021920BERRY | 100,000.00 |
| 817380 | 11/12/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60392 | 0003 | ESCOPETA OIL | NOV RENT | 112020 | 967.92 |
| 817380 | 11/12/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60394 | 0003 | RAILROAD COMMISSION OF TX | P-5 RENEWAL 20/21 | 391652020 | 1,562.50 |
| 817380 | 11/16/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60465 | 0045 | MATTHEW E MARRA | 10/19-10/30/20 | MARRA40 | 7,307.70 |
| 817380 | 11/16/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60465 | 0047 | STALWART STRATEGIES INC | NOV 20 SVCS | 1906 | 10,408.59 |
| 817380 | 11/18/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60518 | 0002 | BERRY Y&V FABRICATORS LLC | FABRICATORS PERSON | 5739 | 64,000.00 |
| 817380 | 11/18/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60518 | 0006 | BERRY Y&V FABRICATORS LLC | FABRICATORS PERSON | 5745 | 40,440.00 |
| 817380 | 11/18/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60518 | 0008 | BERRY Y&V FABRICATORS LLC | FABRICATORS PERSON | 5738 | 7,905.00 |
| 817380 | 11/18/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60523 | 0008 | BERRY Y&V FABRICATORS LLC | FABRICATORS PERSON | 6190 | 9,610.00 |
| 817380 | 11/18/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60518 | 0010 | BERRY Y&V FABRICATORS LLC | FABRICATORS PERSON | 5801 | 12,400.00 |
| 817380 | 11/18/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60523 | 0010 | BERRY Y&V FABRICATORS LLC | FABRICATORS PERSON | 6191 | 7,872.00 |
| 817380 | 11/18/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60518 | 0012 | BERRY Y&V FABRICATORS LLC | FABRICATORS PERSON | 6080 | 7,680.00 |
| 817380 | 11/18/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60523 | 0012 | BERRY Y&V FABRICATORS LLC | FABRICATORS PERSON | 6192 | 62,335.35 |
| 817380 | 11/18/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60521 | 0013 | BERRY Y&V FABRICATORS LLC | FABRICATORS PERSON | 6133 | 11,780.00 |
| 817380 | 11/18/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60518 | 0014 | BERRY Y&V FABRICATORS LLC | FABRICATORS PERSON | 6081 | 59,019.85 |
| 817380 | 11/18/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60521 | 0015 | BERRY Y&V FABRICATORS LLC | FABRICATORS PERSON | 6135 | 63,064.19 |
| 817380 | 11/18/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60518 | 0016 | BERRY Y&V FABRICATORS LLC | FABRICATORS PERSON | 6079 | 8,370.00 |
| 817380 | 11/18/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60523 | 0014 | BERRY Y&V FABRICATORS LLC | EXPENSES-LSP | 6142 | 8,925.00 |
| 817380 | 11/19/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60614 | 0002 | BERRY Y&V FABRICATORS LLC | FABRICATORS PERSON | 5830 | 17,616.00 |
| 817380 | 11/19/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60613 | 0004 | BERRY Y&V FABRICATORS LLC | BAY EXP- ALEJANDRO | 5836 | 5,565.00 |
| 817380 | 11/19/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60614 | 0004 | BERRY Y&V FABRICATORS LLC | FABRICATORS PERSON | 5831 | 78,275.96 |
| 817380 | 11/19/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60614 | 0008 | BERRY Y&V FABRICATORS LLC | FABRICATORS PERSON | 5824 | 11,625.00 |
| 817380 | 11/19/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60615 | 0008 | BERRY Y&V FABRICATORS LLC | FAB PERSONNEL - AX | 5923 | 11,005.00 |
| 817380 | 11/19/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60616 | 0008 | BERRY Y&V FABRICATORS LLC | FABRICATORS PERSON | 6025 | 7,296.00 |
| 817380 | 11/19/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60614 | 0010 | BERRY Y&V FABRICATORS LLC | FABRICATORS PERSON | 5825 | 2,064.00 |
| 817380 | 11/19/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60615 | 0010 | BERRY Y&V FABRICATORS LLC | FAB PERSONNEL - MI | 5924 | 7,680.00 |
| 817380 | 11/19/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60612 | 0012 | BERRY Y&V FABRICATORS LLC | FABRICATORS PERSON | 6134 | 7,296.00 |
| 817380 | 11/19/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60614 | 0012 | BERRY Y&V FABRICATORS LLC | FABRICATORS PERSON | 5826 | 2,776.00 |
| 817380 | 11/19/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60615 | 0012 | BERRY Y&V FABRICATORS LLC | FAB PERSONNEL - LSP | 5925 | 74,560.00 |
| 817380 | 11/19/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60614 | 0014 | BERRY Y&V FABRICATORS LLC | FABRICATORS PERSON | 5827 | 2,064.00 |
| 817380 | 11/19/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60615 | 0018 | BERRY Y&V FABRICATORS LLC | BAY EXP - ALEJANDR | 5919 | 11,760.00 |
| 817380 | 11/19/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60611 | 0035 | BERRY Y&V FABRICATORS LLC | FABRICATORS PERSON | 5740 | 4,840.00 |
| 817380 | 11/19/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60615 | 0036 | BERRY Y&V FABRICATORS LLC | BAY EXP -AXIS-C MA | 5970 | 12,090.00 |
| 817380 | 11/19/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60615 | 0040 | BERRY Y&V FABRICATORS LLC | FABRICATORS PERSON | 5972 | 8,064.00 |
| 817380 | 11/19/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60611 | 0041 | BERRY Y&V FABRICATORS LLC | FABRICATORS PERSON | 5744 | 4,128.00 |
| 817380 | 11/19/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60615 | 0042 | BERRY Y&V FABRICATORS LLC | FABRICATORS PERSON | 5973 | 79,773.29 |
| 817380 | 11/19/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60615 | 0052 | BERRY Y&V FABRICATORS LLC | FABRICATORS PERSON | 6026 | 11,470.00 |
| 817380 | 11/19/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60615 | 0054 | BERRY Y&V FABRICATORS LLC | FABRICATORS PERSON | 6027 | 64,910.71 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 817380 | 11/19/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60613 | 0002 | BERRY Y&V FABRICATORS LLC | HOUSTON OFFICE REN | 5677 | 6,640.79 |
| 817380 | 11/19/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60616 | 0002 | BERRY Y&V FABRICATORS LLC | BAY EXP - AXIS - M | 6015 | 2,928.12 |
| 817380 | 11/19/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60612 | 0006 | BERRY Y&V FABRICATORS LLC | HOUSTON OFFICE REN | 6056 | 6,584.48 |
| 817380 | 11/19/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60612 | 0008 | BERRY Y&V FABRICATORS LLC | HOUSTON OFFICE RENT | 6128 | 6,584.48 |
| 817380 | 11/19/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60613 | 0008 | BERRY Y&V FABRICATORS LLC | HOUSTON OFFICE REN | 5853 | 6,584.48 |
| 817380 | 11/19/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60613 | 0012 | BERRY Y&V FABRICATORS LLC | BAY EXP - MATTHEW | 5870 | 2,436.84 |
| 817380 | 11/19/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60616 | 0012 | BERRY Y&V FABRICATORS LLC | HOU OFF RENT STE 1 | 5996 | 6,584.48 |
| 817380 | 11/19/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60615 | 0016 | BERRY Y&V FABRICATORS LLC | BAY EXP - AXIS - M | 5913 | 4,889.19 |
| 817380 | 11/19/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60612 | 0018 | BERRY Y&V FABRICATORS LLC | BAY EXP - AXIS | 6100 | 5,151.44 |
| 817380 | 11/19/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60612 | 0024 | BERRY Y&V FABRICATORS LLC | BAY EXP - AXIS | 6170 | 2,919.37 |
| 817380 | 11/19/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60615 | 0025 | BERRY Y&V FABRICATORS LLC | HOUSTON OFFICE REN | 5880 | 6,584.48 |
| 817380 | 11/19/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60612 | 0030 | BERRY Y&V FABRICATORS LLC | HOUSTON OFFICE RENT | 6183 | 6,779.66 |
| 817380 | 11/19/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60611 | 0045 | BERRY Y&V FABRICATORS LLC | BAY EXP - PATRICK | 5725 | 2,243.33 |
| 817380 | 11/19/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60615 | 0048 | BERRY Y&V FABRICATORS LLC | HOUSTON OFFICE REN | 5931 | 6,584.48 |
| 817380 | 11/19/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60615 | 0050 | BERRY Y&V FABRICATORS LLC | BAY EXP-M HICKS GE | 5939 | 2,493.38 |
| 817380 | 11/19/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60611 | 0051 | BERRY Y&V FABRICATORS LLC | BAY EXP - AXIS - M | 6070 | 4,838.65 |
| 817380 | 11/19/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60615 | 0061 | BERRY Y&V FABRICATORS LLC | BAY EXP - PATRICK | 5914 | 4,791.40 |
| 817380 | 11/19/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60606 | 0006 | BUTCH BOYD LAW FIRM, P.C. | LEGAL TO 11/10/20 | 20374 | 8,490.05 |
| 817380 | 11/19/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60606 | 0010 | DHYEAGER CONSULTING LLC | 11/2-11/15/20 SVCS | DHY051 | 7,693.00 |
| 817380 | 11/19/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60606 | 0012 | DHYEAGER CONSULTING LLC | 10/19-11/1/20 | DHY050 | 9,909.44 |
| 817380 | 11/19/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60606 | 0004 | DISORBO CONSULTING, LLC | HARBOR ISL. 10/20 | 201649 | 14,651.61 |
| 797380 | 11/19/2020 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ46816 | 0006 | GULLET & ASSOCIATES INC | 9/16/18-9/29/18 | 128056A | 40,139.30 |
| 817380 | 11/19/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60606 | 0008 | MATTHEW E MARRA | 11/2-11/13/20 PROF | MARRA41 | 7,307.70 |
| 817380 | 11/20/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60620 | 0002 | BERRY Y&V FABRICATORS LLC | FABRICATORS PERSON | 5670 | 59,428.00 |
| 817380 | 11/30/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60962 | 0033 | AMERICAN EXPRESS | AL BERRY 19009 | AMX112020 | 7.45 |
| 817380 | 11/30/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60862 | 0018 | LLOYD ENGINEERING, INC. | OCT 2020 | 6468 | 40,700.00 |
| 817380 | 11/30/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60962 | 0002 | LUCY FRAISER dba LUCY | WITNESS SVC 8/20 | 1144 | 4,054.17 |
| 817380 | 11/30/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60962 | 0006 | LUCY FRAISER dba LUCY | EXPERT WITNESS | 1137 | 3,144.17 |
| 817380 | 11/30/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60962 | 0008 | LUCY FRAISER dba LUCY | WITNESS SVC 7/20 | 1143 | 20,409.33 |
| 817380 | 11/30/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60962 | 0010 | LUCY FRAISER dba LUCY | WITNESS SVC 6/20 | 1142 | 2,537.50 |
| 817380 | 11/30/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60962 | 0039 | MATTHEW E MARRA | 11/16-11/27/20 | MARRA42 | 7,307.70 |
| 817380 | 11/30/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60862 | 0016 | MCGINNIS LOCHRIDGE LLP | LEGAL SVCS | 241776 | 82,923.11 |
| 797380 | 12/03/2020 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ45052 | 0002 | PROJECT CONSULTING SRVCS | Professional Service | 40911 | 134,611.82 |
| 817380 | 12/08/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60960 | 0004 | BUTCH BOYD LAW FIRM, P.C. | LEGAL TO 11/30/20 | 20380 | 3,400.00 |
| 817380 | 12/08/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60960 | 0006 | DHYEAGER CONSULTING LLC | 11/16-11/26/20 | DHY052 | 7,693.24 |
| 817380 | 12/08/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60960 | 0011 | ESCOPETA OIL | DEC RENT | 122020 | 967.92 |
| 817380 | 12/08/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ60960 | 0008 | STALWART STRATEGIES INC | DEC 2020 | 1926 | 10,389.91 |
| 817380 | 12/16/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ61125 | 0005 | TOUR & TRAVEL | T POWERS TRAVEL | 5194 | 324.00 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 817380 | 12/22/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ61214 | 0012 | AMERICAN EXPRESS | AL BERRY 19009 | AMX122020 | 6.40 |
| 817380 | 12/22/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ61214 | 0034 | LAWRENCE BERRY | LONE STAR PORTS | 121020 | 50.00 |
| 817380 | 12/22/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ61214 | 0036 | LAWRENCE BERRY | MIDWAY JUNCTION | 121420 | 50.00 |
| 817380 | 12/24/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ61276 | 0004 | MATTHEW E MARRA | 11/30-12/11/20 | MARRA43 | 7,307.70 |
| 817380 | 12/30/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ61343 | 0004 | DHYEAGER CONSULTING LLC | PROFESSIONAL SVCS | DHY053 | 7,693.24 |
| 817380 | 12/30/2020 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ61343 | 0002 | MCGINNIS LOCHRIDGE LLP | LEGAL SVCS | 242176 | 74,133.71 |
| 797380 | 01/05/2021 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ45475 | 0002 | PROJECT CONSULTING SRVCS | 11/1-11/30/2018 | 41150 | 162,282.47 |
| 817380 | 01/07/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ61539 | 0003 | ESCOPETA OIL | JAN 21 RENT | 12021 | 967.92 |
| 817380 | 01/12/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ61638 | 0024 | BUTCH BOYD LAW FIRM, P.C. | LEGAL TO 12/31/20 | 20390 | 4,915.00 |
| 817380 | 01/12/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ61638 | 0022 | DHYEAGER CONSULTING LLC | 12/14-12/27/20 | DHY054 | 7,693.24 |
| 817380 | 01/12/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ61638 | 0020 | MATTHEW E MARRA | 12/14-12/30/20 | MARRA44 | 7,307.70 |
| 817380 | 01/12/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ61638 | 0026 | STALWART STRATEGIES INC | JAN 2021 | 1981 | 10,452.42 |
| 817380 | 01/14/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ61733 | 0002 | SANCH | 131400660000001 | 11042020 | 412.90 |
| 817380 | 01/18/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ61804 | 0064 | LAWRENCE BERRY | LONE STAR PORTS | 17046380 | 500.00 |
| 817380 | 01/18/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ61804 | 0066 | LAWRENCE BERRY | MIDWAY JUNCTION | 17046383 | 500.00 |
| 817380 | 01/21/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ61894 | 0024 | AMERICAN EXPRESS | A L BERRY 19009 | AMX 01 2021 | 50.00 |
| 817380 | 01/21/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ61894 | 0006 | LLOYD ENGINEERING, INC. | NOV 2020 | 6489 | 53,670.00 |
| 817380 | 01/21/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ61894 | 0008 | MCGINNIS LOCHRIDGE LLP | CC PIPELINE | 242911 | 872.10 |
| 817380 | 01/27/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ62050 | 0008 | MATTHEW E MARRA | 1/11-1/22/21 | MARRA46 | 7,307.70 |
| 817380 | 01/27/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ62050 | 0010 | MATTHEW E MARRA | 12/28/20-1/08/21 | MARRA45 | 7,307.70 |
| 817380 | 01/27/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ62050 | 0006 | MCGINNIS LOCHRIDGE LLP | LEGAL SERVICES | 243965 | 1,371.00 |
| 817380 | 01/31/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ62147 | 0034 | DISORBO CONSULTING, LLC | HARBOR ISLAND | 201648 | 28,682.22 |
| 817380 | 02/11/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ62439 | 0010 | BUTCH BOYD LAW FIRM, P.C. | LEGAL TO 1/29/21 | 20395 | 1,300.00 |
| 817380 | 02/11/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ62439 | 0004 | DHYEAGER CONSULTING LLC | 1/11/21-1/24/21 | DHY056 | 7,693.24 |
| 817380 | 02/11/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ62439 | 0006 | DHYEAGER CONSULTING LLC | 12/28/20-1/10/21 | DHY055 | 7,693.24 |
| 817380 | 02/11/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ62439 | 0012 | MCGINNIS LOCHRIDGE LLP | LEGAL SERVICES | 242916 | 25,717.07 |
| 817380 | 02/11/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ62439 | 0008 | STALWART STRATEGIES INC | FEB 2021 | 2013 | 10,418.27 |
| 817380 | 02/28/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | GJ51011 | 0001 | ESCOPETA OIL | RECLASS | | 967.92 |
| 817380 | 02/28/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ62755 | 0062 | ESCOPETA OIL | FEB 2021 RENT | 22021 | 967.92 |
| 817380 | 03/09/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ62934 | 0002 | STALWART STRATEGIES INC | MARCH 2021 | 021621 | 10,382.22 |
| 817380 | 03/11/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ63025 | 0010 | DHYEAGER CONSULTING LLC | PROFESSIONAL SERVI | DHY058 | 7,693.24 |
| 817380 | 03/11/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ63025 | 0012 | DHYEAGER CONSULTING LLC | PROFESSIONAL SERVI | DHY057 | 7,693.24 |
| 817380 | 03/11/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ63027 | 0008 | PROJECT CONSULTING SRVCS | PROFESSIONAL SERVI | 44858 | 475.00 |
| 817380 | 03/16/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ63109 | 0004 | DHYEAGER CONSULTING LLC | PROFESSIONAL SERVI | DHY059 | 7,693.24 |
| 817380 | 03/25/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ63347 | 0025 | MCGINNIS LOCHRIDGE LLP | LEGAL SERVICES | 245240 | 36,249.21 |
| 817380 | 04/01/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ63522 | 0020 | MCGINNIS LOCHRIDGE LLP | LEGAL SERVICES | 244328 | 8,852.59 |
| 817380 | 04/01/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ63522 | 0022 | MCGINNIS LOCHRIDGE LLP | LEGAL SERVICES | 243726 | 710.01 |
| 817380 | 04/01/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ63522 | 0024 | MCGINNIS LOCHRIDGE LLP | LEGAL SERVICES | 245198 | 171.00 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 797380 | 04/01/2021 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ46382 | 0034 | PROJECT CONSULTING SRVCS | PROFESSIONAL SERVICE | 41275 | 177,697.41 |
| 817380 | 04/06/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ63581 | 0005 | ESCOPETA OIL | APR 2021 | 042021 | 967.92 |
| 817380 | 04/06/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ63580 | 0002 | POND & COMPANY | LSP TERMINAL | 133953APR21 | 5,700.00 |
| 817380 | 04/07/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ63634 | 0002 | AMERICAN EXPRESS | A.L.BERRY | AMXAB022021 | 3,540.00 |
| 817380 | 04/07/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ63638 | 0008 | AMERICAN EXPRESS | A.L.BERRY | AMX032021APR | 908.00 |
| 817380 | 04/14/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ63803 | 0002 | DHYEAGER CONSULTING LLC | 04032021 | DHY061APR21 | 7,693.24 |
| 817380 | 04/14/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ63803 | 0004 | DHYEAGER CONSULTING LLC | PROFESSIONAL SERVI | DHY-060APR21 | 7,693.24 |
| 817380 | 04/14/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ63805 | 0002 | MCGINNIS LOCHRIDGE LLP | LEGAL SERVICES | 245772 | 228.00 |
| 817380 | 04/14/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ63803 | 0006 | STALWART STRATEGIES INC | SERVICES APR 2021 | 2079APR21 | 10,365.79 |
| 817380 | 04/15/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ63829 | 0011 | CLIPPERDATA LLC | ANNUAL SUBSCRIPTION | 2286APR21 | 4,530.50 |
| 817380 | 04/21/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ63974 | 0002 | LLOYD ENGINEERING, INC. | CONSULT SERVICES | 6577APR21 | 7,227.50 |
| 817380 | 04/21/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ63974 | 0004 | LLOYD ENGINEERING, INC. | CONSULT SERVICES | 6581APR21 | 5,950.00 |
| 817380 | 04/21/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ63979 | 0002 | MCGINNIS LOCHRIDGE LLP | LEGAL SERVICES | 245821APR21 | 17,017.93 |
| 797380 | 04/30/2021 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ46661 | 0016 | PROJECT CONSULTING SRVCS | Professional Service | 41431 | 161,722.99 |
| 797380 | 04/30/2021 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ47318 | 0032 | PROJECT CONSULTING SRVCS | Professional Service | 41750 | 7,197.50 |
| 817380 | 04/30/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | GJ51529 | 0002 | RECLASS TO | RECLASS TO CAP | | (960,172.89) |
| 797380 | 05/03/2021 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ47591 | 0002 | PROJECT CONSULTING SRVCS | PROFESSIONAL SERVICE | 41578 | 349,177.51 |
| 817380 | 05/05/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ64435 | 0004 | BUTCH BOYD LAW FIRM, P.C. | LEGAL SERVICES | 20416MAY21 | 16,710.00 |
| 817380 | 05/05/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ64435 | 0002 | LLOYD ENGINEERING, INC. | CONSULTING SERVICES | 6525MAY21 | 459,311.70 |
| 817380 | 05/12/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ64590 | 0012 | AMERICAN EXPRESS | A.L.BERRY MARCH AM | AMXAB042021 | 388.10 |
| 817380 | 05/12/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ64590 | 0017 | BUTCH BOYD LAW FIRM, P.C. | LEGAL SERVICES | 20437MAY21 | 4,535.00 |
| 817380 | 05/12/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ64590 | 0030 | ESCOPETA OIL | OFFICE RENT | 52021 | 967.92 |
| 817380 | 05/12/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ64613 | 0007 | LAWRENCE BERRY | AMEX 95003 | 51920 | (1,737.60) |
| 817380 | 05/12/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ64613 | 0014 | LAWRENCE BERRY | AMEX 95003 | 51920 | 1,737.60 |
| 817380 | 05/12/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ64590 | 0004 | LLOYD ENGINEERING, INC. | CONSULTING SERVICES | 6546MAY21 | 28,160.00 |
| 817380 | 05/12/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ64590 | 0019 | STALWART STRATEGIES INC | SERVICE AND EXPENS | 2134MAY21 | 10,715.90 |
| 817380 | 05/21/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ64807 | 0002 | LLOYD ENGINEERING, INC. | CONSULTING SERVICES | 6606MAY21 | 1,102.70 |
| 817380 | 05/21/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ64807 | 0004 | LLOYD ENGINEERING, INC. | CONSULTING SERVICES | 6611MAY21 | 8,090.00 |
| 817380 | 05/21/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ64807 | 0006 | MCGINNIS LOCHRIDGE LLP | LEGAL SERVICES | 246883 | 27,833.13 |
| 817380 | 05/31/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ64987 | 0002 | PIPELINE ACCIDENT PREVENTION C-326 | | 26910 | 4,700.50 |
| 797380 | 05/31/2021 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ48385 | 0061 | PROJECT CONSULTING SRVCS | PROFESSIONAL SERVICE | 41769 | 188,352.18 |
| 797380 | 06/01/2021 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ48939 | 0048 | PROJECT CONSULTING SRVCS | Professional Service | 42042 | 64,096.30 |
| 817380 | 06/08/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ65187 | 0006 | CLIPPERDATA LLC | ANNUAL SUBSCRIPTION | 2321 | 4,530.50 |
| 817380 | 06/08/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ65187 | 0013 | ESCOPETA OIL | OFFICE RENT | 62021 | 967.92 |
| 817380 | 06/08/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ65187 | 0010 | STALWART STRATEGIES INC | JUNE 2021 MAY 2021 | 2164 | 10,362.87 |
| 817380 | 06/08/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ65187 | 0004 | WEST 17TH RESOURCES, LLC | CREDIT CARD EXPENS | 73 | 610.53 |
| 797380 | 06/15/2021 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ46812 | 0008 | GULLET & ASSOCIATES INC | 8/5/18-8/18/18 | 127793A | 9,838.57 |
| 817380 | 06/15/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ65396 | 0012 | ORCA ASSETS GP, LLC | ARCGIS ONLINE SERV | 94049261JUNE | 106.60 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 817380 | 06/30/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ65701 | 0018 | ENVIRONMENTAL SYSTEMS | MAINTENANCE | 94053228 | 2,056.75 |
| 817380 | 06/30/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ65702 | 0002 | MCGINNIS LOCHRIDGE LLP | LEGAL SERVICES | 247555JUNE21 | 840.00 |
| 817380 | 06/30/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ65701 | 0016 | MCGINNIS LOCHRIDGE LLP | LEGAL SERVICES | 247689JUNE21 | 425.43 |
| 797380 | 07/02/2021 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ49085 | 0013 | PROJECT CONSULTING SRVCS | Prof Serv 4/1-4/30 | 41870 | 133,006.12 |
| 817380 | 07/06/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ65782 | 0014 | AMERICAN EXPRESS | A# 794874041 | 7062021 | 772.80 |
| 817380 | 07/06/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ65778 | 0005 | ESCOPETA OIL | JULY RENT | 072021 | 967.92 |
| 817380 | 07/13/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ65957 | 0036 | DILL, JOHN | EXPENSE REIMBURSEM | 7062021 | 185.88 |
| 817380 | 07/19/2021 | 4014-81100-000-000 | DIRECT MISCELLANEOUS | GJ51768 | 0086 | ORCA ASSETS GP, LLC | RETURN PAYMENT | | (106.60) |
| 817380 | 07/22/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ66147 | 0007 | BUTCH BOYD LAW FIRM, P.C. | LEGAL SERVICES | 20478 | 4,215.00 |
| 817380 | 07/22/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ66147 | 0009 | BUTCH BOYD LAW FIRM, P.C. | LEGAL SERVICES | 20461 | 1,750.00 |
| 817380 | 07/22/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ66148 | 0008 | CT CORPORATION SYSTEM | DOMESTIC REPRESENT | 500639657900 | 430.00 |
| 817380 | 07/22/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ66148 | 0006 | DISORBO CONSULTING, LLC | CONSULTING SERVICES | 210927 | 7,325.00 |
| 817380 | 07/22/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ66148 | 0010 | LOCKTON COMPANIES | GENERAL LIABILITY | 19812942 | 2,650.40 |
| 817380 | 07/22/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ66147 | 0011 | MCGINNIS LOCHRIDGE LLP | LEGAL SERVICES | 248249 | 9,394.83 |
| 817380 | 07/22/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ66147 | 0013 | MCGINNIS LOCHRIDGE LLP | LEGAL SERVICES | 248571 | 840.00 |
| 797380 | 07/22/2021 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ50252 | 0075 | PROJECT CONSULTING SRVCS | Service 6/1-6/30 | 42199 | 30,035.65 |
| 817380 | 07/22/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ66147 | 0005 | STALWART STRATEGIES INC | JUNE/JULY 2021 | 2199 | 10,411.47 |
| 817380 | 07/22/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ66148 | 0002 | TOUR & TRAVEL | TED POWERS TRAVEL | 5447 | 216.00 |
| 817380 | 07/22/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ66148 | 0004 | TOUR & TRAVEL | TED POWERS TRAVEL | 5377 | 432.00 |
| 817380 | 08/10/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ66467 | 0017 | ESCOPETA OIL | AUGUST | 82021 | 967.92 |
| 817380 | 08/17/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ66606 | 0024 | BUTCH BOYD LAW FIRM, P.C. | LEGAL SERVICES | 20484 | 3,440.00 |
| 817380 | 08/17/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ66606 | 0020 | DISORBO CONSULTING, LLC | CONSULTING SVCS | 211185 | 8,502.50 |
| 817380 | 08/17/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ66606 | 0022 | STALWART STRATEGIES INC | AUG 2021 | 2233 | 10,435.45 |
| 817380 | 08/18/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ66639 | 0008 | AMERICAN EXPRESS | AL BERRY 19009 | AMX AB 05.2021 | 3,294.00 |
| 797380 | 08/23/2021 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ46812 | 0010 | GULLET & ASSOCIATES INC | 7/22/18-8/4/18 | 127697B | 1,440.00 |
| 817380 | 08/23/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ66700 | 0034 | MCGINNIS LOCHRIDGE LLP | LEGAL SERVICES | 249311 | 12,404.84 |
| 817380 | 08/30/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ66851 | 0021 | WHITENTON | HARBOR ISLAND MARI | 20003503 | 4,281.00 |
| 817380 | 08/31/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ66987 | 0004 | LAWRENCE BERRY | LONE STAR PORTS | 17199922 | 500.00 |
| 817380 | 08/31/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ66987 | 0006 | LAWRENCE BERRY | MIDWAY JUNCTION | 17199884 | 500.00 |
| 797380 | 08/31/2021 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ50913 | 0034 | PROJECT CONSULTING SRVCS | Services 7/1-/31/19 | 42325 | 42,818.43 |
| 797380 | 09/02/2021 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ54698 | 0004 | PROJECT CONSULTING SRVCS | 8/1-8/31/2019 | 42479 | 8,327.77 |
| 817380 | 09/03/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ66988 | 0012 | LAWRENCE BERRY | MIDWAY JUNCTION | 7152020 | 50.00 |
| 817380 | 09/08/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ67038 | 0004 | CLIPPERDATA LLC | 2ND QTR PAYMENT | 2421 | 4,530.50 |
| 817380 | 09/08/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ67038 | 0002 | STALWART STRATEGIES INC | SEPT 2021 | 2256 | 10,444.43 |
| 817380 | 09/16/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ67218 | 0004 | BUTCH BOYD LAW FIRM, P.C. | LEGAL SERVICES | 20504 | 1,115.00 |
| 817380 | 09/16/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ67218 | 0014 | LAWRENCE BERRY | LSP/CANOPUS | 92021 | 1,000.00 |
| 817380 | 09/16/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ67218 | 0002 | MCGINNIS LOCHRIDGE LLP | HARBOR ISLAND | 249835 | 2,950.83 |
| 817380 | 09/21/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ67346 | 0004 | CLIPPERDATA LLC | QUARTERLY PAYMENT | 2369 | 4,530.50 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 817380 | 09/21/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ67346 | 0007 | ESCOPETA OIL | SEPT RENT | 92021 | 967.92 |
| 817380 | 10/12/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ67783 | 0031 | AMERICAN EXPRESS | AL BERRY 19009 | AMX AB 09.2021 | 201.98 |
| 817380 | 10/12/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ67783 | 0017 | ESCOPETA OIL | OCT 2021 RENT | 102021 | 967.92 |
| 817380 | 10/14/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ67863 | 0008 | BUTCH BOYD LAW FIRM, P.C. | LEGAL SERVICES | 20509 | 1,950.00 |
| 817380 | 10/14/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ67863 | 0006 | RAILROAD COMMISSION OF TX | P-5 FOR 2020-2021 | 39165 | 2,125.00 |
| 817380 | 10/14/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ67863 | 0004 | STALWART STRATEGIES INC | OCT 2021 | 2301 | 10,500.00 |
| 817380 | 10/14/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ67863 | 0002 | WEST 17TH RESOURCES, LLC | CARD EXPENSES | 117 | 134.97 |
| 817380 | 10/21/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68000 | 0006 | BERRY Y&V FABRICATORS LLC | HOUSTON OFFICE UTI | 5840 | 713.02 |
| 817380 | 10/21/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68000 | 0008 | BERRY Y&V FABRICATORS LLC | HOUSTON OFFICE UTI | 5696 | 702.06 |
| 817380 | 10/21/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68000 | 0012 | BERRY Y&V FABRICATORS LLC | HOUSTON OFFICE UTI | 5882 | 745.84 |
| 817380 | 10/21/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68000 | 0016 | BERRY Y&V FABRICATORS LLC | HOUSTON OFFICE LOG | 5946 | 741.34 |
| 817380 | 10/21/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68000 | 0020 | BERRY Y&V FABRICATORS LLC | HOU OFF UTILITIES | 5990 | 741.33 |
| 817380 | 10/21/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68000 | 0024 | BERRY Y&V FABRICATORS LLC | HOUSTON OFFICE UTI | 6054 | 741.50 |
| 817380 | 10/21/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68000 | 0026 | BERRY Y&V FABRICATORS LLC | HOUSTON OFFICE UTI | 6119 | 744.60 |
| 817380 | 10/22/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68017 | 0002 | BERRY Y&V FABRICATORS LLC | LSP HOUSTON OFFICE | 6247 | 6,584.48 |
| 817380 | 10/22/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68027 | 0002 | BERRY Y&V FABRICATORS LLC | LSP HOUSTON OFFICE | 6144 | 735.21 |
| 817380 | 10/22/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68017 | 0004 | BERRY Y&V FABRICATORS LLC | LSP HOUSTON OFFICE | 6309 | 6,584.48 |
| 817380 | 10/22/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68027 | 0004 | BERRY Y&V FABRICATORS LLC | LSP HOUSTON OFFICE | 6200 | 736.14 |
| 817380 | 10/22/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68017 | 0006 | BERRY Y&V FABRICATORS LLC | LSP HOUSTON OFFICE | 6417 | 6,986.61 |
| 817380 | 10/22/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68027 | 0006 | BERRY Y&V FABRICATORS LLC | LSP HOUSTON OFFICE | 6329 | 985.91 |
| 817380 | 10/22/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68017 | 0008 | BERRY Y&V FABRICATORS LLC | LSP HOUSTON OFFICE | 6419 | 6,986.61 |
| 817380 | 10/22/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68027 | 0008 | BERRY Y&V FABRICATORS LLC | LSP HOUSTON OFFICE | 6414 | 990.98 |
| 817380 | 10/22/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68017 | 0010 | BERRY Y&V FABRICATORS LLC | LSP HOUSTON OFFICE | 6471 | 7,107.01 |
| 817380 | 10/22/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68027 | 0010 | BERRY Y&V FABRICATORS LLC | LSP HOUSTON OFFICE | 6462 | 991.79 |
| 817380 | 10/22/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68017 | 0012 | BERRY Y&V FABRICATORS LLC | LSP HOUSTON OFFICE | 6528 | 6,987.53 |
| 817380 | 10/22/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68027 | 0012 | BERRY Y&V FABRICATORS LLC | LSP HOUSTON OFFICE | 6499 | 992.24 |
| 817380 | 10/22/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68017 | 0014 | BERRY Y&V FABRICATORS LLC | LSP HOUSTON OFFICE | 6596 | 6,987.53 |
| 817380 | 10/22/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68027 | 0014 | BERRY Y&V FABRICATORS LLC | LSP HOUSTON OFFICE | 6575 | 1,000.42 |
| 817380 | 10/22/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68017 | 0016 | BERRY Y&V FABRICATORS LLC | LSP HOUSTON OFFICE | 6651 | 6,987.53 |
| 817380 | 10/22/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68027 | 0016 | BERRY Y&V FABRICATORS LLC | LSP HOUSTON OFFICE | 6637 | 997.80 |
| 817380 | 10/22/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68017 | 0018 | BERRY Y&V FABRICATORS LLC | LSP HOUSTON OFFICE | 6723 | 6,987.53 |
| 817380 | 10/22/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68027 | 0018 | BERRY Y&V FABRICATORS LLC | LSP HOUSTON OFFICE | 6717 | 997.80 |
| 817380 | 10/22/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68017 | 0020 | BERRY Y&V FABRICATORS LLC | LSP HOUSTON OFFICE | 6773 | 6,987.53 |
| 817380 | 10/22/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68027 | 0020 | BERRY Y&V FABRICATORS LLC | LSP HOUSTON OFFICE | 6764 | 995.91 |
| 817380 | 10/22/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68017 | 0022 | BERRY Y&V FABRICATORS LLC | LSP HOUSTON OFFICE | 6809 | 6,987.53 |
| 817380 | 10/22/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68027 | 0022 | BERRY Y&V FABRICATORS LLC | LSP HOUSTON OFFICE | 6801 | 995.91 |
| 817380 | 10/25/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68048 | 0002 | BERRY Y&V FABRICATORS LLC | LONE STAR PORTS PE | 6254 | 57,778.45 |
| 817380 | 10/25/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68048 | 0004 | BERRY Y&V FABRICATORS LLC | LONE STAR PORTS PE | 6303 | 59,555.80 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 817380 | 10/25/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68048 | 0006 | BERRY Y&V FABRICATORS LLC | LONE STAR PORTS PE | 6369 | 57,766.00 |
| 817380 | 10/25/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68048 | 0008 | BERRY Y&V FABRICATORS LLC | LONE STAR PORTS PE | 6428 | 60,429.95 |
| 817380 | 10/25/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68044 | 0012 | BERRY Y&V FABRICATORS LLC | T-MOBILE LONE STAR | 6402 | 90.27 |
| 817380 | 10/25/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68048 | 0012 | BERRY Y&V FABRICATORS LLC | LONE STAR PORTS PE | 6535 | 61,300.60 |
| 817380 | 10/25/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68048 | 0014 | BERRY Y&V FABRICATORS LLC | LONE STAR PORTS PE | 6607 | 59,345.50 |
| 817380 | 10/25/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68048 | 0016 | BERRY Y&V FABRICATORS LLC | LONE STAR PORTS PE | 6659 | 66,321.90 |
| 817380 | 10/25/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68044 | 0018 | BERRY Y&V FABRICATORS LLC | T-MOBILE LONE STAR | 6452 | 88.36 |
| 817380 | 10/25/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68048 | 0018 | BERRY Y&V FABRICATORS LLC | LONE STAR PORTS PE | 6731 | 61,559.10 |
| 817380 | 10/25/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68048 | 0020 | BERRY Y&V FABRICATORS LLC | LONE STAR PORTS PE | 6780 | 64,503.10 |
| 817380 | 10/25/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68048 | 0022 | BERRY Y&V FABRICATORS LLC | LONE STAR PORTS PE | 6833 | 61,478.36 |
| 817380 | 10/25/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68044 | 0028 | BERRY Y&V FABRICATORS LLC | T-MOBILE LONE STAR | 6588 | 92.98 |
| 817380 | 10/25/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68044 | 0038 | BERRY Y&V FABRICATORS LLC | T-MOBILE LONE STAR | 6645 | 92.93 |
| 817380 | 10/25/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68044 | 0044 | BERRY Y&V FABRICATORS LLC | T-MOBILE LONE STAR | 6705 | 96.57 |
| 817380 | 10/25/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68044 | 0050 | BERRY Y&V FABRICATORS LLC | T-MOBILE LONE STAR | 6743 | 361.73 |
| 817380 | 10/25/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68044 | 0056 | BERRY Y&V FABRICATORS LLC | T-MOBILE LONE STAR | 6793 | 95.58 |
| 817380 | 10/25/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68044 | 0058 | BERRY Y&V FABRICATORS LLC | T-MOBILE LONE STAR | 6490 | 98.40 |
| 817380 | 10/25/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68048 | 0010 | BERRY Y&V FABRICATORS LLC | LONE STAR PORTS PE | 6478 | 68,418.10 |
| 817380 | 10/26/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68059 | 0002 | BERRY Y&V FABRICATORS LLC | MIDSTREAM PERSONNEL | 6253 | 5,760.00 |
| 817380 | 10/26/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68059 | 0004 | BERRY Y&V FABRICATORS LLC | MIDSTREAM PERSONNEL | 6302 | 7,488.00 |
| 817380 | 10/26/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68059 | 0006 | BERRY Y&V FABRICATORS LLC | MIDSTREAM PERSONNEL | 6368 | 6,144.00 |
| 817380 | 10/26/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68059 | 0008 | BERRY Y&V FABRICATORS LLC | MIDSTREAM PERSONNEL | 6427 | 7,296.00 |
| 817380 | 10/26/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68059 | 0010 | BERRY Y&V FABRICATORS LLC | MIDSTREAM PERSONNEL | 6477 | 8,640.00 |
| 817380 | 10/26/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68059 | 0012 | BERRY Y&V FABRICATORS LLC | MIDSTREAM PERSONNEL | 6534 | 7,776.00 |
| 817380 | 10/26/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68059 | 0014 | BERRY Y&V FABRICATORS LLC | MIDSTREAM PERSONNEL | 6606 | 7,344.00 |
| 817380 | 10/26/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68059 | 0016 | BERRY Y&V FABRICATORS LLC | MIDSTREAM PERSONNEL | 6658 | 8,856.00 |
| 817380 | 10/26/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68059 | 0018 | BERRY Y&V FABRICATORS LLC | MIDSTREAM PERSONNEL | 6730 | 4,752.00 |
| 817380 | 10/26/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68058 | 0002 | BERRY Y&V FABRICATORS LLC | B SALEHI-LONE STAR | 6174 | 403.24 |
| 817380 | 10/26/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68058 | 0004 | BERRY Y&V FABRICATORS LLC | B SALEHI-LONE STAR | 6238 | 510.91 |
| 817380 | 10/26/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68058 | 0006 | BERRY Y&V FABRICATORS LLC | B SALEHI-LONE STAR | 6296 | 191.73 |
| 817380 | 10/26/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68058 | 0008 | BERRY Y&V FABRICATORS LLC | B SALEHI-LONE STAR | 6349 | 410.78 |
| 817380 | 10/26/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68058 | 0010 | BERRY Y&V FABRICATORS LLC | B SALEHI-LONE STAR | 6468 | 326.08 |
| 817380 | 10/26/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68058 | 0012 | BERRY Y&V FABRICATORS LLC | B SALEHI-LONE STAR | 6524 | 647.78 |
| 817380 | 10/26/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68058 | 0014 | BERRY Y&V FABRICATORS LLC | B SALEHI-LONE STAR | 6600 | 710.17 |
| 817380 | 10/26/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68058 | 0016 | BERRY Y&V FABRICATORS LLC | B SALEHI-LONE STAR | 6697 | 1,564.21 |
| 817380 | 10/26/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68058 | 0018 | BERRY Y&V FABRICATORS LLC | B SALEHI-LONE STAR | 6761 | 132.67 |
| 817380 | 10/26/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68058 | 0020 | BERRY Y&V FABRICATORS LLC | B SALEHI-LONE STAR | 6825 | 694.55 |
| 817380 | 10/26/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68058 | 0022 | BERRY Y&V FABRICATORS LLC | B SALEHI-LONE STAR | 6396 | 369.06 |
| 817380 | 10/31/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68296 | 0008 | AMERICAN EXPRESS | AL BERRY 19009 | AMX AB 10.2021 | 2,508.80 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 817380 | 10/31/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68404 | 0019 | ESCOPETA OIL | NOV 2021 RENT | 112021 | 1,287.75 |
| 797380 | 10/31/2021 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ54698 | 0010 | PROJECT CONSULTING SRVCS | 2/1-2/21/2020 | 43181 | 33,957.79 |
| | | | | | | | | | 3,850,450.40 |
| | | | | | | | | | |
| 797380 | 11/05/2021 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ54698 | 0018 | PROJECT CONSULTING SRVCS | 10/1-10/31/2019 | 42862 | 55,031.80 |
| 817380 | 11/17/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68650 | 0006 | BUTCH BOYD LAW FIRM, P.C. | LEGAL SERVICES | 20532 | 465.00 |
| 817380 | 11/17/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68650 | 0008 | STALWART STRATEGIES INC | NOV 2021 | 2325 | 10,455.98 |
| 817380 | 11/24/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68748 | 0013 | AMERICAN EXPRESS | AL BERRY 19009 | AMX AB 11.2021 | 1,208.56 |
| 817380 | 12/06/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ68936 | 0026 | STALWART STRATEGIES INC | DEC 2021 | 2344 | 10,336.64 |
| 817380 | 12/09/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ69026 | 0006 | ESCOPETA OIL | DEC 21 RENT | 120121 | 967.92 |
| 817380 | 12/20/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ69244 | 0010 | DISORBO CONSULTING, LLC | CONSULTING SVCS | 211870 | 232.16 |
| 817380 | 12/20/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ69244 | 0018 | MCGINNIS LOCHRIDGE LLP | 12072021 | 252543 | 250.00 |
| 797380 | 12/20/2021 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ54698 | 0026 | PROJECT CONSULTING SRVCS | 11/1-11/30/2019 | 43008 | 17,265.66 |
| 817380 | 12/22/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ69313 | 0002 | KPLER INC | CLIPPER DATA SUBSC | 4054146 | 4,250.00 |
| 817380 | 12/31/2021 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ69538 | 0089 | ARGUS MEDIA INC | CRUDE SUMMIT 2022 | 53694 | 4,999.00 |
| 797380 | 12/31/2021 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ51332 | 0045 | Y&V ENGINEERING & CONSTRU | Services for July | 1234 | 24,682.00 |
| 817380 | 01/11/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ70241 | 0002 | ALBERT THEODORE POWERS | NOV/DEC 2021 EXPENS | 102219 | 10,317.69 |
| 817380 | 01/17/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ69821 | 0026 | STALWART STRATEGIES INC | JAN 2022 | 2371 | 10,348.21 |
| 817380 | 01/17/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ69821 | 0024 | TOUR & TRAVEL | TED POWERS TRAVEL | 5802 | 432.00 |
| 817380 | 01/20/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ69887 | 0006 | DISORBO CONSULTING, LLC | CONSULTING SVCS | 212064 | 390.00 |
| 817380 | 01/20/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ69887 | 0011 | ESCOPETA OIL | JAN 22 RENT | 11022 | 967.92 |
| 817380 | 01/21/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ69896 | 0002 | MCGINNIS LOCHRIDGE LLP | LEGAL SERVICES | 253442 | 171.08 |
| 817380 | 01/24/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ69928 | 0453 | UNITE | PLAN0860DU | 12112021 | 21.14 |
| 817380 | 02/10/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ70311 | 0009 | KPLER INC | CORRECTION | 4054146SR | (4,250.00) |
| 817380 | 02/10/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ70311 | 0011 | KPLER INC | CLIPPER DATA SUBSCRI | 4054146A | 4,600.63 |
| 817380 | 02/23/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ70515 | 0016 | BUTCH BOYD LAW FIRM, P.C. | LEGAL SERVICES | 20555 | 2,950.00 |
| 817380 | 02/23/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ70515 | 0029 | ESCOPETA OIL | FEB 22 RENT | 20122 | 967.92 |
| 817380 | 02/23/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ70515 | 0018 | KPLER INC | CLIPPER DATA SUBSCR | 44054335 | 4,600.63 |
| 817380 | 02/23/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ70515 | 0032 | MCGINNIS LOCHRIDGE LLP | HARBOR ISLAND MARIN | 254113 | 111.59 |
| 817380 | 02/23/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ70515 | 0025 | STALWART STRATEGIES INC | SERVICES FOR FEB 20 | 2391 | 10,000.00 |
| 817380 | 02/23/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ70515 | 0026 | STALWART STRATEGIES INC | EXPENSES FOR JAN 20 | 2391 | 176.48 |
| 817380 | 02/28/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ70795 | 0006 | BUTCH BOYD LAW FIRM, P.C. | LEGAL SVCS THRU 02. | 20573 | 1,100.00 |
| 797380 | 02/28/2022 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ55411 | 0010 | PROJECT CONSULTING SRVCS | 1/1-1/31/2020 | 43165 | 75,563.65 |
| 817380 | 02/28/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | GJ52929 | 0020 | | AMEX 02.2022 | | 2,199.00 |
| 797380 | 03/02/2022 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ55267 | 0002 | RAMBOLL US CORPORATION | SEPT THRU DEC '19 | 1690047257 | 31,986.92 |
| 797380 | 03/02/2022 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ55431 | 0012 | RAMBOLL US CORPORATION | JAN 20' TO MAR 20' | 1690050864 | 1,960.30 |
| 817380 | 03/24/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ71209 | 0006 | MCGINNIS LOCHRIDGE LLP | LEGAL SERVICES | 254747 | 111.64 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 817380 | 03/31/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | GJ53091 | 0021 | | MAR AMEX ALLOCATION | | 1,710.20 |
| 817380 | 04/21/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ72049 | 0047 | ESCOPETA OIL | MAR 22 RENT | 3032022 | 967.92 |
| 817380 | 05/18/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ72899 | 0013 | ESCOPETA OIL | APRIL 22 RENT | 3302022 | 1,050.03 |
| 817380 | 05/18/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ72899 | 0006 | STALWART STRATEGIES INC | APR 22 SVCS | 2432 | 10,000.00 |
| 817380 | 05/18/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ72899 | 0007 | STALWART STRATEGIES INC | MAR 22 EXPENSES | 2432 | 451.35 |
| 817380 | 05/18/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ72899 | 0009 | STALWART STRATEGIES INC | MAR22 SVCS | 2410 | 10,000.00 |
| 817380 | 05/18/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ72899 | 0010 | STALWART STRATEGIES INC | FEB 22 EXPENSES | 2410 | 192.12 |
| 817380 | 05/23/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ73045 | 0041 | ESCOPETA OIL | MAY22 RENT | 5022022 | 966.89 |
| 817380 | 05/23/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ73045 | 0029 | KPLER INC | 5/11-8/10/22 CRUDE | 202205100103H | 4,530.50 |
| 817380 | 05/23/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ73045 | 0027 | MCGINNIS LOCHRIDGE LLP | HARBOR ISLAND SHIP- | 255675 | 223.28 |
| 817380 | 05/23/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ73045 | 0036 | MCGINNIS LOCHRIDGE LLP | HARBOR ISLAND SHIP- | 256771 | 111.64 |
| 797380 | 05/23/2022 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | GJ55831 | 0002 | REVERSE | CIP INTEREST | | 678,623.00 |
| 817380 | 05/23/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ73045 | 0031 | STALWART STRATEGIES INC | MAY22 SVCS | 2447 | 10,000.00 |
| 817380 | 05/23/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ73045 | 0032 | STALWART STRATEGIES INC | APR 22 EXPENSES | 2447 | 473.02 |
| 817380 | 06/09/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ73594 | 0058 | BUTCH BOYD LAW FIRM, P.C. | LSP AXIS PERMIT-5/1 | 201596 | 1,550.00 |
| 817380 | 06/09/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ73594 | 0060 | BUTCH BOYD LAW FIRM, P.C. | LSP CONFERENCE W/TE | 20582 | 1,700.00 |
| 817380 | 06/27/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ74142 | 0014 | ESCOPETA OIL | JUNE 2022 RENT | 6012022 | 967.27 |
| 817380 | 06/27/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ74142 | 0004 | MCGINNIS LOCHRIDGE LLP | LEGAL THRU 4.30.22 | 257199 | 472.50 |
| 817380 | 06/27/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ74142 | 0006 | MCGINNIS LOCHRIDGE LLP | LEGAL THRU 5.31.22 | 257961 | 8,767.50 |
| 797380 | 06/27/2022 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | GJ48542 | 0001 | RSM 574362 | RECLASS RSM | | 19,961.00 |
| 817380 | 06/27/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ74142 | 0017 | STALWART STRATEGIES INC | JUNE 2022 | 2470 | 10,000.00 |
| 817380 | 06/27/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ74142 | 0018 | STALWART STRATEGIES INC | MAY 22 EXPENSES 6.1 | 2470 | 460.29 |
| 817380 | 06/27/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ74139 | 0029 | TOUR & TRAVEL | TED POWERS-3.31.22 | 5991 | 216.00 |
| 817380 | 06/27/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ74142 | 0002 | TRINITY CONSULTANTS, INC. | LEGAL THRU 5.31.22 | 1341320 | 146.25 |
| 797380 | 06/27/2022 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ53619 | 0012 | Y&V ENGINEERING & CONSTRU | ALEJANDRO CARVALLO | 1223 | 12,875.00 |
| 797380 | 06/27/2022 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ50789 | 0083 | Y&V ENGINEERING & CONSTRU | Services for July | 1236 | 24,070.00 |
| 817380 | 06/30/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | GJ53401 | 0001 | LOCKTON COMPANIES | LOCKTON | | 2,764.78 |
| 817380 | 07/21/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ74801 | 0008 | MCGINNIS LOCHRIDGE LLP | HARBOR ISLAND MARIN | 258602 | 111.64 |
| 817380 | 07/21/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ74801 | 0009 | MCGINNIS LOCHRIDGE LLP | FESS LEGAL SVCS-6/3 | 258602 | 310.00 |
| 797380 | 07/21/2022 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | GJ48543 | 0001 | RSM 574362 | RECLASS RSM | | (39,922.00) |
| 817380 | 07/22/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ74816 | 0005 | LAWRENCE BERRY | THE PENNINSULABEVER | 5192022 | 247.10 |
| 817380 | 07/25/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ74880 | 0025 | ESCOPETA OIL | JULY 2022 RENT | 7052022 | 967.27 |
| 817380 | 07/25/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ74880 | 0028 | KPLER INC | AUG 11-NOV 10 CRUDE | 202207110170H | 4,530.50 |
| 817380 | 07/31/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ75162 | 0218 | ALBERT THEODORE POWERS | CONSULTING MAR-APR | 5012221 | 10,508.38 |
| 817380 | 07/31/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ75162 | 0220 | ALBERT THEODORE POWERS | CONSULTING MAY-JUNE | 7012222 | 10,336.98 |
| 817380 | 08/23/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ75657 | 0010 | ESCOPETA OIL | AUG 2022 RENT | 7292022 | 967.27 |
| 817380 | 08/23/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ75657 | 0017 | MCGINNIS LOCHRIDGE LLP | CC PIPELINE THRU 6. | 259111 | 1,155.00 |
| 797380 | 08/23/2022 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ50323 | 0016 | RSM US LLP | 779-954-3 | 5743622 | 22,162.00 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 817380 | 08/23/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ75657 | 0015 | STALWART STRATEGIES INC | AUG 2022 EXPENSE JU | 2501 | 10,266.63 |
| 817380 | 08/23/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ75657 | 0004 | TRINITY CONSULTANTS, INC. | THRU 7.29.22 HARBOR | 1349428 | 243.75 |
| 817380 | 08/23/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ75657 | 0006 | TRINITY CONSULTANTS, INC. | HARBOR ISLAND THRU | 220466 | 341.25 |
| 817380 | 08/26/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ75782 | 0017 | TRINITY CONSULTANTS, INC. | HARBOR ISLAND-PERMT | 1349472 | 292.50 |
| 817380 | 08/29/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ75814 | 0030 | MCGINNIS LOCHRIDGE LLP | CC PIPELINE 7.31.22 | 260036 | 157.50 |
| 817380 | 08/30/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | GJ53667 | 0013 | KPLER INC | KPLER INCORPORATED | | 9,061.00 |
| 817380 | 09/14/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ76234 | 0002 | KPLER INC | CLIPPER DATA SUBSCR | 44054335 | (4,600.63) |
| 817380 | 09/14/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ76234 | 0007 | KPLER INC | CLIPPER DATA SUBSC | 4054146 | (4,250.00) |
| 817380 | 09/14/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ76223 | 0007 | STALWART STRATEGIES INC | SEPT 2022 | 2519 | 10,305.99 |
| 817380 | 09/29/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ76653 | 0002 | ESCOPETA OIL | AUG 2022 RENT | 7292022 | (967.27) |
| 817380 | 09/29/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ76653 | 0005 | ESCOPETA OIL | AUG 2022 RENT | 7292022 | 967.27 |
| 817380 | 09/29/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ76655 | 0011 | ESCOPETA OIL | SEPT 2022 | 8302022 | 967.27 |
| 817380 | 09/29/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ76655 | 0016 | LLOYD ENGINEERING, INC. | HARBOR  ISLAND 9.8. | 7356 | 40,475.00 |
| 817380 | 09/29/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ76655 | 0028 | RAILROAD COMMISSION OF TX | P-5 2022-2023 | 39165-2022 | 2,125.00 |
| 817380 | 09/30/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ76716 | 0125 | ALBERT THEODORE POWERS | CONSULTING JULY - | 9012223 | 10,502.83 |
| 817380 | 10/05/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ76816 | 0006 | LAWRENCE BERRY | LSPE | LSP1001 | 5,000.00 |
| 817380 | 10/12/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | GJ53853 | 0001 | RECLASS | CT CORP AXIS GATHER | | 557.00 |
| 817380 | 10/24/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ77269 | 0041 | MCGINNIS LOCHRIDGE LLP | LEGAL SVCS THRU 8.3 | 261355 | 111.64 |
| 817380 | 10/24/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ77269 | 0043 | MCGINNIS LOCHRIDGE LLP | LEGAL SVCS THRU 7.3 | 259383 | 2,035.36 |
| 817380 | 10/24/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ77269 | 0051 | STALWART STRATEGIES INC | SVC JULY22 EXP JUNE | 2485 | 10,230.51 |
| 817380 | 10/24/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ77269 | 0057 | STALWART STRATEGIES INC | OCT 22 EXP SEPT 22 | 2528 | 10,266.85 |
| 817380 | 10/24/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ77269 | 0055 | TRINITY CONSULTANTS, INC. | HARBOR ISLAND THRU | 1352327 | 195.00 |
| 817380 | 10/24/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ77269 | 0053 | WEST 17TH RESOURCES, LLC | LSP QUICKBOOKS | 198 | 560.87 |
| | | | | | | | | | 1,204,341.52 |
| | | | | | | | | | |
| 817380 | 11/18/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ77715 | 0066 | LLOYD ENGINEERING, INC. | CONSULTING  HARBOR | 7418 | 4,990.00 |
| 817380 | 11/18/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ77715 | 0068 | MCGINNIS LOCHRIDGE LLP | THRU 10/31/22 | 262219 | 111.64 |
| 817380 | 11/18/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ77715 | 0070 | STALWART STRATEGIES INC | NOV 2022 SERVICES/O | 2542 | 10,567.63 |
| 817380 | 11/18/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ77715 | 0064 | TOUR & TRAVEL | TED POWERS | 6558 | 462.24 |
| 817380 | 12/01/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ77924 | 0004 | BUTCH BOYD LAW FIRM, P.C. | LSP PERMIT | 20620 | 2,550.00 |
| 817380 | 12/01/2022 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ77924 | 0006 | LLOYD ENGINEERING, INC. | HARBOR ISLAND CONSU | 7410 | 61,362.50 |
| 817380 | 01/09/2023 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ78391 | 0018 | AXIS STRATEGIC | JAN 2023 | 1336 | 10,461.86 |
| 817380 | 01/23/2023 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ78614 | 0030 | IBTX RISK | AXIS MIDSTREAM HOLD | 597313 | 500.00 |
| 817380 | 01/31/2023 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ78903 | 0222 | ALBERT THEODORE POWERS | CONSULTING NOV - D | 1012325 | 10,125.14 |
| 817380 | 01/31/2023 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ78876 | 0023 | BUTCH BOYD LAW FIRM, P.C. | CONFERNCE | 20643 | 4,350.00 |
| 817380 | 01/31/2023 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ78876 | 0008 | MCGINNIS LOCHRIDGE LLP | THRU 8/31/22 | 260452 | 111.64 |
| 817380 | 01/31/2023 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ78876 | 0004 | RIVERWAY GROUP | CC  CHARGES 10/22-1 | 4 | 255.15 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 817380 | 01/31/2023 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ78861 | 0008 | RIVERWAY GROUP | B192A0-AXIS | 2 | 201.92 |
| 817380 | 01/31/2023 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ78900 | 0002 | RIVERWAY GROUP | LSP CC CHARGES DEC | 33 | 1,630.13 |
| 817380 | 01/31/2023 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ78876 | 0006 | STALWART STRATEGIES INC | DEC SVC 22/NOV EXP | 2551 | 10,436.72 |
| 797380 | 01/31/2023 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | GJ48707 | 0027 | STATE COMP | REFUND | | (8,731.84) |
| 817380 | 02/08/2023 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ78899 | 0002 | AXIS STRATEGIC | CONSULTING FEB 2023 | 1354 | 10,407.35 |
| 817380 | 02/16/2023 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ79057 | 0115 | BUTCH BOYD LAW FIRM, P.C. | LONE STAR PORTS | 20665 | 1,750.00 |
| 817380 | 02/16/2023 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ79057 | 0117 | BUTCH BOYD LAW FIRM, P.C. | LONE STAR PORTS | 20652 | 2,580.04 |
| 817380 | 02/16/2023 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ79057 | 0102 | LLOYD ENGINEERING, INC. | LSP-ENGEERING/CONSU | 7577 | 1,110.00 |
| 817380 | 02/16/2023 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ79057 | 0110 | LLOYD ENGINEERING, INC. | LONE STAR PORTS | 7559 | 63,163.50 |
| 817380 | 02/16/2023 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ79057 | 0106 | MCGINNIS LOCHRIDGE LLP | THRU 11.31.22 | 263297 | 4,285.64 |
| 817380 | 02/16/2023 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ79057 | 0108 | MCGINNIS LOCHRIDGE LLP | THRU 12.31.22 | 264120 | 3,437.64 |
| 817380 | 02/23/2023 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ79131 | 0018 | PIZARRO AL | WINDFARM DECOMM PR | 5898 | 6,990.00 |
| 817380 | 02/28/2023 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ79238 | 0002 | ALBERT THEODORE POWERS | CONSULTING SEPT - | 11012224 | 9,520.43 |
| 817380 | 03/17/2023 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ79553 | 0014 | AXIS STRATEGIC | MARCH 2023 | 1382 | 10,363.34 |
| 817380 | 03/17/2023 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ79553 | 0016 | LLOYD ENGINEERING, INC. | HARBOR ISLAND -LPS | 7619 | 20,255.00 |
| 817380 | 03/17/2023 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ79553 | 0008 | MCGINNIS LOCHRIDGE LLP | LSP-TCEQ PERMIT | 265158 | 1,151.14 |
| 817380 | 03/17/2023 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ79553 | 0010 | MCGINNIS LOCHRIDGE LLP | LSP=HARBOR ISLAND T | 265755 | 742.50 |
| 817380 | 03/31/2023 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ79857 | 0249 | ALBERT THEODORE POWERS | CONSULTING JAN - F | 3012326 | 9,479.28 |
| 817380 | 04/13/2023 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ80072 | 0020 | BUTCH BOYD LAW FIRM, P.C. | LSP-CONFERENCE | 20671 | 1,500.00 |
| 817380 | 04/13/2023 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ80072 | 0016 | LLOYD ENGINEERING, INC. | LSP-BERRY HARBOR | 7650 | 675.00 |
| 817380 | 04/13/2023 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ80072 | 0018 | LLOYD ENGINEERING, INC. | FLEETING STUDY-9/1/ | 7408 | 5,540.00 |
| 817380 | 04/18/2023 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ80171 | 0030 | RIVERWAY GROUP | MATTHEW HICKS | 181 | 13,244.00 |
| 817380 | 04/18/2023 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ80171 | 0050 | RIVERWAY GROUP | 1/1-1/31/23 CC | 154 | 2,422.73 |
| 817380 | 04/18/2023 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ80171 | 0048 | RIVERWAY GROUP | M HICKS CC NOV/DEC | 152 | 5,914.70 |
| 817380 | 06/15/2023 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ81585 | 0022 | AXIS STRATEGIC | APRIL 2023 | 1418 | 10,546.88 |
| 817380 | 06/15/2023 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ81585 | 0024 | AXIS STRATEGIC | MAY 2023 | 1446 | 10,631.43 |
| 817380 | 06/16/2023 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ81611 | 0002 | ENVIRONMENTAL SYSTEMS | ARCGIS DESKTOP STAN | 94263541 | 2,056.75 |
| 817380 | 06/30/2023 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ81971 | 0002 | ALBERT THEODORE POWERS | CONSULTING MAR - A | 50123_27 | 9,517.20 |
| 817380 | 07/26/2023 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | GJ54999 | 0009 | LOCKTON COMPANIES | LOCKTON COMPANY | | 1,198.27 |
| 817380 | 07/31/2023 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ82375 | 0011 | BUTCH BOYD LAW FIRM, P.C. | 817380 | 20681 | 3,800.00 |
| 817380 | 07/31/2023 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ82375 | 0013 | BUTCH BOYD LAW FIRM, P.C. | 817380 | 20693 | 2,650.00 |
| 817380 | 09/26/2023 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ83304 | 0002 | BERRY Y&V FABRICATORS LLC | B SALEHI-8/1-8/31/2 | 7420 | 602.83 |
| 817380 | 09/29/2023 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ83401 | 0004 | LLOYD ENGINEERING, INC. | TX GLO LAND LEASE L | 7860 | 13,837.50 |
| 817380 | 09/29/2023 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ83401 | 0010 | RAILROAD COMMISSION OF TX | P-5 2023-2024 LSP | 39165SEPT23 | 2,125.00 |
| 817380 | 10/01/2023 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ83860 | 0002 | RAILROAD COMMISSION OF TX | P-5 2023-2024 LSP | 39165SEPT23 | (2,125.00) |
| 817380 | 10/01/2023 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ83860 | 0004 | RAILROAD COMMISSION OF TX | P-5 2023-2024 LSP | 39165SEPT23 | 2,125.00 |
| 817380 | 10/10/2023 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ83603 | 0002 | ENVIRONMENTAL SYSTEMS | CUST #430613 | 94514241 | 2,723.94 |
| 817380 | 10/31/2023 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ84366 | 0002 | AXIS STRATEGIC | NOV 2023 LONE STAR | 1638 | 10,401.09 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 817380 | 10/31/2023 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ84366 | 0004 | AXIS STRATEGIC | JUNE 23 LONE STAR | 1480 | 10,335.97 |
| 817380 | 10/31/2023 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ84366 | 0006 | AXIS STRATEGIC | JULY 2023 LONE STA | 1515 | 10,267.35 |
| 817380 | 10/31/2023 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ84366 | 0008 | AXIS STRATEGIC | AUG 2023 LONE STAR | 1544 | 10,220.95 |
| 817380 | 10/31/2023 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ84366 | 0010 | AXIS STRATEGIC | SEPT 2023 LONE STA | 1574 | 10,324.46 |
| 817380 | 10/31/2023 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ84366 | 0012 | AXIS STRATEGIC | OCT 2023 LONE STAR | 1605 | 10,218.27 |
| 817380 | 10/31/2023 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ84366 | 0014 | MCGINNIS LOCHRIDGE LLP | 8.31.23 LONE STAR | 370482 | 111.64 |
| 817380 | 10/31/2023 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ84366 | 0016 | MCGINNIS LOCHRIDGE LLP | 3.31.23 LONE STAR | 266642 | 309.64 |
| 817380 | 10/31/2023 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ84366 | 0018 | MCGINNIS LOCHRIDGE LLP | 4.30.23 LONE STAR | 301066 | 382.27 |
| 817380 | 10/31/2023 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ84366 | 0020 | MCGINNIS LOCHRIDGE LLP | 5.31.23 LONE STAR | 303071 | 111.64 |
| 817380 | 10/31/2023 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ84366 | 0022 | MCGINNIS LOCHRIDGE LLP | 6.30.23 LONE STAR | 304219 | 111.64 |
| 817380 | 10/31/2023 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ84366 | 0024 | MCGINNIS LOCHRIDGE LLP | 7.31.23 LONE STAR | 306199 | 111.64 |
| | | | | | | | | | 406,513.38 |
| | | | | | | | | | |
| 817380 | 11/01/2023 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ84402 | 0002 | ACRISURE TX RISK ADVS | P#30035640 | 1282 | 500.00 |
| 817380 | 11/30/2023 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | GJ55597 | 0016 | LOCKTON COMPANIES | LKT-0007807854 | | (104.92) |
| 797380 | 12/01/2023 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ53617 | 0032 | Y&V ENGINEERING & CONSTRU | JUNE SERVICES | 1235 | 25,230.00 |
| 817380 | 12/08/2023 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ84675 | 0008 | AXIS STRATEGIC | DEC 2023 | 1671 | 10,408.24 |
| 817380 | 12/08/2023 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ84675 | 0002 | BUTCH BOYD LAW FIRM, P.C. | CONFERENCE  LSP | 20715 | 1,200.00 |
| 817380 | 12/08/2023 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ84675 | 0004 | MCGINNIS LOCHRIDGE LLP | LEGAL SVCS THRU 11. | 311099 | 223.28 |
| 817380 | 12/18/2023 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ84833 | 0002 | MCGINNIS LOCHRIDGE LLP | 8.31.23 LONE STAR | 370482 | (111.64) |
| 817380 | 12/18/2023 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ84833 | 0004 | MCGINNIS LOCHRIDGE LLP | 3.31.23 LONE STAR | 266642 | (309.64) |
| 817380 | 12/18/2023 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ84833 | 0006 | MCGINNIS LOCHRIDGE LLP | 4.30.23 LONE STAR | 301066 | (382.27) |
| 817380 | 12/18/2023 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ84833 | 0008 | MCGINNIS LOCHRIDGE LLP | 5.31.23 LONE STAR | 303071 | (111.64) |
| 817380 | 12/18/2023 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ84833 | 0010 | MCGINNIS LOCHRIDGE LLP | 6.30.23 LONE STAR | 304219 | (111.64) |
| 817380 | 12/18/2023 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ84833 | 0012 | MCGINNIS LOCHRIDGE LLP | 7.31.23 LONE STAR | 306199 | (111.64) |
| 817380 | 12/19/2023 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ84844 | 0012 | UNITE | PLAN#0680DU | 120223 | 32.34 |
| 817380 | 01/03/2024 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ85019 | 0005 | AXIS STRATEGIC | JAN 2024 | 1703 | 10,315.60 |
| 817380 | 02/05/2024 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ85558 | 0002 | AXIS STRATEGIC | LONE STAR PORTS FEB | 1735 | 10,276.65 |
| 797380 | 02/26/2024 | 4014-77100-000-000 | DIRECT MISCELLANEOUS | PJ56543 | 0002 | TENNESSEE | LABOR & EQUIPMENT | 37160 | 2,760.00 |
| 817380 | 05/30/2024 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ87823 | 0002 | MCGINNIS LOCHRIDGE LLP | JAN 2024 LSP | 312581 | 111.64 |
| 817380 | 05/30/2024 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ87823 | 0004 | MCGINNIS LOCHRIDGE LLP | FEB 2024 LSP | 313777 | 5,135.64 |
| 817380 | 05/30/2024 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ87823 | 0006 | MCGINNIS LOCHRIDGE LLP | MAR 2024 LSP | 314907 | 1,856.14 |
| 817380 | 05/30/2024 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ87823 | 0008 | MCGINNIS LOCHRIDGE LLP | APRIL 2024 LSP | 316033 | 111.64 |
| 817380 | 05/30/2024 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ87823 | 0010 | MCGINNIS LOCHRIDGE LLP | MAY 2024 LSP | 317150 | 111.64 |
| 817380 | 06/28/2024 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | GJ56457 | 0013 | LOCKTON COMPANIES | LOCKTON | | 1,088.08 |
| 817380 | 10/17/2024 | 4014-10100-000-000 | DIRECT MISCELLANEOUS | PJ90147 | 0002 | RAILROAD COMMISSION OF TX | P-5 FOR 2024-2025 | 39165A | 2,125.00 |
| | | | | | | | | | 70,242.50 |

| Account Number | Post Date | Check | Description | | Debit | Credit | Status |
|---|---|---|---|---|---|---|---|
| *7098 | 10/15/2024 | | Outgoing Wire - 1297 | ED RACHAL FOUNDATION 811 | 96,591.89 | | Posted |
| *7098 | 10/15/2024 | | ACH Deposit - BERRY CONTRACTIN CORP PAY | | | 92,000.00 | Posted |
| *7098 | 09/30/2024 | | Outgoing Wire - 1096 | ED RACHAL FOUNDATION 811 | 96,265.00 | | Posted |
| *7098 | 09/30/2024 | | ACH Deposit - BERRY CONTRACTIN CORP PAY | | | 96,000.00 | Posted |
| *7098 | 08/27/2024 | | Outgoing Wire - 0120 | ED RACHAL FOUNDATION 811 | 96,942.97 | | Posted |
| *7098 | 08/26/2024 | | ACH Deposit - BERRY CONTRACTIN CORP PAY | | | 97,000.00 | Posted |
| *7098 | 07/16/2024 | | Outgoing Wire - 0850 | ED RACHAL FOUNDATION 811 | 96,550.87 | | Posted |
| *7098 | 07/16/2024 | | Transfer Deposit FROM ACCOUNT XXXXX0501 | | | 97,000.00 | Posted |
| *7098 | 06/13/2024 | | Outgoing Wire - 0835 | ED RACHAL FOUNDATION 811 | 96,525.91 | | Posted |
| *7098 | 06/13/2024 | | Transfer Deposit FROM ACCOUNT XXXXX0501 | | | 99,000.00 | Posted |
| *7098 | 05/15/2024 | | Outgoing Wire - 0806 | ED RACHAL FOUNDATION 811 | 96,640.32 | | Posted |
| *7098 | 05/15/2024 | | Transfer Deposit FROM ACCOUNT XXXXX0501 | | | 103,400.00 | Posted |
| *7098 | 04/10/2024 | | Outgoing Wire - 0393 | ED RACHAL FOUNDATION 811 | 96,669.04 | | Posted |
| *7098 | 04/10/2024 | | Transfer Deposit FROM ACCOUNT XXXXX0501 | | | 97,000.00 | Posted |
| *7098 | 03/18/2024 | | Outgoing Wire - 0342 | ED RACHAL FOUNDATION 811 | 96,651.34 | | Posted |
| *7098 | 03/18/2024 | | ACH Deposit - BERRY CONTRACTIN CORP PAY | | | 27,000.00 | Posted |
| *7098 | 03/15/2024 | | Transfer Deposit FROM ACCOUNT XXXXX0501 | | | 72,628.74 | Posted |
| *7098 | 02/21/2024 | | Outgoing Wire - 0758 | ED RACHAL FOUNDATION 811 | 96,761.42 | | Posted |
| *7098 | 02/21/2024 | | Transfer Deposit FROM ACCOUNT XXXXX0501 | | | 96,000.00 | Posted |
| *7098 | 01/23/2024 | | Outgoing Wire - 0796 | ED RACHAL FOUNDATION 811 | 206,822.53 | | Posted |
| *7098 | 01/23/2024 | | Transfer Deposit FROM ACCOUNT XXXXX0501 | | | 204,000.00 | Posted |
| *7098 | 12/08/2023 | | Outgoing Wire - 1179 | ED RACHAL FOUNDATION 811 | 96,265.00 | | Posted |
| *7098 | 12/08/2023 | | Transfer Deposit FROM ACCOUNT XXXXX0501 | | | 97,000.00 | Posted |
| *7098 | 11/10/2023 | | Outgoing Wire - 1099 | ED RACHAL FOUNDATION 811 | 96,572.70 | | Posted |
| *7098 | 11/10/2023 | | Transfer Deposit FROM ACCOUNT XXXXX0501 | | | 96,000.00 | Posted |
| *7098 | 10/10/2023 | | Outgoing Wire - 1236 | ED RACHAL FOUNDATION 811 | 96,570.47 | | Posted |
| *7098 | 10/10/2023 | | Transfer Deposit FROM ACCOUNT XXXXX0501 | | | 97,000.00 | Posted |
| *7098 | 10/02/2023 | | Transfer Deposit FROM ACCOUNT XXXXX0501 | | | 15,000.00 | Posted |
| *7098 | 09/11/2023 | | Outgoing Wire - 0720 | ED RACHAL FOUNDATION 811 | 122,840.96 | | Posted |
| *7098 | 09/11/2023 | | Deposit | | | 123,000.00 | Posted |
| *7098 | 08/15/2023 | | Outgoing Wire - 0791 | ED RACHAL FOUNDATION 811 | 70,284.75 | | Posted |
| *7098 | 08/15/2023 | | Transfer Deposit FROM ACCOUNT XXXXX0501 | | | 15,000.00 | Posted |
| *7098 | 07/10/2023 | | Outgoing Wire - 0805 | ED RACHAL FOUNDATION 811 | 70,256.15 | | Posted |
| *7098 | 07/10/2023 | | Transfer Deposit FROM ACCOUNT XXXXX0501 | | | 70,000.00 | Posted |
| *7098 | 06/09/2023 | | Outgoing Wire - 0689 | ED RACHAL FOUNDATION 811 | 70,364.99 | | Posted |
| *7098 | 06/09/2023 | | Transfer Deposit FROM ACCOUNT XXXXX0501 | | | 70,000.00 | Posted |
| *7098 | 05/10/2023 | | Outgoing Wire - 0377 | ED RACHAL FOUNDATION 811 | 70,369.40 | | Posted |
| *7098 | 05/10/2023 | | Transfer Deposit FROM ACCOUNT XXXXX0501 | | | 40,000.00 | Posted |
| *7098 | 04/10/2023 | | Outgoing Wire - 0250 | ED RACHAL FOUNDATION 811 | 70,384.48 | | Posted |
| *7098 | 04/10/2023 | | Transfer Deposit FROM ACCOUNT XXXXX0501 | | | 70,000.00 | Posted |
| *7098 | 03/10/2023 | | Outgoing Wire - 0998 | ED RACHAL FOUNDATION 811 | 70,406.34 | | Posted |

| Account Number | Post Date | Check | Description | Debit | Credit | Status |
|---|---|---|---|---|---|---|
| *7098 | 03/10/2023 | | Transfer Deposit FROM ACCOUNT XXXXX0501 | | 71,000.00 | Posted |
| *7098 | 02/10/2023 | | Outgoing Wire - 0917    ED RACHAL FOUNDATION    811 | 70,401.86 | | Posted |
| *7098 | 02/10/2023 | | Transfer Deposit FROM ACCOUNT XXXXX0501 | | 65,000.00 | Posted |
| *7098 | 01/10/2023 | | Outgoing Wire - 0680    ED RACHAL FOUNDATION    811 | 175,550.19 | | Posted |
| *7098 | 01/10/2023 | | Deposit | | 176,000.00 | Posted |
| *7098 | 12/09/2022 | | Outgoing Wire - 1027    ED RACHAL FOUNDATION    811 | 70,582.48 | | Posted |
| *7098 | 12/09/2022 | | Deposit | | 70,000.00 | Posted |
| *7098 | 11/10/2022 | | Outgoing Wire - 0512    ED RACHAL FOUNDATION    811 | 70,000.00 | | Posted |
| *7098 | 10/07/2022 | | Outgoing Wire - 1057    ED RACHAL FOUNDATION    811 | 70,315.15 | | Posted |
| *7098 | 10/07/2022 | | Transfer Deposit FROM ACCOUNT XXXXX0501 | | 71,000.00 | Posted |
| *7098 | 09/09/2022 | | Outgoing Wire - 0347    ED RACHAL FOUNDATION    811 | 70,309.58 | | Posted |
| *7098 | 09/09/2022 | | Transfer Deposit FROM ACCOUNT XXXXX0501 | | 71,000.00 | Posted |
| *7098 | 08/10/2022 | | Outgoing Wire - 0258    ED RACHAL FOUNDATION    811 | 70,303.52 | | Posted |
| *7098 | 08/10/2022 | | Transfer Deposit FROM ACCOUNT XXXXX0501 | | 70,303.52 | Posted |
| *7098 | 07/08/2022 | | Outgoing Wire - 0896    ED RACHAL FOUNDATION    811 | 70,275.18 | | Posted |
| *7098 | 07/08/2022 | | Transfer Deposit FROM ACCOUNT XXXXX0501 | | 70,000.00 | Posted |
| *7098 | 06/10/2022 | | Outgoing Wire - 0935    ED RACHAL FOUNDATION    811 | 70,818.01 | | Posted |
| *7098 | 06/10/2022 | | Transfer Deposit FROM ACCOUNT XXXXX0501 | | 71,000.00 | Posted |
| *7098 | 05/10/2022 | | Outgoing Wire - 0483    ED RACHAL FOUNDATION    811 | 70,000.00 | | Posted |
| *7098 | 05/10/2022 | | Transfer Deposit FROM ACCOUNT XXXXX0501 | | 70,000.00 | Posted |
| *7098 | 04/08/2022 | | Outgoing Wire - 0567    ED RACHAL FOUNDATION    811 | 70,661.90 | | Posted |
| *7098 | 04/08/2022 | | Transfer Deposit FROM ACCOUNT XXXXX0501 | | 70,000.00 | Posted |
| *7098 | 04/06/2022 | | Transfer Deposit FROM ACCOUNT XXXXX0501 | | 31,600.00 | Posted |
| *7098 | 03/10/2022 | | Outgoing Wire - 0818    ED RACHAL FOUNDATION    811 | 70,402.81 | | Posted |
| *7098 | 02/10/2022 | | Outgoing Wire - 0590    ED RACHAL FOUNDATION FOUNDATIO811 | 70,369.09 | | Posted |
| *7098 | 02/10/2022 | | Transfer Deposit FROM ACCOUNT XXXXX0501 | | 65,000.00 | Posted |
| *7098 | 01/10/2022 | | Outgoing Wire - 0329    ED RACHAL FOUNDATION    811 | 70,000.00 | | Posted |
| *7098 | 01/10/2022 | | Transfer Deposit FROM ACCOUNT XXXXX0501 | | 70,000.00 | Posted |
| *7098 | 12/10/2021 | | Outgoing Wire - 0790    ED RACHAL FOUNDATION    811 | 176,078.82 | | Posted |
| *7098 | 12/10/2021 | | Transfer Deposit FROM ACCOUNT XXXXX0501 | | 180,000.00 | Posted |
| *7098 | 11/10/2021 | | Outgoing Wire - 0221    ED RACHAL FOUNDATION    811 | 70,136.41 | | Posted |
| *7098 | 11/10/2021 | | Transfer Deposit FROM ACCOUNT XXXXX0501 | | 32,000.00 | Posted |
| *7098 | 10/08/2021 | | Outgoing Wire - 0532    ED RACHAL FOUNDATION    811 | 70,203.72 | | Posted |
| *7098 | 10/08/2021 | | Transfer Deposit FROM ACCOUNT XXXXX0501 | | 70,000.00 | Posted |
| *7098 | 09/10/2021 | | Outgoing Wire - 0998    ED RACHAL FOUNDATION    811 | 70,195.03 | | Posted |
| *7098 | 09/10/2021 | | Transfer Deposit FROM ACCOUNT XXXXX0501 | | 70,000.00 | Posted |
| *7098 | 08/10/2021 | | Outgoing Wire - 0431    ED RACHAL FOUNDATION    811 | 70,194.66 | | Posted |
| *7098 | 08/10/2021 | | Transfer Deposit FROM ACCOUNT XXXXX0501 | | 70,000.00 | Posted |
| *7098 | 08/04/2021 | | Transfer Deposit FROM ACCOUNT XXXXX0501 | | 10,000.00 | Posted |
| *7098 | 08/04/2021 | | Transfer Deposit FROM ACCOUNT XXXXX0501 | | 15,000.00 | Posted |
| *7098 | 07/09/2021 | | Outgoing Wire - 0482    ED RACHAL FOUNDATION    811 | 70,000.00 | | Posted |

| Account Number | Post Date | Check | Description | | | Debit | Credit | Status |
|---|---|---|---|---|---|---|---|---|
| *7098 | 06/10/2021 | | Outgoing Wire - 0366 | ED RACHAL FOUNDATION | 811 | 70,339.39 | | Posted |
| *7098 | 05/10/2021 | | Outgoing Wire - 0263 | ED RACHAL FOUNDATION | 811 | 70,308.52 | | Posted |
| *7098 | 04/09/2021 | | Outgoing Wire - 1050 | ED RACHAL FOUNDATION | 811 | 70,233.76 | | Posted |
| *7098 | 03/10/2021 | | Outgoing Wire - 0185 | ED RACHAL FOUNDATION | 811 | 70,000.00 | | Posted |
| *7098 | 02/10/2021 | | Outgoing Wire - 0463 | ED RACHAL FOUNDATION | 811 | 70,223.03 | | Posted |
| *7098 | 01/08/2021 | | Outgoing Wire - 0569 | ED RACHAL FOUNDATION | 811 | 70,230.97 | | Posted |
| *7098 | 12/10/2020 | | Outgoing Wire - 0776 | ED RACHAL FOUNDATION | 811 | 70,252.39 | | Posted |
| *7098 | 12/10/2020 | | Transfer Deposit FROM ACCOUNT XXXXX0501 | | | | 70,000.00 | Posted |
| *7098 | 11/10/2020 | | Outgoing Wire - 0470 | ED RACHAL FOUNDATION | 811 | 182,837.16 | | Posted |
| *7098 | 11/10/2020 | | Transfer Deposit FROM ACCOUNT XXXXX0501 | | | | 183,000.00 | Posted |
| *7098 | 10/13/2020 | | Outgoing Wire - 0763 | ED RACHAL FOUNDATION | 811 | 70,000.00 | | Posted |
| *7098 | 10/13/2020 | | Transfer Deposit FROM ACCOUNT XXXXX0501 | | | | 70,000.00 | Posted |
| *7098 | 09/10/2020 | | Outgoing Wire - 0342 | ED RACHAL FOUNDATION | 811 | 73,480.47 | | Posted |
| *7098 | 09/10/2020 | | Transfer Deposit FROM ACCOUNT XXXXX0501 | | | | 74,000.00 | Posted |
| *7098 | 08/10/2020 | | Outgoing Wire - 0478 | ED RACHAL FOUNDATION | 811 | 73,915.77 | | Posted |
| *7098 | 08/10/2020 | | Transfer Deposit FROM ACCOUNT XXXXX0501 | | | | 74,000.00 | Posted |
| *7098 | 07/10/2020 | | Outgoing Wire - 0591 | ED RACHAL FOUNDATION | 811 | 73,981.39 | | Posted |
| *7098 | 07/10/2020 | | Transfer Deposit FROM ACCOUNT XXXXX0501 | | | | 30,000.00 | Posted |
| *7098 | 06/10/2020 | | Outgoing Wire - 0143 | ED RACHAL FOUNDATION | 811 | 77,832.15 | | Posted |
| *7098 | 06/09/2020 | | Transfer Deposit FROM ACCOUNT XXXXX0501 | | | | 77,000.00 | Posted |
| *7098 | 05/08/2020 | | Outgoing Wire - 0312 | ED RACHAL FOUNDATION | 811 | 74,037.66 | | Posted |
| *7098 | 05/08/2020 | | Transfer Deposit FROM ACCOUNT XXXXX0501 | | | | 20,000.00 | Posted |
| *7098 | 04/10/2020 | | Outgoing Wire - 0281 | ED RACHAL FOUNDATION | 811 | 73,878.77 | | Posted |
| *7098 | 04/10/2020 | | Transfer Deposit FROM ACCOUNT XXXXX0501 | | | | 75,000.00 | Posted |
| *7098 | 03/10/2020 | | Outgoing Wire - 0373 | ED RACHAL FOUNDATION | 811 | 70,000.00 | | Posted |
| *7098 | 03/10/2020 | | Transfer Deposit FROM ACCOUNT XXXXX0501 | | | | 70,000.00 | Posted |
| *7098 | 02/10/2020 | | Outgoing Wire - 0520 | ED RACHAL FOUNDATION | 811 | 78,600.15 | | Posted |
| *7098 | 02/10/2020 | | Transfer Deposit FROM ACCOUNT XXXXX0501 | | | | 78,000.00 | Posted |
| *7098 | 01/10/2020 | | Outgoing Wire - 0630 | ED RACHAL FOUNDATION | 811 | 73,647.12 | | Posted |
| *7098 | 01/10/2020 | | Transfer Deposit FROM ACCOUNT XXXXX0501 | | | | 15,000.00 | Posted |
| *7098 | 12/27/2019 | | Outgoing Wire - 0231 | ED RACHAL FOUNDATION | 811 | 116,860.92 | | Posted |
| *7098 | 12/27/2019 | | Transfer Deposit FROM ACCOUNT XXXXX0501 | | | | 115,000.00 | Posted |
| *7098 | 12/10/2019 | | Outgoing Wire - 0596 | ED RACHAL FOUNDATION | 811 | 74,553.94 | | Posted |
| *7098 | 12/10/2019 | | Transfer Deposit FROM ACCOUNT XXXXX0501 | | | | 75,000.00 | Posted |
| *7098 | 11/08/2019 | | Outgoing Wire - 0731 | ED RACHAL FOUNDATION | 811 | 74,223.77 | | Posted |
| *7098 | 11/08/2019 | | Deposit | | | | 75,000.00 | Posted |
| *7098 | 10/10/2019 | | Outgoing Wire - 0339 | ED RACHAL FOUNDATION | 811 | 74,054.15 | | Posted |
| *7098 | 10/10/2019 | | Transfer Deposit FROM ACCOUNT XXXXX0501 | | | | 30,000.00 | Posted |
| *7098 | 09/10/2019 | | Outgoing Wire - 0628 | ED RACHAL FOUNDATION | 811 | 70,000.00 | | Posted |
| *7098 | 09/10/2019 | | Transfer Deposit FROM ACCOUNT XXXXX0501 | | | | 70,000.00 | Posted |
| *7098 | 08/09/2019 | | Outgoing Wire - 0493 | ED RACHAL FOUNDATION | 811 | 74,692.25 | | Posted |

| Account Number | Post Date | Check | Description | Debit | Credit | Status |
|---|---|---|---|---|---|---|
| *7098 | 08/09/2019 | | Transfer Deposit FROM ACCOUNT XXXXXX0501 | | 70,000.00 | Posted |
| *7098 | 07/10/2019 | | Outgoing Wire - 0614   ED RACHAL FOUNDATION   811 | 73,500.00 | | Posted |
| *7098 | 07/10/2019 | | Transfer Deposit FROM ACCOUNT XXXXXX0501 | | 20,000.00 | Posted |
| *7098 | 06/10/2019 | | Outgoing Wire - 0463   ED RACHAL FOUNDATION   811 | 78,581.76 | | Posted |
| *7098 | 06/10/2019 | | Transfer Deposit FROM ACCOUNT XXXXXX0501 | | 80,000.00 | Posted |
| *7098 | 05/10/2019 | | Outgoing Wire - 0576   ED RACHAL FOUNDATION   811 | 73,780.32 | | Posted |
| *7098 | 05/10/2019 | | Transfer Deposit FROM ACCOUNT XXXXXX0501 | | 75,000.00 | Posted |
| *7098 | 04/10/2019 | | Outgoing Wire - 0545   ED RACHAL FOUNDATION   811 | 73,842.74 | | Posted |
| *7098 | 04/10/2019 | | Transfer Deposit FROM ACCOUNT XXXXXX0501 | | 20,000.00 | Posted |
| *7098 | 03/14/2019 | | Outgoing Wire - 0404   ED RACHAL FOUNDATION   811 | 16,523.62 | | Posted |
| *7098 | 03/08/2019 | | Wire Debit - 0380   ED RACHAL FOUNDATION   811 | 70,000.00 | | Posted |
| *7098 | 03/08/2019 | | Transfer Deposit FROM ACCOUNT XXXXXX0501 | | 70,000.00 | Posted |
| *7098 | 02/08/2019 | | Wire Debit - 0289   ED RACHAL FOUNDATION   811 | 73,999.22 | | Posted |
| *7098 | 02/08/2019 | | Transfer Deposit FROM ACCOUNT XXXXXX0501 | | 70,000.00 | Posted |
| *7098 | 01/10/2019 | | Wire Debit - 0475   ED RACHAL FOUNDATION   811 | 70,290.26 | | Posted |
| *7098 | 12/10/2018 | | Wire Debit - 0195   ED RACHAL FOUNDATION   811 | 70,000.00 | | Posted |
| *7098 | 12/10/2018 | | Transfer Deposit FROM ACCOUNT XXXXXX0501 | | 70,000.00 | Posted |
| *7098 | 11/09/2018 | | Wire Debit - 0692   ED RACHAL FOUNDATION   811 | 70,000.00 | | Posted |
| *7098 | 11/09/2018 | | Transfer Deposit FROM ACCOUNT XXXXXX0501 | | 70,000.00 | Posted |
| *7098 | 10/09/2018 | | Wire Debit - 0353   ED RACHAL FOUNDATION   811 | 140,000.00 | | Posted |
| *7098 | 08/17/2018 | | Wire Debit - 0679   ED RACHAL FOUNDATION   811 | 54,193.55 | | Posted |
| | | | | 6,290,430.14 | 5,008,932.26 | |

# EXHIBIT 42

## CAUSE NO. _____

| | | |
|---|---|---|
| LONE STAR PORTS, LLC, ALLEN LAWRENCE BERRY, MARVIN GLENN BERRY, AND DENNIS WAYNE BERRY | § § § § § § § | IN THE DISTRICT COURT OF |
| *Plaintiffs,* | § § | |
| v. | § § | HARRIS COUNTY, TEXAS |
| THE CARLYLE GROUP LP, CARLYLE INVESTMENT MANAGEMENT, L.L.C AND CARLYLE GLOBAL INFRASTRUCTURE OPPORTUNITY FUND LP | § § § § § § § § | |
| *Defendants.* | § § | _____ JUDICIAL DISTRICT |

## PLAINTIFFS' ORIGINAL PETITION

Lone Star Ports, LLC, Allen Lawrence Berry, Marvin Glenn Berry and Dennis Wayne Berry (collectively "Plaintiffs") file this Original Petition against The Carlyle Group, LP, Carlyle Investment Management, L.L.C., and Carlyle Global Infrastructure Opportunity Fund, L.P. (collectively "Defendants") and would respectfully show the Court the following:

### I. PARTIES

1. Plaintiff, Lone Star Ports, LLC is a Delaware limited liability company.

2. Plaintiff, Allen Lawrence Berry is a resident of Harris County, Texas.

3. Plaintiff, Marvin Glenn Berry is a resident of Nueces County, Texas.

4. Plaintiff, Dennis Wayne Berry is a resident of Nueces County, Texas.

5. Defendant Carlyle Investment Management, LLC is a Delaware limited liability company with its principal address located at 1001 Pennsylvania Avenue, NW,

Washington, DC 20004-2505, is authorized to do business in Texas, and may be served with process by serving its registered agent for service of process, C.T. Corporation System at 1999 Bryan Street, Ste. 900, Dallas, Texas 75201-3136.

6.      Defendant Carlyle Global Infrastructure Opportunity Fund, LP, whose home office is located at 1001 Pennsylvania Avenue, NW, Washington, DC 20004-2505, is a foreign limited partnership that may be served with process by serving the Texas Secretary of State at 1019 Brazos Street, Austin, Texas 78701, as its agent for service because Defendant has not designated or maintained a resident agent for service of process in Texas as required by statute. Additionally, Defendant Carlyle Global Infrastructure Opportunity Fund, LP engages in business in Texas, but has not designated or maintained a resident agent for service of process in Texas.

7.      Defendant The Carlyle Group, LP, whose home office is located at 1001 Pennsylvania Avenue, NW, Washington, DC 20004-2505, is a Delaware limited partnership that may be served with process by serving the Texas Secretary of State at 1019 Brazos Street, Austin, Texas 78701, as its agent for service because Defendant has not designated or maintained a resident agent for service of process in Texas as required by statute. Additionally, Defendant The Carlyle Group, LP engages in business in Texas but has not designated or maintained a resident agent for service of process in Texas.

## II.    JURISDICTION

8.      This Court has jurisdiction over this matter, as the damages in controversy are within the jurisdictional limits of this Court.

9.      This Court has personal jurisdiction over Carlyle Investment Management, L.L.C. because it is authorized to do business in Texas and does business in Texas. This

Court has personal jurisdiction over all Defendants because: Defendants do business in Texas; Defendants engaged in business in Texas by contracting with a Texas resident with respect to a transaction that was to be performed in whole or in part in Texas; and Defendants committed torts, which are the subject of this suit, in whole or in part in Texas.

10.    Defendants purposefully availed themselves of the privileges and benefits of conducting business in Texas by contracting to form an entity to do business in Texas, contracting with Texas residents to do business in Texas, and doing business in Texas as described more thoroughly below. Defendants' agents and representatives traveled to Texas on numerous occasions.

11.    Additionally, Defendants submitted to the jurisdiction of this Court in the Term Sheet among Plaintiffs Allen Lawrence Berry, Marvin Glenn Berry, and Dennis Wayne Berry and Defendants Carlyle Investment Management, L.L.C. and Carlyle Global Infrastructure Opportunity Fund, L.P., which was signed on February 7, 2019 and in which such Defendants agreed that any lawsuit relating to such Term Sheet would be filed in the state courts in Harris County, Texas  and that any cause of action arising out the Term Sheet shall be deemed to have arisen from a transaction of business in the State of Texas.

12.    Pursuant to Texas Rule of Civil Procedure 47(c)(3), Plaintiffs are seeking monetary relief in excess of $1,000,000.

### III.    VENUE

13.    Venue is proper and mandatory in Harris County because the Term Sheet agreement between the parties contains a forum selection clause in which the parties agreed that any lawsuit relating to such Term Sheet shall be brought in the state courts of Harris

County, Texas and that any cause of action arising out the Term Sheet shall be deemed to have arisen from a transaction of business in the State of Texas.

## IV.   DISCOVERY

14.     In accordance with Texas Rules of Civil Procedure, discovery in this case is intended to be conducted under Level 3.

## V.  FACTS

15.     On or about February 7, 2019, Plaintiffs Allen Lawrence Berry, Marvin Glenn Berry, and Dennis Wayne Berry (collectively, "Berry") entered into an agreement with Defendants Carlyle Investment Management, LLC and Carlyle Global Infrastructure Opportunity Fund, L.P. (collectively, "Defendants" or "Carlyle") titled "Term Sheet."

16.     The Term Sheet describes the parties intent to develop, construct, own and operate a hydrocarbon delivery system which would allow hydrocarbon shippers maximum optionality to deliver hydrocarbons to local refinery markets in the vicinity of Corpus Christi, Texas through tankage, shipping reception collection, consolidation, storage, transfer, staging, pumping, delivery and other facilities to be developed near Midway Junction, Texas. (collectively, the "Midway Junction Facility"), and (ii) export hydrocarbons via the Midway Junction Facility through (A) related pipelines and other facilities to be developed starting around the Midway Junction Facility, (B) related tankage, pumping, transfer, storage, staging, delivery facilities, pipelines, and other facilities to be developed adjacent to and under Redfish Bay, Texas (collectively, the "Redfish Bay Facility"), and (C) a premier deep-water crude oil export terminal and related tankage, pipelines, shipping, pumping, transfer, exporting, and other facilities to be developed on Harbor Island, Texas (collectively, the "Harbor Island Terminal") and to facilitate the

4

dredging of the Corpus Christi ship channel to a depth of 75feet from the Gulf of Mexico to the site of the Harbor Island Terminal to permit the loading and unloading of fully-laden Very Large Crude Carriers ("VLCCs") at the Harbor Island Terminal. The Project was intended to include pipeline, shipping, reception, collection, consolidation, storage, staging, transfer, delivery, exporting, and other facilities, including ( I ) the Midway Junction Facility, (II) the Redfish Bay Facility, (Ill) the Harbor Island Terminal and (IV) other associated infrastructure, assets, facilities, and businesses, including without limitation, certain real property currently owned, leased, optioned, or otherwise controlled by Berry at Midway Junction, Redfish Bay, and Harbor Island, Texas (collectively, the "Contributed Land"), (V) to the extent applicable, additional properties and facilities to be acquired, leased, optioned, developed, or otherwise controlled by one or more Project Companies, one or more of the Parties, the Port of Corpus Christi Authority ("POCCA"), and/or third parties, and (VI) facilities for controlling and collecting tolling and/or other fees or charges from vessels that transit the portion of the Corpus Christi Ship channel for which the Project, or one or more Project Companies facilitates dredging (together, the "Project").

17.     One entity to be used by the parties to the Term Sheet in connection with the Project (as defined in the Term Sheet) is Lone Star Ports, LLC ("LSP"), which was formed, and which is a Plaintiff herein.

18.     Both Carlyle and Berry have binding legal obligations under the Term Sheet. Berry has to date fully performed all of its obligations under the Term Sheet. Carlyle has repeatedly breached its obligations under the Term Sheet and continues to do so.

19. Among Carlyle's specific binding obligations under the Term Sheet are Carlyle's:

a) Obligation to disclose to Berry all contracts and obligations of Lone Star Ports, LLC, a Delaware limited liability company ("LSP");

b) Obligation to negotiate in good faith to enter into Definitive Documents (as that term is defined in the Term Sheet);

c) Obligation to negotiate as promptly as practicable the execution of an operating agreement for LSP and the formalization of the transfer of Berry's ownership interests in LSP;

d) Obligation, in the event that Closing (as that term is defined in the Term Sheet) did not occur on or before the FID Date (as that term is defined in the Term Sheet), to transfer to Berry Carlyle's entire interests or units, shares, or other equity interests, if any, in LSP and each Project Company (as that term is defined in the Term Sheet), to confirm and evidence that Berry owns 100% of all membership interests or units, shares, or other equity interests in LSP and each Project Company;

e) Obligation, in the event that Closing did not occur on or before the FID Date, to cause Andrew Marino, Ferris Hussein, and each other officer, director, or employee of any Project Company who is or has been nominated or appointed by Carlyle to resign as members of the Board of LSP and from all other offices or positions in each Project Company;

f) Obligation, in the event that Closing did not occur on or before the FID Date, to cease all ownership in, contractual relationship with, and continuing involvement in the Project or any Project Company;

g) Obligation for all material decisions regarding LSP to be made by at least a majority of the members of LSP's Board;

h) Obligation to provide to Berry full information and the rights and ability to participate in all significant LSP management, operational, and ownership entity matters, including without limitation incurrence of expenses, appointment and remuneration of senior management and consultants, appointment and continuation of legal counsel, approval of all related party and non-ordinary course transactions, issuance of equity interests, and other ownership and ownership entity matters;

6

i) Obligation of confidentiality;

j) Obligation of cooperation with Berry to advance the Project;

k) Obligation to cooperate in good faith to attempt to enter into (i) operating and investment transactions with a highly regarded, experienced, and qualified crude oil marine port operator that has the ability to improve Project economics (the "Operator"), and (ii) one or more equity investment transactions with crude oil producers, pipeline operators, aggregators, shippers, and/or other parties that have the ability to assist the Project to improve Project economics (each, an "Industry Investor") and, in connection therewith to (A) agree with Berry on the identity of the Operator and each Industry Investor and the terms of any transactions or relationships with the Operator and each Industry Investor, (B) jointly negotiate with Berry in good faith regarding the terms of the transactions or relationships with the Operator and each Industry Investor, (C) jointly agree with Berry regarding the terms of any equity interest in the Project or any Project Company to be received by the Operator and each Industry Investor, (D) cooperate with Berry in exercising special caution to ensure that, if such Operator or Industry Investor operates, has any equity interest in, or otherwise has any other potentially competitive relationship with a port or refining facility within a radius of 750 miles of Harbor Island, Texas (the "Non-Compete Zone"), special contractual provisions would be instituted on terms to be agreed by Berry to ensure that such Operator or Industry Investor would not divert business opportunities from the Project or otherwise favor its other equity investments or competitive relationships, and (E) disclose any material direct or indirect equity relationships or contractual relationships Carlyle may have with any such potential Operator or Industry Investor;

l) Obligation for none of Carlyle or any of its affiliated entities or individuals (each, a "Carlyle Affiliate") to, directly or indirectly (A) solicit, provide information to, or otherwise pursue a Directly Competing Project (as that term is defined in the Term Sheet), or (II) make, accept, or negotiate any offer with any operational, development, investment, financing, or other party other than Berry in respect of any Directly Competing Project, without Berry's express written consent;

m) Obligation for Carlyle and each Carlyle Affiliate to refrain from providing information to or assisting any Carlyle Affiliate to directly or indirectly finance or invest in a Directly Competing Project; and

n) Obligation, in the event that Closing did not occur on or before the FID Date, for Carlyle and each Carlyle Affiliate to refrain from (i) directly or indirectly financing or investing in a Directly Competing Project, or (ii) providing

information to or assisting any Carlyle Affiliate to directly or indirectly finance or invest in a Directly Competing Project until the earliest of (A) the substantial completion of the Project, (B) the abandonment or suspension of the Project by Berry, and (C) the date that is two years after the FID Date.

## VI. CAUSES OF ACTION

### A.  BREACH OF CONTRACT

20.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

21.    The failure of Defendants to perform their obligations under the Term Sheet constitutes a breach of contract with Plaintiffs. Plaintiffs have a valid and enforceable contract with Defendants. Plaintiffs are proper parties to sue for breach of contract. Plaintiffs performed under the contract. Defendants have and continue to breach the contract with Plaintiffs. Plaintiffs have suffered and will continue to suffer damages.

22.    Defendants' acts have been the producing and proximate causes of Plaintiff's damages in excess of the minimum jurisdictional limits of this court.

23.    Defendants' conduct was committed knowingly and intentionally. Accordingly, Defendants are liable for additional damages under DTPA section 17.50(b)(1), and Tex. Ins. Code § 541.152. Plaintiff is entitled to the 18% damages allowed by Tex. Ins. Code § 542.060.

24.    Plaintiffs are entitled to reasonable and necessary attorneys' fees pursuant to Tex. Civ. Prac. & Rem. Code section 38.001(8); Tex. Ins. Code § 541.152; and Tex. Ins. Code § 542.061; and DTPA § 17.50(d).

### B.  Tortious Interference with Contract (The Carlyle Group, LP only)

25.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

Defendant The Carlyle Group, LP willfully and intentionally interfered with the rights of the Plaintiffs under the Term Sheet. The interference proximately caused Plaintiffs' injuries, and Plaintiffs incurred actual damage or loss.

**C.      Tortious Interference with Contracts (Against All Defendants)**

26.      Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

27.      Plaintiff Lone Star Ports, LLC has existing contracts with one or more third persons. Defendants willfully and intentionally interfered with those contracts. The interference proximately caused Lone Star Ports, LLC's injuries. Lone Star Ports, LLC suffered actual damage or loss.

**D.      Tortious Interference with Prospective Business Relationships**

28.      Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

29.      There was a reasonable probability that Plaintiffs would have entered into additional business relationships with numerous other third persons. Each of the three Defendants intentionally interfered with those prospective relationships. The conduct of each of the Defendants was independently tortious or unlawful. The interference proximately caused Plaintiffs' injuries. Plaintiffs suffered actual damage or loss.

**VII. REQUEST FOR DECLARATORY RELIEF**

30.      Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

31.      Plaintiffs request a declaratory judgment that: (i) Plaintiffs own 100% of all membership and other equity interests in the Project, Lone Star Ports, LLC, and each Project Company; and (ii) until the date that is two years after the date of such declaratory judgment neither Carlyle nor any Carlyle Affiliate shall consult for, be employed by, invest in, have any ownership interest in, provide debt, equity, or other financing to, provide

information to, or assist in any way any property or project whose principal purpose is the development, acquisition, ownership, or operation of a hydrocarbons marine export terminal to directly compete with the Project and is within seventy-five (75) miles of Harbor Island, Nueces County, Texas, including any offshore systems originating within such radius.

## VIII. <u>DAMAGES</u>

32.     Plaintiffs are entitled to actual damages and special damages, including but not limited to lost profits and lost business and investment opportunities.

33.     Plaintiffs are entitled to exemplary damages because Defendants' conduct constituted gross negligence, malice, or fraud.

## IX. <u>SPECIFIC PERFORMANCE</u>

34.     Plaintiffs request that each of the Defendants be ordered to fully perform each of its common law and statutory duties and each of its remaining contractual obligations under the Term Sheet, including without limitation the following:

> (A) Taking any and all actions necessary to transfer to Berry the entire holdings of and by Carlyle and each Carlyle Affiliate of membership interests or units, shares, or other equity or other interests, if any, in LSP, Lone Star Ports, LLC, a Texas limited liability company ("LSPT"), all other Project Companies, and the Project, including, without limitation (I) providing to the Plaintiffs a written transfer document memorializing such transfer, (II) changing the registered agent of LSP and each other Project Company to Harvard Business Services (https://www.delawareinc.com/ourservices/change-agent/), with the contact person being named as Tonja Fulghum at Plaintiff LSP, and (III) making any necessary filings with the appropriate government officials in the States of Delaware and Texas to effect such transfers;

> (B) Confirming to Plaintiffs in writing that Berry currently owns 100% of all membership interests or units, shares, or other equity interests in the Project, LSP, and each other Project Company;

10

(C) Providing to Plaintiffs a list of contacts and contact details for all actual and potential investors, shippers, and operators relating to LSP or the Project;

(D) Providing the following written notice to Sean Strawbridge at Port of Corpus Christi Authority, Chris Robblee at Vopak, Susan Fong at Shell Midstream, Guy Freshwater at Glencore, Shannon Flowers at Salt Creek Midstream, Phil Mezey at Epic Midstream, Carlyle's contacts at SAF Group, Phillips 66, Harvest, Plains, and each other entity or individual with which Carlyle has had discussions or contact regarding LSP or the Project, including without limitation all actual and potential investors, shippers, and operators, with copies to LSPE:

"None of Carlyle Investment Management LLC, Carlyle Global Infrastructure Opportunity Fund L.P., or any other member of the Carlyle Group has any remaining involvement with Lone Star Ports, LLC or any of its affiliates or the Harbor Island hydrocarbons export terminal or any of its related facilities (the "Project"). The Berry Group owns 100% of Lone Star Ports, the Project, the Harbor Island terminal, and all entities that are involved in developing and owning the Project. The Berry Group is continuing to develop the Project.";

(E) Confirming to Plaintiffs in writing that Carlyle has taken no action that will or may cause the Project, LSP, LSPT, LSPE, any other Project Company, or any of their respective affiliates to incur any expense, obligation, or liability of any nature, unless such expense, obligation, or liability has been fully disclosed in writing by Carlyle to Berry and accepted or assumed by Berry;

(F) Causing (I) Carlyle, (II) each Carlyle Affiliate, and (III) Andrew Marino, Ferris Hussein, and each officer, director, or employee of, or consultant to, the Project, LSP, LSPT, or any Project Company who has been nominated or appointed by Carlyle or any of its Affiliates, including without limitation Jeremiah Ashcroft, Meredith Sadlowski, Anna-Louise Oliver, and Caleb Powers, to resign as members of the Board of LSP, as Managing Member or Manager of LSP, as Member of LSP, and from all other offices or positions in the Project, LSP, LSPT, and each Project Company, in each case with immediate effect;

(G) Confirming to Plaintiffs in writing that Carlyle will take any and all action to ensure that (I) none of Carlyle or any Carlyle Affiliate (a) has disclosed or made any use of, or (b) in the future will disclose or make any use of any documentation, information, and other matters (collectively, "Berry Information") in connection with or in any way related to (a) Lawrence Berry,

Marvin Berry, or Dennis Berry, (b) the Project, LSP, or any Project Company, (c) any predecessors, successors, parent entities, subsidiaries, owners, officers, directors, employees, former employees, representatives, agents, attorneys, and assigns of any such individuals or entities, (d) any entity that directly or indirectly through one or more intermediaries controls, is controlled by, or is under common control with any of such individuals or entities, whether by ownership of voting interests, management policies, contract, or otherwise, (e) any officer, director, shareholder, owner, partner, member, trustee, manager, employee, representative, attorney, or agent of any such individual or entity, (f) any individual or entity who is related to any other such individual to any degree by blood, marriage, or adoption, or (g) any of their respective affiliates and/or businesses (collectively, the "Berry Group"), whether or not such information is strictly confidential or proprietary, for any purpose whatsoever, (II) Carlyle and each Carlyle Affiliate has and will continue to hold all of the Berry Information in the strictest confidence and have not and will not disclose or divulge any part of the Berry Information to any third person without the prior written consent of Berry, on such terms and conditions as Berry considers appropriate, unless such disclosure is absolutely required to be disclosed by a final decision of a relevant court, governmental authority, or stock exchange and Berry is provided with a reasonable opportunity to object to the disclosure of such Berry Information to such court, governmental authority, or stock exchange prior to its disclosure, (III) none of Carlyle or any Carlyle Affiliates will make or solicit any announcement or disclosure regarding any member of the Berry Group without the express prior written consent of Berry, and (IV) none of Carlyle or any Carlyle Affiliates will copy, reproduce, or part with possession of any of the Berry Information;

(H) Confirming to Plaintiffs in writing that none of Carlyle or any Carlyle Affiliate has in the past or will in the future (I) vilify, denigrate, or make any false, negative, critical, or disparaging remarks or statements, implied or expressed, concerning any member of the Berry Group at any time, (II) take any action or do anything that would or could damage the business, reputation, business reputation, or good will of any member of the Berry Group at any time, (III) take any action or do anything that would or could slander or cloud Berry's ownership of or title to LSP, the Project, any Project Company, or any member of the Berry Group at any time, or (IV) do anything that would or could damage the business, reputation, or good will of any member of the Berry Group at any time;

(I) Confirming to Plaintiffs in writing that Carlyle, on behalf of itself and each Carlyle Affiliate, will (I) cooperate with regard to any matters related to

12

Berry, LSP, the Project, and each of their respective Affiliates where its involvement is required after the date of such confirmation, and (II) cooperate fully with Berry, LSP, the Project, and their respective Affiliates and their counsel with respect to any matter (including litigation, investigations, or governmental proceedings) which relates to matters with which Carlyle was involved during its relationship with Berry, the Project, LSP, and their respective Affiliates, in a timely manner on reasonable notice from Berry or LSP;

(J) Confirming to Plaintiffs in writing that, until the date that is two years after the date of such confirmation, neither Carlyle nor any Carlyle Affiliate shall (I) consult for, be employed by, invest in, have any ownership interest in, provide debt, equity, or other financing to, provide information to, or assist in any way any property or project whose principal purpose is the development, acquisition, ownership, or operation of a hydrocarbons marine export terminal to directly compete with the Project and is within seventy-five (75) miles of Harbor Island, Nueces County, Texas, including any offshore systems originating within such radius, or (II) solicit or hire, on behalf of Carlyle or any Carlyle Affiliate, or any other person the services of any person who is, or within one year preceding or following the date of this letter was, an employee or consultant of any member of the Berry Group;

(K) Transferring to LSP's sole possession and control the Lone Star Ports website (including without limitation all domain, email, email archives, administrator user name and password, passwords, etc.), and the Project virtual data room (including without limitation all master administrator access, passwords, etc.) and directly instructing FTI Consulting, by both registered air mail and by email to Cody McGregor at FTI Consulting, to effect such transfer (1301 McKinney, Suite 3500, Houston, TX 77010 USA; www.fticonsulting.com; cody.mcgregor@fticonsulting.com) immediately, with copies to Plaintiffs;

(L) Transferring to Plaintiffs all legal documents, agreements, contracts, letters of intent, memoranda of understanding, term sheets, confidentiality or non-disclosure agreements, communications, etc., that have been completed to date or are pending and relate in any way to the Project, LSP, and each Project Company;

(M) Providing to Plaintiffs a list of professional consultants and contractors that have been appointed in connection with LSP or the Project and any

contracts, engagement materials, and communications to, from, or relating to such individuals or entities;

(N) Transferring to Plaintiffs ownership of and control over all bank or other accounts relating to LSP or the Project;

(O) Providing to Plaintiffs a written status report regarding commercial activities, including committed and anticipated barrel throughput, for LSP and the Project;

(P) Providing to Plaintiffs a written status report regarding all permits for LSP and the Project;

(Q) Providing to Plaintiffs all outstanding invoices and accounts payable for LSP and the Project, it being understood that pursuant to the Term Sheet no member of the Berry Group has any obligation to reimburse or pay any costs or expenses that have been incurred by Carlyle or any Carlyle Affiliate, whether ostensibly on behalf of LSP or otherwise, unless Berry has specifically agreed to reimburse or pay such costs or expenses; and

(R) Providing to LSPE all documents, records, work product, and Information relating in any manner to the Project, LSP, and all Project Companies.

## X. ATTORNEYS' FEES

35.     Plaintiffs are entitled to reasonable and necessary attorneys' fees pursuant to Tex. Civ. Prac. & Rem. Code Ch. 37 and Ch. 38.

## XI. CONDITIONS PRECEDENT

36.     All conditions precedent to bringing the above causes of action have been met or occurred.

14

## XII.  ALTERNATIVE PLEADING

37.    The foregoing facts and theories are pled cumulatively and alternatively, with no election or waiver of rights or remedies.

## XIII.  REQUEST FOR DISCLOSURE

38.    Under the Texas Rules of Civil Procedure 194, Plaintiffs hereby request that Defendants disclose, within 50 (fifty) days of service of this request, the information or material described in Texas Rule of Civil Procedure 194.2.

## XIV.  JURY DEMAND

39.    Plaintiffs requests trial by jury and submits appropriate jury fee.

## XV.  PRAYER

Plaintiffs prays that Defendants be cited to appear, for these reasons and that Plaintiffs have judgment against Defendants for all relief requested and for such other and further relief, general and special, at law or in equity, to which Plaintiffs are entitled.

Respectfully submitted,

**BUTCH BOYD LAW FIRM**

_____
ERNEST W. ("BUTCH") BOYD
State Bar No. 00783694
butchboyd@butchboydlawfirm.com
JEREMY R. STONE
State Bar No. 24013577
jeremystone@butchboydlawfirm.com
2905 Sackett Street
Houston, Texas 77098
Phone: (713) 589-8477
Fax: (713) 589-8563


ATTORNEYS FOR PLAINTIFFS

16

**EXHIBIT 43**

10/7/2019 1:49 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 37436622
By: Chandra Lawson
Filed: 10/7/2019 1:49 PM

**CAUSE NO. 2019-69452**

| | | |
|---|---|---|
| LONE STAR PORTS, LLC, ALLEN LAWRENCE BERRY, MARVIN GLENN BERRY, AND DENNIS WAYNE BERRY | § § § § § | IN THE DISTRICT COURT OF |
| *Plaintiffs*, | § § § | |
| v. | § § § | HARRIS COUNTY, TEXAS |
| THE CARLYLE GROUP LP, CARLYLE INVESTMENT MANAGEMENT, L.L.C AND CARLYLE GLOBAL INFRASTRUCTURE OPPORTUNITY FUND LP | § § § § § § § § | |
| *Defendants*. | § | 190th JUDICIAL DISTRICT |

**PLAINTIFFS' FIRST AMENDED PETITION**

Lone Star Ports, LLC, Allen Lawrence Berry, Marvin Glenn Berry and Dennis Wayne Berry (collectively "Plaintiffs") file this First Amended Petition against The Carlyle Group, LP, Carlyle Investment Management, L.L.C., and Carlyle Global Infrastructure Opportunity Fund, L.P. (collectively "Defendants") and would respectfully show the Court the following:

**I.   PARTIES**

1. Plaintiff Lone Star Ports, LLC is a Delaware limited liability company.

2. Plaintiff Allen Lawrence Berry is a resident of Harris County, Texas.

3. Plaintiff Marvin Glenn Berry is a resident of Nueces County, Texas.

4. Plaintiff Dennis Wayne Berry is a resident of Nueces County, Texas.

5. Defendant Carlyle Investment Management, LLC is a Delaware limited liability company with its principal address located at 1001 Pennsylvania Avenue, NW,

Washington, DC 20004-2505, is authorized to do business in Texas, and may be served with process by serving its registered agent for service of process, C.T. Corporation System at 1999 Bryan Street, Ste. 900, Dallas, Texas 75201-3136.

6.      Defendant Carlyle Global Infrastructure Opportunity Fund, LP, whose home office is located at 1001 Pennsylvania Avenue, NW, Washington, DC 20004-2505, is a foreign limited partnership that may be served with process by serving the Texas Secretary of State at 1019 Brazos Street, Austin, Texas 78701, as its agent for service because Defendant has not designated or maintained a resident agent for service of process in Texas as required by statute. Additionally, Defendant Carlyle Global Infrastructure Opportunity Fund, LP engages in business in Texas, but has not designated or maintained a resident agent for service of process in Texas.

7.      Defendant The Carlyle Group, LP, whose home office is located at 1001 Pennsylvania Avenue, NW, Washington, DC 20004-2505, is a Delaware limited partnership that may be served with process by serving the Texas Secretary of State at 1019 Brazos Street, Austin, Texas 78701, as its agent for service because Defendant has not designated or maintained a resident agent for service of process in Texas as required by statute. Additionally, Defendant The Carlyle Group, LP engages in business in Texas but has not designated or maintained a resident agent for service of process in Texas.

## II.    <u>JURISDICTION</u>

8.      This Court has jurisdiction over this matter, as the damages in controversy are within the jurisdictional limits of this Court.

9.      This Court has personal jurisdiction over Carlyle Investment Management, L.L.C. because it is authorized to do business in Texas and does business in Texas. This

2

Court has personal jurisdiction over all Defendants because: Defendants do business in Texas; Defendants engaged in business in Texas by contracting with a Texas resident with respect to a transaction that was to be performed in whole or in part in Texas; and Defendants committed torts, which are the subject of this suit, in whole or in part in Texas.

10. Defendants purposefully availed themselves of the privileges and benefits of conducting business in Texas by contracting to form an entity to do business in Texas, contracting with Texas residents to do business in Texas, and doing business in Texas as described more thoroughly below. Defendants' agents and representatives traveled to Texas on numerous occasions.

11. Additionally, Defendants submitted to the jurisdiction of this Court in the Term Sheet among Plaintiffs Allen Lawrence Berry, Marvin Glenn Berry, and Dennis Wayne Berry and Defendants Carlyle Investment Management, L.L.C. and Carlyle Global Infrastructure Opportunity Fund, L.P., which was signed on February 7, 2019 and in which such Defendants agreed that any lawsuit relating to such Term Sheet would be filed in the state courts in Harris County, Texas  and that any cause of action arising out the Term Sheet shall be deemed to have arisen from a transaction of business in the State of Texas.

12. Pursuant to Texas Rule of Civil Procedure 47(c)(3), Plaintiffs are seeking monetary relief in excess of $1,000,000.

### III.   VENUE

13. Venue is proper and mandatory in Harris County because the Term Sheet agreement between the parties contains a forum selection clause in which the parties agreed that any lawsuit relating to such Term Sheet shall be brought in the state courts of Harris

County, Texas and that any cause of action arising out the Term Sheet shall be deemed to have arisen from a transaction of business in the State of Texas.

## IV. DISCOVERY

14. In accordance with Texas Rules of Civil Procedure, discovery in this case is intended to be conducted under Level 3.

## V. FACTS

15. On or about February 7, 2019, Plaintiffs Allen Lawrence Berry, Marvin Glenn Berry, and Dennis Wayne Berry (collectively, "Berry") entered into a written agreement with Defendants Carlyle Investment Management, LLC and Carlyle Global Infrastructure Opportunity Fund, L.P. (collectively, "Defendants" or "Carlyle") titled "Term Sheet."

16. The Term Sheet describes the parties intent to have defendants invest in Plaintiffs' project to (a) develop, construct, own and operate a hydrocarbon delivery system, which would allow hydrocarbon shippers maximum optionality to (i) deliver hydrocarbons to local refinery markets in the vicinity of Corpus Christi, Texas through tankage, shipping reception collection, consolidation, storage, transfer, staging, pumping, delivery and other facilities to be developed near Midway Junction, Texas (collectively, the "Midway Junction Facility"), and (ii) export hydrocarbons via the Midway Junction Facility through (A) related pipelines and other facilities to be developed around the Midway Junction Facility, (B) related tankage, pumping, transfer, storage, staging, delivery facilities, pipelines, and other facilities to be developed adjacent to and under Redfish Bay, Texas (collectively, the "Redfish Bay Facility"), and (C) a premier deep-water crude oil export terminal and related tankage, pipelines, shipping, pumping, transfer, exporting, and

4

other facilities to be developed on Harbor Island, Texas (collectively, the "Harbor Island Terminal"), and (b) facilitate the dredging of the Corpus Christi ship channel to a depth of 75 feet from the Gulf of Mexico to the site of the Harbor Island Terminal to permit the loading and unloading of fully-laden Very Large Crude Carriers ("VLCCs") at the Harbor Island Terminal (collectively, the "Project"). The Project was intended to include pipeline, shipping, reception, collection, consolidation, storage, staging, transfer, delivery, exporting, and other facilities, including ( I ) the Midway Junction Facility, (II) the Redfish Bay Facility, (Ill) the Harbor Island Terminal (IV) other associated infrastructure, assets, facilities, and businesses, including without limitation, certain real property currently owned, leased, optioned, or otherwise controlled by Berry at Midway Junction, Redfish Bay, and Harbor Island, Texas (collectively, the "Contributed Land"), (V) to the extent applicable, additional properties and facilities to be acquired, leased, optioned, developed, or otherwise controlled by one or more Project Companies, one or more of the Plaintiffs, the Port of Corpus Christi Authority ("POCCA"), and/or third parties, and (VI) facilities for controlling and collecting tolls and/or other fees or charges from vessels that transit the portion of the Corpus Christi Ship channel to be dredged as part of the Project.

17. One entity to be used by the parties to the Term Sheet in connection with the Project is Lone Star Ports, LLC ("LSP"), which was formed, and which is a Plaintiff herein.

18. Both Carlyle and Berry have binding legal obligations under the Term Sheet. Berry has to date fully performed all of its obligations under the Term Sheet. Carlyle has repeatedly breached its obligations and continues to do so.

19.     Among Carlyle's specific binding obligations under the Term Sheet are Carlyle's:

   a. Obligation to disclose to Berry all contracts and obligations of LSP;

   b. Obligation to negotiate in good faith to enter into Definitive Documents (as defined in the Term Sheet);

   c. Obligation to negotiate as promptly as practicable the execution of an operating agreement for LSP and the formalization of the transfer to Berry their ownership interests in LSP;

   d. Obligation, in the event that Closing (as defined in the Term Sheet) did not occur on or before the FID Date (as defined in the Term Sheet), to transfer to Berry Carlyle's entire interests or units, shares, or other equity interests, if any, in LSP and each Project Company (as defined in the Term Sheet) to Berry, to confirm and evidence that Berry owns 100% of all membership interests or units, shares, or other equity interests in LSP and each Project Company;

   e. Obligation, in the event that Closing did not occur on or before the FID Date, to cause Andrew Marino, Ferris Hussein, and each other officer, director, or employee of any Project Company who is or has been nominated or appointed by Carlyle to resign as members of the Board of LSP and from all other offices or positions in LSP and each Project Company;

   f. Obligation, in the event that Closing did not occur on or before the FID Date, to cease all ownership in, contractual relationship with, and continuing involvement in the Project or any Project Company;

   g. Obligation for all material decisions regarding LSP to be made by at least a majority of the members of LSP's Board;

   h. Obligation to provide to Berry full information and the rights and ability to participate in all significant LSP management, operational, and ownership entity matters, including without limitation incurrence of expenses, appointment and remuneration of senior management and consultants, appointment and continuation of legal counsel, approval of all related party and non-ordinary course

6

transactions, issuance of equity interests, and other ownership and ownership entity matters;

i. Obligation of confidentiality;

j. Obligation of cooperation with Berry to advance the Project;

k. Obligation to cooperate in good faith to attempt to enter into (i) operating and investment transactions with a highly regarded, experienced, and qualified crude oil marine port operator that has the ability to improve Project economics (the "Operator"), and (ii) one or more equity investment transactions with crude oil producers, pipeline operators, aggregators, shippers, and/or other parties that have the ability to assist the Project to improve Project economics (each, an "Industry Investor") and, in connection therewith to (A) agree with Berry on the identity of the Operator and each Industry Investor and the terms of any transactions or relationships with the Operator and each Industry Investor, (B) jointly negotiate with Berry in good faith regarding the terms of the transactions or relationships with the Operator and each Industry Investor, (C) jointly agree with Berry regarding the terms of any equity interest in the Project or any Project Company to be received by the Operator and each Industry Investor, (D) cooperate with Berry in exercising special caution to ensure that, if such Operator or Industry Investor operates, has any equity interest in, or otherwise has any other potentially competitive relationship with a port or refining facility within a radius of 750 miles of Harbor Island, Texas (the "Non-Compete Zone"), special contractual provisions would be instituted on terms to be agreed by Berry to ensure that such Operator or Industry Investor would not divert business opportunities from the Project or otherwise favor its other equity investments or competitive relationships, and (E) disclose any material direct or indirect equity relationships or contractual relationships Carlyle may have with any such potential Operator or Industry Investor;

l. Obligation for none of Carlyle or any of its affiliated entities or individuals (each, a "Carlyle Affiliate") to, directly or indirectly (A) solicit, provide information to, or otherwise pursue a Directly Competing Project (as defined in the Term Sheet), or (B) make, accept, or negotiate any offer with any operational, development, investment, financing, or other party other than Berry in respect of

7

any Directly Competing Project, without Berry's express written consent;

m. Obligation for Carlyle and each Carlyle Affiliate to refrain from providing information to or assisting any Carlyle Affiliate to directly or indirectly finance or invest in a Directly Competing Project; and

n. Obligation, in the event that Closing did not occur on or before the FID Date, for Carlyle and each Carlyle Affiliate to refrain from (i) directly or indirectly financing or investing in a Directly Competing Project, or (ii) providing information to or assisting any Carlyle Affiliate to directly or indirectly finance or invest in a Directly Competing Project until the earliest of (A) the substantial completion of the Project, (B) the abandonment or suspension of the Project by Berry, and (C) the date that is two years after the FID Date.

20. Defendants fraudulently induced Plaintiffs to enter into the Term Sheet agreement with no intention of honoring their obligations under the Term Sheet agreement

21. Defendants fraudulently induced Plaintiffs to enter into an exclusive relationship with Defendants relating to the Project with no intention of honoring their obligations under that relationship.

22. Defendants' true intention at the time they entered into the Term Sheet agreement with Plaintiffs was actually never to honor their obligations under the executed written Term Sheet agreement, but rather to delay the Project, reduce the Project's value, and "re-trade" the deal with Plaintiffs to enrich the Defendants and cause harm to the Plaintiffs.

23. Defendants fraudulently misrepresented to various third parties that Defendants wholly owned Plaintiff LSP and the Project. Defendants knew these representations were false. Defendants made the misrepresentations with the intent to interfere with Plaintiffs' contracts and prospective business relationships.

8

24. Defendants concealed from or failed to disclose to Plaintiffs various acts that Defendants caused to occur on behalf of LSP, including without limitation business transactions, negotiations with potential contract parties, and communications with and instructions to employees and contractors. Defendants had a fiduciary duty to disclose these acts to Plaintiffs. The acts were material. Defendants knew that Plaintiffs were ignorant of such acts, and Plaintiffs did not have an equal opportunity to discover the existence of such acts. Defendants were deliberately silent when they had a duty to speak. By failing to disclose the existence of the acts, Defendants intended to deceive Plaintiffs and prevent Plaintiffs from effectively exercising their rights and protecting their interests. Plaintiffs were injured as a result of acting or failing to act without the knowledge of the existence of such acts.

25. Defendants fraudulently caused and attempted to cause third parties to contract with Defendants or third parties instead of with Plaintiffs and their Affiliates. Defendants' tortious interference with Plaintiffs prospective and potential business relationships caused Plaintiffs' injuries.

26. Defendants made material misrepresentations to Plaintiffs regarding the Plaintiffs' representatives and their motives. Defendants knew the representations were false. Defendants made the misrepresentations with the intent of alienating Plaintiffs from their representatives, depriving Plaintiffs of their right to effective representation, and causing Plaintiffs to act on such misrepresentations.

27. Defendants provided journalists and other media sources with false and misleading information that falsely and unlawfully inflated the value of the Project and induced such journalists and media sources to publish false news stories, which resulted in

9

such journalists and media sources making material misrepresentations to third parties. The misrepresentations caused third parties who may have otherwise entered into contractual relationships with the Defendants to forego entering into negotiation or further negotiations with Defendants. Defendants knew and subsequently bragged that the representations were false. Defendants made the misrepresentations with the intent that third parties act on them. Plaintiffs were unaware of such misrepresentations and the creation of "fake news"

28. Defendants fraudulently included and attempted to include provisions in contracts between Plaintiffs and third parties that were for the benefit of Defendants and to the detriment of Plaintiffs.

29. Defendants fraudulently included and attempted to include provisions in contracts between Plaintiffs and third parties that required or would have required Defendants to be owners of LSP for such contracts to be valid or provide contractual benefits to Plaintiffs. Defendants knew these inclusions and attempts were fraudulent. Defendants made these inclusions and attempts with the intent that third parties act on them. Plaintiffs were unaware of such inclusions and attempts. The inclusions and attempts caused Plaintiffs' injuries.

30. Defendants deliberately caused and attempted to prevent various transactions and potential transactions between Plaintiffs and third parties from being realized, to the detriment of Plaintiffs.

31. Defendants deliberately engaged in various fraudulent actions and attempts to cause the values of the Project, Plaintiffs' contributions to the Project, the "Berry Pre-Money Equity Contribution", the "Berry Equity Contribution", and the "Berry Percentage", (as defined in the Term Sheet), to be artificially and unlawfully depressed in

10

spite of the Defendants' earlier contractual agreement to such values in the Term Sheet. Defendants knew these acts and attempts were fraudulent. Defendants performed these acts and attempts to defraud the Plaintiffs and fraudulently enrich Defendants, and also with the intent that third parties act on them.

32. Defendants deliberately engaged in various fraudulent actions and attempts to cause the values of various assets to be contributed to the Project by Plaintiffs to be artificially depressed. Defendants knew these acts and attempts were fraudulent. Defendants performed these acts and attempts to defraud the Plaintiffs and fraudulently enrich Defendants.

33. Defendants made fraudulent misrepresentations to cause Plaintiffs to extend the period of effectiveness and exclusivity of the Term Sheet agreement. Defendants' fraudulent misrepresentations were successful and Plaintiffs extended the period of effectiveness and exclusivity of the Term Sheet agreement.

## VI. CAUSES OF ACTION

### A. BREACH OF CONTRACT

34. Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

35. The failure of Defendants to perform their obligations under the Term Sheet constitutes a breach of contract with Plaintiffs. Plaintiffs have a valid and enforceable contract with Defendants. Plaintiffs are proper parties to sue for breach of contract.

11

Plaintiffs performed under the contract. Defendants have breached and continue to breach the contract with Plaintiffs. Plaintiffs have suffered and will continue to suffer damages.

36.     Defendants' acts have been the producing and proximate causes of Plaintiff's damages in excess of the minimum jurisdictional limits of this court.

**B.     TORTIOUS INTERFERENCE WITH CONTRACT (THE CARLYLE GROUP, LP ONLY)**

37.     Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

38.     Defendant The Carlyle Group, LP willfully and intentionally interfered with the rights of the Plaintiffs under the Term Sheet. The interference proximately caused Plaintiffs' injuries, and Plaintiffs incurred actual damage or loss.

**C.     TORTIOUS INTERFERENCE WITH CONTRACTS (AGAINST ALL DEFENDANTS)**

39.     Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

40.     Plaintiff LSP has existing contracts with one or more third persons. Defendants willfully and intentionally interfered with those contracts. The interference proximately caused Lone Star Ports, LLC's injuries. LSP suffered actual damage or loss.

**D.     TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONSHIPS**

41.     Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

42.     There was a reasonable probability that Plaintiffs would have entered into additional business relationships with numerous other third persons. Each of the Defendants intentionally interfered with those prospective relationships. The conduct of each of the Defendants was independently tortious or unlawful. The interference proximately caused Plaintiffs' injuries. Plaintiffs suffered actual damage or loss.

12

**E.  FRAUD**

43.  Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

44.  Defendants made material misrepresentations to Plaintiffs. Defendants knew the representations were false or made them recklessly, as a positive assertion and without knowledge of their truth. Defendants made the misrepresentations with the intent that Plaintiffs act on them. Plaintiffs relied on the misrepresentations to their detriment. The misrepresentations caused Plaintiffs' injuries.

45.  Defendants concealed from or failed to disclose certain facts to Plaintiffs. Defendants had a duty to disclose the facts to Plaintiffs. The facts were material. Defendants knew that Plaintiffs were ignorant of the facts, and Plaintiffs did not have an equal opportunity to discover the facts. Defendants were deliberately silent when they had a duty to speak. By failing to disclose the facts, Defendants intended to induce Plaintiffs to take some action or refrain from acting. Plaintiffs relied on Defendants' nondisclosures. Plaintiffs were injured as a result of acting without the knowledge of the undisclosed facts.

46.  Defendants misrepresented facts to third parties. The facts were material. Defendants knew that the third parties were ignorant of the facts. Defendants had a duty to disclose to Plaintiffs that they were making material misrepresentations in the market.  By making these misrepresentations, Defendants intended to reduce Plaintiffs value in the Project Plaintiffs were injured as a result of Defendants failure to disclose this information to Plaintiffs.

**F.  BREACH OF FIDUCIARY DUTY**

47.  Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

13

48.     Plaintiffs and Defendants had a fiduciary relationship. Defendants breached their fiduciary duties to the Plaintiffs, resulting in injury to Plaintiffs or benefits to Defendants.

49.     Defendants concealed from or failed to disclose certain facts to Plaintiffs. Defendants had a fiduciary duty to disclose the facts to Plaintiffs. The facts were material. Defendants knew that Plaintiffs were unaware of the facts, and Plaintiffs did not have an equal opportunity to discover the facts.

50.     Defendants were deliberately silent when they had a duty to speak. By failing to disclose the facts, Defendants intended to induce Plaintiffs to take some action or refrain from acting. Plaintiffs relied on Defendants' nondisclosures. Plaintiffs were injured as a result of acting without the knowledge of the undisclosed facts.

51.     Defendants concealed from or failed to disclose to Plaintiffs various acts that Defendants caused to occur on behalf of Plaintiff LSP, including without limitation business transactions, negotiations with potential contract parties, and communications with and instructions to employees and contractors.  Defendants had a fiduciary duty to disclose these acts to Plaintiffs.  The acts were material. Defendants knew that Plaintiffs were ignorant of such acts, and Plaintiffs did not have an equal opportunity to discover the existence of such acts. Defendants were deliberately silent when they had a duty to speak. By failing to disclose the existence of the acts, Defendants intended to deceive Plaintiffs and prevent Plaintiffs from effectively exercising their rights and protecting their interests. Plaintiffs were injured as a result of acting or failing to act without the knowledge of the existence of such acts.

14

52. Defendants engaged in self-dealing to derive personal benefit at the expense of the Plaintiffs, to which Defendants owed fiduciary duties, resulting in injury to Plaintiffs or benefits to Defendants.

53. Defendants, by engaging in illegal market activity, breached their fiduciary duties to Plaintiffs.

## VII. REQUEST FOR DECLARATORY RELIEF

54. Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

55. Plaintiffs request a declaratory judgment that: (i) Plaintiffs own 100% of all membership and other equity interests in the Project, LSP, and each Project Company; and (ii) until the date that is two years after the date of such declaratory judgment neither Carlyle nor any Carlyle Affiliate shall consult for, be employed by, invest in, have any ownership interest in, provide debt, equity, or other financing to, provide information to, or assist in any way any property or project whose principal purpose is the development, acquisition, ownership, or operation of a hydrocarbons marine export terminal or related facilities to directly compete with the Project and is within seventy-five (75) miles of Harbor Island, Nueces County, Texas, including any offshore systems originating within or transversing such radius.

## VIII. SPECIFIC PERFORMANCE

56. Plaintiffs request that each of the Defendants be ordered to fully perform each of its common law and statutory duties and each of its remaining contractual obligations under the Term Sheet, including without limitation the following:

> (A) Taking any and all actions necessary to transfer to Berry the entire holdings of and by Carlyle and each Carlyle Affiliate of membership interests or units, shares, or other equity or other interests, if any, in LSP, Lone Star Ports, LLC, a Texas limited liability company ("LSPT"), all other Project

15

Companies, and the Project, including, without limitation (I) providing to the Plaintiffs a written transfer document memorializing such transfer, (II) changing the registered agent of LSP and each other Project Company to Harvard Business Services (https://www.delawareinc.com/ourservices/change-agent/), with the contact person being named as Tonja Fulghum at Plaintiff LSP, and (III) making any necessary filings with the appropriate government officials in the States of Delaware, Texas and any other relevant jurisdiction to effect such transfers;

(B) Confirming to Plaintiffs in writing that Berry currently owns 100% of all membership interests or units, shares, or other equity interests in the Project, LSP, and each other Project Company;

(C) Providing to Plaintiffs a list of contacts and contact details for all actual and potential investors, shippers, and operators relating to LSP or the Project;

(D) Providing the following written notice to Sean Strawbridge at Port of Corpus Christi Authority, Chris Robblee at Vopak, Susan Fong at Shell Midstream, Guy Freshwater at Glencore, Shannon Flowers at Salt Creek Midstream, Phil Mezey at Epic Midstream, Carlyle's contacts at SAF Group, Phillips 66, Harvest, Plains, and each other entity or individual with which Carlyle has had discussions or contact regarding LSP or the Project, including without limitation all actual and potential investors, shippers, and operators, with copies to LSPE:

"None of Carlyle Investment Management LLC, Carlyle Global Infrastructure Opportunity Fund L.P., or any other member of the Carlyle Group has any remaining involvement with LSP or any of its affiliates or the Harbor Island hydrocarbons export terminal or any of its related facilities (the "Project"). The Berry Group owns 100% of Lone Star Ports, the Project, the Harbor Island terminal, and all entities that are involved in developing and owning the Project. The Berry Group is continuing to develop the Project.";

(E) Confirming to Plaintiffs in writing that Carlyle has taken no action that will or may cause the Project, LSP, LSPT, LSPE, any other Project Company, or any of their respective affiliates to incur any expense, obligation, or liability of any nature, unless such expense, obligation, or liability has been fully disclosed in writing by Carlyle to Berry and accepted or assumed by Berry;

(F) Causing (I) Carlyle, (II) each Carlyle Affiliate, and (III) Andrew Marino, Ferris Hussein, and each officer, director, or employee of, or consultant to, the Project, LSP, LSPT, or any Project Company who has been nominated or appointed by Carlyle or any of its Affiliates, including without limitation

16

Jeremiah Ashcroft, Meredith Sadlowski, Anna-Louise Oliver, and Caleb Powers, to resign as members of the Board of LSP, as Managing Member or Manager of LSP, as Member of LSP, and from all other offices or positions in the Project, LSP, LSPT, and each Project Company, in each case with immediate effect;

(G) Confirming to Plaintiffs in writing that Carlyle will take any and all action to ensure that (I) none of Carlyle or any Carlyle Affiliate (a) has disclosed or made any use of, or (b) in the future will disclose or make any use of any documentation, information, and other matters (collectively, "Berry Information") in connection with or in any way related to (a) Lawrence Berry, Marvin Berry, or Dennis Berry, (b) the Project, LSP, or any Project Company, (c) any predecessors, successors, parent entities, subsidiaries, owners, officers, directors, employees, former employees, representatives, agents, attorneys, and assigns of any such individuals or entities, (d) any entity that directly or indirectly through one or more intermediaries controls, is controlled by, or is under common control with any of such individuals or entities, whether by ownership of voting interests, management policies, contract, or otherwise, (e) any officer, director, shareholder, owner, partner, member, trustee, manager, employee, representative, attorney, or agent of any such individual or entity, (f) any individual or entity who is related to any other such individual to any degree by blood, marriage, or adoption, or (g) any of their respective affiliates and/or businesses (collectively, the "Berry Group"), whether or not such information is strictly confidential or proprietary, for any purpose whatsoever, (II) Carlyle and each Carlyle Affiliate has and will continue to hold all of the Berry Information in the strictest confidence and have not and will not disclose or divulge any part of the Berry Information to any third person without the prior written consent of Berry, on such terms and conditions as Berry considers appropriate, unless such disclosure is absolutely required to be disclosed by a final decision of a relevant court, governmental authority, or stock exchange and Berry is provided with a reasonable opportunity to object to the disclosure of such Berry Information to such court, governmental authority, or stock exchange prior to its disclosure, (III) none of Carlyle or any Carlyle Affiliates will make or solicit any announcement or disclosure regarding any member of the Berry Group without the express prior written consent of Berry, and (IV) none of Carlyle or any Carlyle Affiliates will copy, reproduce, or part with possession of any of the Berry Information;

(H) Confirming to Plaintiffs in writing that none of Carlyle or any Carlyle Affiliate has in the past or will in the future (I) vilify, denigrate, or make any false, negative, critical, or disparaging remarks or statements, implied or expressed, concerning any member of the Berry Group at any time, (II) take

17

any action or do anything that would or could damage the business, reputation, business reputation, or good will of any member of the Berry Group at any time, (III) take any action or do anything that would or could slander or cloud Berry's ownership of or title to LSP, the Project, any Project Company, or any member of the Berry Group at any time, or (IV) do anything that would or could damage the business, reputation, or good will of any member of the Berry Group at any time;

(I) Confirming to Plaintiffs in writing that Carlyle, on behalf of itself and each Carlyle Affiliate, will (I) cooperate with regard to any matters related to Berry, LSP, the Project, and each of their respective Affiliates where its involvement is required after the date of such confirmation, and (II) cooperate fully with Berry, LSP, the Project, and their respective Affiliates and their counsel with respect to any matter (including litigation, investigations, or governmental proceedings) which relates to matters with which Carlyle was involved during its relationship with Berry, the Project, LSP, and their respective Affiliates, in a timely manner on reasonable notice from Berry or LSP;

(J) Confirming to Plaintiffs in writing that, until the date that is two years after the date of such confirmation, neither Carlyle nor any Carlyle Affiliate shall (I) consult for, be employed by, invest in, have any ownership interest in, provide debt, equity, or other financing to, provide information to, or assist in any way any property or project whose principal purpose is the development, acquisition, ownership, or operation of a hydrocarbons marine export terminal to directly compete with the Project and is within seventy-five (75) miles of Harbor Island, Nueces County, Texas, including any offshore systems originating within or transversing such radius, or (II) solicit or hire, on behalf of Carlyle or any Carlyle Affiliate, or any other person the services of any person who is, or within one year preceding or following the date of this letter was, an employee or consultant of any member of the Berry Group;

(K) Transferring to LSP's sole possession and control the Lone Star Ports website (including without limitation all domain, email, email archives, administrator user name and password, passwords, etc.), and the Project virtual data room (including without limitation all master administrator access, passwords, etc.) and directly instructing FTI Consulting, by both registered air mail and by email to Cody McGregor at FTI Consulting, to effect such transfer (1301 McKinney, Suite 3500, Houston, TX 77010 USA; www.fticonsulting.com; cody.mcgregor@fticonsulting.com) immediately, with copies to Plaintiffs;

(L) Transferring to Plaintiffs all legal documents, agreements, contracts, letters of intent, memoranda of understanding, term sheets, confidentiality or non-disclosure agreements, communications, etc., that have been completed to date or are pending and relate in any way to the Project, LSP, and each Project Company;

(M) Providing to Plaintiffs a list of professional consultants and contractors that have been appointed in connection with LSP or the Project and any contracts, engagement materials, and communications to, from, or relating to such individuals or entities;

(N) Transferring to Plaintiffs ownership of and control over all bank or other accounts relating to LSP or the Project and providing to Plaintiffs all records relating to such accounts;

(O) Providing to Plaintiffs a written status report regarding commercial activities, including committed and anticipated barrel throughput, for LSP and the Project;

(P) Providing to Plaintiffs a written status report regarding all permits for LSP and the Project;

(Q) Providing to Plaintiffs all outstanding invoices and accounts payable for LSP and the Project, it being understood that pursuant to the Term Sheet no member of the Berry Group has any obligation to reimburse or pay any costs or expenses that have been incurred by Carlyle or any Carlyle Affiliate, whether ostensibly on behalf of LSP or otherwise, unless Berry has specifically agreed to reimburse or pay such costs or expenses; and

(R) Providing to LSPE all documents, records, work product, and Information relating in any manner to the Project, LSP, and all Project Companies.


## IX. **DAMAGES**

57.     Plaintiffs are entitled to actual damages and special damages, including but not limited to lost profits and lost business and investment opportunities.

19

58. Plaintiffs are entitled to exemplary damages because Defendants' conduct constituted gross negligence, malice, or fraud.

## X. ATTORNEYS' FEES

59. Plaintiffs are entitled to reasonable and necessary attorneys' fees pursuant to Tex. Civ. Prac. & Rem. Code Ch. 37.

## XI. CONDITIONS PRECEDENT

60. All conditions precedent to bringing the above causes of action have been met or occurred.

## XII. ALTERNATIVE PLEADING

61. The foregoing facts and theories are pled cumulatively and alternatively, with no election or waiver of rights or remedies.

## XIII. REQUEST FOR DISCLOSURE

62. Under the Texas Rules of Civil Procedure 194, Plaintiffs hereby request that Defendants disclose, within 50 (fifty) days of service of this request, the information or material described in Texas Rule of Civil Procedure 194.2.

## XIV. JURY DEMAND

63. Plaintiffs requests trial by jury and submits appropriate jury fee.

## XV. PRAYER

Plaintiffs prays that Defendants be cited to appear, for these reasons and that Plaintiffs have judgment against Defendants for all relief requested and for such other and further relief, general and special, at law or in equity, to which Plaintiffs are entitled.

Respectfully submitted,

**BUTCH BOYD LAW FIRM**

_____

ERNEST W. ("BUTCH") BOYD
State Bar No. 00783694
butchboyd@butchboydlawfirm.com
JEREMY R. STONE
State Bar No. 24013577
jeremystone@butchboydlawfirm.com
2905 Sackett Street
Houston, Texas 77098
Phone: (713) 589-8477
Fax: (713) 589-8563

**SMYSER KAPLAN & VESELKA, L.L.P.**

Justin M. Waggoner
jwaggoner@skv.com
State Bar No. 24003122
Garland "Land" Murphy
State Bar No. 24058010
lmurphy@skv.com
717 Texas, Suite 2800
Houston, TX 77002
Telephone: (713) 221-2300
Facsimile:  (713) 221-2320

**MEHAFFYWEBER, P.C.**

COREY J. SEEL
State Bar No. 24037465
CoreySeel@mehaffyweber.com
One Allen Center
500 Dallas Street, Ste 1200
Houston, TX 77002
Tel. No. (713) 655-1200
Fax.: (713) 655-0222

**ATTORNEYS FOR PLAINTIFFS**

21

# EXHIBIT 44

## ORCA ASSETS GP, LLC ORGANIZATIONAL MEETING

On the 18th day of May, 2010, the undersigned, being the duly named Manager of Orca Assets GP, LLC ("Company") and in accordance with the proposed Operating Agreement ("Agreement"), immediately following the meeting of the Members of Orca Assets GP, LLC, held the Organizational Meeting of the Company during which time the following matters were approved:

1.      The Operating Agreement as proposed is accepted and execution thereof is hereby authorized.

2.      The Articles of Organization of the Company are approved and accepted.

3.      The Company accepts the resignation of Charles A. Vanaman as its Manager and hereby appoints A. L. Berry as its Manager

4.      The Company establishes the following offices to carry on its day to day business and activities, with such authority as is granted herein or in the Operating Agreement:
    i. President
    ii. Vice President, Land shall have the authority to negotiate all acquisition of real property interests, subject to the final approval of the President. Vice President, Land shall have no authority to execute documents on behalf of the Company, except upon the express authorization of the President. If the authorization is verbal, then it must subsequently be ratified in writing by the President.
    iii. Vice President, Geology shall have the authority to investigate from a geological view, all real property interest prospects which the Company considers for acquisition.
    iv. Secretary
    v. Assistant Secretary
    vi. Treasurer
    vii. Assistant Treasurer

5.      The following persons are hereby appointed as officers to fill such positions until the first meeting of Managers following the annual meeting of the Members, or until his/her successor is chosen and qualified:
    i.      President – A. Lawrence Berry
    ii.     Vice President, Land – John Ellis

|      |                                                        |
| ---- | ------------------------------------------------------ |
| iii. | Vice President, Geology – Eric Yerkovich               |
| iv.  | Secretary- Tonja Fulghum.                              |
| v.   | Assistant Secretary – as appointed by the Secretary   |
| vi.  | Treasurer – Tonja Fulghum                             |
| vii. | Assistant Treasurer – as appointed by the Treasurer   |

6. The secretary submitted to the meeting a specimen Membership Interest Certificate proposed for use as the Company's Certificate for Membership Interest, the form and substance of which is accepted.

7. The secretary submitted to the meeting a record book containing a copy of the Articles of Organization, the Certificate of Organization, the Operating Agreement, the Membership Interest Certificate stubs, and the Membership Interest transfer ledger, the form and substance of which is accepted.

8. Membership Interests in the Company are hereby granted to Allen Lawrence Berry 2007 Trust – 100%.

9. Adequate consideration has been received for the issuance of the Membership Interests. Consequently, the Company is authorized to commence and transact business and to incur indebtedness in Texas and all other states and jurisdictions.

10. The president or vice president of the Company is hereby authorized to pay all charges and expenses incident to or arising out of the organization of and to reimburse any person who has made any disbursement therefore.

11. The president or vice president of the Company is authorized to open a bank account on behalf of the Company with any banks.

12. The officers of the Company are directed to obtain in the name of the Company such authorizations, permits, and licenses as may be required in order to conduct the Company's business in Texas, elsewhere in the United States of America, and any foreign country where business opportunities may exist.

13. The officers of the Company are hereby authorized to appoint and substitute all necessary agents or attorneys for service of process, to designate and change the location of all necessary statutory offices, and to make and file all necessary certificates, reports, powers of attorney, and other instruments as may be required by the laws of such state, territory, dependency, or country to authorize the Company to transact business therein.

14. The fiscal year of the Company shall be the calendar year ending December 31st, subject to change, as appropriate, at the discretion of the Managers.

15. The signing of these minutes shall constitute full consent, confirmation, ratification, adoption, and approval of the holding of the above meeting; the actions hereby taken, the decisions hereby adopted, and waiver of notice of the meeting by the signatories

16. There being no further business, the Organizational Meeting of the Managers of the Company was adjourned.

Signed, executed and effective this 18th day of May, 2010.

Charles A. Vanaman, Manager

# OPERATING AGREEMENT
## OF
## ORCA ASSETS GP, LLC

## I.
## COMPANY NAME AND PURPOSE

1.01 <u>Definition</u>. The company is a domestic limited liability company as that term is defined and regulated by the Texas Limited Liability Company Act.

1.02 <u>Purpose</u>. The company's purpose is to carry on all legal business as allowed by law.

1.03 <u>Name in This Agreement</u>. This limited liability company is referred to in this Agreement as the "Company".

## II.
## MANAGERS

2.01 <u>Management</u>. The Limited Liability Company shall be managed by a Manager or Managers. Managers are not required to be residents of Texas, nor are they required to be Members of the Company.

2.02 <u>Number</u>. There shall be one (1) Manager. The number of initial Managers shall be stated in the Articles of Organization, thereafter, the number of Managers shall be as stated in this Agreement. A majority of the Managers, voting in their capacity as Managers, may alter the number of Managers.

2.03 <u>Classification</u>. The Managers are not divided into classes.

2.04 <u>Manager's Powers</u>. Every Manager is an agent of this Company, and subject to any limitations established in Section 4.11 by the therein described Steering Committee, has the following powers:

    a.    A Manager is authorized to sign any instrument required for accomplishing the Company's business.

    b.    The Company shall be bound by the Manager's actions unless the Manager so acting otherwise lacks the authority to act for the Company and the person with whom the Manager is dealing has knowledge of the fact that the Manager has no such authority or limited authority.

    c.    No transaction between this Company and one or more of its Managers or officers, and any other person(s) or entity is void or voidable solely because of any of the following reasons:

        1.    One or more Managers or officers have a financial interest the transaction; or

        2.    The Manager or officer was present at or participated in the meeting of Managers or of the committee that authorized the contract or transaction.

d.   If a Manager or Member transacts business on behalf of the Company as stated in paragraphs 1 and 2 above, and he or she enters into a contract or transaction that is not fair to the Company, the Company shall have an action against said Member for any damages the Company may suffer. The Member or Manager's interest in this Company shall then be available for sale as provided in these regulations for transfer of stock certificates as security for the aforesaid damages.

e.   If the Company deems the transaction beneficial to itself, then the same may be authorized, approved, or ratified by two-thirds vote of the Members entitled to vote.

f.   This provision shall not be construed to invalidate any contract or transaction which would be valid in the absence of this provision.

## III.
## ELECTION OF MANAGERS

3.01   Majority Vote Required.  Managers are elected by a majority vote of the Members of the Company.

3.02   Cumulative Voting.  Cumulative voting is not permitted.

3.03   Time of Election.  Election of Managers shall occur at any of the following times:
a.   The annual meeting;
b.   Regular meetings of the Members; or
c.   Any special meeting of the Members.

3.04   Term.  The term of each Manager shall be two (2) years from the date of appointment or election, and until such time as his replacement shall be elected and shall have qualified.

## IV.
## MANAGER'S MEETINGS, COMPENSATION AND COMMITTEES

4.01   Place of Meeting.  Managers' Meetings, regular or special, may be held either in or outside the State of Texas.

4.02   Presence at Meeting.  Managers may attend and participate in these meetings in person or by use of electronic tele- or video conferencing equipment.

4.03   Notice of First Meeting.  The first meeting of the newly elected Managers shall be held without further notice immediately following the annual meeting of Members.
a.   The meeting shall be held at the same place as the annual meeting, unless by unanimous consent of the Managers then elected and serving, such time or place shall be changed.

4.04   Regular Meetings.  A regular meeting of the Managers may be held at such time as shall be determined from time to time by resolution of the Managers.

4.05 Special Meetings. The Secretary shall call a special meeting of the Managers whenever requested to do so by the President or by any Manager.

    a. Such meeting shall be held at the time stated in the notice of meeting.

    b. The purpose, place and time of the meeting shall be stated in a notice.

4.06 Required Notice. All meetings of the Managers (annual, regular or special) shall be held upon five days' written notice stating the date, time, place and purpose of the meeting.

    a. The notice shall be delivered to each Manager either personally or by mail or at the direction of the President or the Secretary or the officer or person calling the meeting.

    b. If all of the Managers execute a waiver of notice of the meeting, no notice is required. Accordingly the meeting (whether annual, regular or special) shall be held at the time and at the place (either within or without the State of Texas) stated in the waiver of notice.

    c. Attendance of Managers at any meeting shall constitute a waiver of notice of such meeting, except where the Managers attend a meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

4.07 Consent without Meeting. Any action required by statute to be taken at a meeting of the Managers, or any action which may be taken at a meeting of the Managers, may be taken without a meeting if a consent in writing, setting forth the action so taken, shall be signed by all the Managers.

    a. All consents shall have the same force and effect as a unanimous vote at a meeting.

4.08 Quorum. A majority of the Managers constitutes a quorum for the transaction of business at all meetings of the Managers unless a greater number is required by law or by the Articles of Organization.

    a. The act of a majority of the Managers present at any meeting at which a quorum is present shall be the act of the Managers unless the act of a greater number is required by statute, by the Articles of Organization or by these Regulations.

    b. If there is no quorum at a meeting of the Managers, then the meeting shall adjourn and a new notice be sent for a new meeting. If there is no quorum present at the successor meeting, then a majority of those present shall constitute a quorum, unless this action is prohibited by law.

4.09 Minutes. The Managers shall keep regular minutes of its proceedings and shall place those minutes in the Company's minute book.

4.10 Expenses. Managers shall be paid their expenses, if any, for attendance at each Manager's meeting.

    a. Managers may be paid a fixed sum for attendance at each Manager's meeting or they may receive a stated salary as Manager.

b. Members of any special or standing committees may, by resolution of the Managers, be allowed like compensation for attending committee meetings.

4.11 Committees. The Managers may designate from among the Managers one or more committees, each of which shall be comprised of one or more of its Managers. Any such committee, to the extent provided in such resolution or the Articles of Organization or by these Regulations, shall have and may exercise, to the exclusion of the Managers, all of the authority of the Managers in the management of the business and affairs of the Company, subject to the limitations set forth in the Texas Limited Liability Company Act, and all amendments thereto. Each such committee shall keep regular minutes of its proceedings and report the same to the Managers when required. Any members of any such committee may be removed by the Managers by the affirmative vote of a majority of the Managers, whenever in their judgment the best interests of the Company will be served thereby. The designation of one or more committees and the delegation of authority to any such committee shall not operate to relieve the Managers of any responsibility imposed upon them by law.

V.
MANAGER'S RESIGNATIONS, VACANCIES AND REMOVAL

5.01 Resignation. Any Manager may resign at any time.
   a. Such resignation shall be made in writing and shall take effect at the time stated in the resignation.
   b. If the resignation does not state the time that the resignation becomes effective, then the resignation shall be effective at the date and time when it is delivered to the Company.

5.02 Vacancy. Any vacancy occurring in the Managers may be filled by the affirmative vote of a majority of the remaining Managers.
   a. A Manager elected to fill a vacancy shall be elected for the unexpired term of his or her predecessor in office.
   b. Any Manager's position filled by reason of an increase in the number of Managers shall be filled by election at an annual meeting or at a special meeting of Members called for that purpose.

5.03 Removal. Any and all Managers may be removed, either for or without cause, at any special meeting of Members by the affirmative vote of a majority of the membership interest entitled to vote.
   a. Notice of the date, time, place and purpose of the meeting shall be given to both the Members and the Managers.
   b. The vacancy caused by such removal may be filled at such meeting by a majority vote of the membership interest represented at the meeting and entitled to vote for the election of Managers.

# VI.
## MEMBERS

6.01   Becoming a Member. A person acquiring an interest as a Member becomes a Member on the date he or she receives a stock certificate evidencing membership in the Company.

6.02   Initial Members. The initial Member shall consist of Allen Lawrence Berry 2007 Trust. All other Members shall be designated as new Members.

6.03   Capacity. Any person may be a Member unless the person lacks capacity apart from the Texas Limited Liability Company Act, as amended from time to time.

6.04   Classes or Groups of Members. Unless prohibited by law or the Articles of Organization, one class is established.

6.05   Place and Manner of Meetings. All meetings of the Members shall be held at such time and place, within or out of the State of Texas, as shall be stated in the notice of the meeting or in a duly executed waiver of notice thereof.
    a.   Members may participate in such meetings by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other, and participation in a meeting as provided herein shall constitute presence in person at such meeting except where a person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

6.06   Annual Meeting. The annual meeting of the Members for the election of Managers and for the transaction of all other business which may come before the meeting shall be held on April 1st of each year at the hour specified in the notice of the meeting.
    a.   If the annual meeting is not held on the date above specified, or if the election of Managers shall not be held on that date, the Managers shall cause a special meeting of the Members in lieu thereof to be held as soon thereafter as convenient, and any business transacted or election held at that meeting shall be as valid as if held at the annual meeting.
    b.   Failure to hold the annual meeting at the designated time shall not work a dissolution of the Limited Liability Company.

6.05   Voting Lists. The officer or agent having charge of the records reflecting the membership interest of each Member at least ten (10) days before each meeting of Members, a complete list of the Members, entitled to vote at such meeting or any adjournment thereof.
    a.   The list shall be arranged in alphabetical order with the address of and percentage of membership interest of each Member.
    b.   The list shall be kept on file at the registered office of the Company and shall be subject to inspection by any Member at any time during usual business hours.

c. Such list shall also be produced and kept open at the time and place of the meeting and shall be subject to the inspection of any Member during the whole time of the meeting.

d. The original records reflecting the membership interest of each Member shall be prima-facie evidence as to which Members are entitled to examine such list or records or to vote any meeting of Members.

e. Failure to comply with the requirements of this Article shall not affect the validity of any action taken at such meeting.

6.06 **Special Meetings.** Special meetings of the Members may be called at any time by the President or the Managers.

a. Special meetings of Members may also be called by the Secretary upon the written request of the holders of at least ten percent of the membership interest entitled to be voted at such meeting.

b. The request shall state the purpose or purposes of such meeting and the matters proposed to be acted on.

6.07 **Notice.** Written or printed notice stating the place, day, time and purpose of the meeting shall be delivered not less than ten nor more than sixty days before the date of the meeting either personally or by mail, by or at the direction of the President, the Secretary or the officer or person calling the meeting, to each Member entitled to vote at the meeting.

a. This notice may be waived as provided in these Regulations.

b. If the notice is mailed, such notice shall be deemed to be delivered when deposited in the United States mail addressed to the Member at his or her address as it appears on the records of the Limited Liability Company, with postage thereon prepaid.

c. Any notice required to be given to any Member hereunder or under the Articles of Organization need not be given to the Member if:

1. Notice of three consecutive annual meetings of the Company and all notices of meetings held during the period between those annual meetings have been mailed to that person, addressed at his or her address as shown on the records of the Company, and have been returned undeliverable.

2. Any action or meeting taken or held without notice to such person shall have the same force and effect as if the notice had been duly given.

6.08 **Quorum of Members.** The holders of a majority of the membership interest entitled to vote, represented in person or by proxy, shall constitute a quorum at a meeting of Members.

a. In no event shall a quorum consist of the holders of less than 1/3 of the membership interest entitled to vote for each class, if more than one class, and thus represented at such meeting.

b. The vote of the holders of a majority of the membership interest entitled to vote for each class, if more than one class, and thus represented at a meeting at which a quorum is present shall be the act of the Members' meeting, unless the vote of a

greater number is required by law, the Articles of Organization or these Regulations.

6.09 <u>Majority Vote If No Quorum</u>. When a quorum is present at any meeting, the vote of the holders of a majority of the membership interest, present in person or represented by proxy, having voting power with respect to that matter, shall decide such matter brought before such meeting.

a. If a matter requires a greater number due to an express provision of the Articles of Organization, these Regulations, or by any law which is applicable to such vote, then the mandatory number shall control the matter.

6.10 <u>Voting of Membership Interest</u>. Each outstanding membership interest, regardless of class, shall be entitled to vote the percentage of membership interest owned by him or her on each matter submitted to a vote at a meeting of Members, except to the extent that the voting rights of the membership interest of any class or classes are limited or denied by the Articles of Organization or by law.

6.11 <u>Proxy Voting</u>. A Member may vote either in person or by proxy executed in writing by the Member or by his or her duly authorized attorney in fact.

a. No proxy shall be valid after eleven months from the date of its execution unless otherwise provided in the proxy.

b. Each proxy is revocable unless the proxy form conspicuously states that the proxy is irrevocable and the proxy is coupled with an interest.

c. At each election for Managers, every Member entitled to vote at such election is entitled to vote, in person or by proxy, the percentage of membership interest owned by him or her for as many persons as there are Managers to be elected and for whose election he or she has a right to vote.

6.12 <u>Closing Record Books and Fixing Record Date</u>. For the purpose of determining Members entitled to notice of or to vote at any meeting of Members, the Managers may provide that the record books shall be closed for a stated period not exceeding thirty days.

a. If the record books are closed for the purpose of determining Members entitled to notice of or to vote at a meeting of Members, such books shall be closed for at least ten days immediately preceding such meeting.

b. In lieu of closing the record books, these Regulations or in the absence of an applicable Regulation, the Managers may fix in advance a date as the record date for any such determination of Members, such date in any case to be not more than thirty days and in the case of a meeting of Members, not less than ten days prior to the date of which the particular action requiring such determination of Members is to be taken.

c. If the record books are not closed and no record date is fixed for the determination of Members entitled to notice of or to vote at a meeting of Members, or Members entitled to receive distribution, the date on which notice of the meeting is mailed or the date on which the resolution of the Managers declaring such distribution is adopted, as the case may be, shall be the record date for such determination of Members.

d.    When a determination of Members entitled to vote at any meeting of Members has been made as provided in this section, such determination applies to any adjournment thereof, except where the determination has been made through the closing of record books and the stated period of closing has expired.

6.13    Fixing Record Dates for Consents to Action. Unless a record date has been previously fixed or determined in these regulations, whenever action by Members is proposed to be taken by consent in writing without a meeting of Members, the Managers may fix a record date for purposes of determining Members entitled to consent to that action.

a.    This record date may not precede, and may not be more than ten days after, the date upon which the resolution fixing the record date is adopted by the Managers.

b.    If no record date has been fixed by the Managers and the prior action of the Managers is not required by the Texas Limited Liability Company Act, and any amendments thereto, the record date for determining Members entitled to consent to action in writing without a meeting shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Company by delivery to its registered office, its principal place of business, or an officer of the Company having custody of the books in which proceedings of meetings of Members are recorded.

c.    Delivery shall be by hand or by certified or registered mail, return receipt requested. Delivery to the Company's principal place of business shall be addressed to the President or the principal executive officer of Company.

d.    If no record date has been fixed by the Managers and prior action of the Managers is required by the statute, the record date for determining Members entitled to consent to action in writing without a meeting shall be at the close of business on the date on which the Managers adopt a resolution taking such prior action.

6.14    Action Without Meeting. Any action which is required to be taken at a meeting of the Members by law or by the Texas Limited Liability Company Act, may be taken by signing a consent to the action in lieu of attending the meeting.

a.    Every written consent pursuant to this Section shall be signed, dated and delivered to the Company's administrative offices.

VII.
ASSIGNMENT OF A MEMBERSHIP INTEREST

7.01    Assignability. A membership interest is assignable in whole or in part.

a.    An assignment of a membership interest does not entitle the assignee to become, or to exercise rights or powers of, a Member.

b.    An assignment entitles the assignee to receive distributions, to which the assignor was entitled, to the extent those items are assigned.

c.    Until the assignee becomes a Member, the assignor Member continues to be a Member and to have the power to exercise any rights or powers of a Member, except to the extent those rights or powers are assigned.

7.02 <u>Evidence of Membership Interest</u>. A Member's membership interest may be evidenced by a certificate of membership interest issued by this Company.

7.03 <u>Right of an Assignee to Become a Member</u>.
   a. An assignee of a membership interest may become a Member if and to the extent that all Members consent.
   b. It is the intent of these Regulations that the tax status of this Company be the same as for a partnership.
   c. Except as allowed by the Internal Revenue Code and any corresponding rules and regulations, it is intended that this Company shall not allow free transferability of interests, and to the extent possible, these Regulations shall be read and interpreted to prohibit the free transferability of interests of any Member.
   d. An assignee who becomes a Member has, to the extent assigned, the rights and powers and is subject to the restrictions and liabilities of a Member under these Regulations and the Texas Limited Liability Company Act, as amended from time to time.
   e. Unless otherwise provided by these Regulations, an assignee who becomes a Member also is liable for the obligations of the assignor to make contributions but is not obligated for liabilities unknown to the assignee at the time the assignee became a Member and which could not be ascertained from these Regulations.
   f. Whether or not an assignee of a membership interest becomes a Member, the assignor is not released from the assignor's liability to this Company.

## VIII.
## DEATH, RESIGNATIONS, EXPULSION, BANKRUPTCY OR DISSOLUTION OF A MEMBER

8.01 <u>Resignation of a Member</u>. Any Member may resign at any time.
   a. Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time is specified, then at the time of its receipt by the President or Chairperson.
   b. The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation.
   c. Any Member may be expulsed from this Company by an affirmative vote of at least two-thirds of the Members of each class or group to which the Member belongs at any annual or special meeting of the Members.

## IX.
## TAXATION

9.01 <u>Tax Status</u>. It is the intent of these Regulations that the tax status of this Company be the same as for a partnership, and except as allowed by the Internal Revenue Code and any corresponding rules and regulations.
   a. It is intended that this Company shall not have continuity of life and these regulations shall be read and interpreted as to prohibit continuity of life.

# X.
## CAPITAL ACCOUNTS OF THE MEMBERS

10.01 Establishment of Account. A capital account will be established for each Member and maintained in such a manner to correspond with the capital of the Members as reported for federal income tax purposes.

    a.    Each Member's capital account shall be credited with the value of a Member's contribution of cash or other property to the Company, and shall be credited or charged annually with the Member's distributive share of items of income, gain, loss, deduction and credit for federal income tax purposes.

    b.    Distributions of cash or other property to Members shall be charged against their respective capital accounts as withdrawal of capital.

    c.    The federal income tax basis of a Member's interest in the Company, of property contributed to the Company by a Member, and all other matters pertaining to the distributive share and taxation of items of income, gain, loss, deduction and credit will be as otherwise prescribed by Subchapter K of the Internal Revenue Code. The capital accounts will not bear interest.

# XI.
## CERTIFICATES AND MEMBERS

11.01 Certificates. Certificates in the form determined by the Managers shall be delivered representing all membership interest to which Members are entitled. Such certificates shall be consecutively numbered, and shall be entered in the books of the Company as they are issued. Each certificate shall state on the face thereof the holder's name, the class of membership, the membership interest, and such other matters as may be required by the laws of the State of Texas. They shall be signed by an officer of the Company, and may be sealed with the seal of the Company or a facsimile thereof if adopted. The signature of such officer upon the certificates may be facsimile.

11.02 Replacement of Lost or Destroyed Certificates. The Managers may direct a new certificate or certificates to be issued in place of any certificate or certificates previously issued by the Company alleged to have been lost or destroyed, upon the making of an affidavit of that fact by the holder of record thereof, or his or her duly authorized attorney or legal representative who is claiming the certificate to be lost or destroyed. When authorizing such issue of a new certificate or certificates, the Managers in their discretion and as a condition precedent to the issuance thereof, may require the owner of such lost or destroyed certificate or certificates or his or her legal representative to advertise the same in such a manner as it shall require or to give the Company a bond with surety and in form satisfactory to the Company (which bond shall also name the Company's transfer agents and registrars, if any, as obligees) in such sum as it may direct as indemnity against any claim that may be made against the Company or other obligees with respect to the certificate alleged to have been lost or destroyed, or to both advertise and also give such bond.

11.03  Transfer of Membership Interest.  Upon surrender to the Company or the transfer agent of the Company of a certificate for membership interest duly endorsed or accompanied by proper evidence of succession, assignment or authority to transfer, the Company shall issue a new certificate to the person entitled to the certificate, cancel the old certificate and record the transaction upon its books.

11.04  Registered Members.  The Company is entitled to treat the holder of record of any certificate or certificate of membership interest of the Company as the owner thereof for all purposes and shall not be bound to recognize any equitable or other claim to or interest in such membership interest or any rights deriving from such membership interest on the part of any other person, including (but without limitation) a purchaser, assignee or transferee, unless and until such other person becomes the holder of record of such membership interest, whether or not the Company shall have either actual or constructive notice of the interest of such person, except as otherwise provided by law.

11.05  Preemptive Rights.  No Member or any other person has any preemptive right whatsoever.

11.06  Contribution.  A Member's contribution may be in cash, property, or services rendered, or a promissory note or other obligation to pay cash or transfer property to the Company.

11.07  Liability for Contribution Obligations.  A promise by a Member to make a contribution to, or otherwise pay cash or transfer property to, a Company is not enforceable unless set out in writing and signed by the Member. A Member or the Member's representative or successor is obligated to the Company to perform an enforceable promise to make a contribution to or otherwise pay cash or transfer property to the Company, notwithstanding the Member's death, disability, or other change in circumstances. If a Member's legal representative or successor does not make a contribution or other payment of cash or transfer of property required by the enforceable promise, that Member or the Member's legal representative or successor is obligated to pay to the Company the amount owed. The interest of a Member who fails to make a payment of cash or transfer of property to the Company, required by an enforceable promise shall forfeit his or her interest to the Company.

11.08  Restriction upon Ownership and Transfer of Ownership Interest. The membership interest and transferability of membership interest in the Company are substantially restricted. Neither record title nor beneficial ownership of a membership interest may be transferred or encumbered without the consent of the Managers and the consent of at least two-thirds (2/3) of the membership interests of the Members. This Company is formed by a closely-held group who know and trust one another, who will have surrendered certain management rights (in exchange for limited liability) based upon their relationship and trust. Capital is also material to the business and investment objectives of the Company and its federal tax status. An unauthorized transfer of a membership interest could create a substantial hardship to the Company, jeopardize its capital base, and adversely affect its tax structure. These restrictions upon ownership and transfer are not intended as a penalty, but as a method to protect and preserve existing relationships based upon trust

and the Company's capital and its financial ability to continue. The ownership and transfer of a membership interest is further subject to the following disclosure and condition: THE MEMBERSHIP INTEREST OF THE COMPANY HAS NOT NOR WILL BE, REGISTERED OR QUALIFIED UNDER FEDERAL OR STATE SECURITIES LAWS. THE MEMBERSHIP INTEREST OF THE COMPANY MAY NOT BE OFFERED FOR SALE, SOLD, PLEDGED, OR OTHERWISE TRANSFERRED UNLESS SO REGISTERED OR QUALIFIED, OR UNLESS AN EXEMPTION FROM REGISTRATION OR QUALIFICATION EXISTS. THE AVAILABILITY OF ANY EXEMPTION FROM REGISTRATION OR QUALIFICATION MUST BE ESTABLISHED BY AN OPINION OF COUNSEL FOR THE OWNER THEREOF, WHICH OPINION AND COUNSEL MUST BE REASONABLY SATISFACTORY TO THE COMPANY. Notwithstanding the foregoing restrictions upon transfer and ownership the following transfers are permitted.

11.09    Death of a Member.    The personal representative of a deceased Member's estate, or his or her contract beneficiary, may exercise all of the decedent's rights and powers as a Member, and the decedent's membership interest in the Company will continue and pass to those entitled thereto upon the Member's death. It is specifically provided that a Member may prepare a written acknowledged document in which he or she designates one or more beneficiaries of that person's membership interest, and his or her written designation will be binding upon the Company if delivered to the President before or within sixty days after the death of the Member.

11.10    Incapacity of a Member.    The personal representative of an incapacitated Member, acting under a durable power of attorney or Letters of Guardianship, may exercise all of a Member's rights and powers and will be entitled to receive distributions of cash or other property from the Company. Neither the Company nor any officer or Manager will have a duty to inquire as to the application or use of funds delivered to a personal representative.

11.12    Estate Planning Transfers.    A Member will also have the right to make estate-planning transfers of all or any part of his or her membership interest in the Company. The term "estate planning interest" will mean any transfer made during the life of a Member without value, or for less than full consideration by way of a marital partition agreement and/or transfer of all or any part of a membership interest to a trust whose beneficiary or beneficiaries are the Member and/or the spouse of a Member, and/or the descendants of a Member, and/or one or more beneficiaries qualified to receive a charitable gift under Section 170(c) of the Internal Revenue Code. The Articles of Organization and these Regulations bind the transferee of any estate planning transfer to the exact terms and conditions of the Articles of Organization and these Regulations. The Company is not required to recognize the interest of any transferee who has obtained a purported interest as the result of a transfer of ownership which is not an authorized transfer. If the membership interest is in doubt, or if there is reasonable doubt as to who is entitled to a distribution of the income realized from a membership interest, the Company may accumulate the income until this issue is finally determined and resolved. Accumulated

income will be credited to the capital account of the Member whose interest is in question.

11.13 Required Transfers. If any person or agency should acquire the interest of a Member as the result of an order of a court of competent jurisdiction which the Company is required to recognize, or if a Member makes an unauthorized transfer of a membership interest which the Company is required to recognize, the interest of the transferee may then be acquired by the Company upon the following terms and conditions: The Company is entitled to acquire the membership interest by giving written notice to the transferee of its intent to purchase within sixty days from the date it is finally determined that the Company is required to recognize the transfer. The Company will have 120 days from the first day of the month following the month in which it delivers notice exercising its option to purchase the membership interest. The valuation date for the membership interest will be the first day of the month following the month in which notice is delivered. Unless the Company and the transferee agree otherwise, the fair market value of a Member's membership interest is to be determined by the written appraisal of a person or firm qualified to value this type of business. The appraiser selected by the Company must possess the necessary qualifications to perform appraisals of the type contemplated. Neither the transferee of an unauthorized transfer nor the Member causing the transfer will have the right to vote during the prescribed option period, or if the option to purchase is timely exercised, until the sale is actually closed.

## XII.
## OFFICERS

12.01 Number. The officers of the Company shall consist of a President and a Secretary, each of whom shall be elected by the Managers or as may be otherwise set forth herein. Such offices may be held by the same person.

12.02 Election. The Managers, at their first meeting after each annual meeting of Members, shall choose a President and a Secretary. No officers need be a Manager, a Member, or a resident of Texas.

12.03 Other Officers. The Managers may elect or appoint such other officers and agents as they shall deem necessary, who shall be appointed for such terms and shall exercise such powers and perform such duties as shall be determined from time to time by the Managers. Any two or more offices may be held by the same person.

12.04 Term. Each officer of the Company shall hold office until his or her successor is chosen and qualified in his or her stead or until his or her death or until his or her resignation or removal from office.

12.05 Removal. Any officer or agent or Member of a committee elected or appointed by the Managers may be removed by the Managers whenever in their judgment the best interest of the Company will be served thereby, but such removal shall be without prejudice to the contract rights, if any, of the person so removed. Election or appointment of an officer or agent or Member of a committee shall not of itself create contract rights.

12.06  Vacancies.  If any office becomes vacant for any reason, the vacancy may be filled by the Managers. The officer so elected shall be elected for the unexpired term of his or her predecessor in office.

12.07  Compensation. The compensation of all officers and agents shall be fixed by the Managers.

12.08  Powers.  The Managers may designate one or more persons as officers of the Company who are not Managers. Every officer is an agent of the Company for the purpose of its business and the act of an officer, including the execution in the name of the Company of any instrument for apparently carrying on in the usual way the day to day business of the Company, binds the Company unless the officer so acting otherwise lacks the authority to act for the Company and the person with whom the officer is dealing has knowledge of the fact that the officer has no such authority. Each officer shall have, subject to these Regulations, in addition to the duties and powers specifically set forth in these regulations, such powers and duties as are commonly incident to his or her office and such duties and powers as the Managers shall from time to time designate. All officers shall perform their duties subject to the directions and under the supervision of the Managers and/or the Steering Committee. The president may secure the fidelity of any and all officers by bond or otherwise.

12.09  Chairperson.  The Chairperson, if there shall be such an officer, shall, if present, preside at all meetings of the Managers and exercise and perform such other powers and duties as may from time to time be assigned to the Chairperson or prescribed by these Regulations.

12.10  President.  Subject to the supervisory powers, if any, as may be given by the Managers to the Chairperson, if there be such an officer, the President shall be the chief executive officer of the Company, and subject to the control of the Managers, shall, in general, supervise and control all of the business and affairs of the Company. The President shall preside at all meetings of the Members and the Managers in the absence of the Chairperson. The President or any Vice President together with the Secretary or any Assistant Secretary may execute certificates of membership of the Company, any deeds, mortgages, bonds, contract or other instrument, in the name of the Company, which the Managers have authorized to be executed, except in cases where the signing and execution thereof shall be delegated by the Managers or by these Regulations to some other officer or agent of the Company, or shall be required by law to be otherwise signed and executed.

12.11  Vice Presidents.  In the absence or disability of the President, the Vice President shall perform all the duties of the President. If there is more than one Vice President, the Senior Vice President (in order of their rank as fixed by the Managers, or if not ranked, the Vice President designated by the Managers) shall perform all the duties of the President. When so acting such person shall have all the powers of and be subject to all the restrictions upon the President. The Vice Presidents shall have such other powers and

perform such other duties as from time to time may be prescribed for them respectively by the Managers or these Regulations.

12.12 <u>The Secretary and Assistant Secretaries</u>. The Secretary shall attend all meetings of the Managers and all meetings of the Members and shall record all votes and the minutes of all proceedings in a book suitable for that purpose, and shall perform like duties for the standing committees when required. He or she shall give or cause to be given notice of all meetings of the Members and all meetings of the Managers required by these Regulations or law to be given. If for any reason the Secretary shall fail to give notice of any special meeting of the Managers called by one or more of the persons identified in these Regulations, or if he or she shall fail to give notice of any special meeting of the Members called by one or more of the persons identified in these Regulations, then any such person or persons may give notice of any such special meeting. In addition, the Secretary shall execute together with the President all certificates of membership issued by the Company. The Secretary shall also keep a certificate of membership book in which shall be correctly recorded all transactions pertaining to the membership interest of the Company. If in accordance with these Regulations the Company seal is to be affixed to an instrument, the Secretary shall attest with his or her signature after such seal has been affixed by the President in accordance with the Regulations. The Secretary shall keep in safe custody the seal of the Company. The Secretary shall have such other powers and perform such other duties as from time to time may be prescribed by him or her by the Managers or these Regulations. The Assistant Secretaries in order of their seniority shall, in absence or disability of the Secretary, perform the duties and exercise the powers of the Secretary. The Assistant Secretaries shall perform such other duties as the Managers shall prescribe or as provided in these Regulations. In the absence of the Secretary or an Assistant Secretary, the minutes of all meetings of the Managers and Members shall be recorded by such person as shall be designated by the President or by the Managers.

12.13 <u>The Treasurer and Assistant Treasurers</u>. The Treasurer shall have the custody of the Company funds and securities and shall keep full and accurate accounts of receipts and disbursements in books belonging to the Company and shall deposit all moneys and other valuable effects in the name and to the credit of the Company in such depositories as may be designated by the Managers. The Treasurer shall disburse the funds of the Company as may be ordered by the Managers, taking proper vouchers for such disbursements. He or she shall keep and maintain or cause to be kept and maintained, the Company's books of account and shall render to the President and Managers an account of all his or her transactions as Treasurer and of the financial condition of the Company and exhibit his or her books, records and accounts to the President or Managers at any reasonable time. He or she shall disburse funds for capital expenditures as authorized by the Managers and in accordance with the orders of the President, and present to the President for his or her attention any requests for disbursing funds if in the judgment of the Treasurer any such request is not properly authorized. He or she shall make a detailed annual report of the entire business and financial condition of the Company. If required by the Managers, he or she shall give the Company a bond in such sum and with such surety or sureties as shall be satisfactory to the Managers for the faithful performance of the duties of his or

her office and for the restoration to the Company, in case of his or her death, resignation, retirement or removal from office, of all books, papers, vouchers, money and other property of whatever kind in his or her possession or under his or her control belonging to the Company. The Treasurer shall have such other powers and perform such other duties as from time to time may be prescribed for him or her by the Managers or these Regulations.

12.14 Resignations. Any officer may resign at any time. For the resignation to be effective, the officer must resign in writing. The resignation shall take effect at the time specified in the written resignation, or, if no time is specified then at the time of its receipt by the President or Secretary. The acceptance of a resignation is not necessary to make it effective, unless expressly so provided in the resignation.

## XIII.
## OTHER PROVISIONS

13.01 Declaration and Payment. Distributions to the Members may be authorized by the Managers at any regular or special meeting and made by the Company. Distributions may be paid in cash or in property of the Company.

13.02 Fiscal Year. The fiscal year of the Company shall end on December 31, in each and every year.

13.03 Amendments. These Regulations may be altered or repealed at any annual meeting of the Members or at any special meeting of the Members at which a quorum is present or represented. The vote required is a majority of the Members present.

13.04 Offices. The Company's principal office is currently located at 5005 Riverway, Suite 440, Houston, Texas 77056. The Managers are entitled to change the Company's principal office in their discretion.

13.05 Registered Agent and Office. The registered agent and his or her office for the Company shall be as submitted to the Office of the Secretary of State of the State of Texas as required by law. The agent and the address may be changed from time to time and the same shall be filed with the Secretary of State's office as required by law.

13.06 Other Offices. The Company may also maintain other offices as the Managers may decide.

## XIV.
## INDEMNIFICATION

14.01 Generally. The Company shall indemnify a person who was, is, or is threatened to be made a named defendant or respondent in a proceeding because the person is or was a Manager, Member or Officer of the Company if it is determined in accordance with this Article that the person:

a.  acted in good faith; and
b.  reasonably believed that his or her conduct was in the Company's best interests.

14.02 <u>Personal Benefit</u>.  A Manager may not be indemnified where the person is found liable on the basis that personal benefit was improperly received by him or her or in which the person is found liable to the Company.

14.03 <u>Scope of Indemnification</u>.  A person shall be indemnified under this Article against judgments, penalties (including excise and similar taxes), fines, settlements, and reasonable expenses actually incurred by the person in connection with the proceeding.

14.04 <u>Determination of Indemnification</u>.  A determination of indemnification under any section of this Article must be made a by a majority vote of a quorum consisting of Managers who at the time of the vote are not named defendants or respondents in the proceeding.

## XV.
## <u>DISSOLUTION</u>

15.01 <u>Generally</u>. This Company shall be dissolved on the first of the following to occur:
a.  Upon the death, retirement, resignation, expulsion, bankruptcy or dissolution of a Member, or upon the occurrence of any other event that terminates the continued membership of a Member in this Company, unless the remaining Members consent unanimously, within ninety days after an event of dissolution, to continue this Company; or
b.  When the period fixed for the duration of this Company expires; or
c.  On the occurrence of events specified in the Articles of Organization or Regulations to cause dissolution; or
d.  Upon written consent of all Members to dissolution; or
e.  Upon entry of a decree of judicial dissolution under the Texas Limited Liability Company Act.

15.02 <u>Judicial Dissolution</u>. On application by or for a Member, a court of competent jurisdiction may decree dissolution of this Company if it is not reasonably practicable to carry on the business of this Company in conformity with its Articles of Organization and these Regulations.

15.03 <u>Winding Up</u>.  On the dissolution of this Company, this Company's affairs shall be wound up as soon as reasonably practicable. The winding up shall be accomplished by the Managers or Members.
a.  On the winding up of the Company, its assets shall be paid or transferred as follows:
1.  To the extent otherwise permitted by law, to creditors, including Members who are creditors in satisfaction of liabilities (other than

for distributions) of the Company, whether by payment or by establishment of reserves; and

2. Unless otherwise provided by the Articles of Organization or these Regulations, to Members and former Members in satisfaction of the Company's liability for distributions; and

3. Unless otherwise provided by the Articles of Organization or these Regulations, to Members in the manner provided in these Regulations.

15.04 <u>Distributions Upon Termination and Dissolution of the Company</u>. Upon termination and dissolution of the Company, the Managers will proceed to wind up the affairs of the Company. The liabilities and obligations to creditors and all expenses incurred in its liquidation and dissolution will be paid and will have first priority in winding up as otherwise provided in these Regulations. The Managers may retain from available cash and other assets of the Company sufficient reserves for anticipated and contingent liabilities. Undistributed cash, and other property valued at its fair market value on the date of distribution, will be distributed to the Members in the following order:

a. Distributions will first be made to repay any loans to the Company by a Member, including the amount of any deferred payment obligation to a Member or a Member's personal representative as the result of a buy-out by the Company of a Member's interest;

b. Distributions will then be made to the Members in an amount equal to the credit balances in their capital accounts so that the capital account of each Member shall be brought to zero. For the purpose of determining distributions in liquidation, a negative capital account balance will be considered to be a loan from the Company to a Member;

c. The balance, if any, will be made to the Members in an amount equal to each Member's percentage interest in the Company as determined immediately prior to the distribution of the credit balances of the Member's capital accounts. The Company may continue beyond its scheduled termination date for a time reasonably necessary to conclude the administration of the Company, pay expenses of termination and to distribute property to those entitled such distribution.

Dated: _May 17, 2010_

Orca Assets GP, LLC.

By: _Charles A. Vanaman_

Its: _MANAGER_

# EXHIBIT 45

ORIGINAL

## PURCHASE AND SALE AGREEMENT

This Purchase and Sale Agreement (this "Agreement") is entered into as of January 30, 2014 (the "Effective Date") by and between Inner Channel Investments, Inc., a Texas corporation ("ICI"), and Orca Assets GP, LLC, a Texas limited liability company ("Orca").

### RECITALS

A.    ICI is the owner of a 95.3985% partnership interest in Orca ICI Development, a Texas general partnership (the "Partnership").

B.    ICI has agreed to sell and assign to Orca, and Orca has agreed to purchase from ICI, all of ICI's interests in the Partnership for the price and subject to the terms and conditions set forth in this Agreement.

### AGREEMENT

NOW, THEREFORE, in consideration of the foregoing, and other good and valuable consideration described herein, the receipt and sufficiency of which are hereby acknowledged and confessed, the parties hereto covenant and agree as follows:

1.    Sale of Ownership Interests.

1.1    At Closing (as such term is defined below), ICI shall sell, transfer, convey and assign to Orca, and Orca shall purchase from ICI, at the price and upon the terms and conditions provided in this Agreement, all of ICI's interest in the Partnership.

1.2    Subject to the terms and conditions of this Agreement, the closing of the transfer and conveyance of the membership interests described above, as well as the transfer of the consideration exchanged for such ownership interests (as described herein) (the "Closing") shall take place at the offices of ICI in Corpus Christi, Texas on January 30, 2014, unless the parties agree to some other time and place for Closing (the "Closing Date").

2.    Consideration.

2.1    Purchase Price for ICI's Interests. The Purchase Price for the transfer and sale of the interests described herein by ICI is Twenty Eight Million, Four Hundred Eleven Thousand, Three Hundred Fifty One Dollars and Fifty Cents. ($28,411,351.50).

2.2    Payment of the Purchase Price. ICI has been previously paid the sum of Five Million Dollars ($5,000,000.00) which ICI and Orca acknowledge and agree is applicable to the purchase price. The remainder of the purchase price, being $23,411,351.50 shall be in the form of a non-recourse promissory note from Orca to ICI (the "Note"), which Note shall bear interest from the Closing Date until paid at the rate of five percent (5.0%) per annum, and shall provide for semi-annual payments of interest only for the initial two (2) years of the term of the Note, following which payments of principal and interest shall be made on a quarterly basis, shall be payable in full on the date that is five (5) years after the Closing Date, and may be pre-paid at any time without penalty. Orca shall have the opportunity to extend the loan term under the Note for two (2) years in which event the applicable interest rate shall increase by two percent (2.0%). The form of the Note is attached hereto as Exhibit "A".

2.3    Limited Guaranty Agreement. West 17th Resources, LLC, a Delaware limited liability company ("West 17[th]") is an affiliate of Orca. West 17th owns certain properties and mineral interests in Karnes and DeWitt Counties Texas (the "Conoco Properties") which are to be developed by ConocoPhillips or an affiliate thereof. West 17th intends to either sell all or part of the Conoco Properties to a third party (a "Third Party Sale"), or participate in the development of the same. If West 17th elects to participate in the development of the Conoco Properties, then it is anticipated that in order to fund its

1

obligations with respect to such development, West 17th will create a new wholly-owned affiliate entity into which the Conoco Properties will be conveyed (the "COP Financing Entity"). The COP Financing Entity will then enter into a financing transaction with a third party lender ("TPL"), and consequently, a to-be-negotiated percentage of funds received from production from the Conoco Properties will flow to repay the TPL, with the remainder being paid to the COP Financing Entity (as negotiated between COP Financing Entity and TPL). The funds from the Conoco Properties that are received by the COP Financing Entity after paying the TPL will be distributed to West 17th, as the sole equity owner of the COP Financing Entity. Fund received by West 17th, either as a result of a Third Party Sale, or the development and production of the Conoco Properties that flow through COP Financing Entity, or any combination thereof, are referred to herein as the "COP Distributions". As additional consideration for the sale of ICI's interest in the Partnership, West 17th will provide a limited guaranty of Orca's obligations under the Note. The limited guaranty will provide that West 17th will grant ICI a first priority security interest in the COP Distributions, until the Note is paid in full. The guaranty agreement to be executed and delivered by West 17th is in the form attached hereto as Exhibit "B", and the security agreement pledging West 17th's interest in the COP Distributions is attached hereto as Exhibit "C".

        2.4    Cash Management Agreement. No later than ten (10) days following the Closing, West 17th shall designate a bank account (the "Deposit Account") with a banking institution with offices in Houston, Texas (the "Bank") for the purposes of depositing all COP Distributions. Within thirty (30) days after West 17th's initial receipt of the COP Distributions, West 17th, ICI and Bank shall enter into an agreement (the "Cash Management Agreement"), which shall provide for the custody, management and disposition of the funds in the Deposit Account. The Cash Management Agreement shall provide that Bank will deliver or make available statements and balance data on the Deposit Account to ICI and West 17th. Further, the Cash Management Agreement shall provide that on a periodic basis, no less frequently than quarterly, a percentage of the funds in the Deposit Account (but no less than fifty percent (50%) of the COP Distributions received by West 17th from time to time) shall be disbursed to ICI in order to pay the sums due under the Note, with the remaining funds in the Deposit Account disbursed to West 17th to pay ordinary operating expenses, including but not limited to wages, salaries, benefits and other expenses of employees, agents, and contractors, personal property, ad valorem, and state and federal income taxes, insurance premiums, its costs of operation and maintenance of its properties, general office expenses, tax, legal and other professional consultants. The Cash Management Agreement shall further provide that in the event of a default under the Note, then all funds in the Deposit Account shall be disbursed to ICI until either (i) the event of default is cured; or (ii) the Note is paid in full.

        **2.5    Indemnity. In addition to any other applicable rights under this Agreement, except for the gross negligence or willful misconduct if ICI, Orca agrees to indemnify, defend and hold ICI, its officers, directors, employees, agents, successors and assigns (the "Indemnified Parties") harmless from and against all actual liabilities, liens, claims, damages, costs, expenses, suits or judgments paid or incurred by any of the Indemnified Parties and all expenses related thereto, including, without limitation, court costs and reasonable attorneys' fees arising out of or in any way connected or related to the ownership and operation of the Partnership arising on or after the Closing Date.**

    3.    Closing.

        3.1    At Closing, ICI and Orca shall each execute and/or deliver as appropriate counterparts of the following documents, as appropriate:

    a.    Assignment and Assumption of Partnership Interests in Orca ICI Development, in the form attached hereto as Exhibit "D";

    b.    The Note

    c.    The guaranty agreement executed by West 17th

    d.    The security agreement executed by West 17th

    e.    Consents or resolutions or other documents evidencing the approval of the transactions described herein and the authority of the persons signing on behalf of the parties hereto;

2

4. Representations and Warranties.

4.1. ICI's Representations and Warranties. ICI warrants and represents to Orca as of the Closing Date, as follows:

4.1.1. ICI has the full power and authority to enter into this Agreement and perform its respective obligations hereunder.

4.1.2. ICI represents and warrants that (a) it is the sole and exclusive owner of the interests in the Partnership to be conveyed hereunder, free and clear of all liens, charges, pledges, encumbrances, security interests or rights of third parties, except as described herein; (b) it has full power and authority to enter into this Agreement and to sell and convey the interests in the Partnership upon the terms provided in this Agreement, (c) that there are no outstanding option rights, rights of first refusal or other arrangements relating to ICI's interests in the Partnership, except as set forth in the partnership agreement of the Partnership, and ICI has not sold, granted, transferred or otherwise assigned to any person, entity or any party any right, title or interest in or to either the interests in the Partnership (except as described herein); (d) this Agreement constitutes the valid, binding and enforceable obligation of ICI; and (e) the execution and delivery by ICI of this Agreement and the performance of his respective obligations hereunder do not violate, conflict with, invalidate, cancel, or interfere with, or constitute a default under any contract, agreement or court order to which ICI is a party or is bound.

4.2 Orca's Representations and Warranties. Orca warrants and represents to ICI as of the Closing Date, as follows:

4.2.1. Orca has the full power and authority to enter into this Agreement and perform its respective obligations hereunder.

4.2.2. Orca represents and warrants that this Agreement constitutes the valid, binding and enforceable obligation of Orca; and the execution and delivery by Orca of this Agreement and the performance of its respective obligations hereunder do not violate, conflict with, invalidate, cancel, or interfere with, or constitute a default under any contract, agreement or court order to which Orca is a party or is bound.

4.3 Survival. The representations, warranties, covenants and all other provisions contained in this Agreement shall survive for a period of two (2) years following full payment of the Purchase Price.

5. Commissions. The parties hereto mutually represent and warrant that they have not dealt with any agent, broker or finder in connection with this Agreement or the purchase and sale hereunder, and each agrees to defend, indemnify and hold the other party harmless from any breach of the parties' respective representations and warranties made pursuant to this Agreement.

6. Notices. All notices, requests, or other communications given under this Contract shall be deemed sufficiently given if in writing and delivered personally, by telecopy, or by recognized overnight delivery service, and shall be effective (i) on the date delivered by hand delivery or telecopy (provided such telecopy is received by the recipient's telecopy machine on a weekday before 5:00 p.m., Austin, Texas time, and a copy is sent by another permitted method of delivery, or (ii) one day following the date sent by recognized overnight delivery service. For purposes of notice, the addresses of the parties shall be as follows:

To ICI:            Inner Channel Investments, Inc.
                   1414 Valero Way
                   Corpus Christi, Texas 78409
                   Attn: Ed Martin
                   Telecopy No.: 361-693-2100

3

To Orca:     Orca Assets GP, LLC
        5005 Riverway, Suite 440,
        Houston, Texas 77056
        Telecopy No.: 713-623-6301

   Any party may change its notice address by written notice to all other parties given in accordance with this Section.

   7.  Miscellaneous.

     7.1.  This Agreement is made under and shall be governed by, and construed in accordance with, the laws of the State of Texas, without regard to its conflict of laws provisions.

     7.2.  Neither this Agreement nor any provision hereof may be modified, waived, amended, discharged or terminated except by an instrument in writing signed by the party against whom enforcement of the modification, waiver, amendment, discharge or termination is sought, and then only to the extent set forth in such instrument.

     7.3.  The headings contained in this Agreement are for convenience of reference only and shall not affect the meaning or interpretation of this Agreement.

     7.4.  This Agreement, along with the other documents and agreements to be executed which are attached as exhibits hereto, contains the full and entire agreement between the parties hereto, and neither they nor their agents shall be bound by any terms, conditions or representations not herein written, and this Agreement supersedes all other agreements concerning the subject matter.

     7.5.  This Agreement may not be assigned by any party hereto without the prior written consent of all other parties, which consent shall not be unreasonably withheld.

     7.6.  Time shall be of the essence with respect to all of the obligations of the parties hereunder.

     7.7.  This Agreement shall not be recorded or filed and any attempted recordation or filing shall be void and shall constitute a default by the party attempting such recording or filing.

     7.8.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their heirs, personal representatives, successors and permitted assigns.

     7.9.  After the Closing, each of the parties hereto will from time to time, at the request of any other party and without further cost or expense to the requesting party, and in each case within ten (10) days of delivery of the requesting party's request, execute, acknowledge, deliver and perform such other instruments of conveyance and transfer, and take such other actions as the requesting party may reasonably request, to implement the transactions contemplated hereby. If any party shall violate or breach this provision in any manner, then the party in breach or violation shall be conclusively deemed to have materially breached this Agreement.

     7.10.  This Agreement, as well the other documents and agreements executed in connection with this Agreement, have been negotiated by the parties hereto and their respective legal counsel, and legal or equitable principles that might require the construction of this Agreement, or the other documents and agreements executed in connection herewith, or any provisions thereof for or against the party drafting this Agreement (or the other documents and agreements executed in connection herewith) will not apply in any construction or interpretation of this Agreement (or the other documents and agreements executed in connection herewith).

4

7.11. If any term or provision of this Agreement is found to be invalid or illegal or incapable of being enforced by any rule of law or public policy, all other provisions and conditions of this Agreement shall nevertheless be legally binding and shall remain in full force and effect. Upon the determination that any term or other provision is invalid, illegal, or incapable of being enforced, the parties hereto agree that such provision shall be amended so as to be legal and enforceable and as nearly as possible to give effect to the intentions of the parties hereto.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement under their respective hands and seals as of the day and year first above written.

Purchaser:

Orca Assets GP, LLC, a Texas limited liability company

By: _____
    Allen Lawrence Berry, President

Seller:

Inner Channel Investments, Inc., a Texas corporation

By: _____
    Ed Martin, President

5

Form of Promissory Note

## PROMISSORY NOTE

$23,411,351.50                    Houston, TX                    January 30, 2014

FOR VALUE RECEIVED, the undersigned **Orca Assets GP, LLC**, a Texas limited liability company ("Borrower"), whose address for notice purposes is 5005 Riverway, Suite 440, Houston, Texas, 77056, promises to pay to the order of **Inner Channel Investments, Inc.**, a Texas corporation ("Lender"), at 1414 Valero Way, Corpus Christi, Texas, 78409, or at such other place as may be designated in writing by Lender, the principal sum of **Twenty Three Million, Four Hundred Eleven Thousand, Three Hundred Fifty One Dollars and Fifty Cents. ($23,411,351.50)**, with interest on the unpaid balance thereof at the rate ("Effective Rate") of five percent (5.0%) per annum. All sums owing hereunder are payable in lawful money of the United States of America, in immediately available funds.

Borrower shall make four (4) payments to Lender of accrued interest only, on a semi-annual basis, with the first payment due on the date that is six (6) months after the date hereof. Commencing on the second (2nd) anniversary of the date hereof, Borrower shall commence making quarterly payments in the amount of one twelfth ($1/12^{th}$) of principal and accrued interest on the outstanding balance of the principal amount of this Note, until the date that is five (5) years after the date hereof (the "Maturity Date"), when Borrower shall pay to Lender the entire outstanding principal balance of this Note, together with all accrued and unpaid interest thereon. The Loan may be prepaid in whole or in part at any time prior to maturity without penalty or premium.

Notwithstanding the foregoing, during the initial two (2) years of the term of this Note, Borrower may elect to defer one or more interest-only payment(s) by giving written notice thereof to Lender no later than thirty (30) days after the due date therefor. In addition, during the third and fourth years of the term of this Note, Borrower may elect to defer one or more payments of principal and interest by giving written notice thereof to Lender no later than thirty (30) days after the due date therefor. Upon any such election, the amount of the payment that would have been due on such due date (the "Deferral Sum") will be added to the principal amount of this Note, and such Deferral Sum will bear interest until paid at the rate (the "Deferral Rate") of seven percent (7.0%) per annum.

Borrower shall have the right to extend the Maturity Date of the Note for two (2) years (the "Extended Term") by giving written notice of such extension to Lender at any time prior to the then-applicable Maturity Date. In the event of such an extension, the Effective Rate and the Deferral Rate applicable to unpaid sums under this Note during the Extension Period shall increase by two (2) percentage points to seven percent (7.0%) and nine percent (9.0%), respectively. During the Extension Period, Borrower shall make payments in the amount of one eighth ($1/8^{th}$) of the outstanding principal and interest on a quarterly basis, as described in the preceding paragraph.

Payments made to Lender hereunder shall first be applied to accrued, but unpaid interest on the deferred interest only payments (if any), then to the payment of accrued, but unpaid interest on the principal amount of this Note (excluding deferred interest only payments), then to the repayment of principal.

From and after the Maturity Date, or such earlier date as all sums owing on this Note become due and payable by acceleration or otherwise, all sums owing on this Note shall bear interest until paid in full at a rate equal to the Maximum Lawful Rate or fourteen percent (14%), whichever is less

If Borrower shall fail to pay when due any sums payable hereunder which failure continues for ten (10) days after written notice from Lender specifying such failure; THEN Lender may, at its sole option, declare all sums owing under this Note immediately due and payable.

If any attorney is engaged by Lender to enforce or defend any provision of this Note, or as a

consequence of any default, with or without the filing of any legal action or proceeding, then Borrower shall pay to Lender immediately upon demand all reasonable attorneys' fees and all costs incurred by Lender in connection therewith, together with interest thereon from the date of such demand until paid at the rate of interest applicable to the principal balance owing hereunder as if such unpaid attorneys' fees and costs had been added to the principal. '

No previous waiver and no failure or delay by Lender in acting with respect to the terms of this Note shall constitute a waiver of any breach, default, or failure of condition under this Note or the obligations secured thereby. A waiver of any term of this Note must be made in writing and shall be limited to the express written terms of such waiver. In the event of any inconsistencies between the terms of this Note and the terms of any other document related to the loan evidenced by this Note, the terms of this Note shall prevail.

If this Note is executed by more than one person or entity as Borrower, the obligations of each such person or entity shall be joint and several. No person or entity shall be a mere accommodation Borrower, but each shall be primarily and directly liable hereunder. Except as otherwise provided in any agreement executed in connection with this Note, Borrower, and any endorsers and guarantors hereof, severally waive: presentment; demand; notice of dishonor; notice of default or delinquency; notice of intention to accelerate; notice of acceleration; notice of protest and nonpayment; notice of costs, expenses or losses and interest thereon; notice of late charges; and diligence in taking any action to collect any sums owing under this Note or in proceeding against any of the rights or interests in or to properties securing payment of this Note. Borrower, and any endorsers or guarantors hereof, agree that the time for any payments hereunder may be extended by Lender from time to time without notice and consent, to the acceptance of further collateral, and/or the release of any existing collateral for the payment of this Note, all without in any manner affecting their liability under or with respect to this Note. Provided, however nothing in the foregoing sentence shall affect Borrower's right to extend the Maturity Date as set forth above. No extension of time for the payment of this Note or any installment hereof shall affect the liability of Borrower under this Note or any endorser or guarantor hereof even though Borrower or such endorser or guarantor is not a party to such agreement.

Time is of the essence with respect to every provision hereof. This Note shall be construed and enforced in accordance with the laws of the State of Texas, except to the extent that federal laws preempt the laws of the State of Texas, and all persons and entities in any manner obligated under this Note consent to the jurisdiction of any federal or state court within the State of Texas having proper venue and also consent to service of process by any means authorized by Texas or federal law. This Note is performable in Harris County, Texas.

It is expressly stipulated and agreed to be the intent of Borrower and Lender at all times to comply strictly with the applicable Texas law governing the maximum rate or amount of interest payable on this Note (or applicable United States federal law to the extent that it permits Lender to contract for, charge, take, reserve or receive a greater amount of interest than under Texas law). If the applicable law is ever judicially interpreted so as to render usurious any amount (i) contracted for, charged, taken, reserved or received pursuant to this Note or any other communication or writing by or between Borrower and Lender related to the transaction or transactions that are the subject matter hereof, (ii) contracted for, charged or received by reason of Lender's exercise of the option to accelerate the maturity of this Note, or (iii) Borrower will have paid or Lender will have received by reason of any voluntary prepayment by Borrower of this Note, then it is Borrower's and Lender's express intent that all amounts charged in excess of the Maximum Lawful Rate shall be automatically cancelled, ab initio, and all amounts in excess of the Maximum Lawful Rate theretofore collected by Lender shall be credited on the principal balance of this Note (or, if this Note has been or would thereby be paid in full, refunded to Borrower), and the provisions of this Note immediately be deemed reformed and the amounts thereafter collectible hereunder and thereunder reduced, without the necessity of the execution of any new document, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder and thereunder; provided, however, if this Note has been paid in full before the end of the stated term of this Note, then Borrower and Lender agree that Lender shall, with reasonable promptness after Lender

7

discovers or is advised by Borrower that interest was received in an amount in excess of the Maximum Lawful Rate, either refund such excess interest to Borrower and/or credit such excess interest against this Note. Borrower hereby agrees that as a condition precedent to any claim seeking usury penalties against Lender, Borrower will provide written notice to Lender, advising Lender in reasonable detail of the nature and amount of the violation, and Lender shall have sixty (60) days after receipt of such notice in which to correct such usury violation, if any, by either refunding such excess interest to Borrower or crediting such excess interest against this Note. All sums contracted for, charged or received by Lender for the use, forbearance or detention of any debt evidenced by this Note shall, to the extent permitted by applicable law, be amortized or spread, using the actuarial method, throughout the stated term of this Note (including any and all renewal and extension periods) until payment in full so that the rate or amount of interest on account of this Note does not exceed the Maximum Lawful Rate from time to time in effect and applicable to this Note for so long as debt is outstanding. In no event shall the provisions of Chapter 346 of the Texas Finance Code (which regulates certain revolving credit loan accounts and revolving tri-party accounts) apply to this Note. Notwithstanding anything to the contrary contained herein, it is not the intention of Lender to accelerate the maturity of any interest that has not accrued at the time of such acceleration or to collect unearned interest at the time of such acceleration.

As used herein, the term "Maximum Lawful Rate" shall mean the maximum lawful rate of interest which may be contracted for, charged, taken, received or reserved by Lender in accordance with the applicable laws of the State of Texas (or applicable United States federal law to the extent that it permits Lender to contract for, charge, take, receive or reserve a greater amount of interest than under Texas law), taking into account all Charges (as herein defined) made in connection with the transaction evidenced by this Note. As used herein, the term "Charges" shall mean all fees, charges and/or any other things of value, if any, contracted for, charged, received, taken or reserved by Lender in connection with the transactions relating to this Note, which are treated as interest under applicable law.

All notices or other communications required or permitted to be given pursuant to this Note shall be given to the Borrower or Lender at the address set forth in the first paragraph hereof, and shall be sent by certified United States mail, return receipt requested.

This Note is secured by that certain Security Agreement dated of even date herewith, and that certain Cash Management Agreement (as defined in the Security Agreement) and Lender is entitled to the benefits thereof. Notwithstanding anything to the contrary stated herein, Lender agrees that for payment of this Note it will look solely to the Collateral (as such term is defined in the Security Agreement) or such other collateral, if any, it may now or hereafter be given to secure the payment of this Note, and no other assets of Borrower shall be subject to levy, execution or other enforcement procedure for the satisfaction of the remedies of Lender, or for any payment required to be made under this Note.

THIS NOTE AND ALL THE OTHER RELATED DOCUMENTS EMBODY THE FINAL, ENTIRE AGREEMENT OF BORROWER AND LENDER AND SUPERSEDE ANY AND ALL PRIOR COMMITMENTS, AGREEMENTS, REPRESENTATIONS AND UNDERSTANDINGS, WHETHER WRITTEN OR ORAL, RELATING TO THE SUBJECT MATTER HEREOF AND THEREOF AND MAY NOT BE CONTRADICTED OR VARIED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OF BORROWER AND LENDER. THERE ARE NO ORAL AGREEMENTS BETWEEN BORROWER AND LENDER. The provisions of this Note may be amended or revised only by an instrument in writing signed by the Borrower and Lender.

Borrower:

Orca Assets GP, LLC, a Texas limited liability company

By: _____
Allen Lawrence Berry, President

Form of Guaranty Agreement

## LIMITED GUARANTY AGREEMENT

This LIMITED GUARANTY AGREEMENT (the "Guaranty") is executed as of January 30, 2014, by West 17th Resources, LLC, a Delaware limited liability company (the "Guarantor"), for the benefit of Inner Channel Investments, Inc., a Texas corporation ("Lender").

## W I T N E S S E T H :

WHEREAS, Orca Assets GP, LLC, a Texas limited liability company ("Borrower") has entered into that certain Purchase and Sale Agreement dated of even date herewith (the "Purchase and Sale Agreement") between Borrower and Lender pursuant to which Borrower has become indebted to Lender with respect to a loan (the "Loan") evidenced by that certain promissory note dated of even date herewith in the original principal amount of **$23,411,351.50** executed by Borrower and payable to the order of Lender (together with all renewals, modifications, increases and extensions thereof, the "Note"); and

WHEREAS, Lender is not willing to make the Loan, or otherwise extend credit, to Borrower unless Guarantor guarantees the payment and performance to Lender of the Guaranteed Debt (as herein defined); and

WHEREAS, Guarantor is an affiliate of Borrower, and Guarantor will directly benefit from Lender's making the Loan to Borrower.

NOW, THEREFORE, as an inducement to Lender entering into the Purchase and Sale Agreement with Borrower and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, the Guarantor hereby agrees as follows:

## ARTICLE I
## NATURE AND SCOPE OF GUARANTY

1.1     Guaranty of Obligation. Guarantor hereby irrevocably and unconditionally guarantees to Lender and its successors and assigns the payment and performance of the Guaranteed Debt (as herein defined) as and when the same shall be due and payable, whether by lapse of time, by acceleration of maturity or otherwise. Guarantor hereby irrevocably and unconditionally covenants and agrees that it is liable for the Guaranteed Debt as a primary obligor.

1.2     Definition of Guaranteed Debt. As used herein, the term "Guaranteed Debt" means all principal, interest, attorneys' fees, commitment fees, liabilities for costs and expenses and other indebtedness, obligations and liabilities of Borrower to Lender at any time created or arising in connection with the Loan, or any amendment thereto or substitution therefor, including but not limited to all indebtedness, obligations and liabilities of Borrower to Lender arising under the Note, or under any renewals, modifications, increases and extensions of the Note.

1.3     Nature of Guaranty. This Guaranty is an irrevocable, absolute, continuing guaranty of payment and performance and not a guaranty of collection. This Guaranty may not be revoked by Guarantor and shall continue to be effective with respect to any Guaranteed Debt arising or created after any attempted revocation by Guarantor and after any Guarantor's death (in which event this Guaranty shall be binding upon Guarantor's estate and Guarantor's legal representatives and heirs). The fact that at any time or from time to time the Guaranteed Debt may be increased, reduced or paid in full shall not

release, discharge or reduce the obligation of any Guarantor to Lender with respect to indebtedness or obligations of Borrower thereafter incurred (or other Guaranteed Debt thereafter arising) under the Note. This Guaranty may be enforced by Lender and any subsequent holder of the Guaranteed Debt and shall not be discharged by the assignment or negotiation of all or part of the Guaranteed Debt.

      1.4     <u>Guaranteed Debt Not Reduced by Offset</u>. The Guaranteed Debt and the liabilities and obligations of Guarantor to Lender hereunder, shall not be reduced, discharged or released because or by reason of any existing or future offset, claim or defense of Borrower, or any other party, against Lender or against payment of the Guaranteed Debt, whether such offset, claim or defense arises in connection with the Guaranteed Debt (or the transactions creating the Guaranteed Debt) or otherwise.

      1.5     <u>Payment by Guarantors</u>. If all or any part of the Guaranteed Debt shall not be punctually paid when due, whether at maturity or earlier by acceleration or otherwise, Guarantor shall, immediately upon demand by Lender, and without presentment, protest, notice of protest, notice of non-payment, notice of intention to accelerate the maturity, notice of acceleration of the maturity, or any other notice whatsoever, pay in lawful money of the United States of America, the amount due on the Guaranteed Debt to Lender at Lender's address as set forth herein. Such demand(s) may be made at any time coincident with or after the time for payment of all or part of the Guaranteed Debt, and may be made from time to time with respect to the same or different items of Guaranteed Debt. Such demand shall be deemed made, given and received in accordance with the notice provisions hereof.

      1.6     <u>No Duty to Pursue Others</u>. It shall not be necessary for Lender (and Guarantor hereby waives any rights which Guarantor may have to require Lender), in order to enforce such payment by Guarantor, first to (i) institute suit or exhaust its remedies against Borrower or others liable on the Guaranteed Debt or any other person, (ii) enforce Lender's rights against any collateral which shall ever have been given to secure the Guaranteed Debt, (iii) enforce Lender's rights against any other guarantors of the Guaranteed Debt, (iv) join Borrower or any others liable on the Guaranteed Debt in any action seeking to enforce this Guaranty, (v) exhaust any remedies available to Lender against any collateral which shall ever have been given to secure the Guaranteed Debt, or (vi) resort to any other means of obtaining payment of the Guaranteed Debt.

      1.7     <u>Waivers</u>. Guarantor hereby waives notice of (i) any loans or advances made by Lender to Borrower, (ii) acceptance of this Guaranty, (iii) any amendment or extension of the Note, (iv) the execution and delivery by Borrower and Lender of any other loan or credit agreement or of Borrower's execution and delivery of any promissory notes or other documents, (v) the occurrence of any breach or default by Borrower, (vi) Lender's transfer or disposition of the Guaranteed Debt, or any part thereof, (vii) sale or foreclosure (or posting or advertising for sale or foreclosure) of any collateral for the Guaranteed Debt, (viii) protest, proof of non-payment or default by Borrower, or (ix) any other action at any time taken or omitted by Lender, and, generally, all demands and notices of every kind in connection with this Guaranty, the Note, any documents or agreements evidencing, securing or relating to any of the Guaranteed Debt and the obligations hereby guaranteed.

      1.8     <u>Payment of Expenses</u>. In the event that Guarantor should breach or fail to timely perform any provisions of this Guaranty, Guarantor shall, immediately upon demand by Lender, pay Lender all costs and expenses (including court costs and attorneys' fees) incurred by Lender in the enforcement hereof or the preservation of Lender's rights hereunder. The covenant contained in this Section shall survive the payment of the Guaranteed Debt.

      1.9     <u>Effect of Bankruptcy</u>. In the event that, pursuant to any insolvency, bankruptcy, reorganization, receivership or other debtor relief law, or any judgment, order or decision thereunder, Lender must rescind or restore any payment, or any part thereof, received by Lender in satisfaction of the Guaranteed Debt, as set forth herein, any prior release or discharge from the terms of this Guaranty given to Guarantor by Lender shall be without effect, and this Guaranty shall remain in full force and effect. It

is the intention of Borrower and Guarantor that Guarantor's obligations hereunder shall not be discharged except by Guarantor's performance of such obligations and then only to the extent of such performance.

1.10    Waiver of Subrogation, Reimbursement and Contribution. Notwithstanding anything to the contrary contained in this Guaranty, until such time as the Guaranteed Debt has been paid to the Lender in full Guarantor hereby unconditionally and irrevocably agrees that it shall not assert any and all rights he may now or hereafter have under any agreement, at law or in equity (including, without limitation, any law subrogating Guarantor to the rights of Lender) to assert any claim against or seek contribution, indemnification or any other form of reimbursement from Borrower or any other party liable for payment of any or all of the Guaranteed Debt for any payment made by Guarantor under or in connection with this Guaranty or otherwise.

1.11    "Borrower". The term "Borrower" as used herein shall include any new or successor limited liability company, corporation, association, partnership (general or limited), joint venture, trust or other individual or organization formed as a result of any merger, reorganization, sale, transfer, devise, gift or bequest of Borrower or any interest in Borrower.

1.12    Limitation on Guarantor Liability. In order to secure Guarantor's obligation hereunder, Guarantor has executed that certain Security Agreement dated of even date herewith (the "Security Agreement") granting to Lender a first lien security interest in certain distributions from either (i) the sale of certain oil and gas producing properties; or (ii) a to-be-formed wholly owned affiliate of Guarantor (being defined in the Security Agreement as the "Collateral"). Notwithstanding the provisions contained herein, the liability of Guarantor for the Guaranteed Debt shall in no event exceed the Collateral as defined in the Security Agreement. Further, Lender's sole and exclusive recourse for collection of any sums that are or come due hereunder by Guarantor to Lender is limited to the exercise of those remedies granted to Lender under the Security Agreement.

ARTICLE II
EVENTS AND CIRCUMSTANCES NOT REDUCING
OR DISCHARGING GUARANTOR'S OBLIGATIONS

Guarantor hereby consents and agrees to each of the following, and agrees that subject to the provisions of Section 1.12, Guarantor's obligations under this Guaranty shall not be released, diminished, impaired, reduced or adversely affected by any of the following, and waives any common law, equitable, statutory or other rights (including without limitation rights to notice) which Guarantor might otherwise have as a result of or in connection with any of the following:

2.1    Modifications. Any renewal, extension, increase, modification, alteration or rearrangement of all or any part of the Guaranteed Debt, Note, or other document, instrument, contract or understanding between Borrower and Lender pertaining to the Guaranteed Debt or any failure of Lender to notify any Guarantor of any such action.

2.2    Adjustment. Any adjustment, indulgence, forbearance or compromise that might be granted or given by Lender to Borrower or any Guarantor.

2.3    Condition of Borrower or Guarantor. The insolvency, bankruptcy, arrangement, adjustment, composition, liquidation, disability, dissolution or lack of power of Borrower, any Guarantor or any other party at any time liable for the payment of all or part of the Guaranteed Debt; or any dissolution of Borrower or death of any Guarantor, or any sale, lease or transfer of any or all of the assets of Borrower or any Guarantor, or any changes in the shareholders, partners or members of Borrower; or any reorganization of Borrower.

12

2.4     Invalidity of Guaranteed Debt.  The invalidity, illegality or unenforceability of all or any part of the Guaranteed Debt, or any document or agreement executed in connection with the Guaranteed Debt, for any reason whatsoever, including without limitation the fact that (i) the Guaranteed Debt, or any part thereof, exceeds the amount permitted by law, (ii) the act of creating the Guaranteed Debt or any part thereof is *ultra vires*, (iii) the officers or representatives of Borrower executing the Note, or otherwise creating the Guaranteed Debt acted in excess of their authority, (iv) the Guaranteed Debt violates applicable usury laws, (v) the Borrower has valid defenses, claims or offsets (whether at law, in equity or by agreement) which render the Guaranteed Debt wholly or partially uncollectible from Borrower, (vi) the creation, performance or repayment of the Guaranteed Debt (or the execution, delivery and performance of any document or instrument representing part of the Guaranteed Debt or executed in connection with the Guaranteed Debt, or given to secure the repayment of the Guaranteed Debt) is illegal, uncollectible or unenforceable, or (vii) the Note has been forged or otherwise are irregular or not genuine or authentic, it being agreed that Guarantor shall remain liable hereon regardless of whether Borrower or any other person be found not liable on the Guaranteed Debt or any part thereof for any reason.

2.5     Release of Obligors.  Any full or partial release of the liability of Borrower on the Guaranteed Debt, or any part thereof, or of any co-guarantors, or any other person or entity now or hereafter liable, whether directly or indirectly, jointly, severally, or jointly and severally, to pay, perform, guarantee or assure the payment of the Guaranteed Debt, or any part thereof, it being recognized, acknowledged and agreed by Guarantor that it may be required to pay the Guaranteed Debt in full without assistance or support of any other party, and no Guarantor has been induced to enter into this Guaranty on the basis of a contemplation, belief, understanding or agreement that other parties will be liable to pay or perform the Guaranteed Debt, or that Lender will look to other parties to pay or perform the Guaranteed Debt.

2.6     Other Collateral.  The taking or accepting of any other security, collateral or guaranty, or other assurance of payment, for all or any part of the Guaranteed Debt.

2.7     Release of Collateral.  Any release, surrender, exchange, subordination, deterioration, waste, loss or impairment (including without limitation negligent, willful, unreasonable or unjustifiable impairment) of any collateral, property or security, at any time existing in connection with, or assuring or securing payment of, all or any part of the Guaranteed Debt.

2.8     Care and Diligence.  The failure of Lender or any other party to exercise diligence or reasonable care in the preservation, protection, enforcement, sale or other handling or treatment of all or any part of such collateral, property or security, including but not limited to any neglect, delay, omission, failure or refusal of Lender (i) to take or prosecute any action for the collection of any of the Guaranteed Debt or (ii) to foreclose, or initiate any action to foreclose, or, once commenced, prosecute to completion any action to foreclose upon any security therefor, or (iii) to take or prosecute any action in connection with any instrument or agreement evidencing or securing all or any part of the Guaranteed Debt.

2.9     Unenforceability.  The fact that any collateral, security, security interest or lien contemplated or intended to be given, created or granted as security for the repayment of the Guaranteed Debt, or any part thereof, shall not be properly perfected or created, or shall prove to be unenforceable or subordinate to any other security interest or lien, it being recognized and agreed by Guarantor that it is not entering into this Guaranty in reliance on, or in contemplation of the benefits of, the validity, enforceability, collectability or value of any of the collateral for the Guaranteed Debt.

2.10    Offset.  The Note, the Guaranteed Debt and the liabilities and obligations of Guarantor to Lender hereunder, shall not be reduced, discharged or released because of or by reason of any existing or future right of offset, claim or defense of Borrower or any Guarantor against Lender, or any other party, or against payment of the Guaranteed Debt, whether such right of offset, claim or defense arises in connection with the Guaranteed Debt (or the transactions creating the Guaranteed Debt) or otherwise.

13

2.11     Merger.  The reorganization, merger or consolidation of Borrower into or with any other corporation or entity.

2.12     Preference.  Any payment by Borrower to Lender is held to constitute a preference under bankruptcy laws, or for any reason Lender is required to refund such payment or pay such amount to Borrower or someone else.

2.13     Other Actions Taken or Omitted.  Any other action taken or omitted to be taken with respect to the Note, the Guaranteed Debt, or the security and collateral therefor, whether or not such action or omission prejudices any Guarantor or increases the likelihood that Guarantor will be required to pay the Guaranteed Debt pursuant to the terms hereof, it is the unambiguous and unequivocal intention of Guarantor that it shall be obligated to pay the Guaranteed Debt when due, notwithstanding any occurrence, circumstance, event, action, or omission whatsoever, whether contemplated or uncontemplated, and whether or not otherwise or particularly described herein, which obligation shall be deemed satisfied only upon the full and final payment and satisfaction of the Guaranteed Debt.

ARTICLE III
REPRESENTATIONS AND WARRANTIES

To induce Lender to enter into the Purchase and Sale Agreement and extend credit to Borrower, Guarantor represents and warrants to Lender as follows:

3.1     Benefit.  Guarantor is an affiliate of Borrower, and has received, or will receive, direct or indirect benefit from the making of this Guaranty with respect to the Guaranteed Debt.

3.2     Familiarity and Reliance.  Guarantor is familiar with, and has independently reviewed books and records regarding, the financial condition of the Borrower and is familiar with the value of any and all collateral intended to be created as security for the payment of the Note or Guaranteed Debt; however, no Guarantor is relying on such financial condition or the collateral as an inducement to enter into this Guaranty.

3.3     No Representation by Lender.  Neither Lender nor any other party has made any representation, warranty or statement to Guarantor in order to induce Guarantor to execute this Guaranty.

3.4     Guarantor's Financial Condition.  As of the date hereof, and after giving effect to this Guaranty and the contingent obligation evidenced hereby, Guarantor is, and will be, solvent, and has and will have assets which, fairly valued, exceed its obligations, liabilities (including contingent liabilities) and debts, and has and will have property and assets sufficient to satisfy and repay its obligations and liabilities.

3.5     Legality.  The execution, delivery and performance by Guarantor of this Guaranty and the consummation of the transactions contemplated hereunder do not, and will not, contravene or conflict with any law, statute or regulation whatsoever to which Guarantor is subject or constitute a default (or an event which with notice or lapse of time or both would constitute a default) under, or result in the breach of, any indenture, mortgage, deed of trust, charge, lien, or any contract, agreement or other instrument to which Guarantor is a party or which may be applicable to Guarantor.  This Guaranty is a legal and binding obligation of Guarantor and is enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to the enforcement of creditors' rights.

3.6     Survival.  All representations and warranties made by Guarantor herein shall survive the execution hereof.

14

## ARTICLE IV
## SUBORDINATION OF CERTAIN INDEBTEDNESS

4.1     Subordination of All Guarantor Claims.  As used herein, the term "Guarantor Claims" shall mean all debts and liabilities of Borrower to Guarantor, whether such debts and liabilities now exist or are hereafter incurred or arise, or whether the obligations of Borrower thereon be direct, contingent, primary, secondary, several, joint and several, or otherwise, and irrespective of whether such debts or liabilities be evidenced by note, contract, open account, or otherwise, and irrespective of the person or persons in whose favor such debts or liabilities may, at their inception, have been, or may hereafter be created, or the manner in which they have been or may hereafter be acquired by Guarantor.  The Guarantor Claims shall include without limitation all rights and claims of any Guarantor against Borrower (arising as a result of subrogation or otherwise) as a result of Guarantor's payment of all or a portion of the Guaranteed Debt.  Upon a default under the Note, or upon the occurrence of an event which would, with the giving of notice or the passage of time, or both, constitute a default under the Note, no Guarantor shall receive or collect, directly or indirectly, from Borrower or any other party any amount upon the Guarantor Claims.

4.2     Claims in Bankruptcy.  In the event of receivership, bankruptcy, reorganization, arrangement, debtor's relief, or other insolvency proceedings involving Guarantor as debtor, Lender shall have the right to prove its claim in any such proceeding so as to establish its rights hereunder and receive directly from the receiver, trustee or other court custodian dividends and payments which would otherwise be payable upon Guarantor Claims.  Guarantor hereby assigns such dividends and payments to Lender.  Should Lender receive, for application upon the Guaranteed Debt, any such dividend or payment which is otherwise payable to Guarantor, and which, as between Borrower and Guarantor, shall constitute a credit upon the Guarantor Claims, then upon payment to Lender in full of the Guaranteed Debt, Guarantor shall become subrogated to the rights of Lender to the extent that such payments to Lender on the Guarantor Claims have contributed toward the liquidation of the Guaranteed Debt, and such subrogation shall be with respect to that proportion of the Guaranteed Debt which would have been unpaid if Lender had not received dividends or payments upon the Guarantor Claims.

4.3     Payments Held in Trust.  In the event that, notwithstanding anything to the contrary in this Guaranty, Guarantor should receive any funds, payment, claim or distribution which is prohibited by this Guaranty, Guarantor agrees to hold in trust for Lender an amount equal to the amount of all funds, payments, claims or distributions so received, and agrees that it shall have absolutely no dominion over the amount of such funds, payments, claims or distributions so received except to pay them promptly to Lender, and Guarantor covenants promptly to pay the same to Lender.

4.4     Liens Subordinate.  Guarantor agrees that any liens, security interests, judgment liens, charges or other encumbrances upon Borrower's assets securing payment of the Guarantor Claims shall be and remain inferior and subordinate to any liens, security interests, judgment liens, charges or other encumbrances upon Borrower's assets securing payment of the Guaranteed Debt, regardless of whether such encumbrances in favor of Guarantor or Lender presently exist or are hereafter created or attach.  Without the prior written consent of Lender, no Guarantor shall (i) exercise or enforce any creditor's right it may have against Borrower, or (ii) foreclose, repossess, sequester or otherwise take steps or institute any action or proceedings (judicial or otherwise, including without limitation the commencement of, or joinder in, any liquidation, bankruptcy, rearrangement, debtor's relief or insolvency proceeding) to enforce any liens, mortgages, deeds of trust, security interest, collateral rights, judgments or other encumbrances on assets of Borrower held by Guarantor.

## ARTICLE V
## MISCELLANEOUS

15

5.1    Waiver.  No failure to exercise, and no delay in exercising, on the part of Lender, any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right.  The rights of Lender hereunder shall be in addition to all other rights provided by law.  No modification or waiver of any provision of this Guaranty, nor consent to departure therefrom, shall be effective unless in writing and no such consent or waiver shall extend beyond the particular case and purpose involved.  No notice or demand given in any case shall constitute a waiver of the right to take other action in the same, similar or other instances without such notice or demand.

5.2    Notices.  Any notices or other communications required or permitted to be given by this Guaranty must be given in writing and either (i) mailed by prepaid certified or registered mail, return receipt requested, addressed to the party at the address herein provided, (ii) by delivery to a third party commercial delivery service with evidence of delivery to the office of the addressee, or (iii) by personal delivery to the addressee.  The addresses of the parties hereto are as follows:

> Guarantor:
>
> West 17th Resources, LLC
> 5005 Riverway Suite 440
> Houston, TX  77056
> Attn:  Lawrence Berry
>
> Lender:
>
> Inner Channel Investments, Inc.
> 1414 Valero Way
> Corpus Christi, Texas, 78409
> Attn:  Ed Martin

Any such notice or other communication shall be deemed to have been given (whether actually received or not) on the day it is delivered to the U.S. Post Office or third party delivery service as aforesaid or if delivered by other means, then upon actual receipt by the addressee.  Any party may change its address for purposes of this Guaranty by giving notice of such change to the other party pursuant to this Section.

5.3    Governing Law.  This Guaranty is executed and delivered as an incident to a lending transaction negotiated, consummated, and performable in Nueces County, Texas, and shall be governed by and construed in accordance with the laws of the State of Texas.  Any action or proceeding against Guarantor under or in connection with this Guaranty may be brought in any state or federal court in Nueces County, Texas.  Guarantor hereby irrevocably (i) submits to the nonexclusive jurisdiction of such courts, and (ii) waives any objection it may now or hereafter have as to the venue of any such action or proceeding brought in such court or that such court is an inconvenient forum.  Guarantor agrees that service of process upon it may be made by certified or registered mail, return receipt requested, at its address specified herein.  Nothing herein shall affect the right of Lender to serve process in any other matter permitted by law or shall limit the right of Lender to bring any action or proceeding against Guarantor or with respect to any of Guarantor's property in courts in other jurisdictions.  Any action or proceeding by Guarantor against Lender shall be brought only in a court located in Nueces County, Texas.

5.4    Invalid Provisions.  If any provision of this Guaranty is held to be illegal, invalid, or unenforceable under present or future laws effective during the term of this Guaranty, such provision shall be fully severable and this Guaranty shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Guaranty, and the remaining provisions of this Guaranty shall remain in full force and effect and shall not be affected by the illegal, invalid or

unenforceable provision or by its severance from this Guaranty, unless such continued effectiveness of this Guaranty, as modified, would be contrary to the basic understandings and intentions of the parties as expressed herein.

5.5     Amendments. This Guaranty may be amended only by an instrument in writing executed by the party or an authorized representative of the party against whom such amendment is sought to be enforced.

5.6     Parties Bound; Assignment. This Guaranty shall be binding upon and inure to the benefit of the parties hereto and their respective successors, assigns and legal representatives; provided, however, that no Guarantor may, without the prior written consent of Lender, assign any of its rights, powers, duties or obligations hereunder.

5.7     Headings. Section headings are for convenience of reference only and shall in no way affect the interpretation of this Guaranty.

5.8     Recitals. The recital and introductory paragraphs hereof are a part hereof, form a basis for this Guaranty and shall be considered prima facie evidence of the facts and documents referred to therein.

5.9     Counterparts. To facilitate execution, this Guaranty may be executed in as many counterparts as may be convenient or required. It shall not be necessary that the signature or acknowledgment of, or on behalf of, each party, or that the signature of all persons required to bind any party, or the acknowledgment of such party, appear on each counterpart. All counterparts shall collectively constitute a single instrument. It shall not be necessary in making proof of this Guaranty to produce or account for more than a single counterpart containing the respective signatures of, or on behalf of, and the respective acknowledgments of, each of the parties hereto. Any signature or acknowledgment page to any counterpart may be detached from such counterpart without impairing the legal effect of the signatures or acknowledgments thereon and thereafter attached to another counterpart identical thereto except having attached to it additional signature or acknowledgment pages.

5.10     Rights and Remedies. The exercise by Lender of any right or remedy hereunder or under any other instrument, or at law or in equity, shall not preclude the concurrent or subsequent exercise of any other right or remedy.

5.11     Entirety. THIS GUARANTY EMBODIES THE FINAL, ENTIRE AGREEMENT OF GUARANTOR AND LENDER WITH RESPECT TO THE GUARANTOR'S GUARANTY OF THE GUARANTEED DEBT AND SUPERSEDES ANY AND ALL PRIOR COMMITMENTS, AGREEMENTS, REPRESENTATIONS, AND UNDERSTANDINGS, WHETHER WRITTEN OR ORAL, RELATING TO THE SUBJECT MATTER HEREOF. THIS GUARANTY IS INTENDED BY GUARANTOR AND LENDER AS A FINAL AND COMPLETE EXPRESSION OF THE TERMS OF THE GUARANTY, AND NO COURSE OF DEALING BETWEEN GUARANTOR AND LENDER, NO COURSE OF PERFORMANCE, NO TRADE PRACTICES, AND NO EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OR OTHER EXTRINSIC EVIDENCE OF ANY NATURE SHALL BE USED TO CONTRADICT, VARY, SUPPLEMENT OR MODIFY ANY TERM OF THIS GUARANTY AGREEMENT. THERE ARE NO ORAL AGREEMENTS BETWEEN GUARANTOR AND LENDER.

5.12     Waiver of Right to Trial by Jury. GUARANTOR HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, PROCEEDING, OR COUNTERCLAIM THAT RELATES TO OR ARISES OUT OF ANY OF

17

**THE GUARANTY OR THE ACTS OR FAILURE TO ACT OF OR BY LENDER IN THE ENFORCEMENT OF ANY OF THE TERMS OR PROVISIONS OF THIS GUARANTY.**

EXECUTED as of the day and year first above written.

GUARANTOR:

West 17th Resources, LLC,
a Delaware limited liability company

By: Gansevoort Investments, LLC,
a Delaware limited liability company,
its Manager

By: _____
      Allen Lawrence Berry, Manager

Form of Security Agreement

# SECURITY AGREEMENT
## ("this Agreement")

West 17th Resources, LLC, a Delaware limited liability company (hereinafter called "Assignor"), and Inner Channel Investments, Inc., a Texas corporation (hereinafter called "Secured Party"), enter into this Security Agreement as follows:

## RECITALS

**WHEREAS**, Orca Assets GP, LLC, a Texas limited liability company ("Borrower"), an affiliate of Assignor, has entered into a transaction with Secured Party, whereby Borrower has agreed to pay Secured Party the sum of **$23,411,351.50** (the "Primary Loan"), which Primary Loan is evidenced by that certain <u>Promissory Note</u> from Borrower to Secured Party in the original principal amount of $23,411,351.50, and which note is dated January 30, 2014; and

**WHEREAS**, in connection with the Primary Loan, Secured Party has required that Assignor make a limited guaranty of the Primary Loan, and in connection therewith, Assignor has of even date herewith executed and delivered to Secured Party that certain <u>Limited Guaranty Agreement</u> (the "Guaranty"); and

**WHEREAS**, under the terms of the Guaranty, Assignor has agreed to grant to Secured Party a security interest in certain funds that Assignor anticipates receiving as a result of the development of certain oil and gas producing properties as more particularly described herein, as security for Assignor's obligation to repay the Guaranteed Debt (as such term is defined in the Guaranty); and

**WHEREAS**, Assignor owns certain oil and gas producing properties in Karnes and DeWitt Counties Texas, more particularly described on Exhibit "A" attached hereto (the Production Properties"); and

**WHEREAS**, Assignor intends to either sell the Production Properties to a third party (each a "Third Party Sale"), or participate in the development of the Production Properties; and

**WHEREAS**, if Assignor elects to participate in the development of the Production Properties, then it is anticipated that Assignor will sell and convey the Production Properties to a wholly-owned affiliate of Assignor ("COP"), and COP will enter into one (1) or more financing transactions with third party lenders (each a "TPL"), whereby the TPL will advance all or part of the funds necessary for COP to pay its share of drilling and/or production costs associated with the Production Properties; and

**WHEREAS**, it is anticipated that the funds from the Production Properties will be subject to an agreement between COP and TPL, whereby the cash proceeds from the Production Properties (the "Production Proceeds") will be subject to a cash management agreement so that some percentage of the Production Proceeds are used to pay TPL, with the remaining Production Proceeds to be paid to COP; and

**WHEREAS**, following receipt, COP will distribute all Production Proceeds received in connection with the Production Properties to Assignor; and

**WHEREAS**, Lender requires that Assignor grant and assign to Secured Party, as security for the payment of the Guaranteed Debt and performance by Assignor of all of the terms, covenants and

provisions of the Guaranty on the part of Assignor to be observed and performed, a security interest in the Collateral (hereinafter defined) in the manner hereinafter set forth.

## AGREEMENT

1. **Grant of Security Interest.** In order to secure the prompt and unconditional payment of the Guaranteed Debt and the performance of the obligations, covenants, agreements, and undertaking of Assignor herein described, Assignor hereby grants to Secured Party a security interest in, and assigns to Secured Party the following: (i) all funds to which Assignor is entitled as a result of a Third Party Sale; and (ii) any and all now existing and hereafter arising rights to receive distributions or payments, whether in cash or in kind, from COP. The foregoing is referred to herein as "the Collateral".

2. **Purpose of Agreement.** This Agreement is made to secure and enforce the payment and performance of that certain Limited Guaranty Agreement from Assignor to Secured Party.

3. **Representations and Warranties of Assignor.** Assignor represents, warrants, and covenants that Assignor is the lawful owner of good and marketable title to the Collateral and have good right and authority to grant a security interest in the Collateral; that the Collateral is free and clear from all security interests and encumbrances except as described on Exhibit "B" attached hereto; that there is no financing statement covering the Collateral or its proceeds on file in any public office; that this Agreement constitutes the legal, valid, and binding obligation of Assignor enforceable against Assignor in accordance with its terms; that the execution, delivery, and performance of this Agreement does not and will not contravene or violate any provision of any law, rule, regulation, order, writ, judgment, injunction, decree, determination, or award presently in effect and applicable to Assignor or result in a breach of or constitute a default (with or without the giving of notice or the lapse of time or both) under any indenture or any loan, credit, or other agreement to which Assignor is a party or by which Assignor may be bound or affected; that the execution, delivery, and performance of this Agreement do not require the consent or approval of any regulatory body or governmental authority; that Assignor will warrant and forever defend the title to the Collateral and its proceeds against the claims and demands of all persons whomsoever claiming or to claim the same or any part thereof.

4. **Covenants of Assignor.** Assignor covenants and agrees with Secured Party as follows:

   (a) Assignor will make prompt payment, as the same becomes due, of all indebtedness secured hereby in accordance with the terms and provisions of the Limited Guaranty Agreement.

   (b) Assignor will continuously maintain its corporate existence.

   (c) Assignor shall, at all times keep accurate books and records reflecting all facts concerning the Collateral. Assignor will allow Secured Party or its authorized representative to inspect said books and records and will assist Secured Party or said representative in whatever way necessary to make such inspection.

   (d) Assignor will cause to be paid prior to delinquency all taxes, charges, liens, and assessments heretofore or hereafter levied or assessed against the Collateral, or any part thereof, or against the Secured Party for or on account of the indebtedness secured hereby or the interest created by this Agreement, and will furnish Secured Party with receipts or other satisfactory evidence showing payment of such taxes and assessments upon request by Secured Party.

   (e) If the validity or priority of this Agreement or of any rights, titles, security interests or other interests created or evidenced hereby shall be attacked, endangered, or

20

questioned, or if any legal proceedings are instituted with respect thereto, Assignor will give prompt written notice thereof to Secured Party and, at Assignor's own cost and expense, will diligently endeavor to cure any defect which may be developed or claimed, and will take all necessary and proper steps for the defense of such legal proceedings, and Secured Party (whether or not named as a party to legal proceedings with respect thereto) is hereby authorized and empowered to take such additional steps as in its reasonable judgment and discretion may be necessary or proper for the defense of any such legal proceedings or the protection of the validity or priority of this Agreement and the rights, titles, security interests, and other interests created, or evidenced hereby, and all reasonable expenses so incurred of every kind and character shall be a demand obligation owing by Assignor and the party incurring such expenses shall be subrogated to all rights of the person receiving such payment.

(f)     Assignor will, on request of Secured Party (i) promptly correct any defect, error, or omission which may be discovered in the contents of this Agreement or in any other instrument executed in connection herewith or in the execution or acknowledgment thereof; (ii) execute, acknowledge, deliver, and record, or file such further instrument (including, without limitation, further security agreements, financing statements, and continuation statements) and do such further acts as may be necessary, desirable, or proper to carry out more effectively the purposes of this Agreement and such other instruments, and to subject to the security interests hereof and thereof any property intended by the terms hereof and thereof to be covered hereby and thereby including specifically, but without limitation, any renewals, additions, substitutions, or replacements to the then Collateral; and (iii) execute, acknowledge, deliver, procure and record or file any document or instrument (including specifically any financing statement) deemed advisable by Secured Party to protect the security interest hereunder against the rights or interests of third persons, and Assignor will pay the reasonable costs of any of the foregoing.

(g)     Except as otherwise set forth herein, Assignor will not permit the title to the Collateral, or any interest therein, to be vested in any other party, in any manner whatsoever, by operation of law, or otherwise, without the prior written consent of Secured Party.

(h)     Assignor will reimburse Secured Party for all amounts reasonably expended by Secured Party to satisfy any obligation of Assignor under this Agreement or to protect the Collateral, following Assignor's failure to do so after written notice of the same from Secured Party.

(i)     Assignor will not change its address, location, name, identity, or corporate structure without notifying Secured Party of such change in writing at least thirty (30) days prior to the effective date of such change.

(j)     Assignor shall furnish Secured Party all such information as Secured Party may request with respect to the Collateral.

5.     Secured Party's Right to Perform.  Assignor agrees that if Assignor fails to perform any act or to take any action which hereunder Assignor is required to perform or take, or to pay any money which hereunder Assignor is required to pay, which failure continues for ten (10) days after written notice from Secured Party specifying such failure, Secured Party, in Assignor's name or in its own name, may, but shall not be obligated to, perform or cause or be performed such act or take such action or pay such money, and any reasonable expenses so incurred by Secured Party and any money so paid by Secured Party, shall be a demand obligation owing by Assignor to Secured Party and Secured Party, upon making such payment, shall be subrogated to all of the rights of the person, corporation, or body politic receiving such payment. Any amounts due and owing by Assignor to Secured Party pursuant to this Agreement shall bear interest from the date of expenditure until paid at the rate of twelve percent (12%) per annum

21

and shall be a part of the Guaranteed Debt and shall be secured by this Agreement and by any other instrument securing the Guaranteed Debt.

6.    Default. Assignor shall be in default under this Agreement upon the happening of any of the following events or conditions, herein called an "Event of Default":

(a)    Assignor's failure to pay when due any of the Guaranteed Debt, which failure continues beyond any applicable notice and cure period; or

(b)    Default by Assignor in the punctual performance of any of the obligations, covenants, terms, or provisions contained or referred to in this Agreement or the Guaranty which failure continues beyond any applicable notice and cure period; or

(c)    Any warranty, representation, or statement contained in this Agreement or made or furnished to Secured Party by or on behalf of Assignor shall prove to have been false or misleading in any material respect when made or furnished; or

(e)    The making of any levy, seizure, or attachment of or on the Collateral; or

(f)    The insolvency or business failure of Assignor; the failure of Assignor generally to pay its debts as they come due; the appointment of a receiver, trustee, custodian, or liquidator of all or any part of the property of Assignor; an assignment for the benefit of creditors of Assignor; the calling of a meeting of creditors of Assignor; or the commencement of any proceeding under any bankruptcy, insolvency, or reorganization laws by or against Assignor.

7.    Remedies. Upon the occurrence of an Event of Default, and at any time thereafter, Secured Party shall have all the rights of a secured party after default under the Uniform Commercial Code of Texas and in conjunction with, in addition to or in substitution for those rights and remedies provided for herein or otherwise provided by law. Without limiting the generality of the foregoing, Secured Party may exercise one or more of the remedies set forth in this Section 7.

a.    Upon the occurrence and during the continuance of any Event of Default, Secured Party may, in addition to any other rights or remedies available to it hereunder, at law or in equity, take such action, without notice or demand, as it reasonably deems advisable to protect and enforce its rights against Assignor and in and to the Collateral, including, but not limited to, the following actions, each of which may be pursued singly, concurrently or otherwise, at such time and in such order as Secured Party may determine, in its sole discretion, without impairing or otherwise affecting any other rights and remedies of Secured Party hereunder, at law or in equity: (i) declare all or any portion of the Primary Loan to be immediately due and payable; or (ii) bring an action to foreclose this Agreement and thereupon Secured Party may (A) exercise all rights and powers of Assignor with respect to the Collateral or any part thereof, whether in the name of Assignor or otherwise and (B) apply the receipts from the Collateral to the payment of the Guaranteed Debt, after deducting therefrom all expenses (including, without limitation, reasonable attorneys' fees and disbursements and all applicable transfer taxes) reasonably incurred in connection therewith, as well as just and reasonable compensation for the services of Secured Party's third-party agents; or (iii) sell the Collateral or institute proceedings for the complete foreclosure of this Agreement, or take such other action as may be allowed pursuant to applicable law or in equity, for the enforcement of this Agreement; or (iv) pursue any or all such other rights or remedies as Secured Party may have under applicable law or in equity (including, without limitation, all rights and remedies to a secured party under the UCC); provided, however, that the provisions of this Section shall not be construed to extend or modify any of the notice requirements or grace periods provided for hereunder or under the Guaranty.

b.     In addition to the remedies described in subsection (a) above, if any Event of Default shall occur, so long as such Event of Default shall be continuing, (i) Secured Party and/or its nominees or designees shall have the right to receive any and all dividends, payments or distributions paid with respect to the Collateral (and any dividends and other payments received in trust by Assignor for the benefit of Secured Party shall be segregated from the other funds of Assignor) and (ii) at Secured Party's election, all Collateral shall be transferred to Secured Party and Secured Party may in the name of Assignor or in Secured Party's name, collect all payments and assets due Assignor pursuant to the Collateral, and Secured Party may thereafter exercise (A) all voting and other rights pertaining to the Collateral, and (B) any and all rights of conversion, exchange, subscription and any other rights, privileges or options pertaining to the Collateral as if they were the absolute owners thereof, but Secured Party shall not have any duty to exercise any such right, privilege or option and shall not be responsible for any failure to do so or delay in so doing. Further, unless and until Secured Party succeeds to actual ownership thereof, pursuant to the exercise of Secured Party's remedies described in subsection (a) above, Secured Party shall not be obligated to perform or discharge any obligation, duty or liability in connection with the Collateral. The rights of Secured Party hereunder shall not be conditioned or contingent upon the pursuit by Secured Party of any other right or remedy against Assignor, or against any other person which may be or become liable in respect of all or any part of the Guaranteed Debt or against any other collateral security therefor, guarantee thereof or right of offset with respect thereto. Secured Party shall not be liable for any failure to demand, collect or realize upon all or any part of the Collateral or for any delay in doing so, nor shall they be under any obligation to sell or otherwise dispose of any Collateral upon the request of Assignor or any other person or to take any other action whatsoever with regard to the Collateral or any part thereof.

c.     Following the occurrence and during the continuance of an Event of Default, Secured Party may, at its election, and in addition to any other remedies available hereunder, in its sole and absolute discretion, no such duty being imposed hereby, pay, purchase, contest or compromise any encumbrance, charge or lien which is prior or superior to its security interest in the Collateral and pay all expenses incurred therewith (any payment or expense so incurred shall be deemed a part of the Debt and shall be immediately due and payable and secured hereby), all of which shall be deemed authorized by Assignor.

d.     Any time after an Event of Default Secured Party shall have the power to sell the Collateral or any part thereof at public auction, in such manner, at such time and place, upon such terms and conditions, and upon such public notice as Secured Party may deem best for the interest of Secured Party, or as may be required or permitted by applicable law, consisting of advertisement in a newspaper of general circulation in the jurisdiction and for such period as applicable law may require and at such other times and by such other methods, if any, as may be required by law to convey the Collateral to and at the cost of the purchaser, who shall not be liable to see to the application of the purchase money. Notwithstanding anything contained in this Agreement, the proceeds or avails of any sale made under or by virtue of this Section, together with any other sums which then may be held by Secured Party under this Agreement, whether under the provisions of this Section or otherwise, shall be applied as follows:

First: To the payment of the third-party costs and expenses reasonably incurred in connection with any such sale (including, without limitation, any transfer taxes) and to advances, fees and expenses, including, without limitation, reasonable fees and expenses of Secured Party's legal counsel as applicable, and of any judicial proceedings wherein the same may be made, and of all expenses, liabilities and advances reasonably made or incurred by Secured Party under this Agreement, together with interest as provided herein on all such advances made by Secured Party;

Second: To the payment of the whole amount then due, owing and unpaid under the Guaranty; and

23

Third: The surplus, if any, to Assignor unless otherwise required by applicable law.

Secured Party and any receiver or custodian of the Collateral or any part thereof shall be liable to account for only those rents, issues, proceeds and profits, as applicable, actually received by it.

e.      Secured Party may adjourn from time to time any sale by it to be made under or by virtue of this Agreement by announcement at the time and place appointed for such sale or for such adjourned sale or sales and, except as otherwise provided by any applicable law, Secured Party, without further notice or publication, may make such sale at the time and place to which the same shall be so adjourned.

f.      Upon the completion of any sale or sales made by Secured Party under or by virtue of this Section, Secured Party, or any officer of any court empowered to do so, shall execute and deliver to the accepted purchaser or purchasers a good and sufficient instrument, or good and sufficient instruments, granting, conveying, assigning and transferring all estate, right, title and interest in and to the Collateral. Secured Party is hereby irrevocably appointed the true and lawful attorney-in-fact of Assignor (coupled with an interest), in their name and stead, to make all necessary conveyances, assignments, transfers and deliveries and for that purpose Secured Party may execute all necessary instruments of conveyance, assignment, transfer and delivery, and may substitute one or more Persons with like power, Assignor hereby ratifying and confirming all that their said attorney-in-fact or such substitute or substitutes shall lawfully do by virtue hereof. Nevertheless, Assignor, if so requested by Secured Party, shall ratify and confirm any such sale or sales by executing and delivering to Secured Party, or to such purchaser or purchasers all such instruments as may be advisable, in the sole judgment of Secured Party, for such purpose, and as may be designated in such request. Any such sale or sales made under or by virtue of this Section shall operate to divest all the estate, right, title, interest, claim and demand whatsoever, whether at law or in equity, of Assignor in and to the Collateral, and shall, to the fullest extent permitted under applicable law, be a perpetual bar, both at law and in equity against Assignor and against any and all persons claiming or who may claim the same, or any part thereof, from, through or under Assignor.

g.      In the event of any sale made under or by virtue of this Section, the entire Guaranteed Debt immediately thereupon shall, anything in the Guaranty to the contrary notwithstanding, become due and payable.

h.      Upon any sale made under or by virtue of this Section (whether made under the power of sale herein granted or under or by virtue of judicial proceedings or a judgment or decree of foreclosure and sale), Secured Party may bid for and acquire the Collateral or any part thereof and in lieu of paying cash therefor may make settlement for the purchase price by crediting upon the Guaranteed Debt the net sales price after deducting therefrom the expenses of the sale (including, without limitation, transfer taxes) and the costs of the action.

i.      No recovery of any judgment by Secured Party and no levy of an execution under any judgment upon the Collateral or upon any other property of Assignor shall release the lien of this Agreement upon the Collateral or any part thereof, or any liens, rights, powers or remedies of Secured Party hereunder, but such liens, rights, powers and remedies of Secured Party shall continue unimpaired until all amounts due under the Primary Note and the Guaranty are paid in full.

j.      Upon the exercise by Secured Party of any power, right, privilege, or remedy pursuant to this Agreement which requires any consent, approval, registration, qualification, or authorization of any governmental entity, Assignor agrees to execute and deliver, or will cause the execution and delivery of, all applications, certificates, instruments, assignments and other documents and papers that Secured Party or any purchaser of the Collateral may be required to obtain for such

governmental consent, approval, registration, qualification, or authorization and Secured Party is hereby irrevocably appointed the true and lawful attorney-in-fact of Assignor (coupled with an interest), in its name and stead, to execute all such applications, certificates, instruments, assignments and other documents and papers.

k.	Secured Party may comply with any applicable law in connection with the disposition of the Collateral, and Secured Party's compliance therewith will not be considered to adversely affect the commercial reasonableness of any sale of the Collateral.

l.	Secured Party may sell the Collateral without giving any warranties as to the Collateral. Secured Party may specifically disclaim any warranties of title, possession, quiet enjoyment or the like. This procedure will not be considered to adversely affect the commercial reasonableness of any sale of the Collateral.

m.	Upon request or demand of Secured Party following an Event of Default, Assignor shall, at its expense, assemble the Collateral and make it available to Secured Party at a convenient place acceptable to Secured Party. Assignor shall pay to Secured Party on demand any and all expenses, including reasonable legal expenses and attorneys' fees and all transfer taxes, incurred or paid by Secured Party in protecting its interest in the Collateral and in enforcing its rights hereunder with respect to the Collateral. Any notice of sale, disposition or other intended action by Secured Party with respect to the Collateral given to Assignor in accordance with the provisions hereof at least ten (10) days prior to such action shall constitute reasonable notice to Assignor.

n.	Assignor waives any and all legal requirements that Secured Party institute any action or proceeding at law or in equity against Assignor or any other party, or exhaust its remedies against Assignor or any other party in respect of any other security held by Secured Party for the Guaranteed Debt or any portion thereof as a condition precedent to exercising its right and remedies pursuant to this Agreement.

o.	Secured Party may terminate or rescind any proceeding or other action brought in connection with its exercise of the remedies provided herein at any time before the conclusion thereof, as determined in Secured Party's sole discretion and without prejudice to Secured Party.

p.	The interests and rights of Secured Party under the documents evidencing the Primary Loan shall not be impaired by any indulgence, including (a) any renewal, extension or modification which Secured Party may grant with respect to the Primary Loan; (b) any surrender, compromise, release, renewal, extension, exchange or substitution which Secured Party may grant with respect to the Primary Loan documents or any portion thereof; or (c) any release or indulgence granted to any maker, endorser, or surety of the Primary Loan.

q.	Secured Party shall have the right from time to time to take action to recover any sum or sums which constitute a part of the Guaranteed Debt as the same become due and payable hereunder (after the expiration of any grace period or the giving of any notice herein provided), without regard to whether or not the balance of the Guaranteed Debt shall be due, and without prejudice to the right of Secured Party thereafter to bring an action of foreclosure, or any other action, for a default or defaults by Assignors existing at the time such earlier action was commenced.

r.	Notwithstanding the appointment of any custodian, receiver, liquidator or trustee of Assignor, Borrower, or of any of their property, or of the Collateral or any part thereof, to the extent permitted by applicable law, Secured Party shall be entitled to obtain possession and control of all Collateral.

25

8. Release and Termination. If all of the Primary Loan be paid as the same becomes due and payable, and if all of the covenants, warranties, undertakings, and agreements made in this Agreement are kept and performed, then all rights under this Agreement shall terminate and the Collateral shall become wholly clear of the security interest evidenced hereby, and such security interest shall be released by Secured Party in due form at Assignor's cost.

9. Waiver and Modification. Secured Party may waive any default without waiving any other prior or subsequent default. Secured Party may remedy any default without waiving the default remedied. The failure by Secured Party to exercise any right, power, or remedy upon any default shall not be construed as a waiver of such default or as a waiver of the right to exercise any such right, power, or remedy at a later date. No single or partial exercise by Secured Party of any right, power, or remedy hereunder shall exhaust the same or shall preclude any other or further exercise thereof, and every such right, power, or remedy hereunder may be exercised at any time and from time to time. No modification or waiver of any provision hereof nor consent to any departure by Assignor therefrom shall in any event be effective unless the same shall be in writing and signed by Secured Party and then such waiver or consent shall be effective only in the specific instances, for the purpose for which given and to the extent therein specified. No notice to nor demand on Assignor in any case shall of itself entitle Assignor to any other or further notice of demand in similar or other circumstances. Acceptance by Secured Party of any payment in an amount less than the amount then due on any secured indebtedness shall be deemed an acceptance on account only and shall not in any way affect the existence of a default hereunder.

10. Copies. A photographic or other reproduction of this Agreement or of any financing statement relating to this Agreement shall be sufficient as a financing statement.

11. Recordation and Filing. Assignor will cause all financing statements and continuation statements relating hereto to be recorded, filed, re-recorded, and refiled in such manner and in such places as Secured Party shall reasonably request, and will pay all such recording, filing, re-recording, and refiling taxes, fees, and other charges.

12. Cash Management Agreement. No later than ten (10) days after the date hereof, Assignor shall open a bank account (the "Deposit Account") with a banking institution with offices in Houston, Texas (the "Bank") for the purposes of depositing (i) all funds received from a Third Party Sale and (ii) all distributions received from COP (collectively, the "COP Distributions"). Assignor shall cause COP to make electronic payments of the COP Distributions directly into the Deposit Account no later than two (2) business days following COP's receipt thereof. Within thirty (30) days after Assignor's receipt of the first of the COP Distributions, Assignor, Secured Party and Bank shall enter into an agreement (the "Cash Management Agreement"), which shall provide for the custody, management and disposition of the COP Distributions. The Cash Management Agreement shall provide that Bank will deliver or make available statements and balance data on the Deposit Account to Assignor and Secured Party. Further, the Cash Management Agreement shall provide that on a periodic basis, no less frequently than quarterly, a percentage of the funds in the Deposit Account (being not less than fifty percent (50%) of the COP Distributions received by Assignor from time to time) shall be disbursed to Secured Party in order to pay the Guaranteed Debt, with the remaining funds in the Deposit Account disbursed to Assignor to pay ordinary operating expenses, including but not limited to wages, salaries, benefits and other expenses of employees, agents, and contractors, personal property, ad valorem, and state and federal income taxes, insurance premiums, the Assignor's costs of operation and maintenance of its properties, general office expenses, tax, legal and other professional consultants. The Cash Management Agreement shall further provide that in the event of a default under the Primary Loan, the Guaranty or this Agreement, then all funds in the Deposit Account shall be disbursed to Secured Party until either (i) the event of default is cured; or (ii) Guaranteed Debt is paid in full.

13. **Partial Security.** If any part of the secured indebtedness cannot be lawfully secured by this Agreement, or if any part of the Collateral cannot be lawfully subject to the security interest hereof to the full extent of such indebtedness, then all payments made shall be applied on said indebtedness first in discharge of that portion thereof which is not secured by this Agreement.

14. **Assignment.** Secured Party may assign this Agreement in connection with an assignment of the indebtedness secured hereby so that the assignee shall be entitled to the rights and remedies of Secured Party hereunder and in the event of such assignment, Assignor will assert no claims or defenses it may have against the assignee except those granted in this Agreement.

15. **Power of Attorney.** Assignor hereby irrevocably appoints and instructs Secured Party as its attorney-in-fact, with full authority in the place and stead of Assignor and in the name of Assignor, Secured Party or otherwise, from time to time in Secured Party's discretion to take any and all actions necessary and proper, to carry out the intent of this Agreement and (a) to perfect and protect the lien, pledge, assignment and security interest of Secured Party created hereunder, (b) from and during the continuance of an Event of Default, (i) to ask, demand, collect, sue for, recover, compromise, receive and give acquittance and receipts for moneys due and to become due under or in respect of any of the Collateral, (ii) to file any claims or take any action or institute any proceedings for the collection of any of the Collateral or otherwise to enforce the rights of Secured Party with respect to any of the Collateral, and (iii) in connection with the exercise of any power, right, privilege or remedy pursuant to this Agreement, to make all necessary assignments, transfers and deliveries of the Collateral and rights and to execute all applications, certificates, instruments, assignments and other documents and papers, (c) to collect and receive any insurance proceeds paid with respect to any portion of the insurance policies required to be maintained hereunder, and to endorse any checks, drafts or other instruments representing any insurance proceeds whether payable by reason of loss thereunder or otherwise. Assignor hereby ratifies, approves and confirms all actions taken by Secured Party and its attorneys-in-fact pursuant to this Section. Secured Party will not be liable for any acts of commission or omission nor for any error of judgment or mistake of fact or law with respect to its dealings with the Collateral. This power of attorney, being coupled with an interest, is irrevocable until the date upon which the Guaranteed Debt has been indefeasibly satisfied in full. Without limiting the foregoing, if Assignor fails to perform any agreement or obligation contained herein, Secured Party may itself perform, or cause performance of, where necessary or advisable in the name or on behalf of Assignor, and at the expense of Assignor, as applicable.

16. **Notices.** Any notice, request, demand, or other communication required or permitted hereunder, or under any note, guaranty, loan or agreement, or other instrument securing the payment of the Guaranteed Debt (unless otherwise expressly provided herein), shall be given in writing by delivering same in person to the intended addressee, or by United States Postal Service, postage prepaid, registered, or certified mail, return receipt requested, sent to the intended addressee at the address shown herein, or to such different address as the addressee shall have designated by written notice sent in accordance herewith and actually received by the other party at least ten (10) days in advance of the date upon which such change of address shall be effective.

17. **Binding on Successors and Assigns.** This Agreement shall be binding upon Assignor, and the heirs, devisees, representatives, receivers, trustees, successors, and assigns of Assignor, and shall inure to the benefit of Secured Party and the successors and assigns of Secured Party. All references in this Agreement to Assignor or Secured Party shall be deemed to include all such other persons and entities.

18. **Partial Invalidity.** Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law. A determination that any provision of this Agreement is unenforceable or invalid shall not affect the enforceability or validity of any other provision, and any determination that the application of any provision of this Agreement to any

27

person or circumstance is illegal or unenforceable shall not affect the enforceability or validity of such provision as it may apply to any other persons or circumstances.

19. <u>Consumer Credit Obligations</u>. Notwithstanding anything to the contrary contained herein, if any secured indebtedness shall be indebtedness resulting from an extension of credit to a consumer (as such terms are defined or described in 12 C.F.R. 227, Regulation AA of the Federal Reserve Board) hereinafter referred to as a "consumer credit obligation," then the collateral securing any such consumer credit obligation shall not extend to any non-possessory security interest in household goods which is not a purchase money security interest (as defined in said Regulation AA), and no waiver of any notice herein shall be construed under any circumstances to extend to any waiver of notice which is prohibited by Regulation AA.

20. <u>Miscellaneous</u>.

a. The term "Assignor" as used in this Agreement shall be construed as singular or plural to correspond with the number of persons executing this Agreement as Assignor. The pronouns used in this Agreement are in the neuter gender but shall be construed as feminine or masculine as occasion may require.

b. The section headings appearing in this Agreement have been inserted for convenience only and shall be given no substantive meaning or significance whatever in construing the terms and provisions of this Agreement. Unless otherwise defined herein, terms used in this Agreement which are defined in the Texas Uniform Commercial Code are used with the meanings as therein defined.

c. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas and the United States of America.

**THIS WRITTEN AGREEMENT AND THE GUARANTY AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

This Security Agreement is executed as of the 30 day of January, 2014.

ASSIGNOR:

West 17th Resources, LLC,
a Delaware limited liability company

By: Gansevoort Investments, LLC,
a Delaware limited liability company, its Manager

By: _____
Allen Lawrence Berry, Manager

Address for Notice Purposes:

5005 Riverway, Suite 440
Houston, TX 77056

SECURED PARTY:

Inner Channel Investments, Inc., a Texas corporation

By: _____

Ed Martin, President

Address for Notice Purposes:

1414 Valero Way
Corpus Christi, TX 78409

Form of Assignment of Partnership Interest

## ASSIGNMENT AND ASSUMPTION OF PARTNERSHIP INTEREST

This <u>Assignment and Assumption of Partnership Interest</u> (the "Assignment") is made this 30 day of January, 2014, by and between Inner Channel Investments, Inc., a Texas corporation (the "Assignor"), and Orca Assets GP, LLC, a Texas limited liability company (the "Assignee").

RECITALS

WHEREAS, the Assignor is a partner in Orca ICI Development, a Texas general partnership (the "Partnership"); and

WHEREAS, the Assignee is also a partner in the Partnership; and

WHEREAS, Assignor owns a 95.3985% Percentage Interest in the Partnership, as the term "Percentage Interest" is defined in the <u>Amended and Restated Partnership Agreement of Orca ICI Development</u> dated May 11, 2011 (the "Partnership Agreement"); and

WHEREAS, the Assignor desires by this Assignment to assign to the Assignee all of Assignor's interest in the Partnership (the "Assigned Partnership Interest"), and the Assignee desires by this Assignment to accept the same.

NOW, THEREFORE, FOR AND IN CONSIDERATION of the purchase price of the Assigned Partnership Interest as set forth in that certain <u>Purchase and Sale Agreement</u> of even date herewith, entered into by and among the Assignor and the Assignee, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged and confessed by each party, and the above recitals which are incorporated herein by reference, the parties agree as follows:

ASSIGNMENT

Effective as of _____, 2014 (the "Effective Date"), Assignor conveys, transfers, and assigns to the Assignee and the Assignee accepts and assumes from the Assignor the Assigned Partnership Interest in the Partnership, as well as any and all right, title, and interest of Assignor under the provisions of the Partnership Agreement, or in and to any of the Partnership's assets. Assignor represents and warrants that the Assigned Partnership Interest conveyed, transferred and assigned pursuant to this Assignment represents all of Assignor's interest in the Partnership, and upon execution and delivery of this Assignment, Assignor shall have no further continuing Partnership Interest in the Partnership. Assignor further represents and warrants that (a) it is the owner of the Assigned Partnership Interest, free and clear of all liens, charges, pledges, encumbrances, security interests or rights of third parties; (b) it has full power and authority to enter into this Assignment and to sell and convey the Assigned Partnership Interest upon the terms provided in this Assignment to the Assignee; (c) there are no outstanding option rights, rights of first refusal or other arrangements relating to the Assigned Partnership Interest (other than as set forth in the Partnership Agreement), and Assignor has not sold, granted, transferred or otherwise assigned to any person, entity or any party any right, title or interest in the Assigned Partnership Interest; (d) this Assignment constitutes the valid, binding and enforceable obligation of Assignor; and (e) the execution and delivery by Assignor of this Assignment and the performance of its respective obligations hereunder do not violate, conflict with, invalidate, cancel, or interfere with, or constitute a default under any contract, agreement or court order to which Assignor is a party or is bound.

IN WITNESS WHEREOF, each party hereto has executed and sealed this Assignment or caused it to be executed and sealed on its behalf by its duly authorized representatives, the day and year first above written.

**Assignee:**

Orca Assets GP, LLC, a Texas limited liability company

By: _____
Allen Lawrence Berry, President

**Assignor:**

Inner Channel Investments, Inc., a Texas corporation

By: _____
Ed Martin, President

# EXHIBIT 46

**Attachments:** LSP - EQUITY ORG CHART 051320.pdf

**From:** Albert Theodore Powers <atpowers@allied-pacific-group.com>
**Sent:** Wednesday, May 13, 2020 10:53 AM
**To:** Lawrence Berry; Berry Marvin (Marty); Dennis Berry; Tonja Fulghum; Boyd Butch
**Subject:** [External Email] Organizational Structure

Good Morning All,

The attached organogram reflects the structure that is currently being discussed with ECP.

Best regards,

Ted

--
Albert Theodore Powers
Allied Pacific Group
Email: atpowers@allied-pacific-group.com

New York
Telephone: +(1) (212) 899-9889
Mobile: +(1) (212) 899-9888
Hong Kong
Telephone: +(852) 8108-8380
Mobile: +(852) 9099-3909



STRICTLY CONFIDENTIAL 05.13.2020

**EXHIBIT 50**

CAUSE NO. 21-0621

| | | |
|---|---|---|
| ALBERT THEODORE POWERS and | § | IN THE DISTRICT COURT |
| ALLIED PORTS LLC | § | |
| | § | |
| | § | |
| v. | § | |
| | § | 215th JUDICIAL DISTRICT |
| AXIS MISTREAM HOLDINGS, LLC, | § | |
| ALLEN LAWRENCE BERRY, | § | |
| MARVIN GLENN BERRY, and | § | |
| BONNIE BERRY, as successor in interest to | § | HARRIS COUNTY, TEXAS |
| DENNIS WAYNE BERRY | § | |

**AFFIDAVIT OF MIKE HUMMELL**

| | |
|---|---|
| **STATE OF TEXAS** | § |
| | § |
| **COUNTY OF NUECES** | § |

BEFORE ME, the undersigned notary, on this day personally appeared MIKE HUMMELL, the affiant and a person whose identity is known to me. After I administered an oath to the affiant, the affiant testified as follows:

1.      "My name is Mike Hummell. I am Vice President and General Counsel for Berry GP, Inc. ("Berry GP"). I am over 18 years of age, of sound mind, and capable of making this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct.

2.      As Vice President and General Counsel for Berry GP, Inc., I have knowledge of the company's relationships, operations, and business activities. I have personal knowledge of the Midway to Harbor Island Project, which is the subject of the above-reference litigation.

3.      The Midway to Harbor Island Project that is the subject of the TRO in the above-referenced litigation is located entirely in San Patricio and Nueces Counties. The Project consists of a series of pipelines to transport petroleum products from oil and gas facilities in San Patricio County to a loading terminal to be constructed on Harbor Island, which is the termination point for the pipeline. Harbor island sits on the edge of the Corpus Christi ship channel. The new terminal will allow ships to load petroleum without having to enter the inner harbor.

4.      Berry GP, Inc. has invested over $20 million in the Midway to Harbor Island Project. It is the principal investor in the Project and ultimate parent company of the entities that own the Project property and hold the leases and permits for the Project.

5.      Redfish Bay Terminal, Inc. owns property and infrastructure that will form an

1

integral part of the Project. Redfish Bay Terminal, Inc. is wholly owned by Berry GP, Inc.

6. Marvin Glenn Berry ("Marty") personally invested in the Midway to Harbor Island Project and bought the "Midway Junction" property for the Project, which is located in San Patricio County.

7. Dennis Berry negotiated a lease for Harbor Island with the Ed Rachal foundation for property where terminal will be located. That lease is held by an entity named Canada Project Holdings, which is owned and controlled by the Berry brothers.

8. All of the payments made in furtherance of the Project came through Nueces County and Berry GP, Inc. All of the negotiations, property purchases, leases, infrastructure, permitting, and other activities in furtherance of the project occurred in Nueces County or San Patricio County.

9. Plaintiffs have filed a TRO asserting an interest in Project property located in Nueces County and San Patricio County. The TRO additionally prohibits Bonnie Berry, Marty Berry, and Canada Project Holdings from exercising their ownership interest in the Nueces County property and lease.

10. Attached hereto are 5 pages of records. Exhibit A is a copy of 4 pages from the Permit Application with the U.S. Army Corps of Engineers showing the property that will comprise the Midway to Harbor Island Project and is the subject of this litigation. The Permit Application pages show the Project is located in San Patricio and Nueces County. Exhibit B is a copy of the Notice of Meeting of Owners of Axis Midstream Holdings, LLC, which was to take place in Nueces County on November 6, 2024 and which forms the basis for the filing of the TRO. These are exact duplicates of the original records. As a custodian of records for Berry GP, Inc., I am familiar with the manner in which these records are created and maintained. It is the regular practice of Berry GP, Inc. to make this type of record at or near the time of the act or event set forth in the record. It is also the regular practice of Berry GP, Inc. for this type of record to be made by persons with knowledge of the matters set forth therein. The records were kept in the course of regularly conducted business activity, and it is the regular practice of the business activity to make the records."

Further, Affiant sayeth naught.

2

_Mike Hummell_
MIKE HUMMELL

SWORN TO AND SUBSCRIBED before me by MIKE HUMMELL on this the 8th day of November 2024.

M. Margot Valdez

NOTARY PUBLIC, STATE OF TEXAS

M MARGOT VALDEZ
ID# 124192168
Notary Public
STATE OF TEXAS
My Comm. Exp. 06-29-2028

NOTARY PUBLIC
STATE OF TEXAS

# EXHIBIT 1

REPORTER'S RECORD

VOL. 1 OF VOL. 1

COURT CAUSE NO. 2024-76060

ALBERT THEODORE POWERS;    ) IN THE DISTRICT COURT
ALLIED PORTS, L.L.C.,      )
  Plaintiffs,             )
                           ) HARRIS COUNTY, TEXAS
vs.                        )
                           )
AXIS MIDSTREAM HOLDINGS,LLC)
ALLEN LAWRENCE BERRY       )
MARVIN GLENN BERRY; and    )
BONNIE BERRY, as successor )
in interest to DENNIS WAYNE)
BERRY                      )
  Defendants.              ) 215TH JUDICIAL DISTRICT

*********************************************

PLAINTIFFS' MOTION FOR TEMPORARY INJUNCTION

*********************************************

On the 12th day of November 2024, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Elaine Palmer, Judge Presiding, held in Houston, Harris County, Texas.

Proceedings reported by computer-aided transcription/stenograph machine.

A P P E A R A N C E S

Mr. Alistair B. Dawson
SBOT NO. 05596100
Mr. M. Jake McClellan
SBOT NO. 24109525
Ms. Madeline E. Gay
SBOT NO. 24138681
BECK REDDEN
1221 McKinney Street, Suite 450
Houston, Texas 77010
TELEPHONE: (713) 951-3700
ATTORNEYS FOR THE PLAINTIFFS

    - AND -

Mr. Douglas A. Allison
SBOT NO. 01083500
LAW OFFICES OF DOUGLAS ALLISON
403 N. Tancahua Street
Corpus Christi, Texas 78401
TELEPHONE: (361) 888-6002
Ms. Vanessa Gilmore
SBOT NO. 07960010
ROBERTS MARKLAND LLP
609 Main Street, Suite 3930
Houston, Texas 77002
TELEPHONE: (713) 651-1400
ATTORNEYS FOR THE DEFENDANT

ALSO PRESENT:
Mr. Barrett Reasoner
Mr. Michael Absmeier
ATTORNEYS FOR MR. LAWERENCE BERRY

P R O C E E D I N G

THE COURT: We are now on the record, Cause No. 2024-76060, *Albert Theodore Powers; Allied Ports, LLC v. Axis Midstream Holdings, LLC; et al.*

Will counsels identify themselves for the record and the parties they represent?

MR. DAWSON: Your Honor, Alistair Dawson with Beck Redden, along with me is Jake McClellan and Madeline Gay for the Plaintiffs.

THE COURT: Thank you.

MR. ALLISON: Your Honor, Doug Allison for Marvin Berry and Bonnie Berry, Defendants. dough all son for M be the deposits.

MS. GILMORE: And Your Honor, Vanessa Gilmore, also for Marvin Berry and Bonnie Berry, the Defendants.

THE COURT: Thank you. Mr. Dawson, this is y'all's motion for a temporary injunction, so you may proceed with an opening.

MR. ALLISON: We do have some objections that we want to put on the record. The Court may or may not be aware -- 'cause I realize it was an extended weekend for Veteran's Day and here we are at 8:00 a.m. on a Tuesday morning

and I'm not sure what's on your computer.

THE COURT: It's hitting now.

MR. DAWSON: There's been a lot of filings, okay?

THE COURT: Okay.

MR. DAWSON: And what happened is, whatever it was, 10, 12 days ago, they got a TRO entered; and then that application for a temporary injunction was set for hearing, of course, by the ancillary judge for this morning.

They have since, as of late yesterday, they have filed an amended application. So, we're no longer here on the application that they filed two weeks ago; and we have only had one day, last night, to look at their new application, which in many ways is very, very different. So, we are going to object to going forward.

Candidly, Your Honor, they are looking at tying up a -- it's literally a billion dollar project in Nueces County that's being developed and they want to stop the people, who they even admit, "We think we own 100 percent of it." They admit we own 80 percent of it, and they

want to shut us out and we'd like more than a day to address that.

And we've also, Your Honor, filed a plea in abatement because this control fight actually started a year ago. They filed in Nueces County; and then that case got moved -- I'm sorry, they filed in Harris County a year ago; and that case got moved to Nueces County. So, we've been fighting on this same fight for a year.

So there's a dominate jurisdiction issue that's raised in the motion, our plea in abatement, our motion to abate, that goes to this court's jurisdiction to act since the court in Nueces County already have jurisdiction and have been acting on the matter for a year.

So, there's a jurisdictional issue. My experience, most courts like to get jurisdictional issues resolved before they start ruling on merits.

And then we've also then -- last time, a year ago when they filed, we had an agreed motion to transfer. We transferred it by agreement to Nueces County, and we think this

one should be, because of mandatory venue provisions, transferred.

So, I know that's mouthful, and I apologize; but we think that one, we're certainly entitled to more than one day's notice on a temporary injunction hearing that they want to tie up an entity or project that's, literally, a billion dollar project down in Nueces County.

We think all of those motions probably need to be reset to a later time so that everybody can have -- in fairness, let everybody have their time on briefing, let the Court know the tsunami is no coming, rather than you're walking in this morning and going, "What's on my"-- you know, and figuring out, oh, my gosh. It's probably ten times larger than you thought it was, okay?

And so, I think that's the best I can do in terms of giving you a very broad outline. We do object to going forward on the temporary injunction because we've only had a day's notice, and it's a huge project they want to stop.

THE COURT: Response?

MR. DAWSON: Yes, Your Honor. Can I give you a brief overview of what this case is about and I'll address Mr. Allison's argument?

THE COURT: Sure.

MR. DAWSON: My client, Mr. Powers, who is over here, was hired by the Defendants in November of 2018. They were developing this project -- it's called the Loan Star Ports Project; but it's an oil export terminal to be built outside of Corpus Christi.

And he was hired to help them negotiate terms, financing terms, find investors, put the corporate structure together. In the document, which he was hired, he's granted an ownership interest in the project. It's a 20 percent ownership interest that kicks in after the Defendants received $250 million.

What has happened is, that even though -- you'll see all the exhibits that we have today -- his 20 percent ownership interest is reflected in all the corporate documents. He's set up the corporate structure, as they asked him to. They had a deal with Carlise Group. It ultimately fell apart, but that deal realized huge value for the Defendants, took

the value of this project, from their perspective, from 20 million to $400 million for the Defendants. So he has huge value to this.

He works on the project. They're waiting for their permits from the US Army Corps of Engineers; and what happened is, on October, I believe, 22nd of this year, they got their permits. So now they are ready to get started with building the project and the project is finally going to get moving forward because they can build this terminal.

Well, soon thereafter, arrest the Defendants, you'll see in these documents, they attempt to basically take control of this project and exclude his 20 percent interest. They're trying to steal his 20 percent interest.

They say, "Oh, no, no. It's only by three Berrys. They're the only ones that have an ownership interest," and you'll see these documents.

And then, even though they knew that they were not owners of this Axis Midstream -- Axis Midstream is the company that holds the permit.

They got the permit from the US Army Corps of Engineers; and even though they know that they are not owners of Axis, they purport to call a meeting of Axis Midstream that was set for, I think, November the 6th, to change the managers, to change the officers, to basically do whatever they wanted to do with Axis. And they even talked about moving Axis into this other entity that they own.

So, they would move the company that owns the permit for this billion dollar project, they would move it into another entity that they control, which they there not allowed to do under the corporate documents, which we will show you.

Now, with respect to -- let me address the pleading that we filed yesterday. When I filed this petition, it was on very short notice. We had to get a temporary restraining order. I did not have all the facts.

For example, one of the facts we allege in our original petition was they stopped paying Mr. Powers in April of 2020 under the compensation agreement that he had. Well, I learned yesterday that that part of the

compensation agreement was terminated; and there is a letter that I did not know about -- and I'm going to show you, in evidence in this case, in the injunction hearing, they terminated that agreement effective April of 2020.

So, I modified our breach of contract claim 'cause we're no longer that they stopped paying $100,000 a month that he was entitled to under the compensation agreement 'cause it was properly terminated; and there is a response from Mr. Powers that I discovered yesterday where he acknowledges that he will not be paid this monthly stipend.

The relief that we're seeking, I think, is identical to what we originally sought in our original petition. Here is my practical suggestion and then I'm going to get to the plea in abatement.

My practical suggestion, Your Honor, is Mr. Powers is here from New York City. He's our first witness. I suggest that the Court proceed with the injunction hearing today and let us put on our evidence; and if you want to give them some time to respond to whatever they

think they need to respond to in the amended petition, the Court can extend the TRO for a period of 14 days and then give them some time to respond and then the Court can issue its ruling on the injunction and that's my suggestion on how we proceed today. We got all of our exhibits here and we're ready to go.

With respect to the plea in abatement, two issues. One is, the issues in this case are -- they are not related at all to the issues in the other case.

The other case, as I understand it, is the three Berrys. They own various Berry-related companies, and they are fighting about mismanagement of those three companies. None of those parties, none of those Berry entities are a party to this case.

Similarly, Mr. Powers and his company Allied, is not a party in that case. The courts will have to determine whether the claims being asserted by the Plaintiffs in this case are compulsory counterclaims to the claims that are being asserted in the Corpus Christi case. They cannot compulsory counterclaims because we are not a party to that case. How

can it be a compulsory counterclaim to Mr. Powers, when he's not a party to the case?

Moreover, the transactions and occurrences that are the subject of this case all have to do with his ownership interest in the Loan Star Ports Project. There's no contention, no mention of his ownership interest in the Corpus Christi case.

They do not even mention the Loan Star Ports Project. The project that is the central figure in this case is not even discussed in their petition or in their counterclaim.

Now, they filed this on Friday, after hours on Friday; and I have not had a chance to really to respond to it. We did file a response this morning, a brief response, which I'm happy to hand up to Your Honor if you would like it.

THE COURT: Okay.

MR. DAWSON: My suggestion is -- may I approach, Your Honor?

THE COURT: Yes.

MR. DAWSON: Would you like a copy of the book?

MS. GILMORE: Thank you.

MR. DAWSON: My suggestion, Your Honor, on the plea in abatement is, we need to get some discovery from this other case. I understand there was an injunction hearing in that other case. I need to get that transcript. I don't know whether it's -- depositions are not taken in that other case; but we did need to get some discovery in that case that we can file with Your Honor.

Your Honor, proceed with the hearing today. You will get a good flavor for what this case is about and what the issues are in this case, and then set a hearing down the road. We can file whatever we need to file in terms of the injunction transcripts or the pleadings from that other case, we can file those with the Court and the Court can have a hearing on the plea in abatement at some point in the future.

If you decide you want to abate it -- I don't think you will; but if you did, you can then address whatever needs to be addressed to the temporary injunction you may enter in this case.

And I'm not predisposing that; but if you

do grant the injunction and then you decided that their plea in abatement was appropriate, you can address what you need to do with the injunction order at that time.

So, I request, Your Honor, respectfully, let us proceed; and then as I said at the beginning, if you want to extend the TRO for 14 days and let them file something, they can file it and take that into consideration and issue your ruling on the injunction.

THE COURT: Response?

MS. GILMORE: Yes, Your Honor. I think that the principal thing we need to think about here is, the Court should always test jurisdiction first.

The case in Nueces County has already been pending for over a year. There was a three-day temporary injunction hearing filed in that case. Mr. Dawson is correct, they were not exactly the same parties; but the issues are completely interrelated and that case really does dominance jurisdiction over the issues in this case.

And so, it would really not be -- it would be really a waste of the Court's judicial

efficiency to start all over again with another temporary injunction hearing today, when we already had another one. Mr. Dawson acknowledges that he needs to figure out what happened in that case. He needs to see what the transcript read in terms of what happened during that temporary injunction hearing.

He's needing some discovery with regard to that, and then he mentioned some other documents that he just discovered yesterday. I do not even know what he's talking about. We need to see what documents he's talking about that he just came address yesterday.

With respect to the contract at issue he's basing his entire case on and relying on with respect to the claims against Marvin Berry, Marvin Berry did not sign that contract. Now, his brother, Lawrence, did sign that contract; but we are not even parties to that contract that he is basing his entire case on today.

And the fact that he -- that his client was not originally in the other lawsuit, does not deprive the court of Nueces County for dominant jurisdiction if the issues are interrelated, and they are very interrelated

here.

We think that the best course of action would be to give both of us a chance to do some discovery on those issues. Mr. Dawson needs some discovery. We need some discovery, and to let us come back in a couple of weeks and first address the plea in abatement and the motion for change of venue before we spend days rehashing some of the issues that are the exact issues that were already addressed by the court in Nueces County.

We think that this case belongs in Nueces County, consolidate it with the case that's already been pending for over a year on very interrelated issues, and that it would not be a good use of the Court's time to proceed with this temporary injunction hearing this morning, particularly when both of us are just getting documents in late.

They filed an amended complaint last night. We filed a motion for abatement and a motion for change of venue on Friday. All of us need some time to look at the issues that are going to be addressed before the Court, and we think that the best course of action, we

would hope that the Court will agree, is to give all of us a couple of weeks to figure out what we do with the motion for plea in abatement, what we do with the motion for change of venue and then come back and not waste this Court's time today with a temporary injunction hearing that is very interrelated to the temporary injunction hearing that we've already spent three days on in Nueces County.

THE COURT: Okay.

MR. DAWSON: Your Honor, brief response? First of all, it's often the case that you have injunction hearings and you go conduct discovery before the injunction hearing because they're set very quickly after the case is filed.

I'll also point out, they did not ask for any discovery. They did not ask me for a single thing. They didn't ask me for a document. All they asked for were the exhibits that were filed with our temporary restraining order, which we gave them. So, they haven't any sought any discovery.

The other thing I'll point out, Your Honor, is I'm looking at the original

petition in the Corpus case; and it's brought by Lawerence Berry against a number of --

THE COURT: Quick question, Counsel. Was that the case that was initially in the 333rd that y'all agreed to have transferred to Nueces County?

MR. DAWSON: It was originally filed in the 333rdd; and the lawyers in this case -- I'm not involved in that case -- they did agree to have it transferred to Nueces County, is my understanding.

THE COURT: Right. So, the Court's concern at this point is that because, if you-all are arguing that these are interrelated, then this -- I'm just saying, because it's being argued that it's interrelated, that this case may need to be attracted to the 333rd.

And if the 333rd was the original court that had these matters in Harris County and since Nueces is the nexus, for lack of a better word, with what's going on with both, that may pose a problem as to having a hearing in here when the hearing should be in the 333rd.

MR. DAWSON: So, Your Honor, the cases are

not interrelated; and if I can spend a moment on that and I'll address the venue in a second. So, the original petition in the Lawrence Berry, alleges misconduct by the Defendants for the three entities that are referred to in this petition as the Berry entities.

Those Berry entities are not parties this case. There's no mention in his original petition about Mr. Powers, about Allied, the Plaintiff. There's no mention about the Loan Star Ports Project. There's no mention about who owns the Loan Star Ports Project, which is central issue in this case.

The counterclaim by Berry Operating Company, Berry Contracting Company and Marty Berry, only Mr. Berry is a party to this case, the Berry Operating Company and Berry Contracting, they allege similar misconduct or they allege misconduct on the part of Mr. Berry.

That's not an issue in this case. There's no allegation in this case that Mr. Lawrence Berry did anything wrong, and there's no allegation in the counterclaim about the Loan Star Ports Project, the ownership of

the Loan Star Ports Project, no mention of Mr. Powers or his company Allied. So they are not interrelated.

With respect to the venue, I would point out that the agreement that is the center of this case -- there's two agreements, an investment agreement and a compensation agreement; and you're going to hear testimony that those agreements were signed by Marty Berry in a meeting that took place on May 28th, 2019 in Corpus Christi.

And that agreement provides for jurisdiction and venue in Harris County. So, it's very different for whatever happened in that other case.

And you're going to hear testimony, Your Honor, that all the work that Mr. Powers did in connection with this project was done here in Houston. He had an apartment here in Houston. It was paid for by the Defendants. He did work here in Houston. He negotiated deals here in Houston. He negotiated terms of -- the Carlise deal was done here in Houston. So, the nexus of his work is not in Corpus. It's here in Houston.

So, I respectfully submit, Your Honor, that the way to go -- we properly noticed the hearing for the injunction. It's the time the Court gave us or the ancillary judge gave it to us. I think we should proceed today. We're ready to go; and if the Court determines later that it needs to go to the 333rd or you want to consider their plea in abatement, that's fine.

But at least the Court will have the benefit of today's testimony and the documents that we're going to put in evidence so you'll know exactly what this case is about; and I'm confident that once you learn about this case and what the issues are in this case, you're going to determine that what this case -- claims in this case are not at all related to the claims that are being asserted down in Nueces County.

MR. REASONER: Your Honor, this is Barrett Reasoner with Gibbs and Bruns. I'm sorry to be talking in front of the cheap seats here.

THE COURT: You can come up so that the court reporter can hear you and see who's talking.

MR. REASONER: Thank you. Barrett Reasoner, good morning, Your Honor.

THE COURT: Good morning.

MR. REASONER: I just wanted to -- we were pointed out here, so I just wanted to point out one thing. We represent Mr. Lawrence Berry, who has been suspended here as a witness this morning. So, should he be presented, my colleague, Mr. Absmeier, will defend his testimony.

But I just wanted to clarify for the Court as to what happened a year ago in the 333rd. That -- there was no substance heard or decided upon by that court. There was a TRO entered by the ancillary judge and then went to the 333rd and we reached an agreement with opposing counsel to extend the TRO and transfer venue.

Importantly, this is not my motion to be heard; but it is accurate that this Loan Star Project is not involved in any way, shape or form in that the other case.

That is about they and the Berry companies and how they are operating, et cetera. The Loan Star Project and Mr. Powers are not involved whatsoever, and the 333rd has heard no

substance on that case, much less this separate case involving Mr Powers.

So, I just wanted to make that point for the record.  Sorry to interrupt, Your Honor.  Thank you.

THE COURT:  You're welcome.

MR. ALLISON:  Your Honor?

THE COURT:  Yes.

MR. ALLISON:  Just to kind of -- nothing on the merits in the 333rd that case, for the same reasons we're asking this one to move.  That one was moved by agreement.  I understand they do not want to agree that that was moved by agreement to Nueces County.

There is huge point to be made.  I think it's interesting, what we're all over here really arguing so far is about the jurisdictional issue, whether or not the dominate jurisdiction and that should be the first one to get heard.

THE COURT:  Right.

MR. ALLISON:  And here they are pushing to hear an amended motion for temporary injunction that we just got yesterday and we do not even have three days notice on shutting down a

million dollar project.

And I do want to correct one thing for the record and I want to be very clear about this, the documents that they are relying on to ask this court for relief, my clients Marty Berry and Bonnie Berry, would have been her husband before her, her husband passed, Dennis Berry, Marty Berry and Dennis Berry never signed those documents they are trying to enforce on us, against us.

So, there's just a lot to unwind here; but we need more than a day's notice and on this amended pleading and the first thing to take up needs to be jurisdiction and I'm okay with given them time to do all of that.

And on top of that -- and this is probably the most important thing -- I was at the temporary injunction hearing for three days and I understand he wants the transcript and wants to find out what happened there, he told me that, Mr. Dawson; and he's entitled to that.

And when this clerk gets that -- nobody has it right now because it was not transcribed; but we had portions of the ruling transcribed, but not the entire transcript, I

don't think; but a big part of the fight there between the three brothers has to do with -- had to do with control of what they call Berry GP, which is sort of, for lack of a better term, the mothership, the main company that controls things.

And it was a huge control fight, which then trickles down to every company that the three brothers' fight, frankly, are involved in, including Axis.

And one thing -- I think Mr. Reasoner slightly misspoke, probably because he does not know the small details, the ownership of the Axis company we're here taking about today, was through that ownership -- Berry GP used to own 100 percent of the membership interest in it.

So, the light word in the case law specifically -- we used the word repeatedly -- interrelated, they are interrelated; but that's a fight that -- that jurisdictional fight needs to happen first.

And the only fair way to do that, if we cannot do the TI today on a day's notice, get us reset. We'll be happy to come back. Let's get them all heard and whatever order the Court

thinks it needs.

THE COURT: Right. So what I'm going to do is the jurisdictional. I'm going to move this to Monday morning; and if your client needs to appear via zoom, that's fine. We'll reset this so that everybody has enough time to respond to -- you'll get what you need for what they have.

They can look at your amended petition and application for temporary restraining order that was filed -- it just popped up on my page -- I'm presuming last night, sometime yesterday; but we can set you-all for 8:00 or 8:30. I said 8:30, but y'all get to pick.

MR. DAWSON: So, Your Honor, just while you're considering that, two things, one is, I anticipate this injunction hearing will be three hours.

THE COURT: That's fine. We can clear the day.

MR. DAWSON: And then the other thing is, we would like an order from the Court extending the temporary restraining order that's in place until the time of the injunction.

MS. GILMORE: Your Honor, we would just

agree to that extension.

MR. DAWSON: We'll submit an agreed order.

MR. ALLISON: There's some odd history and Mr. Reasoner knows why I'm about to say this, we like it to be unopposed by us, not agreed to it and then it will be your order.

THE COURT: That's fine, but we'll block out 8:30 to 12:30 on Monday for you-all. I know your client is here from New York; but if he needs to appear by zoom, let us know and we can queue it up so he can appear. We do not have a problem with that.

MS. GILMORE: Your Honor, what motion would you like to address first?

THE COURT: We're going to address the jurisdictional first, and then we'll do the T.I.

MR. ALLISON: We also have a motion to transfer venue on file, and we'll notice that and then it'll be up to Your Honor whether or not you want to hear that at any point in time.

MR. DAWSON: Your Honor, as you know, the rules provide 45 days timeframe from a motion to transfer venue.

My suggestion is, they don't want you to

hear anything. They want to file every motion they can so that they don't want you to get to the merits of this case. My suggestion is, you want to rule on the plea in abatement first, fine; and then take up the temporary injunction.

The motion to transfer venue should be set in accordance with the rules or at least 45 days out. If you decide later that you want to transfer venue, I guess it'll get transferred. I don't think that's going to happen.

But we'll just go with whatever rulings the Court has already made. So, respectfully, Your Honor, we just do the plea in abatement and the injunction next Monday.

MR. ALLISON: Just so the Court is aware, Texas Rule of Procedure 87 says 45 days. Then, of course, the phrase he left out, it says, except upon leave of court.

So, Your Honor can shorten the time to whatever amount of time Your Honor wants. Just so we have a complete record.

THE COURT: That's fine. I'll see you-all Monday morning at 8:30. You are excused.

(Hearing recessed at 8:30 a.m.)

THE STATE OF TEXAS )

COUNTY OF HARRIS   )

     I, Cantrece A. Addison, Certified Shorthand Reporter in and for the State of Texas, do hereby certify that the above and foregoing contains a true and correct transcript of all portions of evidence and other proceedings requested in writing by Counsel for the parties to be included in this Volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred via Zoom and were reported by me.

     I further certify that this Reporter's Record of the proceedings, truly and correctly reflects the exhibits, if any, admitted by the respective parties.

     I further certify that the total cost for the preparation of this Reporter's Record is $_____ and will be paid by _____.

     WITNESS MY OFFICIAL HAND this the 12th day of November, 2024.

             /s/Cantrece Addison
             _____
             CANTRECE A. ADDISON, CSR NO. 8236
             Expiration Date: 11/30/2025
             201 Caroline, 13th Floor
             Houston, Texas 77002

# EXHIBIT 2

# INVESTMENT AGREEMENT

THIS INVESTMENT AGREEMENT (the "Agreement") is made and entered into as of the 1st day of November, 2018 by and among Marvin Glen Berry, Dennis Wayne Berry, and Allen Lawrence Berry (collectively, the "Berrys"), and Albert Theodore Powers ("Powers") (each of the Berrys and Powers being referred to herein individually as a "Party" and collectively as the "Parties").

## RECITALS:

WHEREAS, the Berrys have devised a plan to develop, construct, own, and operate a system to allow hydrocarbon shippers maximum optionality to deliver hydrocarbons to local refinery markets in the vicinity of Corpus Christi, Texas and to export hydrocarbons via a premier United States Gulf Coast deep-water exporting facility, including without limitation shipping, reception, collection, consolidation, storage, staging, delivery, and exporting facilities, including a deep-water export terminal on Harbor Island, Texas, related tankage and pipelines, and other associated infrastructure, assets, facilities, and businesses, including without limitation certain real property and improvements currently owned, leased, optioned, or otherwise controlled by the Berrys and others at Redfish Bay, Midway Junction, and Harbor Island, Texas and additional properties and facilities to be acquired, leased, optioned, developed, or otherwise controlled by the Berrys and others (collectively, the "Project"); and

WHEREAS, simultaneously with this Agreement, the Parties are entering into another Agreement, pursuant to which the Berrys are appointing Powers as their representative and chief negotiator and adviser for the financing of the Project including without limitation negotiations with The Carlyle Group, and to perform due diligence, advice, and assistance regarding the sourcing of capital, develop strategy, and provide financial management and structuring advice and services. It is understood that Powers shall investigate various alternatives for financing all or portions of the Project, discuss with the Berrys various financing alternatives, assist the Berrys in formulating and interpreting financial projections for the Project and various potential transactions relating to the Project, assist the Berrys in formulating strategies to arrange the most favorable forms of financing for the Project, make financing recommendations to the Berrys, assist the Berrys in formulating strategies for achieving the most favorable terms for financing the Project, assist the Berrys in formulating business and holding structures for the Project, and negotiate terms and conditions of financing for the Project on behalf of the Berrys with various potential finance providers, including without limitation The Carlyle Group; and

WHEREAS, the Berrys and Powers wish to cooperate to (a) devise an ownership structure for directly and indirectly holding the Project and each of its major components, (b) secure third party financing for the Project, and (c) own and hold a portion of all interests in the Project, upon and subject to the terms and conditions of this Agreement;

NOW, THEREFORE, in consideration of the foregoing recitals and other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the Berrys and Powers hereby agree as follows:

1. **Creation of Holding Structure and Contribution of Project and Project Interests.** On or before May 31, 2019 (a) the Berrys and all other owners of interests in the Project and its major components or their respective designees will form one or more corporations, limited liability companies, or other tax efficient limited liability entities (each a "**Project Company**" and, collectively, the "**Project Companies**) to collectively own and hold one hundred percent (100%) of all equity interests in the Project and its major components, (b) the Berrys will transfer to the Project Companies one hundred percent (100%) of their interests in the Project and each of its major components in exchange for one hundred percent (100%) of the equity interests in the Project Companies, (c) the Berrys will form a limited liability company or other tax efficient limited liability entity ("**Holding Company**") to hold all equity interests in the Project Companies, (d) the Berrys will contribute to Holding Company all equity interests in the Project Companies in exchange for one hundred percent (100%) of the equity interests in Holding Company, (e) the Berrys will form a limited liability company or other tax efficient limited liability entity ("**Investment Company**") to hold all equity interests in Holding Company, and (f) the Berrys will contribute to Investment Company all equity interests in Holding Company in exchange for one hundred percent (100%) of the equity interests in Investment Company.

2. **Investment By Manager in Investment Company.** Within fifteen (15) days after (a) the Berrys and all other owners of interests in the Project and its major components or their respective designees have formed the Project Companies and transferred one hundred percent (100%) of their interests in the Project and each of its major components to the Project Companies, (b) all equity interests in the Project Companies have been contributed to Holding Company, (c) all equity interests in Holding Company have been contributed to Investment Company, and (d) the Berrys or their designees have received all equity interests in Investment Company (i) Powers will form a limited liability company or other tax efficient limited liability entity that is wholly owned by, or for the benefit of, Powers or his designees ("**Manager**"), (ii) Powers will contribute Five Thousand United States Dollars (US$5,000.00) to Manager in exchange for one hundred percent (100%) of Manager's operating interests and other ownership rights and interests, and (iii) Manager will contribute Five Thousand United States Dollars ($5,000) to Investment Company in exchange for a twenty percent (20%) overall carried interest and future profits interest in Investment Company after priority distributions to the Berrys or their designees of Two Hundred Fifty Million United States Dollars ($250,000,000) plus a ten percent (10%) cumulative preferred return on the outstanding balance of such amount. Except for the Five Thousand United States Dollar ($5,000) contribution to Manager and Investment Company described above, none of Manager, Powers, or any of their respective designees shall have any other obligation to contribute any other amounts to Investment Company, Holding Company, or any Project Company. The governing documents of Investment Company will reflect the respective interests of the Berrys, including their entitlement to priority distributions and preferred returns, and Investment Manager's twenty percent (20%) overall carried interest and future profits interest in Investment Company. Until the Berrys receive a priority return from Investment Company, Holding Company, and/or the Project Companies of Two

2

Hundred Fifty Million United States Dollars ($250,000,000) plus a ten percent (10%) cumulative preferred return on the outstanding balance of such amount, all gross amounts received by, or distributions made to, or on behalf of, Investment Company, Holding Company, and the Project Companies, including without limitation all earnings, proceeds, dividends, refinancing proceeds, disposition proceeds, incentive units or payments, or other receipts of any type or nature, shall be distributed to and paid to or on behalf of the Berrys or their designees and none of such amounts shall be paid or payable to or for the benefit of Manager or its designees. After the Berrys or their designees have received their priority distributions of Two Hundred Fifty Million United States Dollars plus a ten percent (10%) cumulative preferred return on the outstanding balance of such amount and Manager has received catch-up distributions from the Investment Company, eighty percent (80%) of all gross amounts received by, or distributions made to, or on behalf of Investment Company, Holding Company, and the Project Companies, including without limitation all earnings, proceeds, dividends, refinancing proceeds, disposition proceeds, incentive units or payments, or other receipts of any type or nature, shall be distributed to and paid to or on behalf of the Berrys or their designees and twenty percent (20%) of such amounts shall be paid or payable to or for the benefit of Manager or its designees. It is intended that the interests of Manager in Investment Company will qualify (i) as a carried interest within the meaning of Section 1061 of the United States Internal Revenue Code, and (ii) as a future profits interest within the meaning of Revenue Procedure 93-27, and that the governing documents of Investment Company will be drafted to reflect this intent. It is also intended that the capital accounts to be established and maintained by Investment Company will comply with the requirements of Treasury Regulations §1.704-1(b)(2)(iv) or any successor provision, and that such provisions will be interpreted and applied in a manner consistent with such Treasury Regulations or successor provisions and that the targeted allocations to be made to such capital accounts will reflect the Members' interests in the Company and have substantial economic effect. On or before the fifth (5th) day of each month, the Berrys shall provide to Manager a statement setting forth the total amounts of preferred return and priority distributions, if any, that have been received by them from Investment Company, Holding Company, and the Project Companies. Manager shall review each such statement and either confirm its agreement with the amounts shown on such statement or provide an alternative calculation of such amounts. If the Berrys and Manager do not agree on such calculation, they shall meet and attempt to reconcile their differences in the calculation of such amounts before resorting to any other remedy.

3. **Financing of Project**. To finance the development of the Project, it is anticipated that Investment Company will transfer its equity interests in Holding Company and/or one or more Project Companies to one or more other corporations, limited liability companies, or other tax efficient limited liability entities (each, a "**Project Entity**" and. collectively, the "**Project Entities**") that will be jointly owned by Investment Company and other investors that will contribute equity capital for the development of the Project. In exchange for contributing its interests in Holding Company and/or one or more of the Project Companies to such Project Entities, it is anticipated that Investment Company will receive (a) shares, operating interests, or other equity interests in the Project Entities, (b) other rights and interests, including incentive

interests, incentive units, or other benefits in or from the Project Entities, and (c) other amounts directly or indirectly received, or distributions made, in respect of the Project Entities, including without limitation earnings, proceeds, dividends, refinancing proceeds, disposition proceeds, incentive units or payments, and other receipts of any type or nature in respect of or relating to the Project or any Project Company (collectively, "**Project Interests**").

4. **Distributions From Project Entities**. All (a) shares, operating interests, or other equity interests in the Project Entities, (b) other rights and interests, including incentive interests, incentive units, or other benefits in or from the Project Entities, and (c) Project Interests shall be distributed to and held by Investment Company. Distributions shall be made from Investment Company in accordance with the governing documents of Investment Company, which shall reflect the interests of the Berrys, including their entitlement to priority distributions and preferred returns, and the twenty percent (20%) carried interest and future profits interest of Manager.

5. **Miscellaneous Provisions**.

(a) **Governing Law, Jurisdiction, and Venue**. This Agreement and all issues and questions concerning its application, construction, validity, interpretation, and enforcement shall be governed by and construed in accordance with the laws of the State of Texas, without giving effect to any choice or conflict of laws provisions or rules (whether of the State of Texas or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Texas. Powers and each of the Berrys hereby agrees that any suit, action, or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby, whether in contract, tort, or otherwise, shall be brought in the state or federal courts in Harris County, Texas, so long as one of such courts shall have subject-matter jurisdiction over such suit, action, or proceeding, and that any cause of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of Texas. Powers and each of the Berrys hereby irrevocably consents to the exclusive jurisdiction of such courts and of the appropriate appellate courts therefrom in any such suit, action, or proceeding and irrevocably waives, to the fullest extent permitted by relevant law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action, or proceeding in any such court or that any such suit, action, or proceeding which is brought in any such court has been brought in an inconvenient forum.

(b) **Notices**. All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of (i) actual receipt, (ii) the time of personal delivery to the party to be notified, (iii) when sent, if sent by electronic mail during normal business hours of the recipient, and if not sent during normal business hours, then on the recipient's next business day, (iv) five (5) days after

4

having been sent by registered or certified United States Post Office air mail, return receipt requested, postage prepaid, or (v) one (1) business day after deposit with a nationally recognized overnight air courier, freight prepaid, specifying next business day delivery, with written verification of receipt. All communications shall be sent to the respective Parties at their addresses as set forth in this section or to such addresses as subsequently modified by written notice given in accordance with this section. Each Party to this Agreement agrees to promptly notify the other Parties of any change in its address or electronic mail address, and any failure to do so shall not affect the foregoing.

Mailing and delivery address for Marvin Glen Berry, Dennis Wayne Berry, Allen Lawrence Berry, Bay Ltd, and all Berry entities:

> Berry Group
> 5005 Riverway
> Suite 440
> Houston, Texas 77056
>
> Email address for Allen Lawrence Berry:
> alb@riverway.us
>
> Email address for Marvin Glen Berry:
> captberry@aol.com
>
> Email address for Dennis Wayne Berry:
> berryd@bayltd.com

Mailing and delivery address for Albert Theodore Powers and Manager:

> Albert Theodore Powers
> 205 West 57th Street
> Apartment 4C
> New York, New York 10019
>
> Email address for Albert Theodore Powers
> atpowers@allied-pacific-group.com

(c) **Delays or Omissions**. No delay or omission to exercise any right, power, or remedy accruing to any Party under this Agreement, upon any breach or default of any other Party under this Agreement, shall impair any such right, power, or remedy of such non-breaching or non-defaulting Party nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. Any

5

waiver, permit, consent, or approval of any kind or character on the part of any Party of any breach or default under this Agreement, or any waiver on the part of any Party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement or by law or otherwise afforded to any Party, shall be cumulative and not alternative.

(d)  **Amendment, Waiver, and Termination**. This Agreement may be amended, modified, or terminated and the observance of any term hereof may be waived (either generally or in a particular instance and either retroactively or prospectively) only by a written instrument executed by all Parties. Any amendment, modification, termination, or waiver so effected shall be binding upon the Parties and all of their respective successors and permitted assigns whether or not such Party, successor, assignee, or other individual or entity entered into or approved such amendment, modification, termination, or waiver. No waivers of or exceptions to any term, condition, or provision of this Agreement, in any one or more instances, shall be deemed to be, or construed as, a further or continuing waiver of any such term, condition, or provision or any other term, condition, or provision.

(e)  **Assignment of Rights**. The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns. Nothing in this Agreement, express or implied, is intended to confer upon any individual or entity other than the Parties hereto or their respective successors and permitted assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement. Any successor or permitted assignee of any of the Berry Interests, including without limitation any prospective transferee who purchases any direct or indirect interest in the Project and/or any inter vivos or testamentary donee or transferee of any such interest, shall deliver to Powers, as a condition to any transfer or assignment, a counterpart signature page hereto pursuant to which such successor or permitted assignee shall confirm his or its agreement to be subject to and bound by all of the provisions set forth in this Agreement that were applicable to the predecessor or assignor of such successor or permitted assignee.

(f)  **Severability**. The invalidity or unenforceability of any provision of this Agreement shall in no way affect the validity or enforceability of any other provision.

(g)  **Titles and Subtitles**. The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

(h)  **Counterparts**. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which

6

together shall constitute one and the same instrument. Counterparts may be delivered via electronic mail (including pdf or any electronic signature complying with the United States Federal ESIGN Act of 2000, i.e., www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

          (i)    **Specific Performance**. In addition to any and all other remedies that may be available at law in the event of any breach of this Agreement, each Party shall be entitled to specific performance of the agreements and obligations of the other Parties hereunder and to such other injunctive or other equitable relief as may be granted by a court of competent jurisdiction.

          (j)    **No Partnership**. This Agreement does not create or constitute any partnership, joint venture, or other similar relationship among the Parties, no such relationship shall be implied, and no Party shall make any representation to the contrary.

          (k)    **Advice of Counsel**. Each Party hereby acknowledges that he has sought and obtained the advice of legal counsel before entering into this Agreement and has fully read and understands the meaning and import of all terms in this Agreement.

          (l)    **Entire Agreement**. This Agreement constitutes and expresses the entire agreement and understanding among the Parties in reference to all matters referred to; all previous discussions, promises, representations, and understandings relative thereto, if any, among the Parties, being herein merged. No modification of this Agreement shall be binding unless in writing and signed by authorized representatives of all Parties.

          **IN WITNESS WHEREOF**, the Parties, intending to be bound, have executed this Agreement as of the date first written above.

 

 

_____
ALLEN LAWRENCE BERRY

 

 

_____
MARVIN GLEN BERRY

7

DENNIS WAYNE BERRY

ALBERT THEODORE POWERS

8

# EXHIBIT 3

# AGREEMENT

Plaintiffs' Exhibit

26

2024-76060

exhibitsticker.com

**THIS AGREEMENT** is made and entered into as of the 1st day of November, 2018 by and among Allen Lawrence Berry, Marvin Glen Berry, and Dennis Wayne Berry (collectively, the "**Berrys**"), and Albert Theodore Powers ("**Powers**") (each of the Berrys and Powers being referred to herein individually as a "**Party**" and collectively as the "**Parties**").

## RECITALS:

**WHEREAS**, the Berrys intend to develop, construct, own, and operate a system to allow hydrocarbon shippers maximum optionality to deliver hydrocarbons to local refinery markets in the vicinity of Corpus Christi, Texas and to export hydrocarbons via a premier United States Gulf Coast deep-water exporting facility, including without limitation shipping, reception, collection, consolidation, storage, staging, delivery, and exporting facilities, including a deep-water export terminal on Harbor Island, Texas, related tankage and pipelines, and other associated infrastructure, assets, facilities, and businesses, including without limitation certain real property and improvements currently owned, leased, optioned, or otherwise controlled by the Berrys at Redfish Bay, Midway Junction, and Harbor Island, Texas and additional properties and facilities to be acquired, leased, optioned, developed, or otherwise controlled by the Berrys (collectively, the "**Project**"); and

**WHEREAS**, the Berrys intend to finance the Project through a combination of contributions of cash and tangible and intangible property from their own resources, third party debt financing, government grants and/or subsidies, and equity contributions from outside investors; and

**WHEREAS**, the Berrys have been engaged for several months in discussions with The Carlyle Group regarding the Project and The Carlyle Group potentially providing a substantial equity investment in the Project; and

**WHEREAS**, the Berrys wish to appoint Powers to represent them and to act as their chief negotiator and adviser for the financing of the Project, including without limitation negotiations with The Carlyle Group, and to perform due diligence, advice, and assistance regarding the sourcing of capital, develop strategy, and provide financial management and structuring advice and services, upon and subject to the terms and conditions of this Agreement; and

**WHEREAS**, Powers is willing to represent the Berrys and to act as their chief negotiator and adviser for the financing of the Project, including without limitation negotiations with The Carlyle Group, and to perform due diligence, advice, and assistance regarding the sourcing of capital, develop strategy, and provide financial management and structuring advice and services upon and subject to the terms and conditions of this Agreement;

**NOW, THEREFORE**, in consideration of the foregoing recitals and other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the Berrys and Powers hereby agree as follows:

1.     **Appointment**. The Berrys hereby appoint Powers as their representative and chief negotiator and adviser for the financing of the Project including without limitation negotiations with The Carlyle Group, and to perform due diligence, advice, and assistance regarding the sourcing of capital, develop strategy, and provide financial management and structuring advice and services. It is understood that Powers shall investigate various alternatives for financing all or portions of the Project, discuss with the Berrys various financing alternatives, assist the Berrys in formulating and interpreting financial projections for the Project and various potential transactions relating to the Project, assist the Berrys in formulating strategies to arrange the most favorable forms of financing for the Project, make financing recommendations to the Berrys, assist the Berrys in formulating strategies for achieving the most favorable terms for financing the Project, assist the Berrys in formulating business and holding structures for the Project, and negotiate terms and conditions of financing for the Project on behalf of the Berrys with various potential finance providers, including without limitation The Carlyle Group. In performing his duties under this Agreement, Powers shall at all times act as agent for the Berrys and shall have no power to conclude any financing arrangement for all or any portion of the Project without the express consent of the Berrys, in their sole discretion.

2.     **Term of Appointment**. The term of Powers's appointment under this Agreement shall commence on the date first set forth above and shall continue until the Project is fully financed or until either the Berrys or Powers terminates this Agreement by providing at least three (3) month's written notice to the other Parties.

3.     **Compensation**. As compensation for his services as representative and chief negotiator for the financing of the Project, the Berrys hereby agree to pay Powers compensation and to reimburse his expenses, as follows:

   (a)     **Compensation**. The Berrys shall pay to Powers, Allied Pacific Group Limited, or such other individual or entity designated by Powers from time to time fixed ordinary compensation in the amount of One Hundred Thousand United States Dollars (US$100,000) per month during the term of his appointment under this Agreement ("**Compensation**"). Powers shall provide to the Berrys monthly invoices during the term which shall designate the account or accounts to which payments of Ordinary Compensation shall be made.

   (b)     **Expenses**. In addition to Compensation, the Berrys shall promptly reimburse Powers for his actual out-of-pocket expenses incurred in performing his services pursuant to this Agreement, including without limitation travel and transportation expenses. Powers shall provide to the Berrys invoices which shall indicate the expense amounts to be reimbursed and the account or accounts to which reimbursement payments shall be made.

2

(c) **Interest on Late Payments.** All amounts payable under this agreement shall be paid promptly and in cash or by wire transfer to such accounts as shall be designated from time to time by Powers. In the event that any amounts are not paid promptly when due, the Party liable for making such payment shall pay such amounts, plus interest thereon, at the rate of ten percent (10%) per annum on the overdue amount, without prior demand or notice.

(d) **No Offset.** All payments of Compensation, reimbursements, and interest made pursuant to this Agreement shall be made in cash or by wire transfer to such accounts as shall be designated from time to time by Powers, without withholding or offsets of any kind, shall be non-refundable, and shall be free and clear of any and all encumbrances of any type or nature.

4. **Investment Agreement.** In addition to the Compensation and other matters described in this Agreement, the Berrys and Powers are simultaneously with this Agreement entering into another agreement (the "**Investment Agreement**") relating to the investment by Powers or an entity designated by him in one or more limited liability companies or other entities that will hold all of the Berrys' interests in the Project and its major components in exchange for a twenty percent (20%) overall carried interest and profits interest in such limited liability companies or entities after priority distributions to the Berrys of Two Hundred Fifty Million United States Dollars (US$250,000,000) plus a ten percent (10%) cumulative preferred return on the outstanding balance of such amount. The ownership of such limited liability companies or other entities and the entitlement to distributions from such limited liability companies or other entities shall be governed by the Investment Agreement and the governing documents of such limited liability companies or other entities.

5. **Miscellaneous Provisions.**

(a) **Governing Law, Jurisdiction, and Venue.** This Agreement and all issues and questions concerning its application, construction, validity, interpretation, and enforcement shall be governed by and construed in accordance with the laws of the State of Texas, without giving effect to any choice or conflict of laws provisions or rules (whether of the State of Texas or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Texas. Powers and each of the Berrys hereby agrees that any suit, action, or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby, whether in contract, tort, or otherwise, shall be brought in the state or federal courts in Harris County, Texas, so long as one of such courts shall have subject-matter jurisdiction over such suit, action, or proceeding, and that any cause of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of Texas. Powers and each of the Berrys hereby irrevocably consents to the exclusive jurisdiction of such courts and of the appropriate appellate courts therefrom in any

3

such suit, action, or proceeding and irrevocably waives, to the fullest extent permitted by relevant law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action, or proceeding in any such court or that any such suit, action, or proceeding which is brought in any such court has been brought in an inconvenient forum.

(b) **Notices**. All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of (i) actual receipt, (ii) the time of personal delivery to the party to be notified, (iii) when sent, if sent by electronic mail during normal business hours of the recipient, and if not sent during normal business hours, then on the recipient's next business day, (iv) five (5) days after having been sent by registered or certified United States Post Office air mail, return receipt requested, postage prepaid, or (v) one (1) business day after deposit with a nationally recognized overnight air courier, freight prepaid, specifying next business day delivery, with written verification of receipt. All communications shall be sent to the respective Parties at their addresses as set forth in this section or to such addresses as subsequently modified by written notice given in accordance with this section. Each Party to this Agreement agrees to promptly notify the other Parties of any change in its address or electronic mail address, and any failure to do so shall not affect the foregoing.

Mailing and delivery address for Allen Lawrence Berry, Marvin Glen Berry, Dennis Wayne Berry, Bay Ltd, and all Berry entities:

Berry Group
5005 Riverway
Suite 440
Houston, Texas 77056

Email address for Lawrence Allen Berry:
alb@riverway.us

Email address for Marvin Glen Berry:
captberry@aol.com

Email address for Dennis Wayne Berry:
berryd@bayltd.com

Mailing and delivery address for Albert Theodore Powers, Allied Pacific Group Limited, and all Powers entities:

4

Albert Theodore Powers
205 West 57th Street
Apartment 4C
New York, New York 10019

Email address for Albert Theodore Powers
atpowers@allied-pacific-group.com

(c) **Delays or Omissions**. No delay or omission to exercise any right, power, or remedy accruing to any Party under this Agreement, upon any breach or default of any other Party under this Agreement, shall impair any such right, power, or remedy of such non-breaching or non-defaulting Party nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. Any waiver, permit, consent, or approval of any kind or character on the part of any Party of any breach or default under this Agreement, or any waiver on the part of any Party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement or by law or otherwise afforded to any Party, shall be cumulative and not alternative.

(d) **Amendment, Waiver, and Termination**. This Agreement may be amended, modified, or terminated and the observance of any term hereof may be waived (either generally or in a particular instance and either retroactively or prospectively) only by a written instrument executed by all Parties. Any amendment, modification, termination, or waiver so effected shall be binding upon the Parties and all of their respective successors and permitted assigns whether or not such Party, successor, assignee, or other individual or entity entered into or approved such amendment, modification, termination, or waiver. No waivers of or exceptions to any term, condition, or provision of this Agreement, in any one or more instances, shall be deemed to be, or construed as, a further or continuing waiver of any such term, condition, or provision or any other term, condition, or provision.

(e) **Assignment of Rights**. The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns. Nothing in this Agreement, express or implied, is intended to confer upon any individual or entity other than the Parties hereto or their respective successors and permitted assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement. Any successor or permitted assignee of any of the Berrys' interests in the Project, including any prospective transferee who purchases any direct or indirect interest in the Project and/or any inter vivos

5

or testamentary donee or transferee of any such interest, shall deliver to Powers, as a condition to any transfer or assignment, a counterpart signature page hereto pursuant to which such successor or permitted assignee shall confirm his or its agreement to be subject to and bound by all of the provisions set forth in this Agreement that were applicable to the predecessor or assignor of such successor or permitted assignee.

      **(f)**     **Severability**. The invalidity or unenforceability of any provision of this Agreement shall in no way affect the validity or enforceability of any other provision.

      **(g)**     **Titles and Subtitles**. The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

      **(h)**     **Counterparts**. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via electronic mail (including pdf or any electronic signature complying with the United States Federal ESIGN Act of 2000, i.e., www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

      **(i)**     **Specific Performance**. In addition to any and all other remedies that may be available at law in the event of any breach of this Agreement, each Party shall be entitled to specific performance of the agreements and obligations of the other Parties hereunder and to such other injunctive or other equitable relief as may be granted by a court of competent jurisdiction.

      **(j)**     **No Partnership**. This Agreement does not create or constitute any partnership, joint venture, or other similar relationship among the Parties, no such relationship shall be implied, and no Party shall make any representation to the contrary.

      **(k)**     **Advice of Counsel**. Each Party hereby acknowledges that he has sought and obtained the advice of legal counsel before entering into this Agreement and has fully read and understands the meaning and import of all terms in this Agreement.

(l)  **Entire Agreement**.  This Agreement constitutes and expresses the entire agreement and understanding among the Parties in reference to all matters referred to; all previous discussions, promises, representations, and understandings relative thereto, if any, among the Parties, being herein merged. No modification of this Agreement shall be binding unless in writing and signed by authorized representatives of all Parties.

**IN WITNESS WHEREOF**, the Parties, intending to be bound, have executed this Agreement as of the date first written above.

_____
ALLEN LAWRENCE BERRY

_____
MARVIN GLEN BERRY

_____
DENNIS WAYNE BERRY

_____
ALBERT THEODORE POWERS

7

# EXHIBIT 4

CAUSE NO.: 2024DCV-0045-C

| | | |
|---|---|---|
| LAWRENCE BERRY, individually and as Trustee of the ALLEN LAWRENCE BERRY TRUST, directly and derivatively on behalf of BECON, INC.; LDMA LIMITED PARTNERSHIP; and BERRY GP, INC.; | § § § § § § § § | IN THE DISTRICT COURT OF |
| *Plaintiff,* | § § | NUECES COUNTY, TEXAS |
| BERRY GP, INC.; LDMA LIMITED PARTNERSHIP; and BECON, INC.; | § § § | |
| *Nominal Plaintiffs,* | § § | |
| | § | **JURY TRIAL DEMANDED** |
| v. | § § | |
| MARTY BERRY; MICHAEL HUMMELL; BERRY GP, INC.; BERRY OPERATING COMPANY LLC; and BERRY CONTRACTING LP; | § § § § § | 94TH JUDICIAL DISTRICT |
| *Defendants*. | § § | |

**PLAINTIFF'S SECOND AMENDED PETITION**

TO THE HONORABLE JUDGE OF THIS COURT:

Lawrence Berry ("Lawrence" or "Plaintiff"), in his personal capacity and as Trustee of the Allen Lawrence Berry Trust, directly and derivatively on behalf of Becon, Inc., LDMA Limited Partnership, and Berry GP, Inc. (with Lawrence, "Plaintiffs"), files this Second Amended Petition against Marty Berry ("Marty"), Michael "Mike" Hummell ("Hummell"), Berry GP, Inc., Berry Operating Company LLC, and Berry Contracting LP (collectively, "Defendants"). Plaintiff asserts claims for breach of fiduciary duty, knowing participation in a breach of fiduciary duty, declaratory judgment, conversion, corporate waste, a demand for an equitable accounting, and a demand for books and records. In support of these claims, Plaintiff respectfully shows as follows:

1
73

## I. INTRODUCTION

1. This action concerns the management and finances of several Texas companies—Berry GP, Inc.; Berry Operating Company LLC; and Berry Contracting LP (collectively, the "Berry Entities")—which are majority owned in equal shares by Plaintiff Lawrence Berry and his two brothers, Marty Berry ("Marty") and Dennis Berry ("Dennis"). In the past several months, it has become apparent that the Berry Entities have been unlawfully usurped, controlled, and mismanaged in secret by Defendants Marty Berry and Mike Hummell, Berry GP, Inc.'s Vice President and General Counsel.

2. The Berry Entities operate a large organization of companies engaged in the construction, fabrication, and maintenance contracting industries throughout the United States, and have successfully done so since the 1950s. While the Berry Entities were founded and originally controlled by Lawrence's father, ownership passed to Lawrence and his brothers beginning in the 1990s.

3. In recent months, Lawrence—an officer, director, and shareholder of the Berry Entities—has come to learn that Marty Berry, with assistance from Mike Hummell and other management personnel, has been mismanaging the Berry Entities' finances such that he imperiled a long-standing line of credit that represented the Berry Entities' primary source of operational funding, causing that line of credit to be placed in default. Further, Hummell and other management personnel colluded in secret to authorize self-dealing loan agreements from Marty and Dennis—themselves officers, directors, and shareholders of the Berry Entities—to the Berry Entities without notice or consultation with the other officers and directors. What is more, Marty has been secretly usurping corporate opportunities by buying cranes through a personally owned company, and then leasing the cranes back to the Berry Entities in a series of undisclosed self-

dealing transactions. Finally, presumably in an attempt to repay the self-interested loans, Defendants have recently begun secretly attempting to sell the company's real property, including an important and valuable dock facility, without notice to or authorization from the Board of Directors. This type of undisclosed engagement in self-dealing and ultra vires transactions violates the Defendants' fiduciary obligations and Texas law.

4. When Lawrence inquired about this mismanagement and apparent covert self-dealing through valid requests for books and records information, his requests went ignored, in further violation of Texas law.

5. Lawrence, both directly and derivatively on behalf of the Berry Entities, brings this lawsuit against Marty Berry, Hummell, and the Berry Entities, to recover damages, enforce his rights to inspect the Berry Entities' books and records, and to demand an accounting of the Berry Entities' finances.

## II. DISCOVERY LEVEL

6. Discovery should be conducted in accordance with a Level 3 tailored discovery control plan under Rule 190.4 of the Texas Rules of Civil Procedure.

## III. JURISDICTION AND VENUE

7. Plaintiff seeks monetary relief of over $1,000,000, including damages, penalties, costs, expenses, pre- and post-judgment interest, and attorney fees, as well as non-monetary relief. The relief sought by Plaintiff is within the jurisdiction of this Court.

8. The Court has subject matter jurisdiction to hear this matter because the amount in controversy exceeds the jurisdictional minimum of this Court.

9. This Court has personal jurisdiction over Defendant Marty Berry because he is a resident of Texas and Plaintiff's claims against him arise directly from his contacts with and activities in this state.

10. This Court has personal jurisdiction over Defendant Michael Hummell because he is a resident of Texas and Plaintiff's claims against him arise directly from his contacts with and activities in this state.

11. This Court has personal jurisdiction over Defendant Berry Contracting LP because it is a Texas limited partnership headquartered in this state.

12. This Court has personal jurisdiction over Berry GP, Inc. because it is a Texas corporation headquartered in this state.

13. This Court has personal jurisdiction over Becon, Inc. because it is a Texas corporation headquartered in this state.

14. This Court has personal jurisdiction over LDMA Partnership because it is a Texas limited partnership.

15. This Court has personal jurisdiction over Defendant Berry Operating Company LLC because it is a Texas limited liability corporation headquartered in this state.

16. Venue is proper in Nueces County, Texas because it is the county of the Berry Entities' principal offices in this state.

## IV. PARTIES AND SERVICE

17. Plaintiff Lawrence Berry is an individual residing in Harris County, Texas. At all relevant times, Lawrence has owned shares of Berry GP, Inc., Berry Operating Company LLC, and Berry Contracting LP individually, through a series of holding companies, including Becon, Inc. and LDMA Limited Partnership. Lawrence is also the beneficial owner of the shares in those

4

companies held in the Allen Lawrence Berry Trust. Finally, at all relevant times, Lawrence has been an Officer, Director, partner, and/or shareholder of LDMA Limited Partnership; Becon, Inc.; Berry GP, Inc.; Berry Operating Company LL;, and Berry Contracting LP.

18. Nominal Plaintiff LDMA Limited Partnership is a Texas limited partnership with a registered address at 1414 Valero Way, Corpus Christi, Texas 78409. Berry GP, Inc. is its registered agent for service of process and it can be served at 1414 Valero Way, Corpus Christi, Texas 78409.

19. Nominal Plaintiff Becon, Inc. is a Texas corporation with a registered address at 1414 Corn Products Road, Corpus Christi, Texas 78409. Charles Vanaman is its registered agent for service of process and it can be served at 1414 Corn Products Road, Corpus Christi, Texas 78409.

20. Defendant Berry Contracting LP, doing business as Bay Ltd., is a Texas limited partnership with a registered address at 1414 Corn Products Road, Corpus Christi, Texas 78409. Berry GP, Inc. is its registered agent for service of process and it can be served at 1414 Corn Products Road, Corpus Christi, Texas 78409.

21. Defendant Berry Operating Company LLC is a Texas limited liability company with a registered address at 1414 Corn Products Road, Corpus Christi, Texas 78409. Mike Hummell is its registered agent for service of process and it can be served at 1414 Corn Products Road, Corpus Christi, Texas 78409.

22. Defendant Berry GP, Inc. is a Texas corporation with a registered address at 1414 Corn Products Road, Corpus Christi, Texas 78409. Mike Hummell is its registered agent for service of process and it can be served at 1414 Corn Products Road, Corpus Christi, Texas 78409.

23. Defendant Marty Berry is a natural person. Marty Berry is an Officer, Director, and shareholder of Berry GP, Inc., Berry Operating Company LLC, and Berry Contracting LP, and he

maintains custody and control over the corporate records of Berry GP, Inc., Berry Operating Company LLC, and Berry Contracting LP. Marty Berry can be served at his office at 1414 Corn Products Road, Corpus Christi, Texas 78409.

24. Defendant Mike Hummell is a natural person. He is the Vice President and General Counsel of Berry GP, Inc. Mr. Hummell can be served at his office at 1414 Corn Products Road, Corpus Christi, Texas 78409.

## V. STANDING

25. Plaintiff Lawrence Berry is a 19% limited partner of LDMA Limited Partnership ("LDMA"). Lawrence Berry is also the Trustee of the Allen Lawrence Berry Trust, which is a 11 2/3% limited partner of LDMA. LDMA owns Berry GP, Inc., which is the umbrella company over the Berry Entities and their subsidiaries.

26. Lawrence Berry is also a 1/3 shareholder of Becon, Inc., which is the 3% general partner of LDMA.

27. Lawrence Berry—in his personal capacity and as Trustee of the Allen Lawrence Berry Trust—has standing to bring these claims directly and derivatively on behalf of LDMA Limited Partnership, Becon, Inc., and Berry GP, Inc. pursuant to Texas Business Organizations Code §§ 21.563 & 153.413, as well as Texas common law providing for representative actions in closely held limited partnerships and corporations.

## VI. FACTUAL BACKGROUND

### A. The Berry Entities are a family operation.

28. The Berry Entities and their subsidiaries are a group of companies focused on the construction, fabrication, and maintenance contracting industries throughout the United States.

The Berry Entities were founded in the 1950s by Lawrence Berry's father, Marvin Berry, who ran the organization for several decades.

29.     Marvin Berry had four sons: Plaintiff Lawrence Berry, Marty Berry, Dennis Berry, and Kenneth Berry.  When Marvin passed away in 1997, control of the Berry Entities began shifting to his sons, although the other brothers bought Kenneth out several years ago.  LDMA sits at the top of the Berry organization.  LDMA's 3% general partner is Becon, Inc., which is owned in equal shares by Lawrence, Marty, and Dennis.  Lawrence, Marty, and Dennis are each direct 19% limited partners of LDMA, and each is also a beneficial owner of trusts which are 11 2/3% limited partners of LDMA.  The remaining 5% limited partner of LDMA is Lone Star Equipment, Inc., which is a subsidiary of Berry Contracting LP.  Dennis Berry passed away in 2024 and, on information and belief, his shares passed via his estate plan.

30.     LDMA owns Berry GP, Inc., which in turn owns several holding companies which own Berry Operating Company LLC, which in turn functions as the 1% owner and general partner of Berry Contracting LP.

31.     An organizational chart reflecting the structure and ownership of the various entities at issue is attached hereto as Exhibit A.

32.     While the Berry Entities employ several officers who are not members of the Berry Family—including Robert Powers, who has served as President and Chief Executive Officer of Berry GP, Inc., and Defendant Hummell, who serves as Vice President and General Counsel of Berry GP, Inc.—ownership and control of the Berry Entities is vested with Lawrence and the other shareholders.

33. The Berry Entities are governed by the Board of Directors of Berry GP, Inc. (the "Board"), in accordance with the Bylaws of Berry GP, Inc., which are attached hereto as Exhibit B. The Board consists of directors Lawrence, Marty, and Dennis Berry's wife—Bonnie Berry.

**B. Defendants have excluded Lawrence from key decisions related to the Berry Entities, including improper self-interested transactions.**

34. Despite Marvin Berry's wishes that the Berry Entities operate as a family business, it has become clear that Marty, with Hummell's assistance, has gone behind Lawrence's back to exclude him from key decisions related to the Berry Entities, instead choosing to engage in self-dealing and attempt major corporate transactions without informing the other officers and directors of his actions.

35. For instance, in the past several years, Defendants have, among many other things:

- Purported to approve the acquisition of major equipment such as cranes and "yellow iron" without Board discussion or authorization;

- Negotiated and purported to approve terms with major equipment lenders that include significant potential negative impacts to the Berry Entities without Board discussion or authorization;

- Marketed corporate aircraft owned by the Berry Entities for resale without Board discussion or authorization; and

- Deliberately dissolved the largest revenue producing division of the Berry Entities by systematically terminating key individuals material to that division's structure and revenue development.

36. Of particular concern, Lawrence recently came to learn that Marty has engaged in multiple improper self-dealing transactions with the Berry Entities.

37. Specifically, it appears that Rob Powers and Defendant Hummell approved and executed two loan agreements, each between Marty and Dennis on the one hand, and one of the Berry Entities on the other, by which Marty and Dennis loaned a total of approximately $75 million to the Berry Entities (the "Berry Loans"). For nearly a year, Defendants refused to provide the

loan documents or information about the loan terms despite requests from Lawrence. After being forced to file this lawsuit, Lawrence was finally provided with the purported loan documents and learned that Marty loaned $45 million and Dennis loaned $30 million to one or more of the Berry Entities.

38. Despite being an officer, director, and shareholder of the Berry Entities, Lawrence was never directly informed about the Berry Loans, never consulted about their propriety, and never asked to vote on them as an officer, director, or shareholder. Nor was Lawrence informed about the terms of the Berry Loans; how the proceeds of the Berry Loans were used; or how, when, and to what extent Marty and Dennis expected repayment from the Berry Entities with respect to the Berry Loans.

39. Review of the limited financial information to which Lawrence has been privy since the filing of this lawsuit indicates that the Berry Entities have made payments to Marty and Dennis in service of the Berry Loan. In particular, Marty approved payments to himself of at least $10 million in principal, despite the purported promissory note governing his loan indicating that the loan is not payable until December 31, 2024. Because the self-dealing loans were made without Board authorization and Defendants have largely refused to provide the requested documentation to Lawrence, the extent of further improper payments is presently unclear.

40. Prior to the filing of this lawsuit, the Berry Loan transactions were never discussed by the directors of Berry GP, Inc., were not voted on at any meeting of the directors, and do not appear in any minutes of Board meetings. In fact, it appears that Powers, Hummell, Marty, and Dennis were the only individuals at the Berry Entities who were aware that they were encumbering the Berry Entities with this $75 million unauthorized debt.

41. Lawrence also recently came to learn that Defendant Marty Berry has been purchasing "rolling stock" equipment such as motor cranes through a company unaffiliated with the Berry Entities called Western Gulf Equipment LLC ("Western Gulf"). Western Gulf was originally established as a special purpose entity that would purchase a portion of a crane in Canada in conjunction with a Canadian affiliate of the Berry Entities, and then lease the crane back to that Canadian affiliate. This original transaction was fully disclosed and approved by the Board. However, Western Gulf now appears to have purchased at least six (6) additional cranes without first presenting the opportunity to the Board or the Berry Entities, and then leased those cranes back to the Berry Entities in a self-dealing transaction—again, without disclosing the transaction to the Board or seeking Board approval. According to the limited financial information presented to Lawrence, it appears that Western Gulf is leasing seven (7) cranes to the Berry Entities at a total rate of $449,000 per month. To date, the full extent of Marty's undisclosed, self-dealing transactions with Western Gulf remains unclear.

42. Plaintiff understands that Western Gulf is wholly owned by Marty Berry and his wife, Courtenay Berry, and that the registered address for Western Gulf is the Berry Entities' headquarters in Corpus Christi. What is more, the registered agent for Western Gulf is Mike Hummell, indicating that Defendant Hummell is aware of Marty's self-dealing transactions perpetrated through Western Gulf. On information and belief, Marty uses corporate assets of the Berry Entities to operate Western Gulf for his own personal gain.

43. Plaintiff also recently learned that Defendants have offered to sell some of the Berry Entities' vital real property assets, including a dock facility and adjacent real property that generates tens of thousands of dollars in monthly revenue, presumably in an effort to repay the unauthorized and self-interested loans. Plaintiff believes that Marty intends to sell the Berry real

property to raise funds for additional unauthorized self-dealing payments to himself in service of the Berry Loans.

44. Plaintiff recently was made aware that in or around late May 2023, Defendants began an effort to sell the dock facility and other real property to at least one third party. In their communications to that third party, Defendants falsely represented that "the principals at Berry G.P. have decided to open two strategic properties to the marketplace." *See* Ex. C (May 30, 2023 Letter from Berry G.P. to Port of Corpus Christi). In truth, the decision to sell significant company assets was made unilaterally by Marty and without calling a Board meeting and without discussion with or notice to Lawrence.

**C. Defendants have threatened the financial operations of the Berry Entities.**

45. Until recently, the Berry Entities relied on a $50,000,000.00 revolving line of credit (the "LOC") with International Bank of Commerce ("IBC") for general operations. This LOC was governed by a loan agreement between several of the Berry Entities and IBC, dated March 31, 2019 (the "Loan Agreement").

46. The Loan Agreement contained provisions allowing IBC to invoke default if certain conditions were not met, including particular thresholds for EBITDA and combined net profit after taxes.

47. Under Defendants' mismanagement, the Berry Entities recently failed to meet certain of the thresholds detailed in the Loan Agreement.

48. In fact, IBC recently made repeated requests to members of the Berry Entities' management team for information related to standard reporting as part of the Loan Agreement covenants. This includes quarterly financials, WIP reports, financial projections, and more. It appears as if the management team either refused or was unable to produce this information to

IBC. Further, when IBC made an effort to schedule a meeting with the Board of Directors to discuss the status of the Berry Entities in person, Marty did not show up, imperiling the 30-year banking relationship with IBC. Lawrence was never informed that IBC was sending repeated requests for information, that the Berry Entities were struggling to produce accurate or timely reporting, or that IBC had attempted to schedule meetings with the Board of Directors to discuss the problems in person.

49. Accordingly, on March 13, 2023, IBC sent a letter to the Berry Entities informing them that IBC had placed the LOC in default. IBC asserted that the Berry Entities had failed to achieve the minimum EBITDA and net profits targets for the 2022 fiscal year. Defendants did not share this letter with Lawrence at the time.

50. Because of these claimed defaults, IBC (1) elected to limit future advances to the Berry Entities on the LOC to $30 million rather than the full $50 million, and (2) accelerated maturation of the LOC to March 31, 2023, at which time IBC was going to require the entire balance to be due and payable.

51. Following this March 13, 2023 letter, IBC and counsel for the Berry Entities engaged in additional correspondence regarding the extension of the LOC. On March 28, 2023, IBC proposed an extension of the LOC to October 1, 2023, pursuant to several terms, including a reduction of the LOC from $50 million to $30 million, a requirement that the $75 million debt purportedly owed by the Berry Entities to Marty and Dennis be subordinated to the LOC debt owed to IBC, and a requirement that no payments be made on that debt until the Berry Entities' indebtedness to IBC was fully satisfied. On March 30, 2023, counsel for the Berry Entities responded and rejected many of these terms, including the subordination and repayment proposals.

Lawrence was not consulted regarding these decisions, nor was he made aware of the IBC proposal at the time.

52.    As a result of the March 30, 2023 rejection letter from the Berry Entities, IBC appears to have placed the LOC into default.  Despite being an officer, director, and shareholder of the Berry Entities, Lawrence was not informed of the precise status of the LOC with IBC, nor of the Berry Entities' plan for ensuring sufficient liquidity to fund its operations.  Defendants apparently decided to keep Lawrence in the dark regarding the Berry Entities' financial status.

53.    Following the collapse of the IBC banking relationship, Marty unilaterally caused the Berry Entities to repay himself $10 million in principal on his loan, despite the fact that the terms of the purported promissory note governing his loan did not require Berry GP to make any principal or interest payments to Marty until December 31, 2024.

54.    Around the same time, Defendants began negotiations with Frost Bank to obtain a new revolving line of credit.  As part of these negotiations, Defendants pledged the Berry Entities' real property as collateral, including the Entities' commercial property in Corpus Christi.  Lawrence was not fully apprised of the situation with Frost Bank, nor was he initially consulted about or asked to approve the collateralization of any of the Berry Entities' real property.

55.    Indeed, as part of the negotiations with Frost Bank, Marty executed a "Certificate of Corporate Resolutions" that purports to set forth "resolutions duly adopted either: (a) at a meeting of [Berry GP, Inc.'s] Board of Directors duly called and held, at which meeting a quorum was present and acting throughout, or (b) by unanimous written consent of the Board of Directors of [Berry GP, Inc.], which resolutions save not in any way been amended or modified[.]". *See* Ex. D.  No such Board meeting was ever held, and Lawrence was never notified of or asked to approve

any written consents adopting the purported resolutions contained in this "Certificate of Corporate Resolutions."

56. Lawrence has since signed resolutions authorizing the creation of a Frost Bank relationship because it is in the best interest of the Berry Entities to receive outside financing.

**D. Defendants refuse to honor Lawrence's legitimate requests for information related to the Berry Entities.**

57. On April 18, 2023, Lawrence sent an email to Powers and Jim Klein—CFO of Berry GP, Inc.—copying Marty and Dennis. This email attached a memorandum of "Key Concerns" that the Berry Entities apparently received from IBC and requested information from Powers and Klein related to the financial condition of the Berry Entities.

58. Lawrence sent the information request so that he could better understand the Berry Entities' present financial condition and what may have caused the Berry Entities to purportedly fail to meet the thresholds included in the Loan Agreement with IBC. Lawrence also requested information related to the Berry Loans, since he has still been kept in the dark as to the nature and terms of that debt.

59. As an officer, director, and shareholder of the Berry Entities, Lawrence is entitled to inspect the books and records of the Berry Entities, and a valid request such as the April 18, 2023 email should have been honored. However, Lawrence never received a response to his April 18, 2023 request, much less access to any of the books and records he requested.

60. Lawrence has made numerous other requests for information since April 18, 2023, including since filing this lawsuit, but all have been ignored or refused.

**E. Defendants attempt to ratify their own improper conduct.**

61. Immediately after filing his Original Petition on November 27, 2023, Plaintiff secured a hearing on the application for temporary restraining order and provided notice to

14

86

Defendants. The hearing took place on November 28, 2023 in the Harris County Ancillary Court before the Honorable Lauren Reeder. Despite receiving notice from Plaintiff nearly 24 hours previously, Defendants did not appear at the temporary restraining order hearing.

62. After considering Plaintiff's Original Petition and evidence, Judge Reeder granted the Berry TRO on November 28, 2023, enjoining Defendants from selling, mortgaging, or otherwise encumbering any of the Berry Entities' real property without the approval of the disinterested members of the Board of Directors.

63. On the evening of December 1, 2023, Defendants sent an email to Lawrence, attaching two "notices of special meetings."

64. The first purported to give notice that a "Special Meeting of the Board of Directors" of Berry GP, Inc. was called by Marty and Dennis Berry to be held on December 7, 2023 (the "Board Notice"). The Board Notice, which was signed by Marty and Dennis Berry, indicated that the purpose of the Board meeting was to discuss the following agenda items:

a. Defense and indemnity for Marty Berry, Robert Powers, Robert Rickett, and Mike Hummell in Cause No 2023-81703 in the District Court of Harris County, and any location to which such claims may be transferred;

b. Discussion and action regarding the employment contract of CEO Robert Powers;

c. Clarification and ratification concerning previous board action on loans from shareholders Dennis Berry and Marty Berry to Berry Contracting, L.P. and offer to Lawrence Berry to participate in said loans for up to 100%;

d. Clarification and ratification of previous board and employee action concerning the sale of the Berry Dock and adjacent real property, and of moving forward with the sale after resolution of pending litigation;

e. Discussion and action on marketing corporate aircraft and use of corporate aircraft pending sale;

f. Consider and take action on need to transfer title to property acquired in Robert Rickett's name, using Berry funds, to any Berry owned Company;

g. Discussions and ratification of previous board action concerning the discontinuation of banking relations with International Bank of Commerce;

h. Discussion and ratification of previous board action establishing a banking relationship with Frost Bank;

i. Discussion and ratification of previous board action establishing an operational credit line and any other action needed to provide security for loans;

j. Evaluation of accounts as to any and all director debt (individually or director owned or controlled entities) to any Berry owned Company and development of plans for repayment; and

k. Other business.

65. The second purported to give notice that a "Special Meeting of the Shareholders" of Berry GP, Inc. was called by Marty and Dennis Berry to be held on December 7, 2023 immediately following the Special Meeting of the Board of Directors (the "Shareholder Notice"). The Shareholder Notice, which was also signed by Marty and Dennis Berry, indicated that the purpose of the shareholder meeting was to discuss the following agenda items:

a. Discussion and action concerning the election of and/or removal of Directors.

66. The Special Meetings of the Board of Directors and Shareholders took place on December 7, 2023 while counsel for the parties were reaching agreement on the Agreed TRO. At the Special Meeting of the Board of Directors, Marty and Dennis Berry purported to ratify—frequently over Lawrence's objection—all of the topics and actions listed in the Board Notice. This included topics on which Marty and Dennis were unquestionably interested Directors, such as "defense and indemnity" and "loans from shareholders Dennis Berry and Marty Berry."

67. After the meeting, Defendant Hummell circulated proposed meeting minutes to the members of the Board, including Lawrence. The minutes incorrectly reflected that certain of the agenda items had passed, despite the fact that they required—and had not gotten—approval by disinterested members of the Board of Directors. Accordingly, Lawrence sent redlines of the

minutes back to Defendant Hummell in advance of the upcoming December 12, 2023 Board meeting, which properly reflected what had occurred at the December 7, 2023 meeting.

68. At the December 12, 2023 meeting, Defendant Hummell claimed that he "could not open" the redlines that Lawrence had sent—despite the fact that they were sent as PDFs. Further, Marty and Dennis purported to accept Hummell's incorrect meeting minutes, over Lawrence's objection.

69. The same conduct occurred again at the February 13, 2024 meeting of the Shareholders of Berry GP, Inc., at which Marty and Bonnie Berry purported to ratify post hoc a number of actions over Lawrence's objections. Several of those votes should not have passed, since they failed to garner approval from a majority of the disinterested shareholders.

## VII. CAUSES OF ACTION

### COUNT 1
### Breach of Fiduciary Duty
### (against Marty Berry and Mike Hummell)

70. Plaintiff incorporates the above paragraphs as if set forth herein in their entirety.

71. Defendant Marty Berry has been a shareholder, officer, and director of Berry GP, Inc. at all relevant times. Defendant Mike Hummell has served as Vice President and Chief Executive Officer of Berry GP, Inc. at all relevant times. In those positions, Marty and Hummell owe certain fiduciary duties to the Berry Entities, including the duty of loyalty and the duty of utmost good faith, fairness, and honesty. These duties that Marty and Hummell owe to the Berry Entities encompass obligations and/or duties to refrain from allowing self-dealing and to make full disclosure of information.

72.    While serving in their respective positions, Marty and Hummell have engaged in, directed, approved, and/or taken actions in contravention of the fiduciary duties they owe to the Berry Entities, including without limitation the following willful and intentional misconduct:

A.    <u>Self-Dealing</u>

    i.    Marty and Hummell approved and directed at least one of the Berry Entities to enter into loan agreements with Marty and Dennis—who are themselves officers, directors, and shareholders of Berry GP, Inc. and the other Berry Entities—without giving notice to or obtaining the consent or approval of Berry GP, Inc.'s Board;

    ii.    At a minimum, Marty's and Hummell's actions breached their fiduciary duties of loyalty to Berry GP, Inc. and amounted to self-dealing.

B.    <u>Unauthorized Acts and Failure to Make Full and Adequate Disclosure</u>

    i.    Marty and Hummell failed to disclose their unauthorized decision to sell vital company assets and the self-dealing Berry Loans and failed to properly seek or obtain board approval or approval of the sole disinterested director for those self-dealing transactions;

    ii.    Marty and Hummell similarly failed to disclose the Berry Entities' financial information to Lawrence before IBC held the Berry Entities in default with respect to the LOC.

C.    <u>Usurpation of Corporate Opportunity and Self-Dealing</u>

    i.    Marty directed his wholly owned company—Western Gulf Equipment—to purchase cranes without first presenting the opportunities to the Board or the Berry Entities.  Then, Marty directed Western Gulf to lease those cranes back

18
90

to the Berry Entities, without disclosing such lease transactions to the Board or seeking approval by the disinterested members of the Board. Mike Hummell participated in these actions as the registered agent for Western Gulf Equipment. These and other actions by Marty and Hummell amounted to breaches of their fiduciary duties of loyalty to the Berry Entities and to behave with the utmost good faith, fairness, and honesty.

73. The Berry Entities and Lawrence have been damaged by the Defendants' self-dealing, unauthorized acts, breaches of fiduciary duty, and failure to make full disclosure.

74. Because Berry GP, Inc., Becon, Inc., and LDMA Limited Partnership operate as closely held entities—and Defendants have concealed information and refused to share requested information with Lawrence—an officer, director, and shareholder—about the operations of the Berry Entities, justice requires treating this claim as a direct action by Lawrence, with any recovery being paid directly to Lawrence, pursuant to Tex. Bus. Org. Code §§ 21.563 and 153.413.

75. Alternatively, Plaintiff brings these claims derivatively on behalf of LDMA Limited Partnership, Becon Inc., and Berry GP, Inc.

**COUNT 2**
**Knowing Participation in a Breach of Fiduciary Duty**
**(against Mike Hummell)**

76. Plaintiff incorporates the above paragraphs as if set forth herein in their entirety.

77. Defendant Mike Hummell knowingly participated in a breach of fiduciary duty by Defendant Marty Berry.

78. Marty has been a shareholder, officer, and director of Berry GP, Inc. at all relevant times. In those positions, Marty owes certain fiduciary duties to the Berry Entities, including the duty of loyalty and the duty of utmost good faith, fairness, and honesty. These duties that Marty

19
91

owes to the Berry Entities encompass obligations and/or duties to refrain from allowing self-dealing and to make full disclosure of information.

79. Hummell has served as Vice President and Chief Executive Officer of Berry GP, Inc. at all relevant times, and knew of Marty's fiduciary relationship with the Berry Entities.

80. Marty breached his fiduciary relationship to the Berry Entities, as detailed in the above allegations and in Paragraph 72.

81. Hummell participated and substantially assisted Marty in the breach of his fiduciary duties, including by serving as registered agent for Marty's personally owned company—Western Gulf Equipment—and by suppressing information to Plaintiff regarding Marty's self-dealing and usurpation of corporate opportunities.

82. Hummell was aware that he was participating in the breach of Marty's fiduciary relationship.

83. Hummell's assistance and participation was a substantial factor in causing Marty's breach of fiduciary duty.

84. Having knowingly participated in breach of Marty's fiduciary duties, Hummell is jointly and severally liable for breaches of fiduciary duties by Marty.

85. The Berry Entities and Lawrence have been damaged by these breaches of fiduciary duty, and by Hummell's knowing participation in same.

86. Because Berry GP, Inc., Becon, Inc., and LDMA Limited Partnership operate as closely held entities—and Defendants have concealed information and refused to share requested information with Lawrence—an officer, director, and shareholder—about the operations of the Berry Entities, justice requires treating this claim as a direct action by Lawrence, with any recovery being paid directly to Lawrence, pursuant to Tex. Bus. Org. Code §§ 21.563 and 153.413.

87.     Alternatively, Plaintiff brings this claim derivatively on behalf of LDMA Limited Partnership, Becon Inc., and Berry GP, Inc.

## COUNT 3
### Demand for an Equitable Accounting

88.     Plaintiff incorporates the above paragraphs as if set forth herein in their entirety.

89.     As an officer and director of Berry GP, Inc. at all relevant times, Marty owed fiduciary duties to Berry GP, Inc. that give rise to grounds for an accounting.  Additionally, as an officers of Berry GP, Inc. at all relevant times, Hummell owes fiduciary duties to Berry GP, Inc. that give rise to grounds for an accounting.

90.     Defendants have provided Lawrence with almost no financial records related to the Berry Entities.  The task of determining whether those records are accurate or complete, and the need to verify details about the concealment, wrongdoing, and mismanagement detailed above, is likely to be complex.  Adequate relief is unlikely to be obtained at law or through traditional discovery.  Performing an accurate accounting for the Berry Entities is likely to require the creation of accurate financial records where none exist, as opposed to merely granting Plaintiff access to the Berry Entities' existing records.

91.     Plaintiff therefore seek an order appointing an independent auditor and requiring the Berry Entities, Marty, and Hummell to prepare and present accurate financial records, which properly account for all corporate receipts, expenditures, assets, and liabilities for Berry GP, Inc. and its subsidiaries, including without limitation the other Berry Entities, since January 2023. *See* TEX. R. CIV. P. 172.

92.     Plaintiff bring this claim derivatively on behalf of LDMA Limited Partnership, Becon Inc., and Berry GP, Inc.

## COUNT 4
### Demand for Books and Records

93.     Plaintiff incorporates the above paragraphs as if set forth in their entirety.

94.     At all relevant times, Plaintiff Lawrence Berry has been a shareholder of at least 5% of Berry GP, Inc. through his interests in LDMA Limited Partnership and Becon, Inc.

95.     On April 18, 2023, Lawrence sent a good faith written demand to Defendants for books and records related to Berry GP, Inc. and its subsidiaries, including without limitation the other Berry Entities.  However, this request was ignored, and Lawrence never received a response.

96.     As a shareholder of Berry GP, Inc. for at least six months immediately preceding that April 18, 2023 demand, and as a holder of at least 5% of all of the outstanding shares in Berry GP, Inc., Lawrence is entitled to examine and copy Berry GP, Inc.'s books, records of account, minutes, and share transfer records.  TEX. BUS. ORG. CODE § 21.218.

97.     The Bylaws of Berry GP, Inc. do not alter or limit Lawrence's right to inspect Berry GP, Inc.'s books and records.  Indeed, Section XXIV states that "the books, accounts and records of [Berry GP, Inc.] shall be open to inspection by the shareholders at all reasonable times[.]" *See* Ex. B, at 11.

98.     Defendants never responded to Lawrence's lawful request, let alone provided any reason why Lawrence would not be entitled to inspect the books and records of Berry GP, Inc. and its subsidiaries.

99.     Plaintiff Lawrence Berry therefore seeks an order compelling the production for examination of the books and records of Berry GP, Inc. and its subsidiaries, including but not limited to the other Berry Entities, pursuant to Section 21.218(c) of the Texas Business Organizations Code.

100.    Plaintiff Lawrence Berry brings this claim directly and derivatively on behalf of LDMA Limited Partnership, Becon Inc., and Berry GP, Inc.

**COUNT 5**
**Declaratory Judgment**

101.    Plaintiff incorporates the above paragraphs as if set forth in their entirety.

102.    Pursuant to TEX. CIV. PRAC. & REM. CODE § 37.001 *et. seq.*, Plaintiff seeks a judicial declaration of his rights, status, and other legal relations with respect to Defendants under the Berry GP bylaws and laws of the State of Texas.

103.    First, Plaintiff seeks a judicial declaration that the purported December 7, 2023 "ratifications" of the following agenda items were ineffectual, because they were not procured with the approval of a majority of the fully informed and disinterested members of the Board of Directors, nor were they approved in good faith by a vote of the disinterested shareholders after disclosure of all material facts:

a. Defense and indemnity for Marty Berry, Robert Powers, Robert Rickett, and Mike Hummell in Cause No 2023-81703 in the District Court of Harris County, and any location to which such claims may be transferred;

b. Clarification and ratification concerning previous board action on loans from shareholders Dennis Berry and Marty Berry to Berry Contracting, L.P. and offer to Lawrence Berry to participate in said loans for up to 100%;

c. Clarification and ratification of previous board and employee action concerning the sale of the Berry Dock and adjacent real property, and of moving forward with the sale after resolution of pending litigation;

d. Discussion and action on marketing corporate aircraft and use of corporate aircraft pending sale; and

e. Discussions and ratification of previous board action concerning the discontinuation of banking relations with International Bank of Commerce;

104.    Second, Plaintiff seeks a judicial declaration that the purported February 13, 2024 "ratifications" or "resolutions" were ineffectual, because they were not approved by a majority of

23
95

the fully informed and disinterested members of the Board of Directors, nor were they approved in good faith by a vote of a majority of the fully informed and disinterested shareholders:

   a. BE IT RESOLVED that all action previously taken by any Director of Berry GP, Inc. or any employee of Bay Ltd. to promote, advertise, or seek offers for the sale of the Berry Dock is hereby ratified. The Board further determines that the Berry Dock and adjacent property is to remain listed for sale and that no sale shall take place pending the resolution of the TRO currently in place in Nueces County, Texas.

   b. BE IT RESOLVED that the loans made to Berry GP Inc. by Dennis Berry and Marty Berry in July 2022 are recognized as fair, and in the best interest of Berry GP, and are ratified.

   c. BE IT RESOLVED that the two (2) aircraft owned by Berry GP Inc. are to remain listed for sale, and are to be sold upon approval of an acceptable offer to purchase.

   d. BE IT RESOLVED that all actions taken by any director of Berry GP, Inc. or any employee of Bay Ltd. including Robert Powers and Mike Hummell, in furtherance of discontinuing the banking relations between Berry GP, Inc. and International Bank of Commerce is hereby ratified.

   e. BE IT RESOLVED that the acquisition of cranes or other equipment by Marty Berry, individually or through any company he owns or controls, and the subsequent leasing of that company to any Berry company for performing the work of that Berry company, is approved. To the extent such conduct has occurred in the past, it is ratified.

105. Each of the "ratifications" or "resolutions" detailed above required informed approval by a majority of the disinterested Directors or Shareholders, pursuant to TEX. BUS. ORGS. CODE § 21.418. However, they were not approved by a majority of the disinterested Directors or Shareholders, because Lawrence Berry objected.

106. Plaintiff brings this claim individually and derivatively on behalf of LDMA Limited Partnership, Becon Inc., and Berry GP, Inc.

## COUNT 6
## Conversion

107. Plaintiff incorporates the above paragraphs as if set forth in their entirety.

108. Pursuant to Texas law, Defendants are liable to Plaintiff for conversion.

109. Becon Inc., LDMA Limited Partnership and Berry GP, Inc. have the right to possess property of the Berry Entities.

110. By unlawfully voting to indemnify themselves and advance themselves litigation costs—over the objection of Lawrence as the sole disinterested member of the Board for such vote—Defendants are depriving Plaintiffs of their rightful interest in the property of the Berry Entities.

111. Lawrence's objection to the vote constitutes his demand for the return of the advanced litigation fees. Alternatively, demand was not required.

112. As a result of Defendants' unlawful vote and improper squandering of the Berry Entities' money, LDMA Limited Partnership, Becon Inc., and Berry GP, Inc. have suffered damages within the jurisdictional limits of this Court. Further, under the Texas Damages Act and Texas common law, Plaintiff is entitled to recover exemplary damages because Defendants acted with actual malice when converting the Berry Entities' property.

113. Because Berry GP, Inc., Becon, Inc., and LDMA Limited Partnership operate as closely held entities—and Defendants have concealed information and refused to share requested information with Lawrence—an officer, director, and shareholder—about the operations of the Berry Entities, justice requires treating this claim as a direct action by Lawrence, with any recovery being paid directly to Lawrence, pursuant to Tex. Bus. Org. Code §§ 21.563 and 153.413.

114. Alternatively, Plaintiff brings this claim derivatively on behalf of LDMA Limited Partnership, Becon Inc., and Berry GP, Inc.

## COUNT 7
### Corporate Waste (against Marty Berry)

115. Plaintiff incorporates the above paragraphs as if set forth in their entirety.

25
97

116. Defendant Marty Berry's use of corporate assets for personal applications constitutes corporate waste.

117. In particular, on information and belief, Defendant Marty Berry uses assets of the Berry Entities to operate his personally-owned company, Western Gulf Equipment. Defendant Marty Berry does not provide adequate consideration to the Berry Entities in return for these uses of Berry Entity assets, and instead further encumbers the Berry Entities by charging lease payments for the Berry Entities' use of Western Gulf cranes. There is no business justification for using the Berry Entities' corporate assets for Defendant Marty Berry's personal applications without adequate consideration.

118. Further, Defendant Marty Berry approved payments to himself from the Berry Entities of at least $10 million in principal on his undisclosed and improper self-dealing loan, despite the purported promissory note governing his loan indicating that the loan is not payable until December 31, 2024. There is no business justification for using the Berry Entities' corporate assets to make such voluntary payments for Marty's personal benefit, thus depriving the Berry Entities' of vital liquidity.

119. Finally, on information and belief, Plaintiff understands that Defendant Marty Berry engages in additional corporate waste by using other Berry Entity assets for personal applications without adequate consideration. However, because Plaintiff has been denied adequate access to the Berry Entities' books and records, the scope and extent of that additional corporate waste is not yet clear. Plaintiff reserves the right to add additional claims for corporate waste after a proper accounting has been made and Plaintiff has been able to perform a fulsome review of the Entities' books and records.

120. The Berry Entities and Lawrence have been damaged by Defendant Marty Berry's waste of corporate assets.

121. Because Berry GP, Inc., Becon, Inc., and LDMA Limited Partnership operate as closely held entities—and Defendants have concealed information and refused to share requested information with Lawrence—an officer, director, and shareholder—about the operations of the Berry Entities, justice requires treating this claim as a direct action by Lawrence, with any recovery being paid directly to Lawrence, pursuant to Tex. Bus. Org. Code §§ 21.563 and 153.413.

122. Alternatively, Plaintiff brings this claim derivatively on behalf of LDMA Limited Partnership, Becon Inc., and Berry GP, Inc.

## VIII. APPLICATION FOR PERMANENT INJUNCTION

123. Plaintiff incorporates the above paragraphs as if set forth in their entirety.

124. Plaintiff also incorporates its February 15, 2024 Brief in Support of Temporary Injunction and its March 14, 2024 Verified Application for Temporary Injunction as if set forth in their entirety.

125. Plaintiff requests that the Court issue a permanent injunction enjoining Defendants from selling any of the Berry Entities' real property without first giving forty-eight hours' (48) written notice to Lawrence Berry, including details of the proposed transaction. Further, Plaintiff requests that the court issue a permanent injunction enjoining Defendants from removing Lawrence Berry from the Board of Directors of Berry GP, Inc. or any related entities. Plaintiff further requests that upon final trial on the merits, the Court award a permanent injunction against Defendants for the same activity.

126. Unless this Court grants Plaintiff's application and permanently restrains Defendants from the wrongful acts described above, Plaintiff will suffer imminent harm and

irreparable injury for which Plaintiff will have no adequate remedy at law. In cases involving real or personal property such as this one, the movant need not show the lack of an adequate remedy at law. TEX. CIV. PRAC. & REM. CODE § 65.011(5).

### A. The harm facing Plaintiff is imminent.

127. For the purposes of obtaining an injunction, an injury is "imminent" if one has expressed "demonstrable intent to do that for which injunctive relief is sought," *Harbor Perfusion, Inc. v. Floyd*, 45 S.W.3d 713, 717-18 (Tex. App.—Corpus Christi 2001, no pet.), or if the "defendant will engage in the activity sought to be enjoined." *Schmidt v. Richardson*, 420 S.W.3d 442, 447 (Tex. App.—Dallas 2014, no writ).

128. Defendants have already made unauthorized offers to sell real property belonging to the Berry Entities, including a unique and valuable commercial dock and other real property. Defendants are believed to be selling such assets to raise money for further unauthorized payments in service of the self-dealing Berry Loan. This past behavior, coupled with the Defendants' recent purported Board and shareholder resolutions, demonstrates that Defendants intend to engage in activity that will undoubtedly alter the status quo—and irreparably harm Lawrence—if they are not permanently enjoined from doing so.

### B. The harm facing Plaintiff is irreparable.

129. If Defendants are not enjoined as requested above, the harm Plaintiff will suffer is irreparable. "An injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard." *Butnaru*, 84 S.W.3d at 204. Injury is likewise irreparable if "damages [are] not presently ascertainable or readily subject to calculation." *Wright v. Sport Supply Group, Inc.*, 137 S.W.3d 289, 294 (Tex. App.—Beaumont 2004, no pet.) (citing *Butnaru*, 84 S.W.3d at 204). The loss of management

rights over a company can constitute irreparable harm, because those rights are "unique, irreplaceable, and 'cannot be measured by any certain pecuniary standard.'" *Cheniere Energy, Inc. v. Parallax Enters.*, 585 S.W.3d 70, 83 (Tex. App.—Houston [14th Dist.] 2019, pet. dism'd (citing *Sonwalkar v. St. Luke's Sugar Land P'ship, L.L.P.*, 394 S.W.3d 186, 201 (Tex. App.—Houston [1st Dist.] 2012, no pet.)). Additionally, "a trial court may grant injunctive relief when the enjoined conduct threatens to disrupt an ongoing business." *Sonwalkar*, 394 S.W.3d at 199; *see also Intercont'l Terminals Co., LLC*, 354 S.W.3d at 896 ("[d]isruption to a business can be irreparable harm," and "assigning a dollar amount to such intangibles as a company's loss of clientele, goodwill, marketing techniques, and office stability, among others, is not easy.").

130. Further, trial courts typically grant injunctive relief in "actions involving real property because real estate is generally considered unique" and "irreplaceable," such that money damages are generally inadequate. *See Chenier Energy*, 585 S.W.3d at 76-77 (citing cases).

131. First, as explained above, Plaintiff has already been damaged by Defendants' actions, but the extent of that damage is not readily ascertainable because of Defendants intentional concealment of information and the lack of clear records detailing the financial status of the Berry Entities. Additionally, Defendants' actions have already caused irreparable harm to the Berry Entities' decades-long banking relationship with IBC and could cause similar harm to the new banking relationship with Frost Bank. Assigning a dollar amount to remedy this kind of intangible but serious harm is not easy.

132. Second, Plaintiff understands that Defendants have pledged the Berry Entities' real property as collateral to secure an increase to the new Frost Bank line of credit. Should unauthorized self-dealing payments made in service of the Berry Loans imperil the line of credit

with Frost Bank such that the company's real property interests are threatened, Plaintiff will be irreparably harmed as a result.

133. Third, Defendants have been secretly attempting sell—without notice to or authorization from the Board—other real property belonging to the Berry Entities, including the company's valuable dock facility, presumably to raise funds to make additional self-dealing payments. If Defendants dispose of such real property without the requisite notice or approval, Plaintiff will be irreparably harmed.

C. **Plaintiff lacks an adequate remedy at law, or in the alternative, is not required to prove lack of an adequate remedy at law.**

134. Because Plaintiff applies for an injunction under Section 65.011(5) of the Texas Civil Practice and Remedies Code, he is not required to prove lack of an adequate remedy at law. *See* TEX. CIV. PRAC. & REM. CODE § 65.011(5) ("A writ of injunction may be granted if: (5) irreparable injury to real or personal property is threatened, *irrespective of any remedy at law*.") (emphasis added).

135. Alternatively, Plaintiff has no adequate remedy at law, so a permanent injunction must issue. An irreparable injury is one that, by definition, has no adequate remedy at law. *See, e.g., Kennedy v. Gulf Coast Cancer & Diag. Center at Southeast, Inc.*, 326 S.W.3d 352, 260 (Tex. App.—Houston [1st Dist.] 2010, no pet.) ("An injury is irreparable if there is no adequate remedy at law; if for example, a prevailing applicant could not be compensated adequately in damages or if damages cannot be measured by any certain pecuniary standard.") (citations omitted). As explained above, the injuries Plaintiff will suffer—including the likely loss of management rights and of unique and valuable real property belonging to the company—cannot be adequately compensated in damages, and Plaintiff thus has no adequate remedy at law.

136. Further, to justify denial of an application for injunction, a remedy at law must be as "complete, practical, and efficient to the prompt administration of justice as is equitable relief." *Tex. Black Iron, Inc. v. Arawak Energy Int.'l Ltd.*, 572 S.W.3d 579, 584 (Tex. App.—Houston [14th Dist.] 2017, no pet.). Here, the equitable relief that Plaintiff seeks is for the purpose of avoiding harm that could not be responded to fully in money damages, including threatening the status of the Berry Entities' real property interests and of Plaintiff's management rights in the Berry Entities. Damages would be an incomplete remedy at best, because the harm Defendants threatens to impose on Plaintiff is non-monetary in part. *See RWI Constr., Inc. v. Comerica Bank*, 583 S.W.3d 269, 275 (Tex. App.—Dallas Apr. 12, 2019, no pet.) ("Generally, an adequate remedy at law exists and injunctive relief is improper where any potential harm may be adequately cured by monetary damages.").

**D.  Plaintiff is entitled to a permanent injunction.**

137. For the reasons set forth above, Plaintiff is entitled to a permanent injunction. Plaintiff requests that upon final hearing, the Court permanently enjoin Defendants from (1) removing Lawrence Berry from the Board of Directors of Berry GP, Inc. or any related entities; and (2) voting on the sale of the Berry Entities' real property without first giving forty-eight (48) hours' written notice to Lawrence Berry, including details of the proposed transaction.

## IX.  ATTORNEY'S FEES

138. Plaintiff Lawrence Berry is entitled to recover his attorneys' fees incurred in this matter pursuant to Sections 21.222 and 21.561 of the Texas Business Organizations Code and Section 37.009 of the Texas Civil Practice and Remedies Code.

## X.  JURY DEMAND

139. Plaintiff hereby requests a jury trial.

## XI.    CONDITIONS PRECEDENT

140.    Plaintiff pleads that all conditions precedent to the relief requested have been satisfied, waived, excused, and/or are deemed as a matter of law to have been satisfied.

## XII.    PRAYER

141.    Plaintiff respectfully prays that Defendants be cited to appear and answer herein, and that the Court:

(1)    Order that Defendants produce the books and records of the Berry Entities for inspection by Plaintiff Lawrence Berry;

(2)    Order that Plaintiff Lawrence Berry recover from Defendants the reasonable costs and expenses Plaintiff incurred in obtaining the books and records;

(3)    Appoint an independent auditor and order Defendants to prepare and present accurate financial records, which properly account for all corporate receipts, expenditures, assets, and liabilities for Berry GP, Inc. and its subsidiaries, including without limitation the other Berry Entities, since January 2023;

(4)    Set a trial date and upon final hearing enter a permanent injunction that enjoins Defendants from (1) removing Lawrence Berry from the Board of Directors of Berry GP, Inc. or any related entities, and (2) voting on the sale of the Berry Entities' real property without first giving forty-eight (48) hours' written notice to Lawrence Berry, including details of the proposed transaction; and order that Plaintiff have final judgment against Defendants breach of fiduciary duty, knowing participation in a breach of fiduciary duty, declaratory judgment, conversion, and corporate waste and award:

    (i)    compensatory, actual, consequential, restitutionary, and disgorgement damages,

    (ii)    exemplary damages,

    (iii)    pre-judgment interest,

    (iv)    post-judgment interest,

    (v)    reasonable and necessary attorneys' fees and costs, and

    (vi)    any other relief to which Plaintiff may show himself justly entitled.

Dated: October 11, 2024

Respectfully submitted,

By:  */s/ Barrett Reasoner*
Barrett Reasoner
State Bar No. 16641980
breasoner@gibbsbruns.com
Michael Absmeier
State Bar No. 24050195
mabsmeier@gibbsbruns.com
L. Bruce Baldree
State Bar No. 24116064
bbaldree@gibbsbruns.com
**GIBBS & BRUNS LLP**
1100 Louisiana, Suite 5300
Houston, Texas 77002
Tel: 713.650.8805
Fax: 713.750.0903

and

Butch Boyd
State Bar No. 00783694
butchboyd@butchboydlawfirm.com
**BUTCH BOYD LAW FIRM**
2905 Sackett Street
Houston, Texas 77098
Tel: 713.589.8477

and

Gabi S. Canales
State Bar No. 24012376
gabilaw14@gmail.com
**GABI CANALES LAW OFFICE**
5262 South Staples St., Suite 100
Corpus Christi, Texas 78411
Tel: 361.887.4700
Fax: 361.887.4761

**ATTORNEYS FOR PLAINTIFF**

33
105

**CERTIFICATE OF SERVICE**

I hereby certify that on October 11, 2024, a true and correct copy of this document was served on all counsel of record pursuant to the Texas Rules of Civil Procedure.

_/s/ Bruce Baldree_____
L. Bruce Baldree

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Christina Pena on behalf of Barrett Reasoner
Bar No. 16641980
cpena@gibbsbruns.com
Envelope ID: 93122880
Filing Code Description: Motion for Continuance
Filing Description: Plaintiff's Motion for Continuance and in the Alternative, Response to Motion for Summary Judgment
Status as of 10/14/2024 12:44 PM CST

Associated Case Party: Michael Hummell

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Van Huseman | | vhuseman@husemanlawfirm.com | 10/14/2024 12:02:20 PM | SENT |
| John Swallow | | jswallow@husemanlawfirm.com | 10/14/2024 12:02:20 PM | SENT |

Associated Case Party: Lawrence Berry

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Barrett H.Reasoner | | breasoner@gibbsbruns.com | 10/14/2024 12:02:20 PM | SENT |
| Michael R.Absmeier | | mabsmeier@gibbsbruns.com | 10/14/2024 12:02:20 PM | SENT |
| Rosa Brennan | | rbrennan@gibbsbruns.com | 10/14/2024 12:02:20 PM | SENT |
| Roxanne Graham | | rgraham@gibbsbruns.com | 10/14/2024 12:02:20 PM | SENT |
| Christina Pena | | cpena@gibbsbruns.com | 10/14/2024 12:02:20 PM | SENT |
| Katrina Chamblee-Boyd | | katrinaboyd@butchboydlawfirm.com | 10/14/2024 12:02:20 PM | SENT |
| Sydney Ballesteros | | sballesteros@gibbsbruns.com | 10/14/2024 12:02:20 PM | SENT |
| Bruce Baldree | | bbaldree@gibbsbruns.com | 10/14/2024 12:02:20 PM | SENT |
| Butch Boyd | | butchboyd@butchboydlawfirm.com | 10/14/2024 12:02:20 PM | SENT |
| Cameron Roth | | CRoth@gibbsbruns.com | 10/14/2024 12:02:20 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Shanna Gohlke | | gohlkes@bayltd.com | 10/14/2024 12:02:20 PM | SENT |

Associated Case Party: Marty Berry

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Christina Pena on behalf of Barrett Reasoner
Bar No. 16641980
cpena@gibbsbruns.com
Envelope ID: 93122880
Filing Code Description: Motion for Continuance
Filing Description: Plaintiff's Motion for Continuance and in the Alternative, Response to Motion for Summary Judgment
Status as of 10/14/2024 12:44 PM CST

Associated Case Party: Marty Berry

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Douglas  Allison | | doug@dallisonlaw.com | 10/14/2024 12:02:20 PM | SENT |
| Kim Brunkenhoefer | | kim@dallisonlaw.com | 10/14/2024 12:02:20 PM | SENT |
| Susan  Gonzales | | susan@dallisonlaw.com | 10/14/2024 12:02:20 PM | SENT |

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Susan Gonzales on behalf of Douglas Allison
Bar No. 1083500
susan@dallisonlaw.com
Envelope ID: 97254375
Filing Code Description: Appendix
Filing Description: Relators' Appendix Vol 3 of 5
Status as of 2/11/2025 4:25 PM CST

Associated Case Party: Marty Berry

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Douglas AAllison | | doug@dallisonlaw.com | 2/11/2025 3:44:21 PM | SENT |
| Vanessa AGilmore | | vg@robertsmarkland.com | 2/11/2025 3:44:21 PM | SENT |
| Kim Brunkenhoefer | | kim@dallisonlaw.com | 2/11/2025 3:44:21 PM | SENT |
| Susan Gonzales | | susan@dallisonlaw.com | 2/11/2025 3:44:21 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Rosa Brennan | | rbrennan@gibbsbruns.com | 2/11/2025 3:44:21 PM | SENT |
| Michelle Bultman | | MBultman@gibbsbruns.com | 2/11/2025 3:44:21 PM | SENT |
| Roxanne Graham | | rgraham@gibbsbruns.com | 2/11/2025 3:44:21 PM | SENT |
| Christina Pena | | cpena@gibbsbruns.com | 2/11/2025 3:44:21 PM | SENT |

Associated Case Party: AllenLawrenceBerry

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Michael Absmeier | 24050195 | mabsmeier@gibbsbruns.com | 2/11/2025 3:44:21 PM | SENT |
| Barrett Reasoner | 16641980 | breasoner@gibbsbruns.com | 2/11/2025 3:44:21 PM | SENT |
| Sydney Ballesteros | | sballesteros@gibbsbruns.com | 2/11/2025 3:44:21 PM | SENT |
| Bruce Baldree | | bbaldree@gibbsbruns.com | 2/11/2025 3:44:21 PM | SENT |

Associated Case Party: AlbertTheodorePowers

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Susan Gonzales on behalf of Douglas Allison
Bar No. 1083500
susan@dallisonlaw.com
Envelope ID: 97254375
Filing Code Description: Appendix
Filing Description: Relators' Appendix Vol 3 of 5
Status as of 2/11/2025 4:25 PM CST

Associated Case Party: AlbertTheodorePowers

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Alistair Dawson | 5596100 | adawson@beckredden.com | 2/11/2025 3:44:21 PM | SENT |

Associated Case Party: Allied Ports, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Roland Garcia | 7645250 | garciar@gtlaw.com | 2/11/2025 3:44:21 PM | SENT |